IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION AT COVINGTON

CASE NUMBER: 2:22-CV-00111-WOB-EBA

JUDGE WILLIAM O. BERTELSMAN

DR. AMY DICHIARA                          PLAINTIFF

    vs.

SUMMIT MEDICAL GROUP, INC., ET AL.        DEFENDANTS


\* \* \* \* \* \* \* \* \*

DEPONENT:            ROBERT PRITCHARD

DATE:               AUGUST 4, 2023

\* \* \* \* \* \* \* \* \*




Mindy Davis

Certified Court Reporter




Barlow
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky  41011
(859) 261-8440

```
 1                        INDEX

 2   ROBERT PRITCHARD

 3                                           PAGE

 4   Cross-Examination By Mr. Wiest            5

 5

 6                     EXHIBITS

 7   EXHIBIT              DESCRIPTION         PAGE

 8   Plaintiff's Exhibit 1                     22
     Plaintiff's Exhibit 2                     22
 9   Plaintiff's Exhibit 3                     22
     Plaintiff's Exhibit 4                     22
10   Plaintiff's Exhibit 5                     43
     Plaintiff's Exhibit 6                     61
11   Plaintiff's Exhibit 7                     63
     Plaintiff's Exhibit 8                     63
12   Plaintiff's Exhibit 9                     64
     Plaintiff's Exhibit 10                    64
13   Plaintiff's Exhibit 11                    64
     Plaintiff's Exhibit 12                    66
14   Plaintiff's Exhibit 13                    76
     Plaintiff's Exhibit 14                    78
15   Plaintiff's Exhibit 15                    82
     Plaintiff's Exhibit 16                    86
16   Plaintiff's Exhibit 17                    86
     Plaintiff's Exhibit 18                    86
17   Plaintiff's Exhibit 19                    93
     Plaintiff's Exhibit 20                    94
18   Plaintiff's Exhibit 21                    97
     Plaintiff's Exhibit 22                    99
19   Plaintiff's Exhibit 23                   105
     Plaintiff's Exhibit 24                   108
20   Plaintiff's Exhibit 25                   123
     Plaintiff's Exhibit 26                   141
21   Plaintiff's Exhibit 27                   146
     Plaintiff's Exhibit 28                   155
22   Plaintiff's Exhibit 29                   156
     Plaintiff's Exhibit 30                   157
23   Plaintiff's Exhibit 31                   159
     Plaintiff's Exhibit 32                   160
24   Plaintiff's Exhibit 33                   166
     Plaintiff's Exhibit 34                   172
25   Plaintiff's Exhibit 35                   175
```

                                                          Page 3

 1

 2    Plaintiff's Exhibit 36                              180
      Plaintiff's Exhibit 37                              202
 3    Plaintiff's Exhibit 38                              204
      Plaintiff's Exhibit 39                              205
 4    Plaintiff's Exhibit 40                              205
      Plaintiff's Exhibit 41                              219
 5    Plaintiff's Exhibit 42                              219
      Plaintiff's Exhibit 43                              222
 6    Plaintiff's Exhibit 44                              224
      Plaintiff's Exhibit 45                              225
 7    Plaintiff's Exhibit 46                              226
      Plaintiff's Exhibit 47                              233
 8    Plaintiff's Exhibit 48                              235
      Plaintiff's Exhibit 49                              236
 9    Plaintiff's Exhibit 50                              238
      Plaintiff's Exhibit 51                              239
10    Plaintiff's Exhibit 52                              242
      Plaintiff's Exhibit 53                              243
11    Plaintiff's Exhibit 54                              245
      Plaintiff's Exhibit 55                              246
12    Plaintiff's Exhibit 56                              246
      Plaintiff's Exhibit 57                              247
13    Plaintiff's Exhibit 58                              254
      Plaintiff's Exhibit 59                              269
14    Plaintiff's Exhibit 60                              299
      Plaintiff's Exhibit 61                              300
15    Plaintiff's Exhibit 62                              303
      Plaintiff's Exhibit 63                              304
16    Plaintiff's Exhibit 64                              312
      Plaintiff's Exhibit 65                              314
17    Plaintiff's Exhibit 66                              314

18

19

20

21

22

23

24

25

Page 4

1        The videotaped deposition of ROBERT PRITCHARD,

2    taken for the purpose of discovery and/or use as

3    evidence in the within action, pursuant to notice,

4    heretofore taken at the office of Dressman Benzinger,

5    109 East Fourth Street, Covington, Kentucky, on

6    August 4, 2023, at 9:00 a.m., upon oral examination,

7    and to be used in accordance with the Kentucky Rules

8    of Federal Procedure.

9                    * * * * * * * *

10                   APPEARANCES

11   ATTORNEY FOR PLAINTIFF:

12   Christopher D. Wiest, Esq.
     Thomas B. Bruns, Esq.
13

14   ATTORNEY FOR DEFENDANTS:

15   Nick Birkenhauer, Esq.
     Mark Guilfoyle, Esq.
16   Katie Koch, Esq.

17

     VIDEO TECHNICIAN:       Connie Adkins-Ihle
18

     ALSO PRESENT:           T.J. Roberts
19

20                   * * * * * * * *

21

22

23

24

25

1          VIDEO TECHNICIAN:  We are on videotape

2     record.  Today is Friday, August 4, 2023.  The

3     time is 8:59 a.m.  We're here today to take

4     the deposition of Robert Pritchard in the case

5     styled Dr. Amy DiChiara versus Summit Medical

6     Group, Inc., et al, in the United States

7     District Court for the Eastern District of

8     Kentucky, Northern Division at Covington, Case

9     No. 2:22-CV-00111-WOB-EBA.

10          Would the attorneys now introduce

11     themselves and state who they represent.

12          MR. WIEST:  Chris Wiest for Dr. DiChiara,

13     and Tom Bruns is also with me for

14     Dr. DiChiara.

15          MR. BIRKENHAUER:  And Nick Birkenhauer,

16     Mark Guilfoyle, and Katie Koch for the

17     defendants.

18          VIDEO TECHNICIAN:  And would the court

19     reporter please swear in the witness.

20                    ROBERT PRITCHARD,

21     called on behalf of the Plaintiff, after having been

22     first duly sworn, was examined and deposed as

23     follows:

24                    CROSS-EXAMINATION

25     BY MR. WIEST:

1        Q.   Good morning, Mr. Pritchard.  My name is

2   Chris Wiest.  I represent Dr. DiChiara, along with

3   Mr. Bruns.  Just a couple of ground rules and then

4   we'll get into the substance of the testimony today.

5   First, if you don't understand one of my questions,

6   let me know.  I'll rephrase it.  I'll reask it.  I'm

7   not trying to confuse you or trick you, but if you do

8   understand it, I'm going to -- you go ahead and

9   answer it.  If you answer it, I'm going to assume

10  that you've understood it, fair?

11       A.   Yes.

12       Q.   That gets me to my second rule.  If you can

13  verbalize any answers instead of head nods.  And I

14  may remind you if you fail to do that.  The court

15  reporter may remind me if I fail to remind you.

16  That's ground rule two.  Okay?

17       A.   Yes.

18       Q.   Ground rule three; if you need a break at

19  any time, this is not a marathon, just let us know.

20  And as long as there's not a question pending, we're

21  happy to take a break at any point that you need one.

22  Okay?

23       A.   Thank you.

24       Q.   Can you state your name for the record.

25       A.   Robert Lawrence Pritchard, Junior.

1        Q.    Okay.  And I'm going to call you

2    Dr. Pritchard.  We'll get into your qualifications in

3    a little bit.  Where do you currently reside?

4        A.    I reside at 31 South Caserea, C-A-S-E-R-A

5    [sic], Court, in Vero Beach, Florida.

6        Q.    And, Dr. Pritchard, what's your date of

7    birth?

8        A.    3/6/1959.

9        Q.    Do you have any relatives, and by relatives

10   I mean anyone through the first degree of

11   relationship, and I'm going to list some counties,

12   and then I'm going to ask you whether you have

13   relatives in Kenton, Boone, Campbell, Grant, Mason,

14   Pendleton, or Gallatin Counties, Kentucky.

15       A.    In Kenton County, yes.

16       Q.    Okay.  And what are their last names?

17       A.    Pritchard.

18       Q.    Okay.  Anyone other than -- anyone that's

19   not named Pritchard?

20       A.    Oh, Kidwell.

21       Q.    Okay.  Anyone else?

22       A.    I believe that's it.

23       Q.    Sir, you've never been convicted of a

24   felony, correct?

25       A.    No.

1          Q.    Have you ever been convicted of a

2    misdemeanor crime of dishonesty?

3          A.    No.

4          Q.    Okay.  Have you ever been sued before?

5          A.    Yes.

6          Q.    Over what and when?

7          A.    Medical malpractice.

8          Q.    And what year?

9          A.    It was in the late '80s.

10          Q.    Okay.  Anything other than that med mal

11    case?

12          A.    Not that I know of.

13          Q.    Okay.  Did that case go to trial?

14          A.    Actually, there was more than one and one

15    did go to trial, yes.

16          Q.    Okay.  And I take it that you've testified

17    in connection with those cases?

18          A.    Yes.

19          Q.    Have you testified in any other proceedings

20    other than that med mal proceeding?

21          A.    I've done on the certificate of need issue

22    in Frankfort regarding Christ Hospital and the Pike

23    property I testified.  I've testified in the past on

24    an EEOC claim with a physician back in the '90s.

25          Q.    Okay.  What was that -- by the way,

Page 9

1    anything else, other than what we've talked about,

2    where you've given testimony in a proceeding before?

3        A.    Not off the top of my head, no.

4        Q.    Can you tell me what that EEOC proceeding

5    was about in the '90s?

6        A.    Regarding wrongful termination.

7        Q.    Were you the person that was responsible

8    for terminating that physician?

9        A.    I was.

10       Q.    Who was that physician?

11       A.    I don't remember her name.

12       Q.    Do you remember what of kind doctor she

13   was?

14       A.    I believe she was a primary care doctor.

15       Q.    What was the nature of the allegation in

16   that case?

17       A.    That she was wrongfully terminated.  And by

18   testifying, I mean a deposition.  I've never appeared

19   in court in any case.

20       Q.    It did not go to trial?

21       A.    No.

22       Q.    Can you give me your educational

23   background, Dr. Pritchard, starting with college?

24       A.    Yes.  I have a bachelor of science from the

25   University of Kentucky in Zoology and I have an M.D.

Page 10

1    degree from the University of Kentucky College of

2    Medicine.  And then I did my residency education at

3    St. Elizabeth Healthcare and Family Medicine.

4        Q.    What year did you get your M.D.?

5        A.    1985.

6        Q.    And then how long was the residency program

7    in family medicine at St. E?

8        A.    Three years.

9        Q.    And what did you do starting in 1988?

10       A.    I went into practice here in Northern

11   Kentucky.

12       Q.    Is that with St. Elizabeth Physicians?

13       A.    No.  St. Elizabeth Physicians didn't exist

14   at that time.  It was a group we -- locally we were

15   called Florence Medical Arts.  That was not the legal

16   name of the group, but that's what we were sort of

17   known as out in Florence, Kentucky.

18       Q.    Was that a primary care group?

19       A.    It was.

20       Q.    Do you have any board certifications?

21       A.    I do.

22       Q.    In what?

23       A.    Family medicine.

24       Q.    What year did you get that?

25       A.    It would have been -- 1988 would have been

Page 11

1   my first time I had to sitfor the boards.

2       Q.   And have you maintained that certification

3   since?

4       A.   I have.

5       Q.   Is your -- I understand, Doctor, that

6   you're currently retired?

7       A.   I am.

8       Q.   Do you still maintain your medical license?

9       A.   No.  I let that expire this year.

10      Q.   Okay.  And I take it you probably have

11  allowed your board certifications to expire, too?

12      A.   It has not expired yet.  It's a timing

13  issue.  It will in a few years.

14      Q.   Okay.  When did you begin with

15  St. Elizabeth or St. Elizabeth Physicians?  When did

16  you begin employment?

17      A.   Well, two different stages.  I first was

18  employed there as a resident from 1985 to 1988, then

19  returned to their employment in 2005.

20      Q.   And when you returned in 2005, in what

21  capacity?

22      A.   I was the CEO of Summit Medical Group.

23      Q.   What were you doing prior to that?

24      A.   I'd been the senior vice president of the

25  Health Alliance of Greater Cincinnati overseeing

Page 12

1    their physician group.

2         Q.   And how long have you been with Health

3    Alliance?

4         A.   I was with the Health Alliance from 1994

5    through -- midway through 2005.

6         Q.   As the --

7         A.   Let me correct that.  It was 1998 to 2005.

8    Sorry about that.

9         Q.   And was that all in the SEP role with the

10   physician group at Health Alliance?

11        A.   Yes.  I had some additional

12   responsibilities in ambulatory development and things

13   like that, but generally my job was running physician

14   group practices.

15        Q.   So I know we talked before about the EEOC

16   matter that you testified in.  Was that an EEOC

17   matter that involved University of Cincinnati or the

18   UC Health?

19        A.   Alliance Primary Care, which was the

20   physician group for the Health Alliance.

21        Q.   Okay.  What did you do from '88 to 98?

22        A.   I practiced here in Northern Kentucky as a

23   family physician.

24        Q.   Okay.  Was that with the group that we

25   talked about before?

Page 13

1       A.   Yes.

2       Q.   So you began your employment with Summit

3    Medical Group, which is known as St. Elizabeth

4    Physicians --

5       A.   Yes.

6       Q.   -- in 2005?

7       A.   Yes.

8       Q.   And you remained in that role until you

9    retired, I believe, in 2021 or 2022?

10      A.   Had varying roles in that period of time.

11      Q.   Okay.  When you came in with Summit Medical

12   Group, what was your role?

13      A.   CEO and president of Summit Medical Group.

14      Q.   And when did that change?

15      A.   I believe it changed in 2010.

16      Q.   Why?

17      A.   I became chief medical officer for

18   St. Elizabeth Healthcare.  I left the group practice.

19      Q.   And then you went to the hospital side?

20      A.   Yes.

21      Q.   And then at some point, you went back to

22   SEP or Summit Medical Group?

23      A.   Yes.

24      Q.   I'm going to use the term SEP today.  I

25   mean Summit Medical Group or St. Elizabeth

Page 14

1    Physicians, but I'm going to use SEP just to make it

2    easy.  I'm going to use St. Elizabeth Healthcare or

3    SEH for the hospital side today.

4         A.   Thank you.

5         Q.   And those are the names that the folks use

6    in the business, correct, SEH or SEP?

7         A.   Yes.

8         Q.   Okay.  How long were you with SEH as a CMO

9    before you moved back to Summit or SEP?

10        A.   I think that from some point in 2010

11   through -- I think I came back in to SEP in 2016.

12   Could have been '15, but I think it was '16.

13        Q.   And then did you stay with SEP until you

14   retired?

15        A.   Yes.  I had dual responsibilities.  I had

16   the SEP responsibility.  I was also the executive

17   vice president chief medical integration officer on

18   the St. Elizabeth Healthcare side.

19        Q.   And on the SEH side, you reported to

20   Mr. Colvin, Garren Colvin?

21        A.   Yes.

22        Q.   On the SEP side, you reported to the board?

23        A.   To my board and to Mr. Colvin.

24        Q.   Okay.  What's Mr. Colvin role on the SEP

25   side?

1       A.   He was, one, a board member.  Due to his

2  position at SEH, was an ex officio building member of

3  the SEP board.  Also SEP -- let me turn around.  SEH

4  is the sole member of SEP.  So SEH had certain

5  reserved powers pertaining to SEP.

6       Q.   What reserve powers?

7       A.   Well, I'll never get them all, but budget,

8  for instance.  If we were selling our group, we would

9  have to get permission from the SEH board.  If we

10  were buying a large group, we'd have to get

11  permission from the SEP board.  Those were probably

12  the three major.  There were about eight or nine, but

13  those are the major.  Strategic planning was also --

14  they had to approve our strategic planning.

15       Q.   Let me laser focus that in just a little

16  bit.  Did Mr. Colvin or SEH have any rights or

17  responsibilities with respect to the employment of

18  anyone who worked for SEP?

19       A.   Only myself.

20       Q.   Okay.  Only the CEO?

21       A.   Yes.

22       Q.   Okay.  Were they consulted or informed ever

23  about employment issues with respect to any SEP or

24  any of its employees?

25       A.    If there were issues that I felt could

Page 16

1   adversely impact the hospital side of the SEH side of

2   the equation, yes.  I tried to keep folks informed.

3        Q.   We'll dig into that a little bit later

4   today with respect to this situation.  They didn't

5   have -- did they have a legal right to be informed or

6   is that part of the duties, or was that just

7   something that you felt like you should do?

8        A.   It was something I felt I should do.

9        Q.   Okay.  All right.  How many people were on

10  the SEP board?

11       A.   I believe it was 15, maybe 16, but I

12  believe it was 15.

13       Q.   And how are they appointed?

14       A.   Okay.  Give me a minute here and I'll

15  try -- we had three divisions within SEP.

16       Q.   Okay.

17       A.   Primary care, medical specialty, and

18  surgical specialty.

19       Q.   Okay.

20       A.   And each of those divisions elected a

21  representative for the board.  The other 12

22  physicians were elected at large by the board -- by

23  the group, I mean.  So it was an election.

24       Q.   So all of the doctors got to vote

25  essentially --

Page 17

1       A.   Yes.

2       Q.   -- on board members?

3       A.   Yes.

4       Q.   Or within the practice group if it was a

5    practice group --

6       A.   Yeah, all providers.  So physicians and

7    nurse practitioners, PAs, et cetera.

8       Q.   Did the board have the ability to control

9    the CEO?

10      A.   Oh, I'm sure they could have had some major

11   impact on that if they wished to flex their muscles.

12      Q.   Okay.  And what role did Mr. Colvin have on

13   the SEP CEO?  Could he terminate the SEP CEO?

14      A.   He had the sole responsibility of hiring

15   and terminating the CEO of SEP.

16      Q.   Okay.  Did SEP have any position on the SEH

17   board?

18      A.   Yes.

19      Q.   Was that an ex officio also where you sat

20   on the SEH board?

21      A.   I sit on the SE -- I did not sit on the SEH

22   board.  I attended as a staff member.

23      Q.   Okay.

24      A.   We did have one physician due to his role

25   in SEP.  That would have been at that time Curtis

Page 18

1    Dorsch, who was the chair of the SEP board, that had

2    a position on the board.  We also had, I think, two

3    other SEP members on the board at SEH.  But due to

4    other positions -- one was president of the medical

5    staff, so that was an ex officio member.  I'm trying

6    to remember who all was on that board.  At least two.

7    There may have been a third, but I can't remember who

8    it is at this stage.

9         Q.   Okay.  Did SEP have policies or procedures

10   in place that were different than SEH?

11        A.   Yes.  Similar, but different.

12        Q.   Such as?  Could you give me just an example

13   or two?

14        A.   I'll probably never come up with a specific

15   example, but always say physician practices run

16   different than hospitals.  So we at times had

17   different policies that pertained to certain things

18   we did that maybe the hospital didn't do and vice

19   versa.  We tried to align our policies as much as

20   possible.

21        Q.   Were there SEH policies that applied to SEP

22   employees or providers?

23        A.   Except for the medical staff, who as

24   members of the medical staff, they sign an agreement

25   with St. Elizabeth Healthcare that they will follow

Page 19

1  their policies and procedures.  But as an employee of

2  SEP in particular, no.

3      Q.   Okay.  During your time as CEO or president

4  of SEP, how many employees did the organization have,

5  roughly?

6      A.   Probably 2,500 or more.

7      Q.   Okay.  And those were full time employed

8  primarily in Kentucky?

9      A.   Kentucky, Indiana, a few in Ohio, but

10  primarily in Kentucky.

11      Q.   Okay.  And during your time as CEO or

12  president of SEP, how many employees did you

13  personally fire?

14      A.   I really only got involved when it was a

15  physician from that perspective.  And so me

16  personally, three or four maybe.  I doubt it was even

17  that many.

18      Q.   How many prior to 2021?

19      A.   Oh, gosh.  Probably almost all those I

20  mentioned.  I would clarify that often I would not be

21  the one personally doing it because these divisions

22  had operation heads over them.  And so often those

23  physician leads fired physicians.  But there were

24  some back in the original Summit day.  I remember one

25  in particular that I discharged.  And I'm trying to

Page 20

1    decide if there was anybody else other than

2    Dr. DiChiara that I sat face to face with and did the

3    termination.

4         Q.   Who was that other employee; do you

5    remember?

6         A.   I can remember the office.  It was in our

7    Covington office.  It may have been a Dr. Whalen, but

8    I'm not 100 percent sure.

9         Q.   Do you remember what the circumstances were

10   that led to that termination?

11        A.   Yes.

12        Q.   Generally, what were they?

13        A.    We felt that he was not documenting,

14   billing for the appropriate level of documentation.

15   So we had several meetings with him and discussions

16   with him and coached him and tried to teach him.  And

17   he did not change his billing habits, so, therefore,

18   we terminated him.

19        Q.   So you indicated to him he wasn't meeting

20   standards.  He was still not meeting standards.  He

21   got terminated?

22        A.   Correct.

23        Q.   Okay.  Let me ask:  Did you know

24   Dr. DiChiara personally prior to August of 2021?

25        A.   Just through our business, our practice.  I

1    did not know her outside socially.

2        Q.   So let me pin that down and unpack that a

3    little bit.  You had interactions with her prior --

4    personal interactions with her in a business sense

5    prior to August of 2021?

6        A.   Yes.

7        Q.   You knew who she was.  You had interacted

8    with her in the workplace?

9        A.   Yes.

10       Q.   What did you think generally about the

11   practice or the standard of care that she was

12   providing at the time?

13       A.   She always appeared to be a good physician.

14   She got good patient satisfaction results, to the

15   best of my knowledge.  I don't remember her getting

16   any complaints about her healthcare.

17       Q.   Did you know her husband?

18       A.   No.

19       Q.   Were you aware that she was a 0.6 FTE so

20   that she could manage time with the family and her

21   children and her time at work?

22       A.   I was aware she was, quote, part time, but

23   I didn't know what percentage that was.

24       Q.   Okay.  Were you aware about why she was

25   part time?

Page 22

1          A.   Well, I knew she homeschooled her children

2     and did not wish to work full time.  We have multiple

3     physicians who are a percentage of FTE.

4          Q.   I want to go back -- by the way, there was

5     a period of time I think you would have been perhaps

6     the CMO at SEH when Glenn Loomis was the CEO of SEP?

7          A.   Correct.

8          Q.   Okay.  And that would have been starting in

9     2011 until you came back to the SEP side in '15 or

10    '16, you said?

11         A.   Correct.

12              MR. WIEST:  I'm going to go ahead and

13         mark this as Exhibit 1.

14              (Plaintiff's Exhibit 1 was marked for

15    identification.)

16         Q.   We're going to just kind of unpack these.

17              (Plaintiff's Exhibit 2 was marked for

18    identification.)

19         Q.   2.

20              (Plaintiff's Exhibit 3 was marked for

21    identification.)

22         Q.   3.

23              (Plaintiff's Exhibit 4 was marked for

24    identification.)

25         Q.   4.  We're going to start talking about

Page 23

1    them.  Let me start with Exhibit 1 and 2.  The hiring

2    process back in 2011, and I don't know if this

3    continued, was someone would be hired and it would be

4    contingent on, in this case, verification of

5    references, drug screens, and background checks.  I

6    take it that was a typical practice at SEP?

7        A.   Yes.

8        Q.   And then after all that got done, then

9    there would be an employment agreement that at least

10   would be negotiated with physician providers; is that

11   fair?

12       A.   Fair.

13       Q.   In most cases, maybe not all cases, or was

14   it?

15       A.   There was always an employment agreement

16   provided.

17       Q.   For the doctors?

18       A.   Yes.

19       Q.   Okay.  And if you look at Exhibit 3,

20   there's the SEP employment agreement request form

21   that was provided in discovery.  And somebody filled

22   out the doctor's name, that they were an M.D.,

23   female, their practice location, put in the contract

24   term.  Was this a request to prepare an employment

25   agreement internal to SEP?

Page 24

1           MR. BIRKENHAUER:  And take your time to

2      review the document if you need to, Bob.

3      A.   Repeat what you asked again.

4      Q.   If you look at Exhibit 3, this was with

5  respect to Dr. DiChiara.  Was this a request to

6  prepare an employment agreement, with respect to

7  Dr. DiChiara, that somebody had filled out relative

8  to her employment that we saw with the offer?  And

9  then it looks like the follow-up offer of employment

10  in Exhibit 2 and then it looks like Exhibit 3

11  somebody asked for a contract to be prepared?

12      A.   I would have to say it appears that way.  I

13  wasn't there, so I can't state for sure that this is

14  how they did it.

15      Q.   Did this process change at some point?

16      A.   I'll be honest with you, from my level, I

17  probably would have never seen something like this.

18  HR would have prepared this or legal would have

19  prepared this.  So this was their probably

20  communications among one another on what needed to be

21  developed.

22      Q.   Okay.  And then I take it the contract --

23  if we look at Exhibit 4, the contract was prepared by

24  St. Elizabeth Physicians.  Would you agree?

25      A.   I would assume so, yes.

Page 25

1       Q.    Your role in SEP in 2011 was you were not

2   in SEP.  You were the CMO at SEH, correct?

3       A.    Correct.

4       Q.    And I want to look at this employment

5   agreement between SEP and Dr. DiChiara, and I want to

6   ask you some questions about it.

7       A.    Okay.

8       Q.    First of all, you've reviewed this

9   agreement before today, right?

10      A.    Yes.

11      Q.    Well, let me follow up.  What documents, if

12  any, did you review in preparing for your deposition

13  today?

14      A.    I reviewed some documents with counsel that

15  were provided during disclosures.

16      Q.    Okay.  And I don't want to get into any

17  discussions you had with counsel, but had you

18  reviewed this employment agreement between SEP and

19  Dr. DiChiara prior to your deposition preparation?

20      A.    Not in its entirety, no.

21      Q.    Okay.  We're going to get into later the

22  termination letter in which you cited some provisions

23  in this contract.

24      A.    Correct.

25      Q.    At the time that letter was prepared, had

Page 26

1   you reviewed those provisions?

2        A.   Yes.

3        Q.   Okay.  And I'm going to ask you more about

4   that letter and we'll get that letter out later

5   today.

6        A.   Okay.

7        Q.   I want to look at a couple of things.

8   First of all, you agree this contract would have not

9   been prepared by Dr. DiChiara.  It would have been

10  prepared by SEP.  Fair?

11       A.   Yes.  That was a fair way to ask it.

12       Q.   And I want to get into some provisions in

13  this in a couple of minutes.  Specifically if you

14  look at this contract -- and there's a Bates number

15  on that bottom right.  I'm going to be referring to

16  particular pages by -- and I'm going to call it

17  Defendants and then the number today as we go through

18  documents, or in some cases it may be something we

19  produced in discovery and then I'll refer to it as

20  DiChiara and then the number.  If you look and you

21  get into the general duties on that second page,

22  Defendants 92 -- tell me when you're there.

23            MR. BIRKENHAUER:  Which page was that,

24       Chris?

25            MR. WIEST:  924.

1      A.   Bottom of page 2?

2      Q.   Yeah, bottom of page 2.

3      A.   Yeah, 924.

4      Q.   The expectation was that the physician is

5    hereby engaged as an employed physician and shall

6    devote all of his or her professional and vocational

7    time, attention, and best efforts to render

8    professional patient care services or other duties

9    under this agreement.  That was generally what

10   Dr. DiChiara was engaged to do.  Would you agree?

11     A.   Yes, provide care to patients.

12     Q.   Okay.  And the initial term of this, we got

13   to go back to the Exhibit A that's attached.  I'm

14   going to get you the page to make it easy.

15     A.   I think it should be 939.

16     Q.   Okay.  This was a three-year term contract

17   starting January 1, 2013, ending December 31, 2015,

18   and then it renewed for one-year periods, right?

19     A.   Yes.

20     Q.   Okay.  It had a practice location at 340

21   Thomas More Parkway, Suite 160A, in Crestview Hills,

22   correct?

23     A.   Correct.

24     Q.   And it had some qualifications that the

25   physician had to meet, correct?

Page 28

1      A.    Correct.

2      Q.    If you look at page 3, there's a

3  requirement that the physician maintain membership on

4  the medical staff at St. Elizabeth Medical Center,

5  Inc., correct?

6      A.    Correct.

7      Q.    And generally, unless it was not in the

8  patient's best interest, that would violate a third

9  party payor restriction or would be contrary to

10 patient preference, the expectation was the physician

11 would only admit patients to St. Elizabeth

12 Healthcare.   Agree?

13     A.    Correct.

14     Q.    There's a conflict of interest provision

15 that prohibited the physician from rendering

16 professional services for compensation, correct,

17 except in relation to this contract, without the

18 consent side?

19     A.    Without permission, yes.

20     Q.    And then there were some reps and

21 warranties that the physician had to make, starting

22 on page 3 running into page 4, correct?

23     A.    Correct.

24     Q.    There was a confidentiality provision that

25 I want to talk to you about that starts on page 4.

Page 29

1  And the physician was required to keep absolutely --

2  the term uses absolutely confidential both during and

3  after employment with SEP, all confidential

4  information of SEP which includes, but is not limited

5  to, the following.  And I'm just going to generally

6  describe those.  You can tell me if you agree.  A is

7  patient names and records, office charts, that kind

8  of thing.  We're dealing with individual patient

9  charts on subparagraph 4.5(a), right?

10      A.   Correct.

11      Q.   4.5(b) are documents showing the names of

12  patients treated, right?

13      A.   Yes.

14      Q.   C are price lists, fee schedules, reports,

15  and other documents disclosing the fees that are

16  being charged?

17      A.   Yes.

18      Q.   And said another way, C is really the --

19  some of the financial information of SEP, right?

20      A.   Yes.

21      Q.   Okay.  D is any portion or phase of any

22  information -- financial information, business plans,

23  medical services, accounting data, or other financial

24  or business information which has not been published

25  or disseminated outside of SEP or which has otherwise

Page 30

1   not become a matter of general public knowledge,

2   right?  That's D.

3        A.   Yes.

4        Q.   And then E is payroll, fringe benefits,

5   salaries, bonuses, commissions, and other

6   compensation related items, right?

7        A.   Correct.

8        Q.   Generally, 4.5, you would agree with me,

9   does not include information that is already out in

10  the public, correct?

11       A.   There's probably what's out in the public

12  and what's not out in the public.  It would be

13  rumored, but it may be not be factual information.

14  So I think that would be a case-by-case basis you'd

15  have to --

16       Q.   Well, let me give you some hypotheticals.

17       A.   Yeah.

18       Q.   Published peer reviewed studies would not

19  be confidential information to SEP, right?

20       A.   Correct.

21       Q.   And I know that the requirement is to keep

22  absolutely confidential all of the information in A

23  to E, but there's some things that are not listed --

24  and let me back up.  Let me back up just a little bit

25  with respect to this contract.  You would agree with

Page 31

1   me that SEP chose the language in this contract,

2   correct?

3        A.   Yes.

4        Q.   SEP could have defined any terms or phrases

5   that it wanted in this contract in Exhibit 4,

6   correct?

7        A.   Yes.

8        Q.   There's this requirement in 4.5 to keep

9   absolutely confidential.  There's some implicit

10  things that might be exceptions to that; would you

11  agree?  Let me give you a couple examples.  If

12  somebody gets a grand jury subpoena for testimony,

13  are they required to keep SEP's information

14  absolutely confidential in that instance?

15       A.   I would assume if they're required by law

16  to provide it, they can.

17       Q.   Okay.  How about -- and that's an implicit

18  exception to this absolute confidentiality

19  requirement, right, the requirement to disclose by

20  law; you'd agree?

21       A.   I would think that would be the case.

22       Q.   Okay.  That would be the case with a civil

23  subpoena, too, right?  If somebody gets civilly

24  subpoenaed, that's going to be another implicit

25  exception that's required by law?

Page 32

1      A.   I would --

2           MR. BIRKENHAUER:  Just objection as to

3      the extent you're asking for any legal

4      conclusions, Chris.  You can answer if you

5      can, Bob.

6      A.   Well, I was actually going to say I would

7 have consulted our legal team and asked them what

8 should not be done.

9      Q.   Let me ask:  Did SEP get subpoenas on a

10 somewhat regular basis while you were the president

11 and CEO?

12     A.   Yes.

13     Q.   And was it a requirement of SEP to get a

14 clearance or waiver from confidentiality agreements

15 to respond to those -- for employees to respond to

16 those in the course of business?

17     A.   I would say those were typically responded

18 to with the assistance of the corporate team.

19     Q.   Okay.  But no one employee had to go and

20 say I need an exception to my employment agreement

21 and its confidentiality provision to respond to this

22 subpoena.  That wasn't a practice?

23     A.   There was -- I'm not sure where it was, in

24 the contract or in some policies, but they were

25 required to notify us if they received any such

Page 33

1    notice and, therefore, they worked with the senior

2    team on how to respond to those sorts of issues.

3         Q.    And that's not in this contract, though,

4    right?

5         A.    I cannot tell you where it is, but I know

6    that we have information that says and all physicians

7    are informed that they need to notify our in-house

8    counsel if something like that arises, or their

9    immediate supervisor.

10        Q.    Let me get into another possible exception.

11   The Joint Commission came through SEH and I suppose

12   SEP on a somewhat regular basis.  Fair?

13        A.    Not SEP, no.

14        Q.    Okay.  SEH they did?

15        A.    Yes.

16        Q.    And in a Joint Commission review of SEH,

17   were physicians allowed to disclose the information

18   that's contained in Exhibit -- or that's contained in

19   Section 4.5 of this agreement?

20        A.    They would have never asked about an

21   employment contract with SEP.  They're not related.

22        Q.    Well, I'm asking about the information.

23   For instance, patient records.  Would Joint

24   Commission ever look at patient records?

25        A.    They would have to request those from our

1    health information team and get those.

2        Q.    And would the -- if a physician was

3    involved in the release of that, would that violate

4    this contract?

5        A.    It would -- should not have been released

6    by a physician.  It would have gone strictly through

7    our health information team.

8        Q.    Was Joint Commission allowed to interview

9    physicians about their treatment of patients?

10       A.    They would often ask physicians questions

11   in the hallways or usually more formal small meeting

12   groups.

13       Q.    And would it be a violation of this

14   contract, Section 4.5, for the physician to answer

15   them honestly?

16       A.    Well, I think they should always answer

17   those things honestly, but I think it would depend on

18   what the questions were asked.

19       Q.    What if they were asking about patient

20   treatment?

21       A.    Yes.  And do we have any policies that

22   dictate any type of care or what they should do?

23   Absolutely.

24       Q.    So they could answer that question,

25   correct?

Page 35

1      A.   Yes.

2      Q.   Would that violate Section 4.5 of this

3   employment agreement?

4      A.   It would have nothing to do with this

5   employment agreement.  That's their role as a member

6   of the medical staff of St. Elizabeth Healthcare.

7      Q.   Well, if they're disclosing patient names

8   and records, office charts, hospital charts, films,

9   correspondence, about a patient in the course of that

10  conversation, wouldn't that violate --

11     A.   The doctors aren't doing that.  The Joint

12  Commission has requested that information from

13  St. Elizabeth Healthcare.  St. Elizabeth Healthcare's

14  team has looked at it, provided them the charts they

15  requested, and then usually go through a process --

16  I've never had them specifically get one doctor and

17  say how do you treat this.  That just isn't how Joint

18  Commission usually works.

19     Q.   Or what's your policy for treating this?

20     A.   What's our policy for treating what?

21     Q.   For any course of treatment as Joint

22  Commission goes through and certifies --

23     A.   Oh, they'll ask about policies, yes.

24     Q.   Okay.  Isn't that business information

25  that's not published or disseminated outside of SEP?

Page 36

1      A.   But it's with the permission of the

2  organization to provide that information.

3      Q.   So that's an exception to 4.5 if it's with

4  the permission of the organization?

5      A.   I don't even know if I know the answer to

6  that.  We're going and playing with hypotheticals

7  here.  But usually we work with our physicians in

8  answering interrogatories or other issues.

9      Q.   Where, if any, were these procedures that

10  we've talked about, these exceptions to this policy,

11  written?

12      A.   I don't know that there's any written

13  exceptions to a policy.  That's usually why there's

14  information as includes these but not limited to.

15      Q.   Let me ask about a couple other

16  hypotheticals on this Section 4.5.  You would agree

17  with me that the physician's agreement in 4.5 are

18  asking the physician to do things within their

19  reasonable control, right?

20           MR. BIRKENHAUER:  Objection as to form.

21  You can answer if you understand, Bob.

22      A.   I'm really not sure what you're asking, Mr.

23  Wiest.

24      Q.   Dr. Pritchard, 4.5, this confidentiality

25  requirement, what you're asking the physician to do

1    is keep things confidential to the extent that

2    they're able -- reasonably able to do so, correct?

3        A.    Yes.

4        Q.    Let me --

5        A.    I don't know if I like your word

6    reasonably, but, yes, we expect them to keep things

7    confidential.

8        Q.    If somebody were to burgle SEP's offices

9    and obtain confidential information through no fault

10   of a physician, that wouldn't be a violation of 4.5,

11   right?

12       A.    No.  The physician did not volunteer that

13   information.

14       Q.    Right.  It was outside their control,

15   something that happened outside of their control,

16   correct?

17       A.    Yes.

18       Q.    Even though it was in their office, maybe

19   the office door wasn't locked because they had an

20   expectation the building was secured, it was going to

21   be good, but if it wasn't their fault, no violation,

22   right?

23       A.    I would not think so, but I'd need

24   specifics.

25       Q.    And so the term, if you look in 4.5,

Page 38

1    absolutely confidential doesn't, in fact, mean

2    absolutely confidential.  We're dealing with people

3    taking reasonable steps to ensure compliance with

4    that provision.  Fair?

5         A.   I don't think that's what the contract

6    states.  I think it says keep it absolute

7    confidential.

8         Q.   Well, the contract says absolute

9    confidential --

10        A.   Yeah.

11        Q.   -- right?  And if somebody comes in and

12   takes patient records out of a physician's office,

13   not through their fault, you told me that's not a

14   violation, right?

15        A.   Well, I've never had a physician that it

16   happened to, but I can give you other employees who

17   had patient information stolen from their car when

18   they took their computer home and that violated a

19   policy taking information outside the office.  And,

20   yes, I saw people terminated for that.

21        Q.   Right.  If somebody comes in and breaks in

22   and takes things from the office, not through that --

23   by the way -- let me back up.  In that instance,

24   Dr. Pritchard, somebody violated a policy taking

25   confidential information outside the building,

Page 39

1    correct?

2         A.   Yes.

3         Q.   And if somebody had kept that information

4    in their office and there was a security problem in

5    SEP, for instance, that resulted in obtaining of

6    information, that wouldn't be the physician's fault,

7    right?

8         A.   I would not think the physician or the

9    associate had any role in that whatsoever.

10        Q.   Right.  I want to ask about a couple of

11   other provisions in this contract.  Let's go and look

12   at 10.2(h) -- or, I'm sorry, Section 10.2.  Starts on

13   929 and goes into 930.  This is the list of things

14   that can result in for cause terminations, correct?

15        A.   Correct.

16        Q.   And I want to focus in on a couple of these

17   in particular.  I'm going to start, Dr. Pritchard,

18   with 10.2(h), and that's on 930.  And that says:

19   Misappropriating any funds or property of SEP with

20   the exception of incidental medical supplies.  Do you

21   see that?

22        A.   Yes.

23        Q.   What is your definition of

24   misappropriation?

25        A.   Use it in a way that was not conducive to

Page 40

1    our business practices.

2        Q.   Would you apply a dictionary definition to

3    that term?

4        A.   If I had a dictionary in front of me, I'd

5    be glad to look it up and read it to you, but I don't

6    know the dictionary definition.

7        Q.   Well, let me back up.  Misappropriating is

8    not a defined term in this agreement, right?

9        A.   Not that I know of.

10        Q.   Okay.  And let me give you the Oxford

11    definition and tell me if you agree.

12        A.   Okay.

13        Q.   Dishonestly or unfairly taking something,

14    especially money, belonging to another for one's own

15    use.  Would you agree with that definition?

16        A.   Well, I think I would have to.  It's the

17    Oxford definition of it.

18        Q.   Let me back up just a little bit.  As you

19    were employed at SEP, did you have an employment

20    agreement?

21        A.   I did.

22        Q.   Did you consult with an attorney about that

23    agreement?

24        A.   My employment agreement with St. Elizabeth

25    Healthcare, I did not consult an attorney.

Page 41

1      Q.   You had the right to consult your attorney?

2      A.   I think you always have the right to

3  consult your attorney pertaining to your employment

4  agreement.

5      Q.   Okay.  Can you consult with an attorney

6  concerning other things that are going on at work?

7      A.   I think that would be appropriate.

8      Q.   Can you discuss your employment's

9  confidential information in getting advice from your

10  personal attorney?

11      A.   If it pertains to a perceived wrongdoing or

12  a violation of the contract, I would think so.

13      Q.   Or a general violation of law, right?

14      A.   I would think that's appropriate.

15      Q.   And the expectation, you agree with me, in

16  consulting with an attorney is that the attorney's

17  going to keep things confidential, right?

18      A.   I do believe in attorney-client privilege,

19  yes.

20      Q.   Right.  And there's a duty of the attorney

21  to keep things confidential, right?  You knew that.

22  You understood that.

23      A.   Correct.

24      Q.   Okay.  Let me ask.  If someone takes

25  confidential information of SEP relating to a

Page 42

1    violation of law and provides it to their attorney,

2    is that dishonestly or unfairly taking the property

3    of SEP?

4        A.   I would probably say that I would love to

5    think if you're an associate of SEP and you feel

6    something is being done illegally, you would approach

7    your leadership first before you make assumptions

8    first and run to an outside attorney.

9        Q.   Okay.  That wasn't my question.  My

10   question was:  If someone takes confidential

11   information of SEP or SEH and consults with their

12   attorney about it, is that dishonestly or unfairly

13   taking something belonging to SEP for their own use?

14       A.   What's their own use?

15       Q.   To get legal advice on legal obligations

16   and requirements.

17       A.   No, that's probably not a violation.

18       Q.   Okay.  All right.  Let's look at 10.2(m),

19   which is at 931.  10.2(m) says:  Upon investigation

20   by SEP, physician is deemed by SEP to be disruptive

21   pursuant to the medical staff code of conduct policy

22   of SEP or SEH, or as otherwise solely determined by

23   SEP, physician violates SEP or SEH policies or

24   procedures.  Right?

25       A.   Yes.

Page 43

1        Q.   So let me begin here.  First of all, the

2    expectation is to comply with SEH policies and

3    procedures, as well as SEH policies and procedures,

4    correct?

5        A.   As they're all members of the SEH medical

6    staff, we expect them to follow those policies as

7    well as any physician on the medical staff at

8    St. Elizabeth Healthcare would be required to do.

9        Q.   Right.  And that's written in the contract,

10    right?

11        A.   Yes.

12        Q.   Okay.  Is the medical staff code of conduct

13    policy of SEH the same as the medical staff code of

14    conduct policy of SEP?

15        A.   Honestly don't know the answer to that.

16        Q.   I want to look at the code of conduct of

17    SEH.

18             MR. WIEST:  Are we on 5?  I think we're

19        on 5.

20             VIDEO TECHNICIAN:  Five, yes.

21             MR. BIRKENHAUER:  Yes.

22             (Plaintiff's Exhibit 5 was marked for

23    identification.)

24        Q.   And there's a definition, Doctor -- or let

25    me back up.  Have you seen this document before?

Page 44

1      A.   I am sure I have at some time in the past,

2  but --

3      Q.   Let me start on -- I think it's the table

4  of contents.  And I will represent to you I did not

5  print out the entire code of conduct.  I just grabbed

6  the relevant sections to save trees, but let me start

7  with the signature on about the third or fourth page

8  back.  You recognize Mr. Colvin's signature, right?

9      A.   I recognize his name, and I would guess

10  that that's his writing.  It looks somewhat familiar.

11      Q.   I will represent to you that this document

12  was -- I pulled it off of St. Elizabeth's website and

13  it was dated 2011.  Do you have any reason to dispute

14  that?

15      A.   No.

16      Q.   And you think you might have seen this

17  before?

18      A.   Oh, I'm sure I have.  I had to when I

19  signed on the medical staff and other things.

20      Q.   Okay.  If you look at the -- let me ask.

21  Is this the code of conduct that's referenced in

22  Dr. DiChiara's agreement, Subsection 10.2(m)?

23      A.   I believe so, yes.

24      Q.   Okay.  There is a discussion -- if you go

25  back to the bottom page and you get into page 16 all

Page 45

1    the way -- it's the last page that I printed.

2         A.   Okay.

3         Q.   And there's a discussion in Subsection 4

4    that indicates, I think it's E4, prevention of

5    workplace violence and disruptive behavior.  Do you

6    see that?

7         A.   Yes.

8         Q.   Disruptive behavior is actually defined

9    here as behaviors that intimidate staff, decrease

10   morale, or increase staff turnover.  Do you agree

11   that those are the things that are disruptive

12   behaviors?

13        A.   Let me read this.

14        Q.   Absolutely.  Take your time.

15        A.   Now, you'll have to repeat your question

16   after I read it.

17        Q.   Disruptive -- do you see where it begins

18   the sentence --

19        A.   Yes.

20        Q.   -- undesirable and disruptive behaviors

21   that intimidates staff, decrease morale, or increase

22   staff turnover can threaten the safety and quality of

23   care and will not be tolerated?

24        A.   Correct.

25        Q.   These behaviors may be verbal or nonverbal

Page 46

1    and may involve the use of rude language, threatening

2    manners, or even physical abuse, right?

3         A.   Yes.

4         Q.   And so my question is:  Disruptive

5    behaviors are those that either intimidate staff,

6    decrease morale, or increase staff turnover; would

7    you agree?

8         A.   Yes.

9         Q.   And those are the only behaviors that are

10   defined as disruptive under this policy; do you

11   agree?

12        A.   It appears to be that way.

13        Q.   Okay.  And then that covers M.  I want to

14   talk about 10.2(n), which is Defendants 931.

15        A.   Are we back to the --

16        Q.   Yeah, we're back to the contract.  10.2(n)

17   is physician engages in conduct that is disruptive,

18   unprofessional, unethical, fraudulent, inconsistent

19   with SEP's core values, or constitutes a threat to

20   the health, safety or welfare of any person.  I read

21   that right, correct?

22        A.   Yes.

23        Q.   I want to focus in on disruptive.  I'm

24   going to start with disruptive.  We just talked about

25   disruptive, right?

Page 47

1       A.   We talked about disruptive as defined at

2   St. Elizabeth Healthcare and the medical staff.

3       Q.   Is 10.2(n) different?

4       A.   Yes.  This is a contract with an

5   organization, not -- the disruptive behavior in the

6   code of conduct is greatly driven by -- you mentioned

7   Joint Commission and CMS on the Medicare rules, what

8   things are expected in an organization.  These are

9   two separate documents and situations.

10       Q.   Okay.  What is disruptive under 10.2(n)?

11       A.   I would say it's not defined.

12       Q.   It's not defined Dr. DiChiara as the person

13   that's presented this contract and had no role in

14   drafting it can apply any reasonable construction to

15   that term, can't she?

16            MR. BIRKENHAUER:  Objection as to form.

17       You can answer if you understand it.

18       A.   I would think most people would understand

19   what's disruptive to an organization.

20       Q.   Well, that wasn't my question.  My question

21   was:  As someone who this contract is presented to

22   that had no role in drafting it, Dr. DiChiara can

23   apply any reasonable construction to the term

24   disruptive, can't she?

25       A.   I don't know the answer to that.

Page 48

1      Q.   Okay.  What -- and you can't give me a
2  definition of what's disruptive, sitting here today?
3      A.   It can go in any number of areas, but if
4  something makes it more difficult for a company to do
5  their business, I would think that would be
6  disruptive.
7      Q.   Was that ever expressed to the employees of
8  SEP in any way, any policy of communication?
9      A.   Not that I know of, except through their
10  contract.
11      Q.   Okay.  Is providing information to a law
12  firm to get legal advice that should be kept
13  confidential disruptive?
14      A.   Well, I think you're trying to pigeonhole a
15  very broad definition to a single situation.  So I
16  think it's often dependent on what's the
17  circumstances surrounding that situation.
18      Q.   Okay.  What has to result as a consequence
19  of some action for it to be disruptive?  In other
20  words, is annoying senior leadership sufficient for
21  it to be disruptive, something that annoys leadership
22  of an organization?
23      A.   We probably wouldn't have had too many docs
24  around if that was disruptive.
25      Q.   Okay.  So we know it's not simply doing

1    something that annoys leadership.  How much

2    disruption has to occur before it's disruptive?  So

3    it's not annoying leadership.  What does it have to

4    rise to?

5         A.   I don't have a specific answer to

6    disruption in that way.

7         Q.   How did you apply this term as the CEO and

8    president of SEP?

9         A.   Well, I think that she violated our -- it

10   says physician engages in conduct that is disruptive,

11   unprofessional, unethical, fraudulent, or

12   inconsistent with our core values, or threatens the

13   health or safety or the welfare.  I believe that what

14   Dr. DiChiara did definitely was disruptive.  We had a

15   lot of things we were battling at that time with the

16   pandemic, we were focusing on.  This was taking our

17   attention off trying to provide good healthcare to

18   folks and keep people safe.  I personally think that

19   it was inconsistent of our core values or the

20   collaboration, of respect, of excellence.  What she

21   did was not consistent with any of those in my mind.

22        Q.   What did she do?

23        A.   She engaged in private conversations with

24   myself and Garren Colvin and then took that

25   information directly to an outside counsel -- not an

1  outside counsel, a representative of a law firm who

2  is currently suing the organization over our vaccine

3  mandate.

4       Q.   And what -- how specifically did her

5  providing information to a law firm disrupt --

6  confidentially providing information to a law firm

7  disrupt SEP?

8            MR. BIRKENHAUER:  Objection as to form.

9       You can answer if you understand.

10      A.   I mean, how was it disruptive?  Our whole

11  world was disrupted at that time, and I think adding

12  additional things that we're having to chase and do

13  creates disruption.

14      Q.   Was it the fact of the lawsuit that was

15  disruptive?

16      A.   I think any lawsuit is basically

17  disruptive.  It makes you change the course of what

18  you're working on at the moment.  But I think what

19  bothered me on this is that here's a colleague who

20  requests a meeting.  You sit down and you try to have

21  an honest conversation and listen to that person, and

22  then they take everything you say and do and take it

23  to an outside counsel.  That felt dishonest and, in

24  my mind, therefore disruptive.

25      Q.   Do you know whether or not Dr. DiChiara had

Page 51

1    an expectation the information that she provided to

2    the law firm would be kept confidential?

3           A.   She sent me a later e-mail apologizing for

4    having shared our private e-mails.  And she said she

5    felt that they were not going to be shared or asked

6    that they not be shared publicly.

7           Q.   Okay.  And you were aware of that?

8           A.   I received an e-mail from Dr. DiChiara that

9    stated that.

10          Q.   If that had happened, if it had been kept

11   confidential, the Deters firm hadn't violated ethics

12   yet again, would that have been disruptive?

13          A.   Well, she also said in that same letter

14   that he was not her attorney.  He was one of a

15   trusted number of friends she was consulting with.

16   So it does not sound like she went to him necessarily

17   as an attorney.

18          Q.   So you're saying by the date you terminated

19   her, you were not aware that she had an expectation

20   of confidentiality with the Deters firm?

21          A.   We had received that e-mail, as I stated,

22   prior to her termination.  That's what sort of got

23   this ball rolling was her e-mail that said, hey, I

24   basically violated your guys' trust, I'm sorry.  And

25   she stated in that that he was not her attorney.  She

Page 52

1    had no intent of doing any legal action.  She

2    apologized that it had been used sort of against us

3    in a lawsuit.  That's a little disruptive.

4         Q.   We'll talk about this more later today.

5    Unprofessional, what does unprofessional mean?

6         A.   Violate our rules and say not acting in a

7    professional manner.  And I say our rules.  You're

8    not supposed to use the word in the definition,

9    but...

10         Q.   Well, let me ask.  If I were to use the

11   Oxford definition of below or contrary to the

12   standards expected in a particular profession, would

13   you disagree with that definition?

14         A.   No.

15         Q.   Who sets the standards expected of a

16   particular profession for a medical doctor in

17   Kentucky?

18         A.   Probably the board of medical licensure.

19         Q.   I want to look at Q.  SEP determines in

20   good faith that physician has breached a fiduciary

21   obligation or duty of loyalty or failed to act in a

22   manner consistent with SEP's values, mission, or code

23   of conduct.  What's a fiduciary obligation to SEP?

24         A.   Well, you do what's best for the

25   organization.  You protect the organization.

1      Q.   Let me ask, Dr. Pritchard.  Is ensuring

2   that an organization complies with the law loyal to

3   the organization?

4      A.   I think so.

5      Q.   Is taking action to ensure that an

6   organization complies with the law loyal to the

7   organization?

8      A.   I believe if you have evidence or belief

9   that it is not following the law.

10     Q.   Then you should do something about it,

11   right?

12     A.   I think you should probably talk to

13   somebody.  I'm not saying you should necessarily go

14   to outside counsel.  I'd preferred in this situation

15   she talked to me.

16     Q.   But you have the right to do so, don't you?

17     A.   I would expect.

18     Q.   I want you to go back to this code of

19   conduct at Exhibit 5 with me for just a minute,

20   Doctor.

21     A.   Okay.

22     Q.   And if you can, just scroll back to page 7.

23     A.   Scroll back to page --

24     Q.   Page 7, the numbered page 7 at the bottom.

25   And I just want to talk about the expectation of

Page 54

```
 1   St. Elizabeth Healthcare on its employees as well as
 2   its medical staff, right?
 3        A.   Okay.
 4        Q.   Do you see C, Legal and Regulatory
 5   Compliance, comply with the law?
 6        A.   Yeah, I see it.
 7        Q.   Okay.  And it says:  St. Elizabeth
 8   Healthcare is subject to numerous laws, regulations,
 9   standards of care, and ethical business practices
10   pertaining to all aspects of its operations.  We have
11   developed policies and procedures to address many of
12   these legal and regulatory requirements.  However, it
13   is not feasible to develop policies and procedures to
14   address every applicable law and regulation.  Still,
15   our associates are required to understand and abide
16   by all applicable laws in the performance of their
17   jobs, whether or not specifically addressed in the
18   code of conduct or in any of St. Elizabeth
19   Healthcare's policies and procedures.  Did I read
20   that right?
21        A.   Yes.
22        Q.   Is that -- was that the true expectation of
23   both St. Elizabeth Healthcare and SEP?
24        A.   I'm going to say something that -- we're
25   using SEH documents to talk about an SEP action.  SEH
```

Page 55

1    took no action against Dr. DiChiara.

2         Q.   We're going to get into that later.

3         A.   Okay.  But you're going to need to apply

4    those standards to a totally different situation.

5         Q.   So are you saying that SEP did not have the

6    expectation that its employees would comply -- and

7    I'm going to use the term that SEH used, that SEP's

8    employees were not required to understand and abide

9    by all applicable laws in the performance of their

10   jobs, whether or not specifically addressed in the

11   code of conduct?

12        A.   I would like to think so, but I would like

13   to see SEP's code of conduct to see if that's

14   actually what we said.  This is SEH.

15        Q.   Well, I asked for every document and I

16   didn't -- this is what I've got.  So are you aware of

17   a separate code of conduct that SEP had?

18        A.   I am not necessarily aware of a separate

19   code of conduct for SEP.  We may have had one.  I

20   don't remember.

21        Q.   Okay.  If you didn't have one, what would

22   be the code of conduct that would govern?

23        A.   Well, I think our contracts and our

24   policies would cover our actions.

25        Q.   And I just want to be clear.  Was it or was

Page 56

1    it not the expectation of SEP that its employees were

2    required to understand and abide by all applicable

3    laws in the performance of their jobs?

4        A.    You're asking about an SEH policy, not --

5        Q.    No, sir.  That was not my question.

6        A.    Okay.

7        Q.    Was it or was it -- and listen to the

8    question.  Was it or was it not SEP's expectation

9    that its employees were required to understand and

10   abide by all applicable laws in the performance of

11   their jobs?

12       A.    Yes.

13       Q.    Okay.  Would that be true regardless of any

14   contractual provisions?

15       A.    Yeah.  We don't ask people to do anything

16   that's against the law.

17       Q.    Okay.  Would it violate the duty of loyalty

18   to obtain legal advice from an outside law firm

19   concerning legal rights or obligations with respect

20   to the terms, conditions, or circumstances of

21   employment?

22       A.    I don't believe so.

23       Q.    The required by law exception is not listed

24   in the contract, is it?

25       A.    I'm sorry.  The required by?  I missed it.

Page 57

1      Q.   There's no provision in Exhibit 4 that

2  indicated that employees were required to abide by

3  legal requirements, were there?

4           MR. BIRKENHAUER:  Objection, for a

5      second, Chris.  So Exhibit 4, the employment

6      agreement --

7           MR. WIEST:  Correct.

8           MR. BIRKENHAUER:  -- what specifically

9      are we looking at?

10     Q.   Is there anything in the employment

11 agreement that indicated that employees had to comply

12 with all legal requirements or the duty of law?

13     A.   Without taking the time to read it, I can't

14 tell you that.

15     Q.   If it's not in there, you would agree with

16 me that that's an implicit requirement of employment,

17 correct?

18     A.   Yes.

19     Q.   I want to talk, Dr. Pritchard, just for a

20 couple minutes about the non-competition provision

21 that starts at 11.1.  There's a non-compete.  It's

22 Bates 933 in Exhibit 4.

23     A.   Okay.

24     Q.   This contract had a non-competition --

25 non-compete within it for a 20-mile non-compete

Page 58

1    measured by air miles, correct?

2        A.    Correct.

3        Q.    Was that standard in SEP contracts?

4        A.    It was for, quote, specialty physicians.

5    Primary care, I believe, was 10 mile and specialty

6    physicians were 20 mile.

7        Q.    Okay.  And you can tell me if you disagree

8    with my understanding of this agreement, but in

9    reading 11.1 through 11.5, if the agreement expired,

10   the non-compete was not triggered, correct?

11           MR. BIRKENHAUER:  Take your time to look

12       at it if you need to, Bob.

13       Q.    Look at 11.1(a).

14       A.    Yeah.  I'm looking at 11.1 and it's dated

15   what I thought it said, which was different than what

16   you said.  So for a period of one year following the

17   date of termination.

18       Q.    Right.

19       A.    So it does -- if the contract just expires,

20   I think they do have a one-year post employment

21   obligation.

22       Q.    Well, let's go look.  Look, if you don't

23   mind, 11.1(a), it does not apply if SEP terminates

24   the agreement without cause under 10.2(g), right?

25       A.    Correct.

Page 59

1      Q.   It does not apply if the physician

2  terminates the agreement for cause, right?

3      A.   Correct.

4      Q.   It does not apply it's if terminated

5  pursuant to Section 12, right?

6      A.   Correct.

7      Q.   That's if something's inconsistent with

8  law.  And it does not apply if the agreement is

9  terminated pursuant to Section 10.4, right?

10     A.   Correct.

11     Q.   Okay.  If you look at the 11.3, there's a

12  private practice exception.

13     A.   Correct.

14     Q.   And that says if it's terminated without

15  cause or it expires, then it's not a violation for

16  the physician to engage in the private practice of

17  medicine within the protected area, right?

18     A.   Correct.

19     Q.   Okay.  So in that sentence it is an

20  exception as long as they're going into private

21  practice?

22     A.   Yes.

23     Q.   Okay.  And these were standard terms and

24  conditions in the SEP employment?

25     A.   Correct.

Page 60

1      Q.   Okay.  I want to go and look at Exhibit A,

2  because there's some additional duties that -- and

3  this starts, Dr. Pritchard, at 939 to 940.  There was

4  requirements, for instance, taking call coverage,

5  correct?

6      A.   Correct.

7      Q.   To do hospital rounds if required, correct?

8      A.   And just let me clarify what page you're

9  looking at.

10     Q.   Yeah.  I'm starting on 940, and there's a

11  specific list of services.

12     A.   Yeah.

13     Q.   There was also a requirement, starting on

14  page 19, to assist with administrative services,

15  correct?

16     A.   Correct.

17     Q.   And on page 20 there was a requirement

18  under applicable standards that actually does have a

19  requirement to comply with the law?

20     A.   Okay.

21     Q.   I'm at 8(a):  Physician shall perform all

22  services hereunder in a cooperative, ethical,

23  collegial and nondisruptive manner and in compliance

24  with all relevant federal and state laws,

25  regulations, and standards governing the practice of

1  medicine.  Correct?

2       A.   Yes.

3       Q.   Okay.  I want to look at a -- and we'll get

4  back to Exhibit 4 a little later today, but I want to

5  look at 6 with you.

6            (Plaintiff's Exhibit 6 was marked for

7  identification.)

8       Q.   This was a confidentiality and

9  non-disclosure agreement that was, I guess, signed by

10 Dr. DiChiara on November 5th of 2012, correct?

11      A.   Yes.

12      Q.   And this talks about what is confidential,

13 correct?

14      A.   I'd have to reread it.

15      Q.   There's a listing of eight things that the

16 company says is confidential.  It doesn't limit it,

17 but it says confidential information includes but is

18 not limited to, right?  Do you see that?  It's about

19 halfway down.

20      A.   Yes.

21      Q.   Okay.  Information about a patient's

22 condition and treatment, clinical data, employee

23 records, marketing plans, project or service plans,

24 strategies and forecasts, patient lists, and

25 financial information, correct?

Page 62

1      A.   Correct.

2      Q.   Are publicly available peer reviewed

3  studies confidential information under this policy?

4      A.   No.

5      Q.   I'm going to ask this question generally.

6  Was it the expectation of SEP that its employed

7  physicians would remain in employment for a period of

8  time?  In other words, these weren't intended to be

9  short-term agreements, were they?

10     A.   I would always tell physicians that I

11 interview I hope they'd be there their entire career.

12     Q.   And to help do that, there was a retention

13 bonus loan program, right, to help make sure people

14 would stick around?

15     A.   I cannot remember specifically, but I know

16 we've done those in the past.

17     Q.   And that was a situation where effectively

18 there would be some upfront money, and then if they

19 stuck around long enough, they would effectively get

20 that paid back by the organization, right?

21     A.   Yes.

22     Q.   And I suspect, Dr. Pritchard, because of

23 the level you were operating at, you probably weren't

24 in the weeds on those kinds of things; is that fair?

25     A.   I knew broadly what we were doing, but not

Page 63

1   necessarily what every specific agreement that was

2   out there.

3        Q.   That's fair.

4             (Plaintiff's Exhibit 7 was marked for

5   identification.)

6             (Plaintiff's Exhibit 8 was marked for

7   identification.)

8        Q.   So if I handed you 7 and 8, you wouldn't

9   dispute that in 2013 there was one of those programs

10  that was afforded to Dr. DiChiara, right?

11       A.   I would not dispute that, no.

12       Q.   Okay.  These employment agreements were

13  updated from time to time, right?

14       A.   Correct.

15       Q.   And I take it the idea was to ensure that

16  the employed physician was subject to such an

17  agreement at all times that they were employed.

18  Would that be fair?

19       A.   Can you repeat it?  I think what you said

20  was correct, but --

21       Q.   Yeah.  It would be fair to say that the

22  intention of SEP was to ensure that the employed

23  physician was subject to an employment agreement at

24  all times that they were employed, correct?

25       A.   Yes.

Page 64

1          (Plaintiff's Exhibit 9 was marked for

2     identification.)

3          (Plaintiff's Exhibit 10 was marked for

4     identification.)

5          (Plaintiff's Exhibit 11 was marked for

6     identification.)

7     Q.   I'm going to hand you 9, 10, and 11.  And I

8     don't have a lot of questions about these, but I do

9     want to get them in the record.  Doctor, I'm handing

10    you 9, 10, and 11.  I'm going to get it over to your

11    counsel before I ask you questions about it.

12          Was it the case that sometimes exhibits to

13    contracts would get updated, if you know?

14    A.   I don't remember doing exhibits

15    particularly.  We do addendums to contracts at times,

16    but it's possible that exhibits could have been

17    covered in that.

18    Q.   Ten and 11 were addendums that took

19    Dr. DiChiara's contract into and through, it looks

20    like, 2017.  Would you agree?  And I think --

21    A.   You said through --

22    Q.   Yes, sir, through 2017.

23    A.   I see an effective date was January of

24    2017.

25    Q.   Right.  And let's start with 10.  Ten had

Page 65

1    an effective date of January 1, 2015, right?

2          A.   Yes.

3          Q.   And that was signed by Dr. Loomis.  He was

4    still the president and CEO as of June 16, 2018;

5    would you agree?

6          A.   Yes.

7          Q.   And then 11, that's you and that was signed

8    on January 13, 2017 by you, correct?

9          A.   Yes.

10         Q.   Out of curiosity, Dr. Pritchard, how many

11   of these agreements were in place?  How many

12   physicians' contracts had you been signing in a given

13   year?

14         A.   Well, when we did mass addendums like this?

15         Q.   Sure.

16         A.   2017, I don't know how many docs we had,

17   but it was probably several hundred at least at that

18   stage, if not more.

19         Q.   Okay.  I would assume, given that, that

20   probably legal counsel or somebody prepared it and

21   you were just signing off assuming everything was

22   okay?

23         A.   Oh, yeah.  I didn't do the day-to-day

24   preparation of contracts.

25         Q.   Would you review these before you signed

Page 66

1    them for the individual doctors or were these mass

2    addendums that were --

3          A.    They were mass.    They were standard.

4          Q.    Okay.    That was my question.    And they were

5    equally prepared by SEP for the doctor to sign and

6    then for you to sign on behalf of SEP; would that be

7    fair?

8          A.    Correct.

9          Q.    Incidentally, the other provisions of the

10   contracts that these addendums had, if you look at

11   them, what these addendums change were the terms of

12   compensation.    But the general provision that we

13   looked at before, Section 10 and Section 11, those

14   continued in force, right?

15         A.    Yes.

16         Q.    I think we're up to 12.    Let me make sure.

17               (Plaintiff's Exhibit 12 was marked for

18   identification.)

19         Q.    I'm going to hand you Exhibit 12.    I take

20   it, Dr. Pritchard, that you've seen Exhibit 12

21   before?

22         A.    I have, yes.

23         Q.    This was the employee's handbook for

24   St. Elizabeth Physicians, associate handbook dated

25   August 1, 2017, correct?

Page 67

1        A.    Yes.

2        Q.    And I just want to begin on the second page

3    of this handbook.  The term associate when used in

4    this handbook, if you look at the bottom of the

5    purpose, includes physicians, APP's, managers and

6    staff at St. Elizabeth Physicians, right?

7        A.    Correct.

8        Q.    It equally indicates that it is to serve as

9    a guide for the employee -- employer/associate

10   relationship.  But as it indicates, it's to keep in

11   mind that it serves only general information and

12   guidelines.  It's not intended to be comprehensive or

13   to address all possible applications or exceptions to

14   general policies and procedures, right?

15       A.    I'm making an assumption, yes.  I don't

16   know which paragraph --

17       Q.    I'm under handbook purpose on page 2.

18       A.    Yeah.  So you were on the last line.  So

19   you went back to the top?

20       Q.    And then I went back to the first line,

21   yes, sir.

22       A.    Okay.

23       Q.    You would agree with me that if there was a

24   disparity between an employment contract and a

25   handbook, the employment contract would govern,

Page 68

1    correct?

2         A.   I would expect that, yes.

3         Q.   Okay.  And I have some specific questions

4    about this handbook.  And specifically I want to

5    start on page 5, Defendants 903 and there's a

6    discussion of confidentiality.  Tell me when you're

7    there.

8         A.   I am there.

9         Q.   103 says you are expected to maintain the

10   privacy and confidentiality of patients, associates,

11   and business information.  Let me start with the term

12   maintain.  That begins with the assumption that the

13   information is confidential to begin with, correct,

14   it's not out in public?

15        A.   Correct.

16        Q.   And so we talked before about publicly

17   available peer reviewed studies.  That's not going to

18   be confidential information to SEP, right?

19        A.   No.  Anybody can go look those up.

20        Q.   Right.  It then says, and I'm moving down,

21   SEP will respect private and confidential information

22   shared by both patient and associates.  SEP will

23   ensure that all associates maintain confidentiality

24   and understand the importance of accepting and

25   demonstrating this principle.  It is the obligation

Page 69

1    of every associate to maintain the confidentiality of

2    our patients and associates.  Conversations regarding

3    patients must be limited to those on a need-to-know

4    basis, right?

5         A.    Correct.

6         Q.    And then the next sentence says:  The

7    disclosure of or distribution of patient information

8    without the patient's consent and for purposes other

9    than patient care is strictly prohibited.  That's

10   referring to patients, correct?

11        A.    Correct.

12        Q.    And then it says:  Any release or improper

13   discussion of such information, that's patient

14   information, is a breach of confidentiality and will

15   subject an associate to disciplinary action up to and

16   including termination.  Right?

17        A.    Yes.

18        Q.    Okay.  If we look and we go back -- by the

19   way, this policy was in place when you were the CEO,

20   correct?

21        A.    Yes, I believe so.

22        Q.    If you go back to 110, there's a discussion

23   about equal opportunity -- equal employment

24   opportunity.  Tell me when you're there.

25        A.    I am there.

Page 70

1        Q.    SEP is committed to equal employment

2    opportunity.  We do not discriminate against

3    associates or applicants for employment because of,

4    and in particular I want to focus on religion or

5    physical or mental disability, correct?

6        A.    Correct.

7        Q.    Or any other classification protected by

8    federal, state, or local laws, correct?

9        A.    Correct.

10        Q.    Is that an accurate statement of policy?

11        A.    Yes.

12        Q.    You then go on to indicate -- or the policy

13    goes on to indicate this applies to all aspects of

14    employment and it is each associate's duty to

15    provide -- to promote fairness, correct?

16        A.    Correct.

17        Q.    Let me ask, Dr. Pritchard:  Did this policy

18    apply to you as the president and CEO of SEP?

19        A.    Yes.

20        Q.    Okay.  I want to go back just a little.

21    There's an electronic communication policy at 106.

22    It starts on page 5, Defendants 903.  Tell me when

23    you're there.  We're back one page.

24        A.    Still on the page.

25             MR. BIRKENHAUER:  Page 5 of the handbook.

Page 71

1       A.    Sorry.   I thought you were referring to a

2   different policy.   I apologize.

3       Q.    I'll tell you when we move past the

4   handbook.

5       A.    Okay.

6       Q.    You there?

7       A.    Yes, I am.   Thank you.

8       Q.    This indicates that associates are provided

9   an e-mail, voice mail, and network access to increase

10  efficiency in performing their jobs through

11  facilitating business related communication and the

12  transfer of information.   It says:   All company

13  electronic communication systems, including but not

14  limited to e-mail, voice mail, and network services

15  are the property of St. Elizabeth Physicians or

16  St. Elizabeth Healthcare.   SEP may inspect or

17  monitor, both content and usage, any of these systems

18  at any time for any or no reason, utilize/release

19  information carried on these systems, remove

20  information for any or no reason and take action in

21  situations that it deems inappropriate.   You were

22  responsible for using the electronic communication

23  systems properly and in accordance with this policy,

24  right?

25      A.    Yes.

Page 72

1    Q.   On the next page it begins:  All associates

2    are required to use these business tools in an

3    appropriate way to meet the standards of their

4    position.  Any personal use should be on an

5    associate's own time.  Do you see that?

6    A.   Yes.

7    Q.   So it was permissible to use the electronic

8    resources of SEP as long as it was on your own time

9    and associate's own time?

10   A.   I think it's our statement.  It looks like

11   that's what it says, yes.

12   Q.   Okay.  Let me ask:  Was it the expectation

13   of SEP that all business communications would be

14   performed on the SEP e-mail system?

15   A.   I would think so, yes.

16   Q.   Were personal e-mails ever used for

17   business purposes?

18   A.   Should not have been.

19   Q.   Was that a violation of policy if somebody

20   was doing that?

21   A.   I think people did it, but was it a

22   violation of policy?  Probably.  It looks like it.

23   Q.   Was that enforced?  In other words, was

24   personnel action taken against people that did that?

25   A.   I'm not aware.

Page 73

1          Q.    I want to go back to 910, that's page 12.

2     It's Defendants 910, page 12.  I want to start at

3     203.  What was the corporate responsibility program?

4          A.    I can't remember specifically without

5     seeing it, but I think it provided a way for any

6     associate to raise concerns.

7          Q.    About potential violations of law?

8          A.    I think so, yes.

9          Q.    Did you have anything to do with that

10    program?

11         A.    I would have to look at what the policy

12    says.  I'm sure I did as CEO.

13         Q.    206, associate health and safety.  The

14    statement was made that St. Elizabeth Physicians is

15    committed to protecting employee safety and health;

16    is that true?

17         A.    Yes.

18         Q.    And I'm going to go to 911, associate

19    conduct, 301.  There was an anti-harassment and

20    non-discrimination provision as well, right?

21         A.    Yes.

22         Q.    And it prohibited discrimination because of

23    an associate's religion, fair?

24         A.    Fair.

25         Q.    Or for any other reason, right?

Page 74

1        A.    Correct.

2        Q.    If you look at 209, what was the open

3    door/conflict resolution policy that's also listed on

4    911?

5        A.    Yeah.  Basically what I had mentioned

6    earlier when I was describing that I would have

7    thought they would have come to us for their direct

8    reporting relationship.  They always have a right to

9    come and tell their immediate supervisor or higher-up

10   about issues.

11       Q.    What if it wasn't resolved?

12       A.    I can't remember SEP having a specific

13   policy for what if it's not resolved.  I think SEH

14   actually did because the medical staff, the Joint

15   Commission required it.

16       Q.    If someone had brought a concern to

17   yourself or Mr. Colvin and it wasn't resolved, who

18   could they escalate it to beyond that?

19       A.    I can't remember who the policy says in

20   particular they had to take it to, but they could

21   probably take it to just about anybody and escalate

22   it up to the process.  In-house counsel would have

23   been -- because they get hotline calls all the time

24   through that that would disclose people were

25   concerned certain issues weren't being met.

Page 75

1     Q.   Who was above you and Mr. Colvin in the

2  reporting chain that somebody --

3     A.   The board of trustees.

4     Q.   And what if the board of trustees did not

5  resolve the concern?

6     A.   I guess a person could take legal action.

7     Q.   Did they have the right to do that then?

8     A.   I would think if they'd gone through the

9  channels.  I don't believe you can ever stop people

10  from taking legal action, but you hope they go

11  through the channels and get it resolved

12  appropriately.

13     Q.   All right.  I want to look at a couple --

14  we're going to go through some policies and then --

15  Dr. Pritchard, we've been at this an hour and a half.

16  Do you need a break?

17     A.   It's always good to take a break.

18     MR. WIEST:  Take one then.

19     VIDEO TECHNICIAN:  We're off the record,

20    10:25.

21             (OFF THE RECORD)

22     VIDEO TECHNICIAN:  We are back on the

23    record.  The time is 10:38.

24  BY MR. WIEST:

25     Q.   Dr. Pritchard, I'm going to hand you

Page 76

1    Exhibit 13.

2              (Plaintiff's Exhibit 13 was marked for

3    identification.)

4         Q.   This is a copy of the electronic forms of

5    communication policy for SEP.  It looks like its

6    origination date was June 1st of 2019; would you

7    agree?

8         A.   Yes.

9         Q.   Who was Jacob Bast?

10        A.   Jacob is the chief operations officer for

11   SEP.

12        Q.   And he reported directly to you?

13        A.   Yes.

14        Q.   There's a discussion in this electronic

15   forms of communication policy that I want to kind of

16   focus in on.  First there is a discussion of

17   electronic forms of communication and information

18   storage mainly to be used for appropriate business

19   purposes, correct?

20        A.   Are you looking --

21        Q.   It's under the use, yeah.

22        A.   Oh, B.  Yes.

23        Q.   Okay.  And then it says there's a

24   prohibition -- by the way, No. 1, e-mail addresses at

25   stelizabeth.com should not be used for personal

Page 77

1  e-mail.  Was that a blanket prohibition, people could

2  never use it for personal use?

3       A.    Sounds to be, yes.

4       Q.    Did you ever terminate anyone's employment

5  for using e-mail for personal use?

6       A.    No.

7       Q.    What about -- there's a discussion on -- if

8  you look, under No. 4, electronic forms of

9  communication and information may not be used.  Then

10  it says for any purpose that is against SEP policy or

11  is in any way contrary to SEP's best interest.  Do

12  you see that?

13      A.    Yes.

14      Q.    How was SEP's best interest evaluated?

15      A.    I think that would be speculation on my

16  part at this stage.

17      Q.    Okay.  How did you evaluate SEP's best

18  interest?

19      A.    I think it would be what -- almost

20  self-explanatory, but what helps us to perform our

21  business and the duties that we have to perform.

22      Q.    Okay.  Would an employee looking up laws

23  and regulations to ensure compliance with law be in

24  the organization's best interest?

25      A.    I think it could be.

Page 78

1    Q.   How about an employee consulting with an
2    attorney about their legal rights or obligations,
3    would that be in SEP's best interest?
4    A.   I think you'd have to give situations, but
5    that sounds like more of a personal thing unless it's
6    a particular business matter.
7    Q.   What if it's related to something going on
8    at SEP and you want to ensure that there's compliance
9    with the law?
10    A.   Well, I think I would advise them to use
11    their personal e-mail.
12    Q.   Okay.  Did anyone ever in your tenure as
13    president and CEO of SEP forward e-mails -- work
14    e-mails to their personal e-mail?
15    A.   I have no way of knowing that.
16    Q.   Did you ever do that?
17    A.   I don't think so.
18    Q.   Did you ever communicate with physicians at
19    SEP via their personal e-mails?
20    A.   Not for any business purpose.
21         (Plaintiff's Exhibit 14 was marked for
22    identification.)
23    Q.   This is Exhibit 14.  It was produced to us
24    via the defendants and there was a compact of mutual
25    expectations and some values that are contained in

Page 79

1    this exhibit.  And my question is:  Have you seen

2    this before?

3         A.   Yes.

4         Q.   What was it?

5         A.   You just stated it.  It's compact of mutual

6    expectations.

7         Q.   And these were the things that SEP was

8    endeavoring to do; would that be fair?

9         A.   Yeah.  It was to try to build our culture.

10        Q.   Okay.  And what kind of culture were you

11   trying to build in particular?

12        A.   Culture collegiality of partnership of

13   working well with one another and staff, all those

14   sorts of things.

15        Q.   Did you sign any similar policy as the

16   president and CEO of SEP?

17        A.   Yes.  It was hanging on my wall in my

18   office.

19        Q.   Okay.  Dr. Pritchard, I meant, after we got

20   back from the break, to just ask you a couple of

21   follow-up questions to some earlier testimony.  I

22   wanted to do that now.  We talked before about the

23   EEOC allegations, while I think you were at the UC

24   Physicians Group, that you gave some testimony in.

25   Do you remember that?

Page 80

1        A.   It was not the UC Physician Group.   It was

2   Alliance Primary Care.

3        Q.   Alliance Primary Care.   Thank you for the

4   correction.   Do you remember what the specific

5   allegation was as to why that employee felt that you

6   had improperly terminated her?

7        A.   I do not.

8        Q.   Do you recall what the outcome of that

9   matter was?

10       A.   The case was dismissed.

11       Q.   Okay.   Was it dismissed and settled or was

12  it just dismissed as invalid?

13       A.   Dismissed as invalid.

14       Q.   I asked you about St. Elizabeth Hospital's

15  ability to control SEP earlier and you said there was

16  some reserve powers.   Do you recall that?

17       A.   Yes.

18       Q.   In what document is that contained in?

19       A.   It's in the bylaws for the St. Elizabeth

20  Physicians.

21       Q.   And who maintains those?

22       A.   Who maintains those?

23       Q.   Yes, sir.

24       A.   Meaning where can you find them?

25       Q.   Correct.

Page 81

 1       A.    The SEP corporate office.

 2       Q.    You indicated that occasionally you would

 3  consult with Mr. Colvin about the termination of a

 4  SEP employee if it impacted SEH.  Do you remember

 5  that?

 6       A.    Yes.

 7       Q.    When would the termination of an SEP

 8  employee affect SEH -- or impact SEH?

 9       A.    Anytime it was a physician because they

10  take care of patients at the hospital.

11       Q.    Okay.  So anytime there's a physician

12  termination, Mr. Colvin would be consulted or

13  informed?

14       A.    I tried to make it my practice to keep them

15  informed.

16       Q.    Did Mr. Colvin ever express concern or veto

17  the termination of a physician?

18       A.    Not that I recollect.

19       Q.    Could he have?

20       A.    Well, we could have had a discussion.  I

21  don't think he could directly veto it.

22       Q.    Would that have changed the outcome if he

23  had?

24       A.    It's possible.

25       Q.    Ultimately he was able to control your

Page 82

1   terms and conditions of employment, correct?

2       A.   Mine, yes.

3       Q.   Yes.  Are you aware at any time that SEP

4   has ever violated the law?

5       A.   I sure hope not, so no.

6       Q.   Okay.  And that would have been your job to

7   know that, right?

8       A.   I would hope.

9       Q.   And your job to correct it if it occurred?

10      A.   Yes.

11      Q.   Let me go back to what's in front of you as

12  Exhibit 14.  There's a statement in here.  If you

13  look under accountability on the right, it indicated

14  we will be responsible for holding each other

15  accountable and feel empowered to do so.  Do you see

16  that?

17      A.   Yes.

18      Q.   Do you agree with that statement?

19      A.   Yes.

20           (Plaintiff's Exhibit 15 was marked for

21  identification.)

22      Q.   This is a policy that was produced in

23  discovery regarding informing associates of fraud and

24  abuse laws/whistleblower protections, ACORP, and I

25  think that's an I-01.  Do you see that?

Page 83

1        A.    I'm sorry.  Oh, yeah ACORP-I-01, yeah.

2        Q.    And there's an applicability on the top

3    right that indicates that it's applicable to

4    St. Elizabeth Healthcare systemwide.  Do you see

5    that?

6        A.    Yes.

7        Q.    Would that have also been applicable to

8    SEP?

9        A.    No.

10       Q.    Okay.  So this was a policy that was

11   only -- well, let me back up.  This policy would have

12   affected SEP physicians performing services at SEH,

13   correct?

14       A.    Correct.

15       Q.    And we looked at Dr. DiChiara's employment

16   contract.  A requirement of the employment contract

17   was to comply with SEH policies while they're

18   performing services at SEH, right?

19       A.    Correct.

20       Q.    And SEP physicians exclusively, almost,

21   although maybe there was some exceptions, provided

22   services at SEH, right?

23       A.    Reword that.  I mean, state that again.

24       Q.    SEP physicians almost exclusively provided

25   services at SEH, correct?

1          A.    Yes.

2          Q.    And I guess there could be some exceptions

3    where somebody's, you know, doing something, but that

4    would require an exception to policy?

5          A.    Correct.

6          Q.    Did SEP have a similar policy regarding

7    whistle-blower protections?

8          A.    I do not know.

9          Q.    Let me -- who would know?

10         A.    I would think probably Jake Bast would

11   know.  I think our in-house counsel would know.

12   Probably our head of HR would know.

13         Q.    This policy talks about being able to make

14   protected reports including to the federal government

15   regarding whistle-blower type actions including

16   overbilling issues.  Do you see that?

17         A.    You got to tell me which page we're looking

18   at.

19         Q.    Let's look at the first one.

20         A.    Okay.

21         Q.    Overview, and I'm looking at the FCA allows

22   any person who discovers that a government contractor

23   is defrauding the federal government to report it,

24   and then to sue the wrongdoer on behalf of the

25   federal government.  Do you see that?

Page 85

1       A.   Yes.

2       Q.   And there's another provision on the second

3  page that talks about protection from retaliation by

4  the FCA.  Do you see that?

5       A.   I do see that.

6       Q.   And there's a specific sentence and it

7  says:  The anti-retaliation provision protects

8  employees who engage in lawful acts in furtherance of

9  an FCA action.  Do you see that?

10       A.   Yes.

11       Q.   Would it be disloyal for an SEP doctor to

12  make a report, a protected report under the FCA under

13  the terms of the employment agreement -- the standard

14  employment agreement?

15       A.   I wouldn't think so.

16       Q.   Would it be disruptive for a doctor to make

17  a protected report under the FCA under the employment

18  agreement?

19       A.   I don't know.

20       Q.   Would it be contrary to SEP's best

21  interests to use SEP e-mails to make a protected

22  report under the FCA?

23       A.   I think it depends on the situation.  We

24  need to be told if we're doing something

25  inappropriately, but I still hope they'll go through

Page 86

1    the proper channels as outlined in the policies.

2        Q.   What if they didn't?  What if they simply

3    reported to the federal government?  Would that be

4    contrary to SEP's best interest?

5        A.   I think eventually, no.  I mean, I think

6    they're trying to do the right thing.

7             (Plaintiff's Exhibit 16 was marked for

8    identification.)

9             (Plaintiff's Exhibit 17 was marked for

10   identification.)

11            (Plaintiff's Exhibit 18 was marked for

12   identification.)

13       Q.   I'll hand you the next one in the series.

14   Doctor, I'm going to hand you what I've marked as

15   Exhibit 16, 17, and 18.  And before I ask you

16   questions, I'm going to hand a copy to counsel so

17   just don't say anything until --

18       A.   I'm busy trying to get organized.

19       Q.   Sixteen is a policy that was applicable to

20   St. Elizabeth Healthcare systemwide, correct?  And

21   that was the support and promotion of Corporate

22   Compliance Program as an evaluation factor for

23   supervisors and managers?

24       A.   Yes.

25       Q.   And it would have been applicable to SEP

 1   physicians providing services in SEH, correct?

 2         A.    Providing services at SEH, yes.

 3         Q.    Okay.  If you look, there's a guideline

 4   that indicates the key Corporate Compliance Program

 5   components by which supervisors and managers

 6   performance will be evaluated include:  To support

 7   and encourage associates, providers, contractors and

 8   vendors to raise questions, issues and concerns or to

 9   report potential violations under the Corporate

10   Compliance Program and to cooperate to resolve such

11   items.  Did I read that correctly?

12         A.    Yes.

13         Q.    There's an E on the second page of that

14   that indicates actively supports St. Elizabeth

15   Healthcare's non-retaliation policy for associates,

16   providers, or contractors who report issues in good

17   faith under the Corporate Compliance Program and

18   enforces the Corporate Compliance Program policies

19   equitably and fairly, correct?

20         A.    Yes.

21         Q.    Was the purpose of this policy to ensure

22   compliance with the law?

23         A.    Yes.

24         Q.    And was it -- was there a similar policy

25   that was in effect for SEP?

Page 88

1        A.    Once again, I don't know without seeing

2    them.  I would think there would be.

3        Q.    Okay.  Was this policy applicable to you in

4    your role as -- because you had a role with SEH also?

5        A.    Yes.

6        Q.    So this policy would have been applicable

7    to you in that role?

8        A.    Yes.

9        Q.    Seventeen is the Corporate Compliance

10   Program, ACORP C-02.  This was also a systemwide

11   St. Elizabeth Healthcare policy, correct?

12       A.    Can we take just a quick --

13       Q.    Sure.

14       A.    I just want to ask a question to them.

15       Q.    If you need to -- so, Doctor, if you need

16   to consult with your counsel, you can feel free to do

17   so.  If you need a break to do so, that's probably

18   the appropriate way to do that.  Is that what you

19   want to do?

20       A.    Okay.  Yeah, just for a second.  I've got a

21   quick question for you.

22            VIDEO TECHNICIAN:  Just one second.

23       Let's go off the record.  We're off the

24       record.

25                    (OFF THE RECORD)

1          VIDEO TECHNICIAN:  We are back on the

2     record, 10:57.

3   BY MR. WIEST:

4        Q.   Dr. Pritchard, I want to back up just a

5   minute to Exhibit 15 if you got that in front of you.

6        A.   Yeah, I do.

7        Q.   And I want you to go to page 6 of 6.

8        A.   6 of 6.

9        Q.   Yes, sir.

10       A.   Yes.

11       Q.   There's a discussion at the top of that

12  that an employer could make a protected report to

13  include a court or grand jury.  Do you see that?

14  It's on the last sentence of the top paragraph.

15       A.   Okay.  Let's see here.  I'm trying to catch

16  the context.

17       Q.   Sure.  The sentence that starts on page 5.

18  That might help.

19       A.   Yes.

20       Q.   And then it says on the bottom of the

21  second paragraph there, the first full paragraph on

22  that page, talks about you could make the report to

23  the hotline.  You can report it directly to the OIG,

24  right?

25       A.   Yes.

Page 90

1      Q.   And then it says the choice of which

2   reporting option to use rests with the individual

3   making the report, correct?

4      A.   Yes.

5      Q.   So it would not violate the contract, would

6   it, of employment to make such a protected report?

7      A.   If SEP has a similar policy, I'd say

8   correct.

9      Q.   Okay.  Even if it doesn't, would it violate

10  the contract to make such a protected record?

11     A.   No.

12     Q.   In the course of such a discussion, if they

13  were to disclose confidential information, would that

14  violate -- to the federal government, would that

15  violate the employment contract?

16     A.   I don't think it would have following this

17  policy.

18     Q.   Let's look at Exhibit 16.  I think we

19  talked about that briefly.  This applies to providers

20  providing services at SEH, right?

21     A.   Yes.

22     Q.   And it also talks about the non-retaliation

23  provision on the second page, right, on Exhibit 16?

24     A.   Yes.

25     Q.   Okay.  Exhibit 17, this was also a

Page 91

1  St. Elizabeth Healthcare systemwide policy, correct?

2      A.   Yes.

3      Q.   And we know Dr. DiChiara was required to

4  comply with it under the terms of her physician

5  agreement, correct?

6      A.   Correct.

7      Q.   You were required to comply with it in

8  terms of your physician agreement as well as your

9  role with SEH, right?

10     A.   Correct.

11     Q.   And if you look, there's a discussion about

12 the purpose of it on No. 3, on the second page.  Tell

13 me when you're there.

14     A.   I'm there.

15     Q.   The purpose of it was to prevent and detect

16 violations of laws, regulations, and St. Elizabeth

17 Healthcare policies, correct?

18     A.   Yes.

19     Q.   To develop and implement processes to

20 improve compliance with federal, state, and local

21 laws, correct?

22     A.   Yes.

23     Q.   And so the -- this Corporate Compliance

24 Program, did that involve the ability to report

25 violations in terms of the law?

Page 92

1        A.    I'm sorry.  Repeat that last part.

2        Q.    Did the Corporate Compliance Program

3  involve the ability to report violations internally

4  in terms of violations of the law?

5        A.    Yes.

6        Q.    Did it allow personnel, if necessary, to

7  file legal actions or participate in legal actions to

8  determine violations of the law?

9        A.    Yes.

10        Q.    Would there be any violation of the

11  employment agreement in taking any of those actions?

12        A.    No.

13        Q.    Exhibit 18, this was a notice to provider

14  and this was specifically to medical staff members at

15  SEH, right?

16        A.    Yes.

17        Q.    This would have been applicable to

18  providers such as Dr. DiChiara, correct?

19        A.    Correct.

20        Q.    And it also was designed to ensure

21  compliance with the law, correct?

22        A.    Yes.

23        Q.    Let me ask, Dr. Pritchard, generally.  SEH

24  was receiving a substantial portion of its patients

25  under Medicare or Medicaid, right?

Page 93

1       A.   Correct.

2       Q.   In doing that, if you take the federal

3   dollars, it comes with federal strings, correct?

4       A.   Correct.

5       Q.   Including compliance with the law, right?

6       A.   Correct.

7       Q.   Would you agree with me that preventing

8   violations of the law and ensuring the continuation

9   of those federal monies was in SEH and SEP's best

10  interest?

11      A.   Yes.

12           (Plaintiff's Exhibit 19 was marked for

13  identification.)

14           MR. WIEST:  I think we're on --

15           VIDEO TECHNICIAN:  19.

16           MR. WIEST:  19.

17      Q.   This is a non-discrimination policy that

18  was provided by the defendants in this case and it

19  was applicable to St. Elizabeth Healthcare

20  systemwide, correct?

21      A.   Correct.

22      Q.   Was this applicable to SEH?  Well, it would

23  have been applicable to SEH, right?

24      A.   Yes.

25      Q.   Was it applicable to SEP?

Page 94

1          A.   This policy would not have been except for

2    physicians who were working at the medical staff and

3    had to apply from that direction.

4          Q.   Okay.  But in terms of the terms and

5    conditions of the individual doctors and their

6    employment with SEP, it would not be applicable; is

7    that fair?

8          A.   I think that's fair.

9          Q.   Okay.  Did SEP have to comply with the

10   requirements of the Americans with Disabilities Act

11   or Title VII; do you know?

12         A.   Yes.

13         Q.   And was that a commitment that SEP

14   undertook to make sure that they were doing?

15         A.   Yes.

16         Q.   Okay.  And it was in SEP's best interest

17   for employees to assist -- to making sure that there

18   was compliance with those laws, correct?

19         A.   Yes.

20         Q.   I have the same question for 20 I'm going

21   to hand you.

22              (Plaintiff's Exhibit 20 was marked for

23   identification.)

24         Q.   The anti -- the harassment policy, was

25   there -- did SEP have a harassment policy similar to

Page 95

1    the one that SEH had?

2         A.   I'm sure we did.

3         Q.   Are you aware of where that would be?

4         A.   It would be in our policy handbook which is

5    online.

6         Q.   Okay.  Was that what we looked at earlier,

7    this exhibit?

8         A.   The associate handbook?

9         Q.   Yes.  Is that what you were talking about?

10        A.   I would think there would be a different

11   collection of individual policies such as your review

12   in here, but...

13        Q.   Okay.  Do you think substantively there's

14   differences?

15        A.   Differences between?

16        Q.   The anti-harassment provisions for SEH and

17   SEP.

18             MR. BIRKENHAUER:  Let's get back to the

19        exhibit that's on the table.

20             MR. WIEST:  Yeah, Exhibit 20.

21             MR. BIRKENHAUER:  Exhibit 20.  Yeah, we

22        can put that handbook aside for now.

23        A.   Yeah.  Got you.  I'm sorry.  Repeat the

24   question, please.

25        Q.   Yeah.  Was there a similar policy to

Page 96

1   Exhibit 20 that SEP had?

2       A.   I would think so, yes.

3       Q.   The substance would be roughly the same?

4       A.   I would believe so.

5       Q.   Do you see -- Dr. Pritchard, go to 1087.

6   It's the second page of this policy.

7       A.   Okay.

8       Q.   And it talks about that there's protection

9   against retaliation.

10      A.   Yes.

11      Q.   And it begins and says:  St. Elizabeth

12  Healthcare will not retaliate against an individual

13  who, in good faith, makes a report of harassment, nor

14  permit any other person to do so.

15      A.   Yes.

16      Q.   It also says:  Retaliation is a very

17  serious violation of this policy and should be

18  reported immediately to a supervisor/corporate

19  compliance officer or the human resources department.

20      A.   Yes.

21      Q.   I mean, you were aware -- let me ask.  Were

22  you aware in 2021 that Title VII and ADA had any kind

23  of retaliation requirements that did not permit

24  retaliation?

25      A.   I knew we did not tolerate retaliation.  I

Page 97

1    couldn't have told you which government thing it came

2    from.

3         Q.   Were you aware that there was

4    anti-retaliation provisions that protected people

5    with disabilities or seeking disability

6    accommodations?

7         A.   Yes.

8         Q.   Were you aware that there was

9    anti-retaliation provisions that protected people

10   seeking religious accommodations?

11        A.   Yes.

12             (Plaintiff's Exhibit 21 was marked for

13   identification.)

14        Q.   This is Exhibit 21.   This is a photography,

15   filming, and broadcasting policy for SEH.

16        A.   Okay.

17        Q.   And my question to you is did -- my first

18   question is:  Did SEH have a similar policy?

19        A.   I can't answer that for sure, but I would

20   think so.

21        Q.   And what this indicates is that it is

22   limited to patient treatment.   In other words, this

23   governs patient treatment.  Do you disagree with

24   that?

25        A.   Where are we reading?  I'm sorry.

Page 98

1        Q.   Yeah.  Let's look at the top.  It's the

2   policy at St. Elizabeth Healthcare to take

3   photographs, film, and to broadcast in an effort to

4   assist educational, treatment, research, scientific,

5   public relations, and charitable goals of the

6   organization, and to document certain physical

7   conditions when it may be of benefit to the patient's

8   plan of care and treatment.  St. Elizabeth Healthcare

9   will obtain appropriate patient consent and maintain

10  patient rights and confidentiality even when

11  recording, filming, broadcasting is being done for

12  the purposes of identification, diagnosis, and

13  treatment.  Recording, filming, broadcasting of

14  patients and procedures as prohibited unless

15  specifically permitted in this policy.  Do you see

16  that?

17       A.   Yes.

18       Q.   This is governing patient interactions,

19  photography, filming, recording, et cetera, correct?

20       A.   I believe so, yes.

21       Q.   I'm going to hand you -- and I don't know

22  if your counsel --

23            MR. WIEST:  Well, we can talk about if

24       you guys want to seal this discussion or not.

25       I don't have an objection.

Page 99

1          (Plaintiff's Exhibit 22 was marked for

2    identification.)

3          MR. BIRKENHAUER:  Chris, if we could just

4      move to place this under seal.  For present

5      purposes, we may revisit that and withdraw the

6      motion, but just to be able to make that

7      determination and reserve that right.

8          MR. WIEST:  She'll transcribe this

9      separately unless you withdraw it.

10   BY MR. WIEST:

11      Q.   Dr. Pritchard, Exhibit 22 was a notice that

12   you provided to Garren Colvin regarding your intent

13   to retire effective December 31, 2021, at least the

14   first page of it, correct?

15      A.   Yes.

16      Q.   And you did that on December 15th.  And you

17   indicated that you were giving him advanced notice to

18   ensure that you were going to receive all the

19   benefits due to you under your employment contract,

20   correct?

21      A.   Correct.

22      Q.   And I take it, and I'm assuming, you can

23   tell me if this is true, that that required a

24   one-year notice?

25      A.   That was practice.  I think the contract

Page 100

1    legally required six months, but it had been common

2    practice that we gave a one-year notice.

3           Q.    And that's what this was?

4           A.    Yeah.

5           Q.    Okay.  And then apparently you had talked

6    about the prospect of pursuing alternative plans in

7    2022.  Do you see that?

8           A.    You talking about the second?

9           Q.    Look at the last paragraph.

10          A.    Oh, yes.

11          Q.    And then on the second page there was a

12   transition plan that you signed and Mr. Colvin

13   signed?

14          A.    Yes.

15          Q.    And this governed both your role at SEP as

16   well as SEH, correct?

17          A.    Correct.

18          Q.    And Mr. Colvin was entitled to and did sign

19   off on that, correct?

20          A.    Correct.

21          Q.    And so you knew effectively you were going

22   to be retiring the end of December of 2021 as of a

23   year prior to that?

24          A.    Yes.

25          Q.    Okay.  Out of curiosity, did the COVID

1    pandemic and the stresses that that caused have

2    anything to do with that retirement?

3         A.    No.

4         Q.    It was just that time of life?

5         A.    It was that time of life.

6         Q.    I understand.  All right.  I want to talk

7    about what was going on from a COVID-19 perspective.

8    And let's just talk generally.  You became aware of

9    COVID-19, I take it, as the president and CEO of SEP

10   as well as in your role with SEH, I'm assuming, in

11   either February or March of 2020, fair?

12        A.    It seems like it was right around the first

13   of March, but I can't remember exactly when that was.

14        Q.    Okay.  And what did that require,

15   generally, from your perspective in terms of dealing

16   with that, its onset?  And I'm not looking for

17   details.  I'm just -- generally, was that disruptive?

18        A.    Well, yeah.  It changed every day.

19        Q.    Things were evolving?

20        A.    Very rapidly.

21        Q.    Things were unknown particularly in March

22   of 2020, I take it, and things were unknown as the

23   pandemic proceeded; would you agree?

24        A.    Yes.

25        Q.    There was vaccines that hit the -- or

1   became available in November or December of 2020 for

2   COVID-19, fair?

3       A.   I will believe you.  I don't remember the

4   dates.

5       Q.   Okay.  And when those were first approved,

6   was it your understanding -- did you have an

7   understanding that they were approved under what's

8   known as an emergency use authorization with the FDA?

9       A.   Yes.

10       Q.   And that's different than full licensure,

11   correct?

12       A.   Correct.

13       Q.   There's -- in particular, there's informed

14   consent requirements that may not be present with

15   other -- with fully-approved vaccines, correct?

16       A.   I can't remember the difference.  There's

17   informed consents on all vaccines.

18       Q.   Okay.  And SEP and SEH did not require

19   COVID-19 vaccines when they first became available in

20   November and December of 2020, correct?

21       A.   That's correct.

22       Q.   Why was that?

23       A.   I don't know there was a particular reason

24   other than they were just becoming available and

25   things were evolving.  So, yeah, we encouraged the

1    vaccines from what I remember.

2         Q.   Okay.  Were physicians -- when they first

3    hit the market, were physicians -- there was scarcity

4    of the vaccines, correct?

5         A.   Correct.

6         Q.   And I'm just wondering.  Did physicians at

7    SEP argue about priority of who should get them first

8    in November, December when they first came out?

9         A.   We had phone calls, yes.

10        Q.   Okay.  And then -- and by the way, I think

11   the first vaccine was the Pfizer vaccine,

12   Pfizer-BioNTech, correct?

13        A.   Actually, I thought it was Moderna, but it

14   could have been Pfizer.

15        Q.   Okay.  In any event, as we're proceeding

16   into the summer of 2021, we had begun to experience

17   variants of COVID-19, correct?

18        A.   Correct.

19        Q.   I think what was starting to hit society in

20   the June to July time frame was the Delta variant.

21   Does that sound right?

22        A.   That sounds right.

23        Q.   What did you know about the Delta variant

24   in the summer of, say, 2021, June, July time frame?

25        A.   I wish I could remember specific time

Page 104

1  frames.  I really don't.  But we obviously had this

2  new variant coming on that seemed more -- is

3  threatening the right word?  More concerning.

4      Q.   Okay.  Was it more concerning from a

5  transmissibility standpoint or from a severity

6  standpoint or both?

7      A.   I would say both.

8      Q.   There was a federal contractor mandate that

9  came out of the federal government regarding

10 vaccines, I think, in July of 2021.  Do you recall

11 that?

12     A.   Not specifically.

13     Q.   There was also discussions or indications

14 that CMS was going to be imposing the vaccine

15 requirement on healthcare providers, correct?

16     A.   Correct.

17     Q.   And you were aware of that and Mr. Colvin

18 was aware of that in July of '21, correct?

19     A.   I just don't remember the dates, but we

20 were obviously aware.

21     Q.   I'm curious.  Did you -- or were you aware

22 of anything from the CDC concerning the effectiveness

23 or the safety of vaccines that had been issued in

24 July -- and I'm talking about COVID-19 vaccines in

25 particular, on or about July 30, 2021?

1        A.    About the safety and concerns?

2        Q.    Either safety or efficacy.

3        A.    I just don't remember specifically.

4        Q.    Do you recall any statements from the CDC

5    or Rachel -- Rochelle Walensky, who was the head of

6    CDC, concerning the vaccines not stopping the spread

7    of COVID-19?

8        A.    I've read it in Dr. DiChiara's e-mails.   Do

9    I remember that conversations were going on about how

10   effective it was?  Yes.  I just don't remember all

11   the specifics that were going on.

12       Q.    Do you recall reading anything from the CDC

13   about it?

14       A.    I would usually check the CDC site almost

15   daily to see if anything new was coming out.

16       Q.    You were checking for vaccine issues or

17   COVID issues?

18       A.    Checking the recommendations.

19             (Plaintiff's Exhibit 23 was marked for

20   identification.)

21       Q.    This is Exhibit 23.  This was a CDC

22   statement that was issued on Friday, July 30, 2021,

23   that recommended, among other things, that everyone

24   wear a mask indoor.  Do you see that?

25       A.    Yes.

1        Q.    It indicated that the recommendation was

2    made with the data and science available to CDC at

3    the time, correct?

4        A.    Yes.

5        Q.    You would agree the science was evolving

6    concerning COVID-19 vaccines and everything, right?

7        A.    Yes.

8        Q.    And it indicated that there was some data

9    that was published demonstrating that the Delta

10   infection resulted in similarly high COVID-19

11   SARS-CoV-2, that's COVID-19, viral loads in

12   vaccinated and unvaccinated people, correct?

13       A.    Yes, that's what it states.

14       Q.    The CDC's indicating that, notwithstanding

15   vaccination, it's spread through infections and

16   transmission, correct?

17       A.    Correct.

18       Q.    And do you think you would have read this

19   on or about July 30, 2021?

20       A.    I'm sure I did, or was at least made aware

21   of it.

22       Q.    Did anyone else at St. E's have a

23   responsibility to be tracking COVID-19 or CDC

24   developments?

25       A.    Absolutely.

1        Q.    Who?

2        A.    A great number of people.  We had our

3    physician vice president of quality who was tracking

4    stuff very closely, our director of infectious

5    disease, Dr. Chad Peterson.  Our pharmacy personnel

6    were tracking it greatly as related to vaccines.

7    There was -- I can't remember when we started.  We

8    had a team that met at least three days a week and

9    sometimes five days, sometimes seven days a week

10   during this period.  We'd be sitting at home on

11   Sundays with our phones having meetings about what's

12   happening.

13       Q.    Were you on that team?

14       A.    Yes.

15       Q.    Were there minutes kept of those meetings?

16       A.    I don't recollect.

17       Q.    Do you know if anyone -- who, if anyone,

18   would have had those duties to keep meeting minutes?

19       A.    I think Dr. Horn, who was our quality --

20   physician quality officer, and Vera Hall who was our

21   chief nursing officer ran those meetings.  I don't

22   know if they kept minutes or not.

23       Q.    Would you have expected a release like this

24   from the CDC concerning masks and vaccine issues to

25   be discussed during those kinds of meetings?

1      A.    I would think so.

2      Q.    On August 5th -- and we're going to look at

3   the e-mail release here.

4           (Plaintiff's Exhibit 24 was marked for

5   identification.)

6      Q.    You and Mr. Colvin penned a joint e-mail to

7   St. Elizabeth Physicians, providers, associates, and

8   volunteers, right?

9      A.    Correct.

10      Q.    And did this go to everyone that was

11   employed by SEP or SEH?

12      A.    Yes.

13      Q.    There were similar -- and we're going to

14   talk about the details of this in a minute, but there

15   were similar employer vaccine mandates that had been

16   released at UC Health, at Christ, all of the medical

17   large hospitals in the Tri-State area?

18      A.    Yes.

19      Q.    Was this mandate discussed in advance

20   between the doctors -- or, I'm sorry, between those

21   hospitals?

22      A.    To my knowledge, no, but I wasn't involved

23   in any meetings with the other health systems.

24      Q.    Okay.  Did Mr. Colvin have any discussions

25   with you about meetings with other systems?

1        A.   I don't know what was going on through the
2    health collaborative at that stage.
3        Q.   Okay.  I take it you reviewed this e-mail
4    before it went out?
5        A.   Absolutely.
6        Q.   Was this e-mail discussed between you and
7    Mr. Colvin before it went out?
8        A.   Our offices were in the same hallway, so
9    I'm sure we did.  He probably was reviewing it.  I
10   was reviewing it.  I don't think we sat down and had
11   a discussion and said here's all the words.
12       Q.   In advance of the mandate on August 5th
13   that came out that we see that's reflected.
14       A.   Yeah.
15       Q.   -- in Exhibit 24 -- and by the way, there
16   was a policy that also was issued that same day, but
17   formalized it by policy.  We're going to look at
18   that.
19       A.   Okay.
20       Q.   Had there been discussions about imposing a
21   mandate prior to August 5, 2021, at 11:11 a.m.?
22       A.   Oh, of course.
23       Q.   And when did those discussions begin?
24       A.   I can't tell you for sure, but probably
25   from the beginning the vaccines were released and

Page 110

1    what was going on in our environment and our

2    community.

3        Q.    The FDA licensure, I will represent to you,

4    occurred later in the month of August of Comirnaty,

5    the Pfizer vaccine, the full FDA licensure of that

6    medicine.

7        A.    Okay.

8        Q.    Was that a driver at all knowing that that

9    was coming out?

10        A.    I don't remember it being.

11        Q.    Okay.  So the fact that it was an

12    unlicensed EUA product on August 5th, but might not

13    be unlicensed, it might be full approval by the date

14    of compliance which was October 1st, that wasn't a

15    factor?

16        A.    I don't remember.

17        Q.    Who besides you and Mr. Colvin were on the

18    discussion team in terms of this vaccine mandate and

19    imposing it; do you remember?

20        A.    I would think the entire senior leadership

21    team.  It would have been something we were

22    discussing probably at every meeting.

23        Q.    What meetings were those at?

24        A.    Oh, we had a meeting called our -- was

25    called administrative council that were all the

Page 111

1    operation leaders throughout the organization.

2        Q.   When you say throughout the organization,

3    you're referring to SEP?  SEH?  Both?

4        A.   At that time, it was just SEH, if I

5    remember correctly.  I was there representing both

6    SEH and SEP in my roles, and I think Jake Bast was

7    there as well.

8        Q.   Were any of the infectious disease doctors

9    or any of the pulmonologists at SEP consulted about

10   that vaccine mandate before it was imposed?

11       A.   They were actually involved in that other

12   meeting I was talking to you about that talked every

13   day.

14       Q.   The COVID-19 meeting.  That's what I'm

15   going to call it.

16       A.   Yeah, that's appropriate.  I can't remember

17   what we called it, but it probably was that.  Well,

18   they were involved in that meeting.

19       Q.   Okay.  Were there any studies or public

20   documents that -- well, let me back up.  Was the

21   vaccine mandate something that was coming out of SEH

22   primarily and SEP was following the lead, or was it a

23   collaborative?  I mean, can you give me some insight

24   on that?

25       A.   Yeah.  I feel it was a very collaborative

 1   process.

 2        Q.   It sounds like, though, that it was

 3   discussed and decided on at the administrative

 4   council which was primarily SEH physicians?

 5        A.   Well, it was driven greatly by our medical

 6   staff.  In these meetings we were having in the

 7   mornings and things like that, it was usually the

 8   providers that were pushing us, Dr. Doris Savani,

 9   Dr. Chad Peterson, who was infectious disease, Dr.

10   Latonya Brown-Puryear, who was president of our

11   medical staff and also a pulmonologist critical care

12   medicine, Dr. Cha Mandapakala, who was -- ran our

13   pulmonology division, critical care division.  These

14   were folks we were taking a great deal of --

15   listening to them greatly.

16        Q.   Okay.  I want to ask about a couple of

17   statements in this Exhibit 24.

18        A.   Okay.

19        Q.   You indicated that -- and I'm looking at

20   the second sentence, first paragraph.  These vaccines

21   have been proven safe and effective at providing

22   long-lasting protection against COVID.  Do you see

23   that?

24        A.   Yes.

25        Q.   What was the basis of that statement?

Page 113

1        A.   It was based on the information we were

2   seeing daily.

3        Q.   What information?

4        A.   Well, it would have come from the CDC.  Our

5   pharmacists were greatly following all the

6   information on vaccines.

7        Q.   Well, we just looked at the CDC document

8   that indicated that there were breakthrough

9   infections in Exhibit 23, right?

10       A.   Yes.

11       Q.   Given that, would you agree -- and I'm not

12  talking about the safety, but would you agree that in

13  light of that statement, would the statement be true

14  that these vaccines have been proven effective at

15  providing long-lasting protection against COVID?

16       A.   I would stick with that, yes, and what we

17  knew at that time.

18       Q.   The CDC statement was that the Delta

19  infection resulted in similarly high SARS-CoV-2 viral

20  loads in vaccinated and unvaccinated people.  We

21  looked at that.  That's what's coming out of CDC,

22  correct?

23       A.   Correct.

24       Q.   But you're taking -- and I just want to be

25  clear.  You still believe that the vaccines were

Page 114

1    proven effective at providing long-lasting

2    protection?

3          A.    Absolutely.

4          Q.    Okay.  Can you point to any particular

5    study you relied on for that statement?

6          A.    I won't -- well, there was information

7    about infection rates across the country.  I'll go to

8    Dr. DiChiara in one of her own e-mail where it said

9    she knew that over 90 percent of all our people

10   hospitalized were unvaccinated.

11         Q.    That data -- and let's talk about that for

12   a minute.  That data measured hospitalizations from

13   the start of COVID, correct?

14         A.    I think it was even what we went on at the

15   point in time.

16         Q.    Okay.  You think that those rates were

17   going on in --

18         A.    It was actually true at St. Elizabeth

19   Healthcare.

20         Q.    Okay.  As of 2020 -- as of July of '21?

21         A.    I believe so.

22         Q.    Who's got that data?

23         A.    I can't tell you exactly who has it, but we

24   were tracking it at the time.

25         Q.    Were there minutes or records, was

1    anybody -- is there a repository for that that was

2    kept?

3         A.   Not that I know of.

4         Q.   Can you, as you sit here today, cite any

5    particular study that was available to you on

6    August 5th that the COVID vaccines provided -- were

7    effective at providing long-lasting protection

8    against the Delta variant?

9         A.   Can I cite a specific study?

10        Q.   Yes.

11        A.   No.

12        Q.   Okay.  This indicates -- I'm going to move

13   down to the next -- the next sentence -- or the next

14   paragraph.  You're now concerned about the COVID

15   Delta variant, correct?

16        A.   You're on the second paragraph?

17        Q.   Yeah.

18        A.   Yes.

19        Q.   And you indicate that healthcare systems

20   throughout the region and nation are experiencing a

21   rapid increase in COVID inpatient volumes and

22   community preference, right?

23        A.   Correct.

24        Q.   With the COVID Delta variant, the severity

25   of the disease for the unvaccinated hospitalized

Page 116

1    COVID patients is rising.  What was that based on?

2         A.    That was based on our practical day-to-day

3    data, plus other information we received from across

4    the country.

5         Q.    Who was providing that data, the day-to-day

6    data?

7         A.    We looked at admission rates every day,

8    what patients were in.  We had vaccination status.

9    Who particularly was providing that, I'm not sure.

10   Maybe coming out of our IT department.

11        Q.    Did that data track at all whether or not

12   those admitted patients had prior infection or any

13   degrees of natural immunity?

14        A.    I can't remember.

15        Q.    Okay.  You indicate that the severity of

16   the illness was rising.  What did that mean?

17        A.    We were seeing sicker patients.

18        Q.    Was that measured by the length of time

19   that they had been admitted in the hospital or --

20        A.    Ventilation status, were they on

21   ventilators, were they -- what was their mortality,

22   other morbidities.

23        Q.    So with the Delta variant, you were seeing

24   more deaths than you had previously seen?

25        A.    I can't remember that exactly, but...

1      Q.   And then you indicate on the next sentence,

2   it was the most aggressive variant that we've seen to

3   date and it's significantly more contagious than the

4   initial strain.   That's -- when you say aggressive,

5   you're talking about its transmissibility?

6      A.   That, among other things, I believe.

7      Q.   What else?

8      A.   Well, just the severity of the illness, the

9   progression through the community, which I guess

10  would go to your transmissibility.

11     Q.   You indicate that this poses a serious

12  threat to unvaccinated residents.   I want to be

13  clear.   Is that talking about like the community at

14  large or is that residents in the hospital setting

15  with physicians?

16     A.   As I read it now, I think it's referring to

17  residents in general, but I...

18     Q.   Okay.   The CDC suggests that 99.5 percent

19  of COVID deaths in the United States have occurred

20  among unvaccinated people.   Can you -- do you recall

21  anything in particular, any CDC study or any CDC

22  report, that that's referring to?

23     A.   No.

24     Q.   Was that measured from the start of the

25  pandemic prior to available vaccines?

Page 118

1          A.    I don't remember at this stage.

2          Q.    Did that measure at all whether or not

3    people had prior infection or natural immunity?

4          A.    Not that I'm aware of.

5          Q.    You indicate on the next sentence that we

6    strongly encourage physicians, providers, associates,

7    and volunteers to get vaccinated, but there hadn't

8    been an employment requirement to do so prior to

9    August 5th.  Agree?

10         A.    Correct.

11         Q.    And then the next sentence was:  However,

12   with the onset of the new, highly contagious Delta

13   variant and recent surges in COVID-19 cases in our

14   facilities and our communities, we must ensure that

15   all of our associates are protected.  We must do our

16   part to keep our patients and communities safe.

17   You're suggesting that in light of Delta, the

18   COVID-19 vaccination would protect associates?

19         A.    Yes.

20         Q.    Would it protect them from getting sick?

21         A.    Very possibly, yes.

22         Q.    Even though the CDC had just told you that,

23   in fact, the viral loads were the same between

24   vaccinated and non-vaccinated --

25         A.    Well, many people got COVID you could say,

1    quote, sick, but they weren't sick enough requiring

2    hospitalizations or more intensive care.

3         Q.   So that's a great point.  So there's a

4    difference, you would agree, between the sterilizing

5    vaccine that's going to prevent transmission and a

6    therapeutic that's going to reduce symptoms, reduce

7    serious hospitalizations, reduce vents, you know, and

8    that kind of thing, correct, maybe even for a death?

9         A.   Yeah.  I mean, it's not 100 percent

10   protective.

11        Q.   Okay.

12        A.   But many vaccines are not 100 percent

13   protective.

14        Q.   Well, there's a difference, right, Doctor,

15   with an MMR vaccine where it's actually sterilizing a

16   high percentage of the cases versus a COVID-19

17   vaccine where -- I'm not disputing that it

18   significantly reduces symptoms and serious outcomes,

19   but it's not preventing transmission?

20        A.   I don't know the literature on that.  You,

21   yourself, just said a percentage.  You didn't say 100

22   percent.

23        Q.   I agree with you.  Right.  Okay.  So it was

24   the belief -- your belief and Mr. Colvin's belief

25   that a vaccine requirement would keep patients and

1    communities safe?

2        A.    We thought it would sure help.  It was part

3    of our arsenal of what we're doing, along with social

4    distancing, masking, not going out to crowded events.

5        Q.    And the requirement was that all

6    physicians, providers, associates, and volunteers be

7    fully vaccinated by October 1, 2021?

8        A.    Correct.

9        Q.    Let me ask:  If someone had begun a vaccine

10   regimen because there were -- two of the vaccines

11   were available with two doses, right?

12       A.    Uh-huh.

13       Q.    Moderna and Pfizer, correct?

14       A.    Correct.

15       Q.    If someone had begun that prior to

16   October 1, would SEP or St. E's allow that employee

17   to complete the regimen after that date, or was that

18   the date for full vaccination?

19       A.    I think if you look at the policy, there

20   was information somewhere about if you initiated the

21   process.  It may not have been in the policy, but we

22   had that.  They had time.  I think a 30-day

23   additional time frame.

24       Q.    Okay.  And in that first e-mail, the next

25   sentence was consistent with our practice for other

Page 121

1    required vaccines, associates can request an

2    exemption for medical or sincerely-held religious

3    reasons?

4          A.    Correct.

5          Q.    Were you aware at the time that -- and by

6    the way, I want to be clear.  SEP and SEH were viewed

7    not only as healthcare providers, but as an extension

8    of Catholic ministry, correct?

9          A.    Correct.

10         Q.    Were you aware of objections from Catholics

11   concerning the available vaccines in July or August

12   of 2021 in either the production, manufacture or

13   testing connections with aborted fetal tissue?

14         A.    From some Catholics, yes.

15         Q.    Okay.  And I understand it wasn't

16   universal.  I understand the Vatican had statements

17   about that too --

18         A.    Yes.

19         Q.    -- but that was out there as well?

20         A.    Right.

21         Q.    And if I understand this e-mail, associates

22   can request an exemption for either medical or

23   religious reasons?

24         A.    Correct.

25         Q.    You indicate that you're finalizing the

Page 122

1    details and process to document vaccine status and

2    will communicate this information as soon as

3    available, right?

4        A.   Yes.

5        Q.   This e-mail -- by the way, this e-mail also

6    indicates that you're now going to require universal

7    masking?

8        A.   Yes.

9        Q.   And incidentally, the CDC indicated in July

10   of 2021 that they were recommending universal

11   masking, correct?

12       A.   Correct.

13       Q.   And that was a recognition that -- the

14   available vaccines, but there were breakthrough

15   cases --

16       A.   Correct.

17       Q.   -- and, in fact, there was frankly a lot of

18   breakthrough cases?

19       A.   I can't tell you what a lot means, but,

20   yes, there were breakthrough cases.

21       Q.   Well, and that was the reason for universal

22   masking as opposed to only masking the unvaccinated

23   was there was a desire to reduce the spread and that

24   was one way to help mitigate that, right?

25       A.   Yes.

1      Q.   Is there anything in this e-mail about how

2  either St. E or SEP was going to evaluate the medical

3  or religious objections that people may have?

4      A.   In this e-mail, I don't think there was.

5      Q.   Okay.  Was there any other document that

6  you're aware of -- and I'll let you see the policy,

7  too, because I'm not trying to hide anything from

8  you.  Let me go ahead and do that now.

9           (Plaintiff's Exhibit 25 was marked for

10  identification.)

11     Q.   I've handed you Exhibit 25 which was the

12  St. Elizabeth Healthcare's required COVID-19

13  vaccination policy.

14     A.   Okay.

15     Q.   This would have been applicable to SEP

16  physicians like Dr. DiChiara who were providing

17  services in the hospital, correct?

18     A.   Yes.

19     Q.   And I just want to kind of go -- by the

20  way, did you have anything to do with the drafting or

21  approval of this policy in Exhibit 25?

22     A.   Probably in the approval, not the drafting.

23     Q.   Okay.  Do you agree that -- or let me back

24  up.  The purpose statement indicates that consistent

25  with its duty to maintain a workplace that is free of

1   recognized hazards, St. Elizabeth Healthcare requires

2   that all associates be fully vaccinated for COVID-19

3   except for those associates who have been granted an

4   exception to the vaccine requirement or those

5   associates for whom the COVID-19 vaccination must be

6   delayed due to clinical precautions and stipulations,

7   correct?

8       A.   Correct.

9       Q.   You agree with me then, in fact, in light

10  of the breakthrough infections, that it would not, in

11  fact, render the hospital completely free of

12  recognized hazards, right?

13      A.   Correct.

14      Q.   So that statement in this policy was

15  inaccurate?

16      A.   I disagree.  We can't eliminate 100 percent

17  of all hazards.  We do our best to eliminate hazards.

18  This is part of that process.

19      Q.   Well, it says it's a duty to provide and

20  maintain.  It doesn't say a duty to attempt to obtain

21  or maintain.  It says provide and maintain, right?

22      A.   Okay.

23      Q.   You acknowledge there's no way, given

24  COVID-19 and Delta and breakthrough, to eliminate the

25  risk, correct?

Page 125

1        A.    A hundred percent, no.

2        Q.    Right.  This policy applied to all

3    associates, volunteers, contract staff, physicians,

4    providers, trainees, and students regardless of

5    clerical responsibility and patient contact, correct?

6        A.    Correct.

7        Q.    If you look at procedures, there is some

8    procedures on this policy -- by the way, let me back

9    up just a little bit.  The policy does not apply to

10   patients or visitors on page 1, correct?

11       A.    Correct.

12       Q.    Number 1, the procedures were all

13   associates are required to be fully vaccinated for

14   COVID-19 except for those associates who have been

15   granted a medical exemption or an exemption for

16   sincerely-held religious beliefs or those associates

17   for whom COVID-19 vaccination must be delayed as

18   recommended by the CDC, due to clinical precautions

19   and considerations, correct?

20       A.    Correct.

21       Q.    And so there was, as you indicated in your

22   e-mail, possible exemptions for medical or religious

23   reasons, correct?

24       A.    Correct.

25       Q.    There was also an exception for associates

Page 126

1    who exclusively provide telehealth, right?  It's No.

2    2.

3        A.    Yes.

4        Q.    Number 4, there was no requirement for

5    boosters, correct?

6        A.    I think at that time, correct.

7        Q.    Was there ever a requirement for boosters?

8        A.    I'm trying to remember.  I got mine, but I

9    can't remember if they ever put that in policy or

10   not.

11       Q.    It may have been recommended, but not

12   required.  You're not sure?

13       A.    I'm not sure.

14       Q.    Okay.  Number 5, failure to comply with the

15   required COVID-19 vaccination policy without an

16   accepted exemption may result in termination for

17   employed associates, and exclusion from St. Elizabeth

18   Healthcare facilities for non-employed associates,

19   including physicians and providers, students,

20   contractors and traveling staff in patient care

21   settings, correct?

22       A.    Correct.

23       Q.    And so it wasn't you only had to request an

24   exemption, it had to be accepted, correct --

25       A.    Correct.  Yes.

Page 127

1        Q.   There's a discussion about requests for
2   vaccine exemptions that start on page 3.  And I just
3   want to make sure we're on the same page.  Number 1
4   says, St. Elizabeth Healthcare allows for exemptions
5   for associates with recognized medical conditions for
6   vaccines are contraindicated as a reasonable
7   accommodation under the Americans with Disabilities
8   Act or for religious beliefs, observances, or
9   practices established under Title VII of the Civil
10   Rights Act of 1964, correct?
11        A.   Correct.
12        Q.   You also indicate, though, that
13   St. Elizabeth Healthcare will not provide any
14   exemption to any associate for whom it is not legally
15   required under the ADA or the Title VII of the Civil
16   Rights Act of 1964, correct?
17        A.   Correct.
18        Q.   And so there's a recognition in this policy
19   that there -- not necessarily you have to grant an
20   exemption, but if you've got a medical or a
21   sincerely-held religious belief, you can at least
22   request one, right?
23        A.   Correct.
24        Q.   And the standard that's outlined by
25   St. Elizabeth Healthcare in that -- we see that that

Page 128

1    follows.  It says that St. Elizabeth Healthcare will

2    provide an exemption from the vaccination requirement

3    and engage in interactive process to determine if a

4    reasonable accommodation can be provided so long as

5    it does not create an undue hardship for

6    St. Elizabeth Healthcare and/or does not pose a

7    direct threat to the health or safety of others in

8    the workplace and/or the associate.  That's the

9    standard, right?

10        A.    Correct.

11        Q.    Undue hardship, I'm curious, Doctor, if you

12   look, were there any discussions about what

13   circumstances, if any, would constitute undue

14   hardship for St. Elizabeth Healthcare?

15        A.    I don't remember those particular

16   discussions.

17        Q.    Would the safety or efficacy of the vaccine

18   weigh in on undue hardship?

19        A.    You're going to have to explain.

20        Q.    Sure.  This policy, No. 1, indicates that

21   St. Elizabeth Healthcare is going to grant an

22   exemption for medical reasons or sincerely-held

23   religious reasons unless it's undue hardship for

24   St. Elizabeth Healthcare, correct?

25        A.    Yes.

1        Q.    And my question to you is:  Does the

2    vaccines' effectiveness or safety have anything to do

3    with the analysis of whether or not it's an undue

4    hardship to grant an exemption?

5        A.    No.

6        Q.    Okay.  So if the vaccine is not effective

7    or is highly effective, that doesn't change the

8    hardship analysis?

9        A.    At this stage, no.

10       Q.    What do you mean at this stage?

11       A.    Well, I mean, if we're putting this out and

12   saying -- I don't know.  I may be going down the

13   wrong direction here, but I think if we were going to

14   evaluate it, it was a hardship for -- the vaccine

15   status at that stage was what the vaccine status was.

16   We were requiring it.

17       Q.    Okay.

18       A.    So you're asking -- well, if it's not

19   effective as this, then I don't know.

20       Q.    Yeah.  Does the effectiveness of the

21   vaccine weigh into the hardship analysis from SEP's

22   perspective?

23       A.    No.

24       Q.    So if the vaccine is not effective at all,

25   that doesn't change the analysis on whether or not

1    you're going to grant an exemption?

2        A.   The vaccine was effective.

3        Q.   But that wasn't the question.  I'm not

4    asking whether it was effective and I'm not asking

5    what determination SEP made or you made about its

6    effectiveness.  I'm asking whether or not the

7    effectiveness of the vaccine weighed in on the

8    hardship to the organization in granting an

9    exemption.

10       A.   And are you talking about this specific

11   situation?

12       Q.   For these exemptions, yes, sir.

13       A.   There is no evidence that the vaccine was

14   not effective.

15       Q.   Well, we're going to talk about that in a

16   minute, but that wasn't my question.  Does

17   the assumption -- was the assumption that the vaccine

18   was effective; is that fair?

19       A.   Yes.

20       Q.   And that assumption drove, in part, the

21   analysis of whether or not there's a hardship to

22   providing the exemption, correct?

23       A.   I'm still getting lost on what you're

24   asking.

25       Q.   Let me explain it to you a little better.

1    You're assuming in issuing the mandate in the first

2    place that the vaccine is effective and safe,

3    correct?

4        A.   I hate to use the word assuming, because

5    there was medical evidence that it was effective.

6        Q.   The determination had been made that the

7    vaccines were safe and effective, correct?

8        A.   Correct.

9        Q.   And that drove why the mandate was put in

10   place in the first place, correct?

11       A.   That, and the increasing incident and

12   severity that we were seeing of the illness.

13       Q.   Right.  And so if the vaccine were not

14   effective, there would be no need for the mandate in

15   the first place, correct?

16       A.   Correct.

17       Q.   And so there would be no hardship granting

18   somebody an exemption if the vaccine were, in fact,

19   ineffective, right?

20       A.   I have a hard time jumping to your

21   question.  I'm totally lost there.  I apologize.  I'm

22   not meaning to be bad.

23       Q.   Well, let me --

24            MR. BIRKENHAUER:  Objection as to form as

25       to the whole line of questioning.  You know,

Page 132

1        you can answer to the best you think, Bob.

2        A.    I still don't really understand the

3    question.

4        Q.    So let me back up.  There is a discussion

5    in this document about exemptions being granted

6    unless they create an undue hardship to the

7    organization.

8        A.    Correct.

9        Q.    What was being evaluated to determine the

10   hardship to the organization?

11       A.    Could we provide the care we needed to

12   patients.

13       Q.    Okay.  By granting the exemption to a

14   particular employee?

15       A.    Yeah.  If we would have to make -- what's

16   the word I'm looking for -- accommodations, if it

17   created a hardship.

18       Q.    Did the number of people that were going to

19   request the accommodations play into the analysis?

20       A.    We really didn't know how many were going

21   to request.

22       Q.    I agree with you.  We're going to talk

23   about process in a minute.  At the outset, you did

24   not know how many were going to request?

25       A.    No.

1      Q.   And so if the entire then existing

2  unvaccinated workforce were going to request an

3  exemption, that would present a different problem

4  than a small subset of employees; would you agree?

5      A.   Yes.

6      Q.   And it would affect whether or not you

7  could provide care to patients, correct?

8      A.   Yes.

9      Q.   Let me ask:  If data had come out --

10  because we talked about data developing -- that the

11  existing vaccines were either unsafe -- well, if

12  they're unsafe and they're injuring your workforce,

13  that's going to impact your ability to provide

14  patient care, correct?

15      A.   Absolutely.

16      Q.   And similarly, if data comes out that the

17  vaccines are ineffective, that they don't work,

18  that's going to also have a bearing on this mandate

19  and the exemption process, right?

20      A.   Exactly, yes.

21      Q.   Okay.  Number 2, the process was the

22  exclusion form had to be filled out, right?

23      A.   Are we referring to No. 2, the paragraph?

24      Q.   Yeah, paragraph 2.  Employed associates and

25  volunteers who wish to exempt -- who wish to be

Page 134

1    exempted for medical or sincerely-held religious

2    reasons must complete an appropriate exclusion and

3    return it to employee health for review.

4        A.   Yes.

5        Q.   Let me ask, Dr. Pritchard, who was

6    evaluating these exemption requests?

7        A.   We had a group of people that were

8    evaluating.  It was run by employee health with input

9    form HR, risk, physicians.  I don't know who all was

10   on that committee.  It was done in a totally separate

11   almost blinded process.

12       Q.   Okay.  So there was a group of people that

13   were assigned to a committee to evaluate the

14   exemption requests that came in from either a medical

15   or religious perspective?

16       A.   Yes.

17       Q.   Were they reporting to you or Mr. Colvin

18   the number of requests and whether or not they were

19   granted or denied?

20       A.   I think we were seeing numbers of requests

21   and who was -- not who, but how many were denied

22   or --

23       Q.   Just the numbers --

24       A.   Yes.

25       Q.   -- or maybe the percentages, I don't know.

Page 135

1    Maybe both?

2        A.    Yeah.  I can't remember if it was actually

3    numbers or percentages, but it probably was numbers.

4        Q.    And so in that sense, there was general

5    tracking being reported to senior management, but I

6    take it -- you indicated it was blinded.  The

7    individual circumstances, that was being run by this

8    committee --

9        A.    Yes.

10        Q.    -- along with confidential process?

11        A.    Yes.

12        Q.    All right.  Do you know whether or not the

13    processing of these exemption requests were being

14    held until the deadline?

15        A.    No.  They were, I think, trying to work

16    through them as they came.

17        Q.    Well, how would you know how many people

18    had request -- we talked about that, you know, if --

19    because I think your e-mail indicated 65 percent of

20    the associates had been vaccinated.  So there was

21    some awareness when you put out your October 5th

22    e-mail about what your vaccination rate was within

23    the system at the hospital, right?

24        A.    Yes.

25        Q.    And so you knew you had another

1    35 percent -- maybe not quite 35 with the exemptions,

2    but you knew you were looking at getting the other

3    35 percent, right?

4         A.   Yes.

5         Q.   We also talked about the fact that if the

6    entirety of those 35 percent were request exemptions,

7    that would be a problem to provide care to patients,

8    correct?

9         A.   I would think so, yes.

10        Q.   So as the requests were coming in, what

11   you're indicating is that they were being processed

12   and either granted or denied as they came in.  They

13   weren't held to see what the total number was?

14        A.   No.  I believe they would be done as they

15   came in.

16        Q.   Okay.  And those numbers were being

17   reported to you and Mr. Colvin?

18        A.   Oh, I don't think I got a direct report.

19   It would often come up in our administrative council

20   meeting, how many they -- they would ask the head of

21   HR if she knew how many.

22        Q.   Was there any discussion about vaccine

23   safety or efficacy with the people that were

24   evaluating those requests?

25        A.   I don't remember a separate conversation.

1      Q.   Okay.  Were there -- was there any

2  directives given by management to that committee in

3  terms of the standards that they would employ to

4  evaluate those requests?

5      A.   Did I know?

6      Q.   Did you participate in any of those

7  conversations --

8      A.   No.  But I am sure they looked at the --

9  what was the requirement under law.

10     Q.   Okay.  If you look at No. 3, there's

11 another discussion about exemptions not being

12 guaranteed.  I'm down at the very bottom of that.

13     A.   Okay.

14     Q.   There's also a discussion about an

15 interactive process, correct?

16     A.   Are we going up a few lines?

17     Q.   Yeah.  I'm in paragraph 3.  Let's start at

18 the top of paragraph 3.

19     A.   Okay.

20     Q.   It says, after receipt of an employed

21 associate's request for an exemption, St. Elizabeth

22 Healthcare will review each request for a medical or

23 sincerely-held religious exemption and will make a

24 determination expeditiously and in a fair,

25 non-discriminatory manner on a case-by-case basis,

1   right?

2       A.   Yes.

3       Q.   St. Elizabeth Healthcare will engage in an

4   interactive process with the associate to clarify the

5   nature of the request.  Exemptions are not

6   guaranteed.  Reasonable accommodations will be

7   granted where they do not create an undue burden on

8   St. Elizabeth Healthcare's operation.  So we're back

9   to undue burden, correct?

10      A.   Yes.

11      Q.   And that's the standard, wasn't it, right,

12  whether or not it was undue burden?

13      A.   If they get the exception or not?

14      Q.   Right.

15      A.   I would have to believe that it came into

16  account.

17      Q.   Well, it says so right here, right?

18      A.   Well, yeah.  That's why I say I have to

19  believe it came into account.  I don't know if

20  individually it ever happened with anybody, but, yes,

21  that was the part of the policy.

22      Q.   Are you aware of any -- well, let me back

23  up.  Page 5 of this policy there's a non-retaliation

24  provision, correct?

25      A.   Yes.

Page 139

1      Q.   And it says:  St. Elizabeth Healthcare

2  prohibits any form of discipline, intimidation, or

3  retaliation for reporting a violation of this policy

4  or any other health or safety concern, correct?

5      A.   Correct.

6      Q.   Was that true?

7      A.   Yes.

8      Q.   And that was something you were bound to?

9      A.   Yes.

10         MR. BIRKENHAUER:  And, Chris, whenever

11     you get to a good spot --

12         MR. WIEST:  Now is as good as any.

13         VIDEO TECHNICIAN:  We are off the record,

14     11:58 AM.

15              (OFF THE RECORD)

16         VIDEO TECHNICIAN:  We are back on the

17     record.  The time is 1:01.

18  BY MR. WIEST:

19     Q.   Dr. Pritchard, we talked about this

20  vaccination mandate before we broke at Exhibits 24

21  and 25, the announcement of 24 and the policy at 25.

22  Did anyone do any research about either natural

23  immunity or risk groups prior to the enactment of the

24  mandate?

25     A.   Are you asking at St. Elizabeth?

Page 140

1        Q.    Yes, sir.  At either SEP or St. Elizabeth.

2        A.    No.

3        Q.    If we look at Exhibit 25, and it talks

4   about recognized hazards, is the recognized hazard

5   someone that's infected with COVID-19?  Is that the

6   hazard that it's referring to?

7        A.    We're back to the first line of the purpose

8   statement?

9        Q.    Yes, sir. yes.

10       A.    I think it's a very broad statement, but in

11  this situation -- was the question for -- restate it.

12  I'm sorry.

13       Q.    This policy talks about being free of

14  recognized hazards and then the COVID-19 vaccination

15  requirement?

16       A.    Yeah.

17       Q.    And I'm wondering if this policy, talking

18  about recognized hazards, is referring to someone

19  that's infected with COVID-19?

20       A.    I would think so, yes, and also those that

21  are unvaccinated as potentially being a hazard.

22       Q.    Okay.  Well, let me ask:  If the CDC had

23  told you at the end of July that the viral load -- by

24  the way, let me back up.  What's your understanding

25  of what viral load is?

Page 141

1    A.   It's a measurement of how much virus is

2  found in the body.

3    Q.   As a consequence of that, it also has a

4  bearing on transmissibility of the virus, correct?

5    A.   I would think so.  I'm sure it's not the

6  only aspect of it.

7    Q.   And so if the CDC is saying that both the

8  vaccinated and unvaccinated have a similar viral load

9  at the end of July of 2021, wouldn't the hazard be

10  the same for both the vaccinated and unvaccinated in

11  terms of COVID-19 transmission?

12    A.   Well, I think that's why we're also doing

13  masking, so I would say potentially.

14    Q.   All right.  What followed, at least in

15  terms of the chain of events that we're here to talk

16  about today, was --

17         MR. WIEST:  We'll mark this as 26.

18         (Plaintiff's Exhibit 26 was marked for

19  identification.)

20    Q.   In response to the policy announcement on

21  August 5th, the following Monday, August 9th,

22  Dr. DiChiara asked for a meeting with both you and

23  Mr. Colvin, correct?

24    A.   Correct.

25    Q.   She indicates that anytime you can meet

Page 142

1    with her is fine because she understands that both

2    you and Mr. Colvin are busy and she's hoping then the

3    next week there can be a time to meet, correct?

4        A.   Correct.

5        Q.   And if you look at the back of this exhibit

6    e-mail, it's got a separate sticker.  You can even

7    call it 26A if you wanted.  Kelley Jump responds with

8    a time for available meetings, correct?

9        A.   Yes.

10       Q.   Was Ms. Jump -- she was your assistant,

11   correct?

12       A.   Correct.

13       Q.   And I take it she provided these times at

14   your direction; would that be fair?

15       A.   Yeah.  I just told her to find times and

16   check with Dr. DiChiara.

17       Q.   Okay.  Did you and Mr. Colvin have a

18   discussion about whether or not you were going to

19   meet with her?

20       A.   I'm guessing I stuck my head in his office

21   and said, hey, do you want to have this meeting.

22       Q.   Okay.  Dr. DiChiara, you knew, was a

23   gastroenterologist, right --

24       A.   Yes.

25       Q.   She says that in the e-mail, correct?  Did

Page 143

1  you know what she wanted to meet about other than the

2  concerns regarding the policy?

3      A.    Correct.  That's it.

4      Q.    Okay.  Did you have any thoughts about

5  meeting with a gastro doc regarding this policy, just

6  as you?

7      A.    No.

8      Q.    Okay.  I mean, how frequently would you or

9  Mr. Colvin meet with individual physicians?

10      A.    Me, probably fairly often.  Garren,

11  probably less often.

12      Q.    Or jointly; how about jointly?

13      A.    We do that occasionally.

14      Q.    And I think your testimony was you did not

15  have an inkling about what she wanted to talk about

16  in advance of the meeting, correct?

17      A.    COVID policy.

18      Q.    Right.  Okay.  The vaccine policy in

19  particular?

20      A.    Yes.

21      Q.    But not what about that policy, if

22  anything?

23      A.    She had not provided us any information.

24      Q.    Okay.  And that meeting ended up occurring,

25  correct?

Page 144

1       A.   Yes.

2       Q.   What do you recall about that meeting?

3       A.   Well, you know, we had an hour-long

4  discussion regarding a document she provided us just

5  before the meeting started with some research she had

6  pulled together regarding the COVID vaccine.

7       Q.   And what was the response by you and

8  Mr. Colvin, as best you remember?

9       A.   I remember giving her an open ear and

10 listening and telling her if things are evolving,

11 we'll continue to assess things as they go forward.

12      Q.   I will represent to you that she recorded

13 that meeting.  Were you aware of that?

14      A.   Not until just a few weeks ago.

15      Q.   Okay.  Did you have a chance to listen to

16 that recording?

17      A.   I did not.

18      Q.   Was there any policy prohibition that her

19 recording that for her own use would be a problem,

20 from your perspective?

21      A.   I don't know that we -- I don't know if we

22 had a policy on that or not.  I just think it's

23 interesting that she didn't say she was going to

24 record it.

25      Q.   I mean, you would be fine with somebody

Page 145

1    recording or not recording a meeting.  You'd say the

2    same things regardless, right?

3         A.   I sure hope I would.

4         Q.   Okay.  Did she raise any issue about the

5    vaccine not preventing transmission in the course of

6    that meeting?

7         A.   I think she presented it as the way you

8    said.  But when I later reviewed the document, it did

9    not say it did not prevent transmission.  It said it

10   reduced transmission to about 47 percent, if I

11   remember correctly.

12        Q.   How about did she raise natural immunity

13   concerns?

14        A.   She did.

15        Q.   And there was no allowance, at least in

16   terms of the COVID-19 vaccine policy we looked at,

17   Exhibit 25, for natural immunity and prior infection,

18   correct?

19        A.   There was not.

20        Q.   Why not?

21        A.   Because there was no medical evidence at

22   the time that substantiated that natural immunity was

23   any more effective than -- or was more effective than

24   immunity due to a vaccination.

25        Q.   Okay.  Was there any research you're aware

1   of that indicated vaccinated immunity was more

2   effective than natural?

3        A.   I think that was out in involving science,

4   but I think the CDC was still recommending vaccine.

5        Q.   So from SEP's perspective and SEH's

6   perspective, would you agree that the intent, or at

7   least the best efforts, were to follow evolving CDC

8   guidance?

9        A.   Yes.

10       Q.   And following that meeting, or maybe it was

11   right before that meeting, Dr. DiChiara communicated

12   to you a letter or some correspondence that indicated

13   kind of her concerns; would you agree?  You indicated

14   there was a study that she provided.

15       A.   There was a letter she provided that cited

16   studies.

17       Q.   Okay.  Let's go look at that.

18            MR. WIEST:  We'll mark this as 27.

19            (Plaintiff's Exhibit 27 was marked for

20   identification.)

21       Q.   And I want to start at the bottom of this

22   exchange where she sent to you and to Mr. Colvin,

23   copy to Kelley Jump and Michelle Jones, a copy of the

24   letter.

25       A.   I'm sorry.  Where are we?

Page 147

1        Q.    Yes, sir.  Right at the bottom of this

2   first page, Exhibit 27.

3        A.    Okay.  Yes.

4        Q.    And she asks that it be forwarded to the

5   St. Elizabeth Healthcare board members, correct?

6        A.    She did, yes.

7        Q.    By the way, did that occur?

8        A.    I sent it to the SEP board members.  I did

9   not have responsibility or authority to send it to

10   the SEH board.

11        Q.    Okay.  And what's attached is a letter

12   to -- if you look, it starts at Defendants 2112.

13        A.    Okay.

14        Q.    It opens with Dear Mr. Garren Colvin,

15   Dr. Robert Pritchard, and the Board of St. Elizabeth

16   Healthcare.  And she says:  This letter is an appeal

17   for you, representing St. Elizabeth Healthcare and

18   St. Elizabeth Physicians, to reconsider the recent

19   COVID-19 vaccine mandate imposed on all your

20   employees to complete this new COVID-19 vaccine

21   series by October 1, 2021.  She says:  While there

22   are many approaches one can discuss on this matter, I

23   wanted to focus my appeal by grounding it in

24   scientific, medical information, right?  That's how

25   she begins?

Page 148

1        A.    That's how she begins, yes.

2        Q.    Let me ask:  Was there any issue, from your

3    perspective, in drafting this letter and sending it

4    to you and Mr. Colvin in terms of Dr. DiChiara's

5    employment agreement?

6        A.    No.

7        Q.    There's no breach of the agreement by her

8    sending this letter, correct?

9        A.    No.

10       Q.    This letter would be consistent with the

11   open door policy we looked at before, correct?

12       A.    Yes.

13       Q.    And she's got some scientific concerns that

14   I want to talk about in just a minute.  I just want

15   to outline I'm not going to go through this entire

16   document or the citations, but she begins and she

17   says this vaccine is not due at St. Elizabeth.  And

18   I'm on the outline on 2113.  Tell me when you're

19   there.

20       A.    2113?  I'm there.

21       Q.    Yes, 2113.  And by the way, I'm not digging

22   into all the details of the citations with you.  I'm

23   just going to kind of cover the overview and then

24   we're going to talk about it a little.

25       A.    I truly appreciate that.

```
 1       Q.    Okay.   Number 1:  This vaccine does not do
 2  what St. Elizabeth Healthcare/Physicians thinks or
 3  claims it does.  It does not prevent the transmission
 4  of SARS-CoV-2 virus.  This is especially true with
 5  that Delta variant, right?
 6       A.    Are you asking is that what she --
 7       Q.    That's what she stated?
 8       A.    That's what she stated.
 9       Q.    And that's what the CDC told you the end of
10  July 2021, correct?
11       A.    It did not say it does not prevent
12  transmission.  It said there was still transmission.
13       Q.    Right.  There's still transmission,
14  correct?
15       A.    Yes.
16       Q.    That's what the CDC said?
17       A.    Yeah.
18       Q.    Okay.  And, in fact, what the CDC said was
19  the viral loads were the same between --
20       A.    Correct.
21       Q.    -- vaccinated and unvaccinated?
22       A.    Correct.
23       Q.    And then she says:  Natural immunity is
24  equal, if not superior to vaccination, correct?
25       A.    That's what she states, yes.
```

1      Q.   I think you just told me from the position

2  of you and the organization, the science was still

3  out on that?

4      A.   Correct.

5      Q.   Okay.  She indicates that she thought that

6  there were safety concerns concerning the

7  vaccination, correct?

8      A.   Yes.

9      Q.   And No. 4 indicates widespread vaccination

10 using a non-sterilizing vaccine, versus targeted

11 population, during a widespread pandemic may be

12 contributing to the development of variants.  Did you

13 have any position on that?

14     A.   No.  I mean, viruses mutate.

15     Q.   Right.

16     A.   Variants develop in the presence of a

17 vaccine or not.

18     Q.   Do you know whether or not the vaccine and

19 it being injected into part but not all the

20 population aided in the development of variants or

21 not?

22     A.   No.

23     Q.   Science out on that, too?

24     A.   I just don't know the answer to that.

25     Q.   Fair enough.  She indicates in No. 5 there

1    are promising options for inexpensive, easily

2    accessible treatment that can, and should be,

3    initiated in the outpatient, correct?

4        A.    That's what she states.

5        Q.    And she states there was no long-term, i.e.

6    one to three years, of information on safety

7    outcomes, correct?

8        A.    Correct.

9        Q.    That's a truthful statement, correct?

10       A.    They had not been out that long.  So, no,

11   there were not three years of history to look back on

12   it.

13       Q.    Right.  I think that's her point, correct?

14       A.    I would think so, yes.

15       Q.    Okay.  And then she's got a request to

16   change policies that she outlines as well in this

17   document, correct?

18       A.    Correct.

19       Q.    You sent this document on to some folks at

20   the top of Exhibit 27.  Back to the first page.

21       A.    Yes.

22       Q.    And I think we talked about who they were

23   in advance of the discussion about this document, but

24   one of whom was Dr. Doris Savani, right?

25       A.    Yes.

1       Q.    She's an infectious disease doc at --

2       A.    Yes.

3       Q.    -- SEP, right?

4       A.    She is now.  She wasn't at that time.

5       Q.    What was she then?

6       A.    She was independent.  She was employed with

7  her own group.

8       Q.    Okay.  So she was not with SEP?

9       A.    She was not with SEP.

10      Q.    Okay.  Did she have a SEP e-mail?

11      A.    No.

12      Q.    Okay.  So you -- okay.  How about

13  Dr. Peterson, Chad Peterson?  He was the -- he was an

14  infectious disease doc at the time at SEP?

15      A.    Yes.  He was Doris Savani's partner, and he

16  was also our chair of our infectious disease

17  committee.

18      Q.    Okay.  And I am never going to get this

19  next doctor's name correct.

20      A.    Would you like me to say it for you?

21      Q.    I would love for you to say it.

22      A.    Cha Mandapakala.

23      Q.    Okay.  And I understand Dr. Mandapakala was

24  a pulmonologist, correct?

25      A.    Correct.

1        Q.   Which, for the benefit of the court and the

2   jury, that is effectively a doctor of the lungs and

3   respiratory system, correct?

4        A.   Yeah.  He's a pulmonologist also certified

5   in critical care medicine, also runs ICUs, works in

6   ICUs specifically, not just with lung patients.

7        Q.   And so you sent this to the three of them.

8   And you said, I truly hate to ask this and feel free

9   to say no.  Why did you truly hate to ask this?

10       A.   I was asking them to read a 27-page letter

11   and look at the research and weigh in.  I was asking

12   them to do a lot of work.

13       Q.   Okay.  And that's why you indicated they

14   should feel free to say no?

15       A.   Yes, sir.

16       Q.   You indicate:  I feel like we should

17   respond and be honest.  You all would be much better

18   at that than I would.  Right?

19       A.   Correct.

20       Q.   And that's because your background was

21   family care.  They're now dealing with viruses and

22   lung diseases, correct?

23       A.   Yeah.  I mean, I was an administrative

24   leader.  I had not practiced medicine in 10, 15

25   years.

Page 154

1    Q.   Okay.  If you do this, we could discuss how

2   to best present to her and if you even want your name

3   attached.  Correct?

4    A.   Correct.

5    Q.   Why did you want to possibly not include

6   folks' names?

7    A.   Many of the -- doctors hate conflict,

8   typically.

9    Q.   Okay.

10    A.   And often they don't want to get into an

11   argument with somebody.  So if they would research

12   the material and present it to me, I would be glad to

13   relay it on.

14    Q.   Okay.  You indicated Dr. Savani was outside

15   of SEP, correct?

16    A.   She and Dr. Peterson both.

17    Q.   Okay.  Was it a violation of SEP's

18   confidentiality policy to share these internal

19   documents with them?

20    A.   I was doing it on behalf of our healthcare.

21   They were physicians on the medical staff running a

22   program for us.  So, no, I don't believe so.

23    Q.   Okay.  Said another way, they had a

24   business reason to receive information?

25    A.   Absolutely.

1        Q.   And if it's a business reason to do it,

2   then it's okay, correct?

3        A.   I believe so.

4        Q.   Okay.

5             (Plaintiff's Exhibit 28 was marked for

6   identification.)

7        Q.   The day after the meeting, it looks like

8   you sent Dr. DiChiara's letter on to the SEP

9   executive team and a number of other people?

10       A.   Yes.

11       Q.   Who were the people that you sent that to?

12       A.   You can see it listed.  It's mostly the SEP

13   administrative team.  There was the SEP board.  It

14   also included, it looks like, Jake Bast's assistant.

15   It included Tom Colvin, who was a member of the

16   board, who's a community member of the board.

17       Q.   SEP board or the SEH board?

18       A.   SEP board.

19       Q.   Okay.  Is he related to Garren Colvin?

20       A.   He is not.

21       Q.   Okay.  And was there any response that you

22   had from any of the people on this list to this

23   e-mail?

24       A.   Not necessarily that I remember.  At least

25   I didn't see any -- in our discovery, I didn't see

1    any e-mails they sent back.  I'm sure we discussed it

2    at our SEP board meeting.

3        Q.   Okay.  And the decision, I take it, was

4    that there was going to be no change in the approach,

5    correct?

6        A.   Correct.

7             (Plaintiff's Exhibit 29 was marked for

8    identification.)

9        Q.   I'm giving you Exhibit 29.  This was an

10   e-mail back that you received from Dr. DiChiara on

11   August 17, 2021, indicating, one, she's thanking you

12   for sharing it with the SEP board.  And she says:  I

13   want to take a stance of scientific humility.  So if

14   any of the people you ask to comment on things have

15   other research to cite, I would welcome to hear their

16   comments and would love to see the data being

17   referenced.  It's hard to keep up with everything.

18   No problem with that, right?

19       A.   No.

20       Q.   And, in fact, as a medical institution, you

21   would agree that the scientific process involves

22   things that evolve, right?

23       A.   Especially in this situation.

24       Q.   Especially in this situation.  In the

25   medical field in general, right?  I mean, there's

Page 157

1    things that evolve, correct?

2        A.    Yes.

3        Q.    That's why people do research and peer

4    review studies and everything else, right?

5        A.    Correct.

6        Q.    So far, nothing we've seen indicates any

7    violation of policy, from your perspective, in terms

8    of Dr. DiChiara, correct?

9        A.    No -- or correct.

10            (Plaintiff's Exhibit 30 was marked for

11    identification.)

12        Q.    This is Exhibit 30.  This is

13    Dr. Mandapakala's response to Amy DiChiara's 27-page

14    letter, correct?

15        A.    Yes.

16        Q.    By the way, there's some other

17    communications that follow this.  This is actually a

18    chain, and I kind of wanted to move back the chain.

19    We'll move from oldest to youngest.  It looks like

20    Chad Peterson sent an e-mail to you at the -- starts

21    at 2101 and goes into 2102.  And he says I'm assuming

22    this came from an anti-vaccine website.  Do you see

23    that?

24        A.    Yes.

25        Q.    Did you take that at face value?  Did you

Page 158

1    confirm it or not?

2        A.    I did not confirm it.

3        Q.    Did it matter to you?

4        A.    I'm sure it mattered, but I did take it at

5    face value.

6        Q.    Okay.  And then Dr. Mandapakala lists some

7    studies that he was relying on in part.  There's a

8    couple of studies he cites on August 18th in

9    response, correct?

10       A.    Yes.

11       Q.    At the top you indicate:  I won't share

12   with Amy without telling you, on August 18th,

13   correct?

14       A.    Correct.

15       Q.    Why wouldn't you share with Amy without

16   telling him?

17       A.    I'm just trying to be kind.  He sends me an

18   e-mail.  I'm not going to share it without his

19   permission.

20       Q.    Okay.  Let me back up for a minute.  Did

21   you think about maybe sending the studies to

22   Dr. DiChiara, notwithstanding who they came from?

23       A.    No.

24       Q.    Why not?

25       A.    I don't have a particular answer on that.

1    Q.   You knew from Exhibit 29 that she said if

2   you got anything that shows I'm wrong, let me know,

3   right?

4    A.   Yes.

5    Q.   I mean, there's a couple of answers to that

6   that come to mind and I just want to know, you know,

7   were there other things you were dealing with?  Were

8   you busy?  This wasn't high priority?  I'm just

9   wondering, you know --

10    A.   We were dealing with a lot of things, but I

11   can't tell you any particular reason why I didn't

12   send it other than I didn't send it.

13    Q.   Did you discuss it at all with Mr. Colvin?

14    A.   I do not remember doing that.

15    Q.   Okay.  Did you discuss responding to Amy's

16   letter with Mr. Colvin?

17    A.   I don't remember.

18    Q.   Okay.

19         (Plaintiff's Exhibit 31 was marked for

20   identification.)

21    Q.   Exhibit 31.  At the top is Doris Savani's

22   response, correct?

23    A.   Okay.

24    Q.   And she says:  My knee jerk reaction is not

25   to give her a written rebuttal point by point as she

Page 160

1    may be expecting exactly that and you would be

2    setting up a trail of evidence to be disputed at a

3    later date.  Do you see that?

4         A.   Yes.

5         Q.   Did it concern you at all that Dr. Savani

6    was concerned about creating an evidence trail that

7    could be subject to dispute?

8         A.   I read that as different than you.

9         Q.   Okay.  How did you read it?

10        A.   I saw it as medical evidence in doing a tat

11   for tat back and forth.  From what I remember, that's

12   how I took it.

13        Q.   Okay.  Was a response ever drafted back to

14   Dr. DiChiara?

15        A.   I responded to her in e-mail when she asked

16   me about my responses.

17        Q.   Let me ask if that's what we're about to

18   see.

19             (Plaintiff's Exhibit 32 was marked for

20   identification.)

21        Q.   I'm handing you Exhibit 32.  At the bottom

22   is an e-mail from her to you on Thursday, August 26,

23   2021, asking about follow-up, correct?

24        A.   Yes.

25        Q.   One of the things she asked about is

Page 161

1    allowing exemptions for vaccinations other

2    institutions are doing, correct?  Let me look at the

3    bullet point on the bottom.  I'll read the whole

4    thing to you.

5          A.    Okay.

6          Q.    Seeing that there is good scientific

7    evidence for prior infection of COVID providing broad

8    and long-lasting immunity, would you consider

9    allowing exemptions for vaccination as other

10   institutions are doing.  And I think she's referring

11   to natural immunity, right?

12         A.    I'm going to have to read it, but if that's

13   the bullet point -- because we were looking at

14   exemptions, which she would known through our policy.

15         Q.    Okay.

16         A.    Yeah, she was referring to natural

17   immunity.

18         Q.    She asks -- at the bottom, there's this

19   bullet point on the next page.  2320 is the Bates

20   number on the bottom right.  And there's a couple of

21   bullet points, but I want to focus on the bottom dot

22   and then there's an open circle.  It says:  If you do

23   not intend to change this mandate, will you at least

24   be sending updated communication vaccine, and I think

25   she meant does not provide strong protection against

Page 162

1   unintentionally carrying the virus to work and

2   spreading to patients and peers, which was -- as was

3   stated in letter that was sent out.  Do you see that?

4        A.   Yes.

5        Q.   I know she had discussed in the meeting

6   with you and Mr. Colvin that there was inaccuracy in

7   the e-mail, at least from her perspective, because

8   the vaccine was not preventing spread and she was

9   asking that that be communicated to people.  Is there

10  a problem with that, from your perspective?

11       A.   Well, that was not the belief we had.  We

12  thought it was preventing transmission.

13       Q.   Okay.  Even though the CDC indicated that

14  the viral loads were the same?

15       A.   Yes.

16       Q.   Look at Exhibit 30 with me.

17       A.   Which number?

18       Q.   Exhibit 30.  This was the e-mail from

19  Dr. Mandapakala.

20       A.   Okay.

21       Q.   He says -- and I'm looking at No. 2, and he

22  gives you a site.  He says, studies show that the

23  vaccinated, even if infected, transmit less viral

24  load for few days.  That's what he told you, right?

25       A.   Correct.

Page 163

1          Q.   Do you have any reason to dispute what he

2    told you?

3          A.   No.

4          Q.   He does not say that vaccination prevents

5    the spread, does he, anywhere in here?

6          A.   No.

7          Q.   Do you think Dr. Mandapakala is someone

8    that you can rely on and trust?

9          A.   Yes.

10         Q.   Particularly with respect to COVID-19

11   issues?

12         A.   Yes.

13         Q.   Do you know who he's referring to,

14   comparative-wise, when he says studies show that

15   vaccinated, even if infected, transmit less viral

16   load and for fewer days.  Do you know who he's

17   comparing that to?

18         A.   I'm assuming he's referring to a study

19   there.  And I've not read that study so I can't tell

20   you.

21         Q.   Did you read any of the studies that he

22   cited?

23         A.   I did not.

24         Q.   Let me ask.  Eric Deters filed suit against

25   SEP and St. E at first I think in state court on

Page 164

1    August 23, 2021.  Sound familiar?  No reason to

2    dispute the date?

3        A.    No reason to dispute it.

4        Q.    Okay.  And I'm not playing games with you.

5    I'll represent that that's the date that he filed the

6    suit that I'm going to call Beckerich 1.

7        A.    Okay.

8        Q.    Let me ask:  Did you review at all that

9    lawsuit?

10       A.    No.

11       Q.    That -- I know that he served SEP and I

12   know that he served SEH.  I take it -- would the

13   process be that that would go to the lawyers to

14   handle?

15       A.    Yes.

16       Q.    Okay.  And did you at any time review the

17   allegations in Beckerich 1?

18       A.    Not that I know of.

19       Q.    Okay.  If I were to represent to you that

20   there are multiple paragraphs that reference either

21   the processing of medical or religious exemptions in

22   that lawsuit, no reason to dispute it?

23       A.    I don't dispute it.

24       Q.    Were you aware generally of the filing of

25   that lawsuit?

1    A.    Yes.

2    Q.    Mr. Deters was less than clandestine about

3  the nature of that.  In other words, he was out

4  publicly promoting it.  Were you aware of that?

5    A.    Yes.

6    Q.    Did anyone at SEP or St. E, St. Elizabeth,

7  SEH, was anyone tasked with tracking what he was

8  doing?

9    A.    Oh, I think there were people following

10  social media as far as what he was doing.

11    Q.    Was that reported back to you or

12  Mr. Colvin?

13    A.    It may have been to Mr. Colvin.  If I heard

14  it, it was just by happenstance.

15    Q.    Okay.  SEP was named separately in that

16  lawsuit along with SEH, correct?

17    A.    I believe so.

18    Q.    At any point in time, did you confirm or

19  disprove whether any of the plaintiffs, the people

20  that were named on the plaintiff side of that

21  lawsuit, whether they were employees of SEP?

22    A.    I think we did, yes.

23    Q.    So there were some employees of SEP that

24  were named?

25    A.    I can't remember specifically, but I'm sure

Page 166

1   we did.

2        Q.   Okay.

3             (Plaintiff's Exhibit 33 was marked for

4   identification.)

5        Q.   I'm going to hand you what I've marked as

6   33.  There's a letter that's attached in this

7   exhibit, but I'm going to kind of take you through,

8   Dr. Pritchard, the entirety of this exhibit.  Let me

9   start with the front page.  Were you aware that

10  Mr. Deters had sent an e-mail to his e-mail list and

11  attached a letter from certain providers at

12  St. Elizabeth Physicians?

13       A.   I'm not sure when I knew that.  Yes, I knew

14  that happened.

15       Q.   Okay.  Do you think you knew it in or

16  around early September of 2021?

17       A.   I would think so.

18            MR. GUILFOYLE:  Don't guess.

19       Q.   Don't guess.  Were you aware that he was

20  soliciting clients?

21       A.   I'd heard he was.

22       Q.   And what's attached was a letter that was

23  sent from a number of physicians regarding the

24  vaccine mandate, fair?

25       A.   Yes.

Page 167

1        Q.   It was sent to the staff administration and

2   board of the St. Elizabeth Healthcare system,

3   correct?

4        A.   Yes.

5        Q.   And it included Dr. Grunkemeyer.  Actually,

6   he's listed twice.  I don't know if you noticed that.

7   Look at 2448.

8        A.   He is, yes.  He's both Matthew and Matt.

9        Q.   Right.  Dr. Klanke, right?

10       A.   Yeah.

11       Q.   Dr. DiChiara?

12       A.   Yes.

13       Q.   And a number of other doctors?

14       A.   Yes.

15       Q.   Was there a problem, from your perspective

16   or Mr. Colvin's perspective, with these physicians

17   sending the letter to the board and the staff and

18   administration?

19       A.   I think we probably thought that was an

20   unusual first step, but...

21       Q.   Well, let me be more specific.  Was there

22   anything disruptive about sending that letter?

23       A.   Everything is somewhat disruptive, but it

24   created quite a few phone calls.

25       Q.   Okay.  Was it a violation of policy or

Page 168

1    providers' agreements for them to send this letter

2    internal to the staff administration and board?

3        A.    No.

4        Q.    Why not?

5        A.    It's their opinion.

6        Q.    Consistent with the open door policy?

7        A.    Yes.

8        Q.    Okay.  Did the fact that Mr. Deters had

9    made this letter public, was that a problem?

10       A.    I can't -- other than just it created extra

11   work.  I don't know that I knew it was a problem.

12       Q.    If you look at the first page of this

13   exhibit, Mr. Deters says:  A member of the

14   St. Elizabeth Board of Trustees sent the attached

15   letter to me this morning.  Do you see that?

16       A.    I do.

17       Q.    Did that create any response from

18   Mr. Colvin or anyone else concerning somebody on the

19   board might be leaking information to Mr. Deters?

20       A.    I'm sure it created some concern that

21   people could be sharing information, but I wasn't

22   involved in anything other than speculation is who

23   would have sent that.

24       Q.    I mean, did anyone inquire whether -- I

25   mean, you were a member of the SEH board at the time,

1  correct?

2        A.    I was staffed to the SEH board.

3        Q.    You were staffed to the SEH board.  You

4  were privy to the SEH board's communications of

5  staff, correct?

6        A.    If it involved staff, yes.  But if it was

7  just strictly board related, I wouldn't necessarily

8  be involved.

9        Q.    Do you know whether there was any

10 investigation that was prompted as a consequence of

11 Mr. Deters' representation in this e-mail that

12 someone who was on the board of trustees sent a

13 letter to him?

14       A.    I am not aware.

15       Q.    Okay.  Did this communication by Mr. Deters

16 constitute disruption from SEP's perspective?

17       A.    I would say.

18       Q.    How?

19       A.    Like I said, it created quite a few phone

20 calls among colleagues.

21       Q.    Did you know or believe that anyone on the

22 list of physicians had communicated this to

23 Mr. Deters as of September 1st?

24       A.    Can you repeat that, please?

25       Q.    Did you know or suspect that any of the

Page 170

1    list of physicians that we see in 2448 and 2449, the

2    last two pages of this exhibit, do you know whether

3    that had prompted any speculation or consternation

4    perhaps that any of the physicians shared anything

5    with Mr. Deters?

6              MR. BIRKENHAUER:  Objection as to form.

7         You can answer if you can.

8         A.   I'm trying to decide which question I'm

9    answering now.

10        Q.   I can ask it again.

11        A.   Yes.

12        Q.   There's a list of physicians at 2448 and

13   2449.

14        A.   Yes.

15        Q.   This letter has been made public by

16   Mr. Deters as of September 1st at 12:15 p.m.,

17   correct?

18        A.   Yes.

19        Q.   Was there any concern that any of the

20   physicians on this list had shared this letter with

21   Mr. Deters as of September 1st?

22        A.   You changed words that time.  I'm not sure

23   there was concern.  There was definitely speculation,

24   which was the first time you asked that question.

25        Q.   Was there speculation about who?

1          A.    We did not have a clue.

2          Q.    Did it prompt an internal investigation at

3     all?

4          A.    No.

5          Q.    Why not?

6          A.    There didn't appear to be a need for an

7     internal investigation.

8          Q.    Did you consider it, if they would have

9     shared that letter, a violation of their employment

10    contracts?

11         A.    It was not a company e-mail, so no.

12         Q.    Okay.  All right.  I don't know if you

13    know -- by the way, what is the relationship between

14    OrthoNKY and St. Elizabeth Healthcare or

15    St. Elizabeth Physicians?  Is there one?

16         A.    OrthoNKY is a -- or OrthoCincy is an

17    independent physician organization.  We do have an

18    institute agreement with them to help run --

19    collaborate in the running of orthopaedics at

20    St. Elizabeth Healthcare.

21         Q.    Okay.  So they are an outside group to

22    provide services at the hospital?

23         A.    Yes.

24         Q.    And I take it that those related to

25    orthopaedics?

1      A.   Correct.

2      Q.   I don't know if you've seen this or not,

3   but I'm going to show it to you.

4           (Plaintiff's Exhibit 34 was marked for

5   identification.)

6      Q.   This is Exhibit 34.  It's an e-mail related

7   to -- and I'm not 100 percent sure who it's between,

8   but it was produced in defendant's discovery.  So it

9   had me scratching my head a little bit.  But at the

10  bottom it looks like Matt Grunkemeyer sent that

11  e-mail out to the staff administration and board on

12  August 31, 2021.  Dr. Grunkemeyer did, correct?  Do

13  you see that at the bottom?

14     A.   I'm just looking to see which party sent.

15  I'm looking at the top.  It's to JoAnn.

16     Q.   Yeah.  The top's JoAnn.  Look at the bottom

17  part.  I want to focus first on the bottom, then

18  we'll talk about the top.

19     A.   Okay.  And so what's your question about

20  the bottom?

21     Q.   So the bottom part it was Dr. Grunkemeyer

22  that transmitted the internal staff, administration,

23  and board e-mail from his Gmail on August 31st,

24  correct?

25     A.   It looks like it, yes.

1          Q.    Okay.  And it looks like that got forwarded

2     to somebody at the ortho group.  And by the way, Dr.

3     Grunkemeyer is expressing some of the same concerns

4     in this -- well, the physician group was expressing

5     some of the same concerns that Dr. DiChiara did,

6     right?

7          A.    Yes.

8          Q.    Natural immunity and the effectiveness of

9     the vaccine, right?

10         A.    Correct.

11         Q.    And up top in response to that, there's

12    this e-mail from Gary to JoAnn Reis within the ortho

13    group that says:  I know we discussed our process

14    with our medical staff office related to religious

15    and medical exemptions if appropriate, and this has

16    been.  Do you see that?

17         A.    I apologize.  My eyes were wandering ahead.

18    So take me back to where you just were.

19         Q.    Look at the top.

20         A.    Yes.

21         Q.    In response to the Grunkemeyer letter, I

22    know we discussed our process with our medical staff

23    office related to religious and medical exemptions --

24         A.    Yeah.

25         Q.    -- if appropriate and this has been?

1      A.    Yes.

2      Q.    Why -- if you know, and if you don't,

3  that's fine, why would the ortho group be commenting

4  on the Grunkemeyer letter and the concerns it raised

5  in relation to religious and medical exemptions?

6      A.    So JoAnn, if you wonder, is the head of

7  OrthoCincy.  She's their head administrator.  I don't

8  know if her title is CEO or COO.

9      Q.    Okay.

10      A.    So it looked like she had received an

11  e-mail from Gary Blank, who's the chief operations

12  officer of St. Elizabeth Healthcare, and they were

13  the main two that worked on orthopaedics.  And so I'm

14  sure, you know, all your guys know about the

15  exemption process and how's this going to impact our

16  ability to do business.  That's the way I read this.

17      Q.    So the firm -- hold on.  The firm here is

18  from Gary Blank, the COO at SEH, to JoAnn Ries who

19  was the head of OrthoCincy?

20      A.    Yes.

21      Q.    And what Gary says, and I just want to

22  quote him, and this is in response to the Grunkemeyer

23  e-mail and the letter to the board that included Dr.

24  DiChiara as of August 31st, quote, I know we

25  discussed our process with our medical staff office

Page 175

1    related to religious and medical exemptions if

2    appropriate and this has been, right?

3        A.    That's what he states, yes.

4        Q.    So he is the raising the fact, in response

5    to this letter, that our exemption process has been

6    appropriate, fair?

7        A.    I think he's stating that it's in place.    I

8    think he was -- yeah.    I can't speculate, but he says

9    it's in place --

10       Q.    Well, he says if appropriate, right?

11       A.    Yes.

12       Q.    Okay.    Were you privy to that e-mail chain

13   at the time, Dr. Pritchard?

14       A.    It doesn't appear I was copied on it, no.

15       Q.    Were you made aware of it in the weeks to

16   follow?

17       A.    I don't know.

18             (Plaintiff's Exhibit 35 was marked for

19   identification.)

20       Q.    Show you 35.    E-mails went out on

21   September 2nd.    And if you look at the bottom, I want

22   to start at the bottom because it's an e-mail from

23   you.    Look at 2144 and 2145.    I'm looking at the

24   e-mail from you Thursday, September 2, 2021, at

25   8:34 a.m.

1      A.    Yeah.   Okay.

2      Q.    You indicate and you say in response to the

3   letter -- and I'm on the substance of the e-mail, and

4   the subject is support statement, right?

5      A.    Yes.

6      Q.    In response to the letter that went out

7   yesterday from a minority of our medical staff, some

8   members of our medical staff have reached out in

9   support of St. Elizabeth in the actions we have taken

10  to battle the COVID pandemic.   Do you see that?

11     A.    Yes.

12     Q.    Let me ask first.   Why did you want to

13  point out that it was the minority of the medical

14  staff that had sent the letter?

15     A.    That's just a simple accurate statement.

16     Q.    Okay.   Why?   I understand it's accurate.

17  Why did you want to point that out, though?

18     A.    Because it was the minority of our medical

19  staff.

20     Q.    If it was a majority of the medical staff

21  that had raised the concerns that were raised in the

22  letter, would that have changed the approach?

23     A.    I've got a feeling it felt much different.

24     Q.    Okay.   And you indicate that some members

25  of the medical staff have reached out in support?

1    A.    As I said, it generated a lot of phone

2    calls.

3    Q.    Do you know how many?

4    A.    I have no clue.

5    Q.    Do you recall anyone in particular that

6    reached out?

7    A.    I talked to several people that both signed

8    the letter and who had not signed the letter.

9    Q.    So when you say signed the letter, are you

10   referring to the first letter or the support letter

11   that we're now looking at?

12   A.    No, the letter that --

13   Q.    The concern letter.

14   A.    -- Grunkemeyer sent to Deters.

15   Q.    Well, that's an interesting statement that

16   you just made.  Did you later learn that Grunkemeyer

17   had sent that letter to Deters?

18   A.    I thought you just said that.  You said

19   Grunkemeyer sent it to -- maybe it was somebody else.

20   Q.    Well, we looked at Grunkemeyer sending it

21   around to the staff administration and board at

22   Exhibit 34 and went on to ortho in Exhibit 34.

23   A.    We were addressing the one he sent to --

24   not the one he sent to Eric Deters.

25   Q.    Well, it's attached to Deters' e-mail at

Page 178

1    33, but Deters represents that it was a member of the

2    St. Elizabeth Board of Trustees that sent it to him

3    in 33, correct?

4         A.    That's what -- yeah.

5         Q.    Right.  Deters didn't indicate he got it

6    from Grunkemeyer.

7         A.    Okay.

8         Q.    Now, I'm here to tell you we know he did

9    get it from Grunkemeyer, but you didn't know that

10   then, right?

11        A.    Not then.  I had no clue.

12        Q.    Okay.  By the way, this letter was signed

13   by -- if you look at the support letter at 33, it's

14   also signed by anonymous SEP/H physicians, do you see

15   that, and anonymous midlevel providers?

16        A.    Yes.

17        Q.    Do you know how many?

18        A.    Not a clue.

19        Q.    Do you know -- how would you know whether

20   it was the minority or majority without knowing who

21   those anonymous --

22        A.    Well, we have over 1,200 members, 1,500

23   members of the medical staff, over 750 members of

24   SEP.

25        Q.    Okay.

1 A. We've got what here, 19, 20 signatures?

2 Q. So even with the anonymous, it wouldn't be

3 a majority?

4 A. No.

5 Q. Okay.  Do you recall anyone in particular

6 that had reached out in support of the vaccination

7 mandate that you're referring to?

8 A. We had gotten many via doctors that we

9 mentioned earlier like Mandapakala.

10 Q. Yeah.

11 A. But throughout the organization, I can't

12 give you specific names, but we got thank yous.  We

13 got -- the reason we did this, I was writing this

14 letter, is docs started telling me they wanted to

15 send letters, who they wanted to send them to.  And I

16 said, then let me just do a general one for you and

17 if you all want to sign it, you can.

18 Q. To manage the debate that was going on?

19 A. Yes.

20 Q. Okay.  And you indicated in this:  Please

21 respect all our colleagues' opinions and please do

22 not coerce folks to sign this document.  Do you see

23 that?

24 A. Yes.

25 Q. When you say respect all our colleagues'

Page 180

1    opinions, you're referring to people on both sides of

2    the debate?

3        A.    Correct.

4        Q.    Give me a second.  This one's big.  These

5    guys know what this is.

6            MR. GUILFOYLE:  Some of Eric's best work.

7            MR. WIEST:  We will have an

8        off-the-record conversation.

9            (Plaintiff's Exhibit 36 was marked for

10   identification.)

11       Q.    I've marked this as 36.  Your counsel has

12   seen it before.  Give me just a moment, Doctor,

13   because I'm going to get organized.

14           MR. BIRKENHAUER:  Take your time.

15           MR. GUILFOYLE:  Do you want to take five

16       real quick?

17           MR. WIEST:  We can.  Why don't we go off

18       the record.

19           VIDEO TECHNICIAN:  We are off the record.

20               (OFF THE RECORD)

21           VIDEO TECHNICIAN:  We are back on the

22       record.  The time is 1:59.

23   BY MR. WIEST:

24       Q.    Let me back up to Exhibit 27 real quick

25   with you.  Are you there?

1    A.    Yes.    Sorry.

2    Q.    So as I understand the top of this, you are

3    sharing Dr. DiChiara's letter with Dr. Savani and

4    Dr. Peterson who are not with the SEP group, correct?

5    A.    Correct.

6    Q.    And so you're sharing essentially --

7    because I -- and I want to be clear.    Did you view

8    Dr. DiChiara's letter as SEP's confidential

9    information?

10    A.    I think it was SEP and SEH, she sent it to

11    both, and these were physicians on the SEH medical

12    staff running our COVID response.

13    Q.    Well, that wasn't -- let me begin.    I'm

14    just asking generally about the letter, the 27-page

15    letter that she sent.    Did you view Dr. DiChiara's

16    letter and the concerns it documented as SEH and

17    SEP's confidential information?

18    A.    No.

19    Q.    Okay.    And was that because she generated

20    that document on her own time?

21    A.    Yes.

22    Q.    And you knew that, right?

23    A.    She said she did, yeah.

24    Q.    Correct.    And she plainly, you know, in the

25    course and scope of -- scope, maybe there's a joke

Page 182

1    there, I don't know.  She is a gastro doc, correct?

2        A.    Right.

3        Q.    And she had to perform procedures, correct?

4        A.    Correct.

5        Q.    And you would agree with me, gastro docs

6    are generally not dealing with vaccines or

7    respiratory issues, right?

8        A.    Yeah, or necessarily COVID patients.

9        Q.    Right.  Do you know whether or not -- by

10   the way, that's an interesting question.

11   Dr. DiChiara had treated COVID patients over -- from

12   2020 to 2021?

13       A.    I would have no idea.

14       Q.    If she were to testify that she was one of

15   the few doctors in the gastro group who were willing

16   to treat COVID positive patients, would you have any

17   reason to dispute that?

18       A.    No.

19       Q.    You would agree with me, not every

20   physician in SEP was willing to treat COVID positive

21   patients, correct?

22       A.    I think there was definitely some concern.

23   I can't remember anybody flatout refusing, but it

24   could have been happening.

25       Q.    And I think you told me that your view was

Page 183

1    that sharing her letter with Dr. Peterson and

2    Dr. Savani, even though they were not employed with

3    SEP, was acceptable because they were on the SEH

4    staff?

5         A.   Correct.

6         Q.   Was that outlined as an exception to any

7    confidentiality policy?

8         A.   No.  But I also think -- didn't she request

9    that I share it with others?

10        Q.   Well, let's talk about that.  She asked

11   that you share it with the board, right?

12        A.   Correct.

13        Q.   She said the St. Elizabeth Healthcare board

14   members, correct?

15        A.   Correct.

16        Q.   Was Dr. Savani on the SEH board?

17        A.   No.

18        Q.   Was Dr. Savani on the SEP board?

19        A.   No.

20        Q.   Was Dr. Peterson on the SEP board?

21        A.   No.

22        Q.   Was he on the SEH board?

23        A.   No.

24        Q.   Did she ask that you share it with other

25   physicians?

Page 184

1    A.   I can't remember.  I'd have to look through

2    it.

3    Q.   If you look at Exhibit 29, you respond to

4    her:  Thanks, Amy.  I will share your PDF with the

5    SEP board members and administration, correct?

6    A.   Where are we at?  I'm sorry.

7    Q.   In the middle of Exhibit 29.

8    A.   Oh, yes.

9    Q.   You did not tell her that you were going to

10   share it with either Dr. Savani or Dr. Peterson,

11   correct?

12   A.   It doesn't appear I did.

13   Q.   Why didn't you tell her that that was who

14   you were going to share her letter with?

15   A.   I would have had no reason not to tell her.

16   Q.   You would have no reason to tell her or not

17   to tell her?

18   A.   I would have no reason not to tell her.

19   They were considered the experts on our medical

20   staff.

21   Q.   Okay.  Let's look at Exhibit 34 just real

22   quick.

23   A.   Okay.

24   Q.   You would agree that Gary Blank had shared

25   the -- I'm going to call it the Grunkemeyer letter,

1  but the letter from Dr. Grunkemeyer and all of the

2  other physicians that are listed on it with JoAnn

3  Ries with Ortho Kentucky, correct?

4       A.   It appears so, yes.

5       Q.   And Ortho Kentucky was outside of SEP,

6  correct?

7       A.   Correct.

8       Q.   Was the letter that Dr. Grunkemeyer sent

9  viewed as confidential information of SEP?

10       A.   No.

11       Q.   Okay.  But he is discussing confidential

12  business information and plans, correct?

13       A.   He was within members of the medical staff

14  and leadership of SEH.

15       Q.   Was JoAnn Ries within the medical staff and

16  leadership?

17       A.   No, but she was affiliated with OrthoCincy.

18       Q.   Okay.  And so he is discussing business

19  information relating to the processing of medical

20  exemptions and religious exemptions with her,

21  correct?

22       A.   It appears so.

23       Q.   Would you consider that to be confidential?

24       A.   No, because her physicians signed this

25  letter.  They work with her.  So how are you going to

1    handle this?

2        Q.    Okay.  By the way, Gary Blank says I'm

3    trying to ascertain how we proceed with October 1 in

4    front of us.  Do you know what he's referring to?

5        A.    No.

6        Q.    Well, obviously that was the deadline for

7    the vaccine mandate?

8        A.    Right.

9        Q.    Okay.  Was the concern that those medical

10    providers may no longer be able to provide services

11    unless they complied with the mandate?

12        A.    That was a concern in the organization.

13        Q.    Would that be disruptive if they were let

14    go?

15        A.    I would think so.

16        Q.    All right.  Back to Mr. Deters' opus, 36.

17    As an aside, Dr. Pritchard, have you -- I'm going to

18    refer to this as Beckerich 2.  Have you seen

19    Beckerich 2, this complaint, before today?

20        A.    No.

21        Q.    Have you reviewed the contents of Beckerich

22    2 before today?

23        A.    No.

24        Q.    We're going to do it together quickly.  And

25    I'm going to not spend -- by the way, you'll be

Page 187

1    thrilled to hear that I'm not reviewing every

2    paragraph of Mr. Deters' pleading with you, but I

3    want to begin.  There's a series of plaintiffs that

4    are listed on the first five pages.  We don't need to

5    review them.  And I think you told me that some of

6    them were SEH employees, correct?

7         A.    That's an assumption I'm making.  I don't

8    know in particular.

9         Q.    Okay.  You can quickly browse.  Any names

10   in particular that was a SEP employee you recognize?

11   And once you recognize one, we can stop.

12        A.    Well, I've not seen one yet.

13        Q.    Okay.

14        A.    None that I recognize.

15        Q.    Would it be fair to assume that if someone

16   is not a physician, you might not recognize them as

17   an employee?

18        A.    I would think that would be very fair to

19   assume.

20        Q.    And I take it at your level, the folks you

21   were interacting with from an employee perspective

22   were primarily physicians; would you agree?

23        A.    Primarily.

24        Q.    Obviously, Mr. -- the high-level executives

25   probably as well, correct?

1      A.   Yes.

2      Q.   And the defendants in this case were

3  St. Elizabeth Medical Center, Inc. and Summit Medical

4  Group, Inc., DBA St. Elizabeth Physicians on page 6,

5  correct?

6      A.   Yes.

7      Q.   Okay.  Let me ask:  Were you aware of the

8  filing of Beckerich 2 in or around the time that it

9  was filed?

10      A.   I would think so, yes.

11      Q.   There's a mention of Dr. DiChiara right on

12  page 7.  Tell me when you're there.

13      A.   Did I miss a question?  I'm sorry.

14      Q.   I asked -- do you see the reference to

15  Dr. DiChiara on page 7?

16      A.   Yes.  I'm sorry.

17      Q.   And specifically, I'm going to read it to

18  you, it says:  Dr. Amy J. DiChiara wrote a 27-page

19  letter to Garren Colvin, CEO of St. Elizabeth

20  Hospital, Dr. Robert Pritchard, CEO of St. Elizabeth

21  Physicians, and the Board of St. Elizabeth

22  Healthcare, Exhibit 2.  It is a detailed explanation

23  of all the issues and speaks for itself.  A review of

24  all the bold subtitles says it all.  So that is --

25  her letter is specifically referenced on page 7 in

Page 189

1    this complaint, correct?

2         A.   Yes.

3         Q.   Incidentally, I think we talked about this,

4    the letter itself, that's not confidential

5    information, correct?

6         A.   That's her work product.

7         Q.   Okay.  And if you look at Exhibit 2,

8    Doctor, and I'll tell you it begins -- if you look at

9    the top right, the easiest way to do this is to look

10   at the page IDs on the right.

11        A.   Okay.

12        Q.   There's not Bates stamps on this, but

13   there's page IDs in the top right.  If you start at

14   105.

15        A.   Okay.

16        Q.   All right.  And you look at Exhibit 2 that

17   starts on page 105 and goes into 106.  I think you

18   told me that this is not SEP confidential

19   information, correct?

20        A.   Her letter, no.

21        Q.   Okay.  If she had provided the letter

22   itself to Mr. Deters, would that be a violation of

23   policy, the Exhibit 2 letter?

24        A.   I think it'd probably greatly depend on why

25   is she providing the letter.

Page 190

1      Q.    We're going to talk about that in a minute.

2      A.    Okay.

3      Q.    Okay.  Why would it depend on why she's

4  providing the letter?

5      A.    To what purpose was she providing the

6  letter?  In some violation she thought we were doing?

7  I don't know, but this is her work product.

8      Q.    Okay.  If you go back to page 8 of the

9  top -- I think we all agree that the Exhibit 2 letter

10  was the one that she previously gave to you and

11  Mr. Colvin, correct?

12      A.    Yes.

13      Q.    Page 8, Deters writes:  Exhibit 2 was

14  provided to Colvin and Pritchard, promised it would

15  be sent to the board.  They did not send it to the

16  board.  They only sent it to the St. Elizabeth

17  Physicians executive team, not to community board

18  members.  The St. Elizabeth Healthcare/Physician

19  letter sent to their workers on August 6 states:

20  Vaccines will be provided -- vaccines will provide

21  strong protection against unintentionally carrying

22  the virus to work and spreading to patients.  Colvin

23  and Pritchard know this is not true.  Colvin conceded

24  the point and promised he would write a new letter to

25  the workers.  Despite this, no new letter to

Page 191

1    healthcare workers has been sent.  Colvin claims the

2    real reason for the vaccine mandate is its

3    therapeutic basis.  He admitted the letter sent to

4    healthcare workers was misleading.  Colvin and

5    Pritchard are intentionally misleading the healthcare

6    workers.  They are misleading them with the claim

7    that the vaccine will stop the spread of infection.

8    Do you see that?

9         A.    I do.

10        Q.    When were you made aware of these

11   allegations on page 8?

12        A.    Probably now.

13        Q.    So the first time you've seen this is now?

14        A.    Yes.

15        Q.    You haven't seen it beforehand?

16        A.    I don't think I've ever seen it.

17        Q.    Okay.  Did you hear about it beforehand?

18        A.    I don't think I ever heard the specifics of

19   what was in the complaint.

20        Q.    Or generally?

21        A.    I don't know that it even referenced us in

22   the lawsuit.  I knew they attached the letter as an

23   exhibit, but I didn't know we were in the body of the

24   suit.

25        Q.    Okay.  Page 9, there's a reference and it

Page 192

1  indicates strongest claim violation of ADA.  Do you

2  see that?

3       A.   Where we at?  I'm sorry.

4       Q.   Page 9, the middle.  It's in bold.

5       A.   In the middle.

6       Q.   We're going to be jumping around.  So,

7  Doctor, I do not intend to take you through every

8  allegation in Mr. Deters' complaint.  We would be

9  here all afternoon.  And I will represent to you that

10 in some ways, it's unintelligible, and so I don't

11 intend to do that.  I intend to pick out the relevant

12 parts for why we're here and we're going to talk

13 about them.

14      A.   Okay.

15      Q.   Page 9, Deters writes strongest claim

16 violation of ADA.  Do you see that?

17      A.   Yes.

18      Q.   Were you aware that Mr. Deters had made an

19 Americans with Disabilities Act allegation in the

20 context of this lawsuit?

21      A.   No.  I knew it surrounded the exemption

22 process.

23      Q.   Okay.  In fact, that's a great segue

24 because if you look at the affidavits of defendants,

25 Deters writes at the bottom of page 9:  Gary Blank,

1    EVP chief operating officer, a defendant, has

2    perjured himself in his prior affidavit.  As will be

3    supported by affidavits, and unlike this paragraph

4    10, nor has St. Elizabeth ever directed at physicians

5    or advanced practice providers to not grant medical

6    exemptions.  They most certainly have.  Do you see

7    that?

8          A.    I do see that, yes.

9          Q.    Let me ask:  Were you aware of allegations

10   that there had been directives to SEP physicians not

11   to write medical exemptions?

12         A.    I think I'd heard that.

13         Q.    Was that true?

14         A.    No.

15         Q.    Okay.  Deters had made the allegation

16   nonetheless?

17         A.    Nonetheless.

18         Q.    We could talk about the Kentucky Supreme

19   Court's commentary about Mr. Deters and his

20   allegation, but that's a separate discussion for a

21   separate day.  Page 10 talks about the medical

22   exemption form, Exhibit 4, is a blanket conclusionary

23   form for which their own doctors contradict.

24   Exhibits 1 and 2.  And then a couple sentences down

25   Deters writes:  In addition, they have done the same

Page 194

1    for religious exemptions, right?

2         A.   I'm not sure what you're saying we did, but

3    we --

4         Q.   Yeah.  I'm just saying that Deters is

5    making allegations directed at medical exemptions and

6    religious exemptions --

7         A.   Yes.

8         Q.   -- in this lawsuit?

9         A.   Yes.

10         Q.   And, Doctor, I'm not going to go through

11    this entire lawsuit with you.  But if I were to

12    represent that there's more than, you know, 20

13    numbered paragraphs that are directed towards medical

14    or religious exemptions, you wouldn't dispute that,

15    would you?

16         A.   No.

17         Q.   The document says what it says and you've

18    not reviewed it before today, correct?

19         A.   I have not.

20         Q.   I do want to get into the -- there's a

21    discussion about the medical exemption, religious

22    exemption process that starts on page 54.  And it's

23    page ID 54.

24         A.   Okay.

25         Q.   You would agree with me, Doctor, that --

Page 195

1    I'm just going to read the numbered paragraphs to you

2    to short circuit this to some degree.  Paragraphs

3    359, 360, 361, 362, 363, 364, 365, 366, 367 are all

4    directed at the exemption process, correct?

5         A.    I'll have to read them.

6         Q.    Sure.

7         A.    And your question was they're all

8    pertaining?

9         Q.    To exemption process, correct?

10        A.    Appears to be.

11        Q.    Okay.  Let's turn to page 55.  368 to 374

12   are equally directed towards exemption process,

13   correct?

14        A.    And you said through 374?

15        Q.    Yes, sir.

16        A.    Yes.

17        Q.    Dr. Pritchard, I will represent to you, and

18   I don't intend to drag you through every numbered

19   paragraph of Mr. Deters' allegations, there are other

20   paragraphs within the complaint prior to causes of

21   action that are directed towards religious or medical

22   exemption process at SEP or SEH.  No reason to

23   dispute that, correct?

24        A.    No.

25        Q.    Were you aware of that fact on or before --

Page 196

1    I'm sorry, on or before October 4 of 2021, that

2    Deters had filed a suit that had raised issues

3    regarding the exemption process?

4         A.   I don't remember a specific date, but I

5    knew that was the issue at hand.

6         Q.   Okay.  If you can go back to 60 with me,

7    page 60 of Mr. Deters' complaint, you would agree

8    with me that the very first cause of action that

9    Mr. Deters raised was a violation of the

10   Rehabilitation Act and the Americans with

11   Disabilities Act, correct?

12        A.   Yes.

13        Q.   And that's related to medical exemption

14   process, correct?

15        A.   Yes, I believe so.

16        Q.   On page 61, the very second cause of action

17   Mr. Deters raises is a violation of Title VII of the

18   Civil Rights Act of 1964, correct?

19        A.   Yes.

20        Q.   And that's related to religious

21   accommodation process, correct?

22        A.   Yes.

23        Q.   Okay.  I want to look at a couple of the

24   exhibits now just for a couple of minutes.

25        A.   What page are we on?

Page 197

1        Q.    We're going to go back to 133, is where the

2    exhibits start.

3        A.    Page 133?

4        Q.    Yes, sir.   Top right, it's got page ID 133.

5    And I have no objection to your counsel helping you

6    get there.

7        A.    I'm there.   It just switched.   The number

8    was no longer in the corner.   It was in the middle of

9    the page.

10        Q.    Look at the top right.   There's some

11    e-mails that are attached to Exhibit 3 that involve

12    and include e-mails from Amy DiChiara to Garren

13    Colvin.   Do you see that?   That's the first e-mail,

14    correct?

15        A.    Yes.

16        Q.    There's some other redacted information

17    that follows, correct?

18        A.    Correct.

19        Q.    It looks like there's e-mails between Bob

20    and Amy DiChiara and Garren Colvin that kind of

21    permeate these exchanges, correct?

22        A.    Well, it's redacted so I can't tell who

23    it's from, but I see some with Garren and my name on

24    it.   Yeah, here's one from Amy.

25        Q.    Was it the view of you and SEP that these

Page 198

1    e-mails were confidential?

2         A.   Yes.

3         Q.   I want to go back to 142, and there's a

4    study that follows.  This begins -- and the to and

5    from is redacted, but it says bonus e-mail.  Info

6    highlighting how mRNA vax goes to ovaries in high

7    concentration.  This is my paper, but thought I'd

8    send it separate because the reference is not as

9    widely known, although you may have received it by

10   now, and it's got some takeaways from a study.  Do

11   you see that?

12        A.   Yes.

13        Q.   And what's attached on the very next page

14   starting on 11, it's got 11 of 41.  And the page ID

15   you can't really see, but it starts at 143.  It looks

16   like there's a study out of Japan titled the

17   SARS-CoV-2 Delta Variant is Poised to Acquire

18   Complete Resistance to Wild-type Spike Vaccines.  Do

19   you see that?

20        A.   Yes.

21        Q.   Is this SEP or SEH's confidential

22   information?

23        A.   That article would not be, no.

24        Q.   Or the takeaways or the e-mails?

25        A.   The e-mails to --

Page 199

1          Q.    Well, bonus e-mail, right?

2          A.    No.    That's pertaining to her study.    But

3     it was an e-mail.    I can't tell who it's from or

4     whether it was to Garren and I from her.    Then it

5     starts being -- conversing back and forth --

6          Q.    Sure.

7          A.    -- with the study.

8          Q.    Do you know or did you ever determine

9     whether or not this bonus e-mail exchange was a

10    conversation between Garren or yourself and

11    Dr. DiChiara?

12         A.    I don't know.    I thought it was attached to

13    her -- one of her e-mails she sent me after she met

14    with Garren and I.

15         Q.    Okay.    That's your understanding looking at

16    it.    Did you research that?

17         A.    No.

18         Q.    Did you pull either your e-mail or

19    Mr. Colvin's e-mail to determine if this study was

20    included in anything that had been exchanged between

21    the three of you?

22         A.    I thought you asked if I researched the

23    study, which I didn't do.

24         Q.    No.    No.    No.    I'm asking whether or not

25    this e-mail cover, this bonus e-mail cover that

1    starts on 142, whether or not this exchange -- the

2    bonus e-mail, whether or not that was a communication

3    between yourself and Garren Colvin and Dr. DiChiara?

4         A.   Did I research that?  No.

5         Q.   You never made a determination whether it

6    was or wasn't, correct?

7         A.   Correct.

8         Q.   And would there be any problem with her --

9    let's assume she sent it to Mr. Deters telling Mr.

10   Deters he could share this study widely.  There would

11   be no problem with that from an employment

12   perspective, would there?

13        A.   Those are not classified e-mails between

14   us.  Those are her work.

15        Q.   Right.  So there's no violation of the

16   employment agreement or any policy with her taking a

17   private e-mail and sending something to Mr. Deters

18   with a study, correct?

19        A.   Correct.

20        Q.   Even if he's going to use it in a lawsuit,

21   correct?

22        A.   Well, it's -- I wouldn't say it's great

23   judgment on her part.

24        Q.   But it's not a violation of policy, is it?

25        A.   If she feels she is having to support a

1    violation of some law, such as ADA, which I've not

2    seen any evidence that we have.

3         Q.    Then it would be okay, right?

4         A.    I'm totally speculating.  I don't know.

5         Q.    Okay.  Let me ask:  As of September 3rd of

6    2021, how many exemptions had been granted to the

7    vaccination requirement for either medical or

8    religious reasons at SEP or SEH; do you know?

9         A.    I have no clue.

10        Q.    Have there been a lot?

11        A.    I have no clue.

12        Q.    The mandate had been in place almost a

13   month by September 3rd, right, August 5th to

14   September 3rd, close to a month.  But you don't

15   know -- can't even give me a ballpark about how many

16   exemptions were granted, right?

17        A.    No.

18        Q.    Do you know whether or not the people that

19   were processing the exemptions had to provide

20   information regarding the processing of the

21   exemptions to the federal court in response to

22   Mr. Deters' lawsuit?

23        A.    Do not know.

24        Q.    Do you know if they changed their approach

25   at all in processing exemptions in light of the

Page 202

1    lawsuit?

2        A.    I do not think they did.

3        Q.    You don't know?

4        A.    I personally do not know.

5        Q.    Okay.  We've looked at the study.  We've

6    looked at -- by the way, other than what's in Exhibit

7    3, there's nothing in this lawsuit that reflects

8    anything confidential that was potentially shared

9    between Dr. DiChiara and Mr. Deters, correct?

10       A.    I've not looked through it, so I can't say

11   that.

12       Q.    Do you know one way or the other?

13       A.    I do not.

14       Q.    I want to look just at Exhibit 37.

15            (Plaintiff's Exhibit 37 was marked for

16   identification.)

17       Q.    I don't know if you've seen this before.

18   We produced it in discovery.

19            MR. BIRKENHAUER:  Can we set this aside

20       for now?

21            MR. WIEST:  We can and hopefully we're

22       done with.  I'd set it aside.

23            MR. BIRKENHAUER:  Thank you.

24       Q.    Dr. Pritchard, this is the share widely

25   e-mail.  Do you see that?  And now we know -- I

Page 203

1    realize it's unredacted, but the content of it and

2    who signed it was known to you in terms of being able

3    to review that Exhibit 36, right?  If you need to, we

4    can do a comparison.  If we go back and look at

5    Exhibit 3, if you'd like, 142.

6         A.    And what's the question?

7         Q.    Well, I've got several, but I just -- this

8    is the unredacted e-mail at Exhibit 37, right?

9         A.    Okay.

10        Q.    And we talked about this.  The study itself

11   is not confidential, correct?

12        A.    Her letter, no.

13        Q.    Okay.

14        A.    It's not a study, but...

15        Q.    Well, there is -- the study's referenced.

16   That's the PDF.

17        A.    Okay.

18        Q.    And there would be nothing wrong with

19   Dr. DiChiara using her Hotmail account to send

20   Mr. Deters an e-mail with this study saying that he

21   can go ahead and share it widely, correct?

22        A.    Correct.

23        Q.    Okay.  Now, we're done with Mr. Deters'

24   opus.  Let me ask:  Had the intention to terminate

25   Dr. DiChiara's employment been made?  In other words,

Page 204

1   was there an attempt to terminate her employment as

2   of September 3rd or September 4th or September 5th of

3   2021?

4           A.   I'd have to look at when her e-mail came to

5   me.

6           Q.   You're talking about the apology e-mail?

7           A.   Yeah.

8           Q.   Prior to that coming to you, was there any

9   intent?

10          A.   Never.

11          Q.   Would you say that that was the trigger

12  point for when the intent began?

13          A.   That was the trigger point for me looking

14  into it, yes.

15          Q.   Okay.  I want to look at another set of

16  exhibits with you before we get to that.

17              (Plaintiff's Exhibit 38 was marked for

18  identification.)

19          Q.   This is Exhibit 38 and it's got some

20  communication that starts with former state

21  representative Koenig.  And underneath it there's an

22  e-mail from Amy DiChiara on her Hotmail account to

23  state representatives asking them not to support

24  vaccine mandates.  Let me ask a couple of questions

25  about this.  One, were you aware of it before today?

1     A.   No.

2     Q.   Were you aware that that had been

3  communicated to Garren Colvin before today?

4     A.   No.

5     Q.   And Garren Colvin, did he ever talk to you

6  about Exhibit 38 before today?

7     A.   No.

8     Q.   There would be nothing wrong with that,

9  from an employment perspective, right, her lobbying

10  legislatures using her own e-mail?

11     A.   No.

12          (Plaintiff's Exhibit 39 was marked for

13  identification.)

14          (Plaintiff's Exhibit 40 was marked for

15  identification.)

16     Q.   I'll hand you 39 and 40 together because

17  they're related and, frankly, I should have attached

18  them.  Hand you 39 and 40 and counsel 39 and 40.

19  Exhibit 39 is a transmittal letter that had Exhibit

20  40 attached.  Do you agree?

21     A.   Yes.

22     Q.   Okay.  And so we talked before about the

23  intent to terminate Dr. DiChiara.  Is Exhibits 39 and

24  40 what began, I think, you looking into it, was the

25  term you used?

1    A.    Yes.

2    Q.    Let's look at what she says in Exhibit 40.

3    A.    Okay.

4    Q.    She says:  Dear Mr. Garren Colvin and

5    Dr. Robert Pritchard, as you are no doubt aware,

6    Deters Law has filed a lawsuit against St. Elizabeth

7    Healthcare along with lawsuits against other hospital

8    systems in Greater Cincinnati.  By the way, that was

9    a truthful statement, correct?  He had done those

10   things, Deters?

11   A.    I don't know that I knew it when I got this

12   letter.

13   Q.    Okay.  The lawsuit was dated September 3rd.

14   And you were not informed by that date that he had

15   filed suit?

16   A.    No.

17   Q.    Okay.

18   A.    I believe that was Labor Day weekend,

19   wasn't it?

20   Q.    I don't know.  I don't know.  Were you

21   aware that he had transmitted the lawsuit out on his

22   e-mail list?

23   A.    The lawsuit out?

24   Q.    After he filed.

25   A.    No.

1      Q.   She says:  The complaint against St.

2   Elizabeth Healthcare, with exhibits, was shared

3   publicly via the e-mails -- via the Deters' e-mail

4   list.  Do you know if that was true?

5      A.   I'm sorry.  Where are we again?

6      Q.   The second sentence.  The complaint against

7   St. Elizabeth Healthcare with exhibits were shared

8   publicly via the Deters' e-mail list.

9      A.   Yeah.  I would have known it by her telling

10  me.

11     Q.   She says:  I was shocked and angered to

12  learn that Deters Law had appended to its complaint

13  against St. Elizabeth Healthcare copies of documents

14  that I shared confidentially with Mr. Deters,

15  including private e-mail exchanges you and I have had

16  from previous weeks.  I am writing to communicate

17  facts and intent regarding this matter.

18          Do you know whether or not she had

19  communicated the e-mails we just looked at with

20  Mr. Deters in confidence?

21     A.   Which question are you asking, that she did

22  it in confidence --

23     Q.   Right.

24     A.   -- or if she transmitted e-mails?

25     Q.   Well, let's start with you know that she

1   transmitted e-mails, right?  We looked --

2       A.   She tells me she transmitted e-mails, not

3   which ones, but that she transmitted e-mails.

4       Q.   She indicates that she shared them on a

5   confidential basis with him, correct?

6       A.   Yes.

7       Q.   Do you have any reason, as you sit here

8   today, to dispute that that was her intent to

9   transmit it confidentially?

10      A.   No.  There was another e-mail that came out

11  in discovery that said feel free to share widely,

12  but --

13      Q.   Well, we just looked at that.

14      A.   -- but sitting here today, I --

15      Q.   Okay.  Let's go back and look at that.

16  That was the study we just looked at in Exhibit 37.

17  We looked at it in the complaint, that it was the

18  study you indicated was not confidential, right?

19      A.   Right.

20      Q.   Okay.  Other than that which we acknowledge

21  is publicly available --

22      A.   Okay.

23      Q.   -- do you have any reason to believe

24  that -- and what she says is private e-mail exchanges

25  you and I have had from previous weeks.  That's what

Page 209

1    she's saying is confidential?

2        A.    Correct.

3        Q.    Do you have any reason to believe that that

4    wasn't the case that she had shared that on a

5    confidential basis?

6        A.    I do not.

7        Q.    From your perspective, was she entitled to

8    share with a representative of a law firm

9    confidential information to get legal advice?

10       A.    Well, she stated in the e-mail that she

11   shared it with Eric Deters and other trusted friends.

12   She never said with my attorney.

13       Q.    Well, she says confidentially with

14   Mr. Deters.

15             MR. GUILFOYLE:  On page 2.

16       Q.    Hold on.  We'll get there.  She says --

17       A.    And he's not an attorney.

18       Q.    Okay.  Well, let's back up.  They were

19   attached to a complaint filed by Deters Law, correct?

20       A.    I hadn't seen that at this stage.  I just

21   got the letter.

22       Q.    Did you see it later?

23       A.    I never looked at the suit.

24       Q.    Okay.  Well, she indicates in this that

25   Deters Law had appended to its complaint --

1        A.    Okay.

2        Q.    -- right?  So you knew that it had been

3    appended to a complaint?

4        A.    Correct.

5        Q.    And so it had been shared and used in a

6    lawsuit, correct?

7        A.    Correct.

8        Q.    And she indicates that it was shared on a

9    confidential basis in this letter, correct?

10       A.    It's what she states, yes.

11       Q.    And other than the public study that we

12   just looked at that was not confidential information,

13   do you have any reason to believe that she did not

14   share it in confidence?

15       A.    That she shared our private e-mails in

16   confidence?

17       Q.    In confidence.

18       A.    It seems like that's breaking confidence,

19   but she says she shared it in conference.

20       Q.    Well, it is shared with a representative of

21   a law firm.  Do you know if they have a duty to

22   maintain the attorney-client privilege?

23       A.    Yes.

24       Q.    They do, right?

25       A.    I said yes.

1     Q.   Okay.  And on that basis, there would be

2   nothing wrong with obtaining legal advice on that

3   basis, correct?

4     A.   If she was obtaining legal advice.  She

5   said she was not in her letter.

6     Q.   Okay.  We're going to get to that in a

7   minute.  Please know that I did not authorize Deters

8   Law to publicize those e-mails or any other documents

9   that I authored regarding the vaccines or the vaccine

10   mandate issued by St. Elizabeth Healthcare.  I

11   certainly did not approve their use as exhibits in a

12   lawsuit.  They were used against my explicitly stated

13   desire for confidentiality.  Did you ever ask her

14   what the purpose was of her sharing the information

15   with Mr. Deters?

16     A.   No.

17     Q.   You could have done that in the

18   investigation of this letter, correct?

19     A.   Yes.

20     Q.   And you knew that they ended up as

21   attachments to a lawsuit that had raised ADA and

22   Title VII claims, correct?

23     A.   Yes.

24     Q.   She indicates:  Second, I want to reiterate

25   what I had stated in the e-mail Wednesday, September

Page 212

1    1st, to you and members of the board.  Regarding the

2    letter that multiple providers in our system sent on

3    Tuesday, August 30th, to the board and executive team

4    on the vaccine mandate our group intended this

5    communication to be private, internal, and

6    professional conversation with the board, allowing

7    for an earnest dialogue around our concerns.

8            Do you have any reason to believe that that

9    wasn't the case?

10       A.   I would maybe believe in Amy's mind that

11   was the case.

12       Q.   Okay.

13       A.   My feeling was some people were pretty

14   naive.

15       Q.   Okay.  She says:  Mr. Deters has publicly

16   stated that he obtained this letter from a board

17   member.  She can't be sure where he actually got this

18   letter.  Do you have any reason to dispute that?

19       A.   No.

20       Q.   She says:  I want it to be clear to you

21   that I did not send the signed letter to Deters, nor

22   did I authorize, encourage, nor endorse its

23   transmittance.  Do you have any reason to dispute

24   that?

25       A.   No.

1      Q.   Third, I had obviously been in private

2  communication with Deters, and other trusted friends

3  elsewhere, as I navigated my personal thoughts about

4  the disturbing conflict between what seems to be, on

5  one hand, the mandate position of our local

6  healthcare systems and, on the other hand, the

7  opinions and reservations of so many doctors,

8  scientists, and valued colleagues.

9           Does she indicate in here anywhere in that

10  sentence that the private communications with Deters

11  were not privileged?

12      A.   She had stated he was not her attorney.

13      Q.   Hold on.  We're going to get to that.  Does

14  she say third -- in that third sentence that this was

15  not -- these were not privileged communications?

16      A.   Okay.  Take me back to the sentence.

17      Q.   Third, I had obviously been in private

18  communication with Deters, and other trusted friends

19  elsewhere, as I navigated my personal thoughts about

20  the disturbing conflict between what seems to be, on

21  one hand, the mandate position of our local

22  healthcare systems and, on the other, the opinions

23  and reservations of so many doctors, scientists, and

24  valued colleagues.

25      A.   And what's the question?

1    Q.   Does she say anywhere that that wasn't in

2  relation to obtaining legal advice?

3    A.   She does not.

4    Q.   Did you ever ask her?

5    A.   No.

6    Q.   Okay.  The next sentence:  It was never my

7  intent to seek litigation against St. Elizabeth

8  Healthcare, and I never asked Deters Law to represent

9  me, nor did I sign any affidavits for Deters Law.  Do

10  you see that?

11    A.   Yes.

12    Q.   Okay.  Here she's indicating that she never

13  asked them to actually represent her, correct?

14    A.   Correct.

15    Q.   Were you aware that the privilege also

16  attaches to potential clients?

17        MR. BIRKENHAUER:  Objection to the extent

18     you're calling for a legal conclusion.

19        MR. WIEST:  I'm asking about his

20     awareness of the attorney-client privilege.

21    A.   No.

22    Q.   That you can go and consult with an

23  attorney without hiring them?

24    A.   No.

25    Q.   Have you ever seen ads on TV that talks

Page 215

1    about free initial consultation?

2         A.   Yes.

3         Q.   Okay.  And do you know whether or not

4    that -- you hire an attorney at that point for that

5    pre-initial consultation?

6              MR. BIRKENHAUER:  Same objection.

7         A.   It's not in my knowledge base.

8         Q.   Did you ask Dr. DiChiara about whether or

9    not the privilege attached with respect to

10   Mr. Deters?

11        A.   No.

12        Q.   She finishes by saying -- needless to say,

13   she feels exploited by Mr. Deters.  Rest assured that

14   I will have no more communications with Deters Law

15   except through legal counsel.  And then she finishes

16   with an apology.  Any reason to dispute the contents

17   of this letter as you sit here today?

18        A.   No.

19        Q.   By the way, she never indicated that she

20   shared SEP e-mails between you and her with others,

21   correct?

22        A.   Others -- who's the others?  Because she

23   said she shared private e-mails that she had with

24   myself and Mr. Colvin with Eric Deters.

25        Q.   Right.  And, third, she talks about she's

Page 216

1    been in private communications.  She never indicates

2    that she had shared your communications with

3    Colvin --

4         A.   No.

5         Q.   -- with others, correct?

6         A.   No.

7         Q.   Did you and Mr. Colvin discuss this apology

8    letter?

9         A.   I'm sure we did.

10        Q.   What do you remember about those

11   conversations?

12        A.   Not a thing, to be honest.

13        Q.   Did you discuss terminating Dr. DiChiara's

14   employment with Mr. Colvin in response to this

15   apology letter?

16        A.   At some point I did, yes.

17        Q.   Do you know when?

18        A.   No.

19        Q.   Do you know if it was immediately in

20   receipt of the letter?

21        A.   I'm not sure.

22        Q.   Do you recall the contents of your

23   conversations?  By the way, let me back up.  How many

24   conversations did you have with Mr. Colvin concerning

25   the termination of Dr. DiChiara?

1      A.   I have no way of recollecting that.  Once

2  it started, probably weekly.  I had a weekly meeting

3  with him and would update him on things that were

4  going on.

5      Q.   Okay.  So this is early September of '21.

6  September 5th you got this letter on Sunday, right?

7  And it looks like you sent it to Mr. Bast the

8  following Tuesday, would that be fair, September 7th?

9      A.   Yes.  That was probably the day I actually

10  saw the e-mail.

11      Q.   Why did you send it to Mr. Bast?

12      A.   He's chief operations officer for SEP and I

13  wanted to make him aware.

14      Q.   What would be the purpose of making him

15  aware?

16      A.   He runs the day-to-day business and I use

17  him as a contact and a consultant.

18      Q.   Did he discuss with you the termination of

19  Dr. DiChiara?

20      A.   I'm sure we did at some point.

21      Q.   How many conversations do you think you had

22  with Mr. Bast about that?

23      A.   I cannot be specific on that.

24      Q.   Do you think you had a weekly discussion

25  with Mr. Colvin, what, starting around September 7th

1    and ending with her termination in October?

2        A.    I think it's possible.

3        Q.    Was Mr. Colvin supportive of the

4    termination of Dr. DiChiara's employment?

5        A.    I don't remember specifically, but he must

6    have not been not supportive.

7        Q.    Okay.  You would not have done that if he

8    were against it, fair?

9        A.    That's not true.  I would have had to stop

10   and think and consult and ask questions, but, yeah, I

11   would like him to have supported my position.

12       Q.    Okay.  Dr. DiChiara had an employment

13   contract between herself and SEP, correct?

14       A.    Correct.

15       Q.    Was Mr. Colvin entitled -- did he have any

16   business reason to weigh in on the termination of her

17   employment?

18       A.    Other than my concerns of the impact it

19   could have on the hospital.

20       Q.    She was a 0.6 FTE, correct?

21       A.    Yes.

22       Q.    That's going to be less impact on the

23   hospital than a full FTE, fair?

24       A.    Fair.

25       Q.    But you nevertheless consulted Mr. Colvin

Page 219

1    perhaps three or four times?

2         A.    Yes.

3         Q.    I'm going to hand you a couple of exhibits

4    kind of all at once.

5              (Plaintiff's Exhibit 41 was marked for

6    identification.)

7              (Plaintiff's Exhibit 42 was marked for

8    identification.)

9         Q.    Forty-one is your initial response to

10   Dr. DiChiara on September 8, 2021, at 3:34 p.m., and

11   you also sent it Garren Colvin.  And you indicate,

12   Amy, I received your e-mail and I must say I am very

13   disappointed and upset that you would share our

14   private conversations and e-mails with Mr. Deters.  I

15   would like you to send me any and all communications

16   and information you shared with Mr. Deters or anyone

17   associated with Mr. Deters without redactions.

18   Please send me the documents by the end of the day

19   this Friday, September 10th.  First of all, that's

20   your e-mail, right?

21        A.    Yes.

22        Q.    Why did you include Mr. Colvin on that

23   response?

24        A.    I'm trying to remember.  Was he on her

25   e-mail when --

1        Q.   He was.

2        A.   -- she apologized?  So that's the reason I

3   would have copied him.

4        Q.   Okay.  And did you discuss with Mr. Colvin

5   wanting her e-mails without redactions?

6        A.   I don't recollect discussing that with

7   Mr. Colvin.

8        Q.   Okay.  Why did you want her e-mails without

9   redactions?

10       A.   I actually talked to in-house counsel and

11  that was the recommendation.

12       Q.   Okay.  You did not accuse her of sharing

13  those e-mails with anyone other than Mr. Deters,

14  correct?  And that's the concern, you wanted the

15  unredacted with Deters in 41?

16       A.   Yes.

17       Q.   Okay.  And then 42, she responds back and

18  says I'm out of town.  And you say I want them by

19  Monday, correct?

20       A.   Correct.

21       Q.   I know the answer to this, but I want to

22  be -- let me ask:  As of September 10th, had the

23  decision been made to terminate Dr. DiChiara's

24  employment?

25       A.   I don't know exactly what date that was

1   made.  I involved members of my team and others to

2   look into it for me.

3        Q.   Who was involved in those discussions other

4   than yourself?

5        A.   Well, you had Mr. Bast's name.  I'm sure he

6   was.  I'm sure that Dr. Ann Beers who is -- was the

7   assistant vice president in charge of medical

8   specialties was.  I'm sure Dan Cole who was the

9   assistant vice president for medical specialties was.

10  I am sure that our in-house counsel was involved.  I

11  probably talked to HR at some period in that time.

12  And as I mentioned, I would have talked to

13  Mr. Colvin.  As things progressed, I talked to the

14  SEP chair of the board.  I can't remember

15  specifically any others.

16       Q.   Do you recall any particular conversations

17  with any of those folks as you sit here today?

18       A.   No.

19       Q.   Well, let me back up.  When you listed

20  Mr. Bast, Dr. Beers, et cetera, as you're listing

21  them, those would have been the people that you

22  typically would have consulted, but you don't have a

23  particular recollection; is that fair?

24       A.   That would be people I would typically

25  consult with, yes.

Page 222

1      Q.   Who was the in-house counsel you consulted

2  with?

3      A.   Katie Koch, probably Lisa Frye.  Talked to

4  both.

5           (Plaintiff's Exhibit 43 was marked for

6  identification.)

7      Q.   This is Exhibit 43.  This is the next

8  e-mail in the chain.  This is an e-mail from you to

9  Dr. DiChiara regarding vaccination scheduling.

10     A.   Yes.

11     Q.   Was this an automatic e-mail that was

12  generated?

13     A.   I honestly don't remember.  I can't imagine

14  I would have signed them all, so it probably was

15  automatic.

16     Q.   Okay.  Something your assistant might have

17  done?

18     A.   Yes, or legal or somebody within the

19  system.

20     Q.   Okay.  I mean, this wasn't a personal

21  e-mail that you were directing at Amy, was it, that

22  you had drafted?

23     A.   No.

24     Q.   And this went out, I take it, to all of the

25  unvaccinated providers or anybody that did not -- you

Page 223

1    did not have a vaccination record with?

2         A.    Yeah, or an exemption or whatever.

3         Q.    Okay.  Dr. Pritchard, as you sit here

4    today, do you know when the final decision was made

5    to terminate Dr. DiChiara's employment?

6         A.    Specifically, no.

7         Q.    I mean, I know the letter went out on

8    October 4th and the meeting went out October 4th, and

9    we're going to look at the e-mail scheduling that on

10   October 1st, but do you know when the decision was

11   made to do that?

12        A.    The final decision, I don't know the dates.

13   I think we were working towards that from early on in

14   that month.

15        Q.    It was under -- said another way, it would

16   have been under consideration, as I understand your

17   testimony, from the time that she sent the apology

18   letter?

19        A.    Yes.

20        Q.    Okay.  And what you were trying to do was

21   to look into it a little more perhaps for making that

22   final decision?

23        A.    Well, tried to look into making sure the

24   contract, policies, things like that, what were the

25   issues.  I felt that she had violated our trust and

1    our loyalty by sharing our private e-mails.

2         Q.   By our, you mean your and Mr. Garren's

3    trust?

4         A.   The organization's.  We represent the

5    organization.

6         Q.   And by the organization, you mean SEH and

7    SEP?

8         A.   Correct.

9         Q.   We'll talk a little more about that in a

10   couple of minutes.

11            (Plaintiff's Exhibit 44 was marked for

12   identification.)

13        Q.   This is Exhibit 44.  There was a letter

14   that was drafted, a form letter, for unvaccinated

15   providers around the middle of September in this

16   case, September 10th, correct?

17        A.   Yes.

18        Q.   And I take it this was a form letter that

19   went out to every practice group.  It indicated who

20   was not vaccinated within the practice group,

21   correct?

22        A.   Correct.

23        Q.   Who was -- I think -- I don't know if you

24   told me this.  Dan Cole was the assistant vice

25   president of?

1        A.    Medical services.

2        Q.    Okay.  And who was he over?

3        A.    He would have, in partnership with Dr. Ann

4   Beers who was the physician vice president of medical

5   services.  They were over all medical specialty

6   practices and providers.

7        Q.    And in this case, this was a note that

8   Dr. DiChiara was unvaccinated as of September 10th.

9   Were you aware of that?

10       A.    No, but is this -- I've not had a chance to

11  read this.  Is this specifically about Dr. DiChiara?

12       Q.    Yeah.  There's some unvaccinated providers

13  that start at the bottom of 2532 and lists Kelly

14  Rawe, Chike -- I'm never going to get his name right.

15       A.    Anusionwu.

16       Q.    Anusionwu, and Dr. DiChiara.

17       A.    Okay.

18             (Plaintiff's Exhibit 45 was marked for

19  identification.)

20       Q.    This is an e-mail -- do you know who Casey

21  Weaver is?

22       A.    Casey Weaver is the manager for the GI

23  practice.

24       Q.    Okay.  And Casey Weaver responds back, Dr.

25  Anusionwu is vaccinated.  He sent the information

Page 226

1    over.  Kelly -- and I think that's related to Kelly

2    Rawe -- received her first dose last week.  She'll be

3    vaccinated by the deadline.  And DiChiara I believe

4    put in for an exemption but I'm not sure of the

5    status.  Were you made aware of that, by the way?

6        A.    I can't remember if I was or not.

7        Q.    Okay.  Did Dr. Beers discuss that with you?

8        A.    It's possible.

9        Q.    At the time, mid September, the litigation

10    was going on with Deters in federal court.  Were you

11    aware of that?

12        A.    Yes.

13        Q.    I think Mr. Guilfoyle and Mr. Markus were

14    handling that at DBL, correct?

15        A.    We'll believe you.

16        Q.    Okay.

17            (Plaintiff's Exhibit 46 was marked for

18    identification.)

19        Q.    This was communication that I directed at

20    Mr. Markus and Mr. Guilfoyle dated Monday, September

21    13, 2021, at 3:58 p.m., and I've got some questions

22    about this.  Were you made aware of this e-mail in

23    September 2021?

24        A.    Not that I'm aware of, no.

25        Q.    So today is the first time you've seen

1   this?

2          A.    I honestly don't know.

3          Q.    Okay.

4          A.    It's the first time I remember seeing it.

5          Q.    Okay.  Do you recall anybody telling you

6   that Dr. DiChiara had retained counsel other than

7   Deters?

8          A.    I think I knew that, yes.

9          Q.    Do you recall anybody telling you that

10  Dr. DiChiara was taking the position that the

11  communications with Mr. Deters -- her communications

12  with Mr. Deters were subject to the attorney-client

13  privilege?

14         A.    That sounds familiar.

15         Q.    Okay.  And you were aware of that sometime

16  in September of 2021?

17         A.    I will say yes.

18         Q.    Let's assume that's true --

19         A.    Okay.

20         Q.    -- just for a moment, that the

21  communications that she had made with Deters as a

22  representative of Deters Law were made in confidence

23  with the intent that she keep them confidential,

24  okay?  And we can discuss whether or not that's true

25  separately.  Let's assume that that's true.  Was that

Page 228

1   a violation of trust or loyalty, from your

2   perspective?

3        A.   I think it has a lot to do with intent.

4        Q.   Okay.  In what way?

5        A.   Well, what was it pertaining to?  Was it

6   pertaining to the science or was it pertaining to

7   that she felt we were not following some federal

8   guideline that we should be following?

9        Q.   Well, let's begin with her wanting to get

10  legal advice on her rights and responsibilities

11  vis-a-vie the vaccine mandate.  Let's assume that

12  that was the initial intent.

13       A.   Okay.

14       Q.   Anything wrong with that from a policy

15  perspective?

16       A.   No.

17       Q.   Let's assume that -- and, in part, there

18  would be nothing wrong with that because the

19  expectation she had would be that it would be kept

20  confidential, right?

21       A.   Yeah.  I still question intent because her

22  conversations with Mr. Colvin and I had nothing to do

23  with exemptions, anything such as that.  It was just

24  on the science of the vaccine and should it be

25  mandated or not.

Page 229

1          Q.    Okay.  You're talking about the meeting she

2     had and the 27-page document that she authored?

3          A.    Or her e-mails with us.

4          Q.    Or the e-mails -- the follow-up e-mails to

5     that that we've looked at today?

6          A.    Yes.

7          Q.    Okay.  Let's go back to Exhibit 37 where

8     she authors the letter with you -- or she shares the

9     letter.

10         A.    When you say the letter?

11         Q.    Yeah.  There's a letter that's attached to

12    Exhibit 27.  It's her -- I think it's the 27-page

13    letter.  Okay.  And I want to just -- look at

14    Defendants 2112.  Tell me when you're there.

15         A.    So you're talking about the 27-page letter?

16         Q.    Yes, sir.  I'm looking at the letter that

17    begins on Monday, August 16th.  And I want to go to

18    the second paragraph.

19         A.    Okay.

20         Q.    What she says is:  This document is

21    intended to be seen as a professional document

22    focused on my medical and scientific concerns as a

23    physician.  I believe I am doing my professional duty

24    to inform the St. Elizabeth system of the current

25    medical literature on this topic so that our system

Page 230

1    can be best served.  This document is not to be

2    construed to represent my personal, individual

3    beliefs re: personal vaccination, right?

4         A.    That's what she states, yes.

5         Q.    That's what she states.  And what she

6    states is I'm not discussing in this my personal,

7    individual beliefs, correct?

8         A.    Correct.

9         Q.    And so if she had personal, individual

10   beliefs, and we're about to look at her list

11   accommodation request in a minute, that would be

12   something different than what's in this document,

13   correct?

14             MR. BIRKENHAUER:  Objection as to form.

15        It calls for speculation.  You can answer if

16        you can.

17        A.    I'm not sure if I know the question.

18        Q.    Well, my point is, this e-mail, this

19   27-page document, what she stated was this document

20   is not to be construed to represent my personal,

21   individual beliefs re: personal vaccination, right?

22        A.    That's what she states, yes.

23        Q.    She'd be free to get advice, legal advice,

24   concerning her personal, individual beliefs and

25   whether or not there's a basis for exemption,

 1    correct?

 2              MR. BIRKENHAUER:  Same objection.  You

 3        can answer.

 4        A.    She never asked us about exemption.

 5        Q.    Well, that wasn't the question.  She

 6    doesn't indicate that this letter is limited -- or

 7    she doesn't indicate that this letter is addressing

 8    her personal --

 9        A.    Correct.

10        Q.    -- individual beliefs, right?

11        A.    Correct.

12        Q.    She tells you that in the letter, right?

13        A.    Yes.

14        Q.    And she would have the right to consult

15    legal counsel concerning her individual -- her

16    personal beliefs and whether or not there's a basis

17    for vaccination, correct?

18        A.    And she could have done that without the

19    personal e-mails from myself and Garren Colvin.

20        Q.    Okay.  So you're saying she could not share

21    those e-mails with legal counsel concerning her

22    rights or privileges confidentially?

23        A.    It was not pertinent to what she was

24    asking.

25        Q.    Do you know what -- do you know whether or

1    not it was pertinent?

2        A.    Well, it was just if she should take the

3    vaccine or not.

4        Q.    Well, let's -- wait a minute.  We looked at

5    the documents, Dr. Pritchard, earlier where

6    St. Elizabeth and SEP acknowledge that exemptions are

7    going to be granted unless it creates an undue burden

8    on the organization?

9        A.    Correct.

10       Q.    Is it your testimony, sir, that a private

11   lawyer would not want to evaluate documents related

12   to the burden on the organization?

13       A.    At that stage, I don't see where it was

14   pertinent.  What question was she consulting him

15   about?

16       Q.    You're not a lawyer, correct?

17       A.    I sure am not.

18       Q.    And you were not handling the processing of

19   these exemption requests, correct?

20       A.    I was not.

21       Q.    Do you know whether an employment lawyer

22   representing her would want to look at the burden on

23   the organization in helping her formulate an

24   exemption request?

25       A.    I think if she was refused an exemption,

Page 233

1    probably, yes, but I would think you'd let the

2    process work.

3         Q.   And is it your testimony that she did not

4    have the right to consult with an attorney prior to

5    her submitting her exemption request?

6         A.   That's not what I said.

7         Q.   Okay.  So she did have the right to consult

8    with an attorney prior to submitting her exemption

9    request, right?

10        A.   Yes.

11             (Plaintiff's Exhibit 47 was marked for

12   identification.)

13        Q.   Let's look at Exhibit 46.  I'm going to

14   start on the second page 364.  I'm sorry.  This is

15   actually 47.  I mismarked it.  Forty-six was my

16   e-mail.  Dr. DiChiara on September 13, 2021,

17   submitted a religious accommodation request.  Do you

18   dispute that?

19        A.   I would have no reason to dispute.

20        Q.   She indicates why she has religious

21   objections to the vaccine mandate on a personal

22   basis, correct?

23        A.   I can't honestly hardly read this topic --

24   this document, but I won't deny you're saying that.

25        Q.   Okay.  If you look at the cover page, it

Page 234

1    looks like her accommodation request was approved on

2    September 17, 2021?

3         A.    Yes.

4         Q.    Do you know who did that?

5         A.    We had a committee that did that.

6         Q.    Do you know whose signature that is?

7         A.    It sort of looks like Smith, so it may be

8    Amy Smith who was the head -- ran employee health for

9    St. Elizabeth Healthcare.

10        Q.    Do you know whether or not the committee

11   was assessing the sincerity of the lease in

12   evaluating these accommodation requests?

13        A.    I wasn't really involved in that process.

14        Q.    Had you been aware that Dr. DiChiara had

15   submitted a religious accommodation request on

16   September 13th or the days that followed?

17        A.    No.

18        Q.    Who is Gary Brown?

19        A.    Gary Brown is director for medical

20   services, I believe.

21        Q.    Okay.

22        A.    So he would have reported to Dan Cole and

23   Ann Beers.

24        Q.    Okay.  And then Ann Beers reported to you?

25        A.    Yes.

1    Q.   Was he in the loop on the discussions of

2  terminating Dr. DiChiara's employment?

3    A.   I don't know the answer to that.  I don't

4  know what Dr. Beers would have shared with her

5  reports.

6    Q.   Dr. Beers was involved and in the group in

7  that discussion?

8    A.   Yes.

9         (Plaintiff's Exhibit 48 was marked for

10  identification.)

11    Q.   Exhibit 48.  Do you know why Gary Brown

12  indicated the day after Dr. DiChiara submitted her

13  religious accommodation request that her schedule

14  should be blocked?

15    A.   I'm sorry.  Where --

16    Q.   I'm at the top of Exhibit 48.

17    A.   Okay.

18         MR. BIRKENHAUER:  Take your time to read

19    it.

20    A.   I don't know.

21    Q.   Okay.  Would it be because the intent had

22  been made to terminate her employment by that date or

23  you just don't know?

24    A.   I would think it was either that we had

25  made a decision to terminate or they had not gotten

1    her exemption back.

2        Q.    Okay.  Let me ask -- we're going to go over

3    a couple of other e-mails with -- between myself and

4    Mr. Guilfoyle and Mr. Markus.  Was Mr. Guilfoyle

5    authorized to speak on behalf of SEP and SEH?

6        A.    Yes.

7              (Plaintiff's Exhibit 49 was marked for

8    identification.)

9        Q.    I want to start on the second page of these

10   communications.  Mr. Guilfoyle had some questions

11   about Mr. Deters and his ability to practice law, if

12   you look on the second page, 1406.  Tell me when

13   you're there.

14       A.    Halfway through the first -- the one at the

15   bottom says first our understanding is?

16       Q.    Right.

17       A.    Okay.

18       Q.    And he asked for authority to support the

19   position that the communications were privileged,

20   right?

21       A.    Yes.

22       Q.    He also asks about Dr. DiChiara

23   communicating with Deters Law Firm after litigation

24   was commenced.  And then he asks about Dr. DiChiara

25   pursuing suit -- or pursuing in the suit with Judge

Page 237

1   Bunning to set the record straight.  Do you see that?

2   And then finally he reserves all rights.  Do you see

3   that?

4        A.   Yes.

5        Q.   And I think you told me he was authorized

6   to say all of those things on behalf of SEP and SEH,

7   correct?

8        A.   Yes.

9        Q.   He gets a response from me on September 15,

10  2021, at 5:14 p.m. about our position that the

11  communications with Mr. Deters were privileged.  And

12  my question is:  Were you generally aware of these

13  e-mail exchanges?

14       A.   I'm unsure at this time.

15       Q.   Were you aware that the distinction was

16  being made between being involved in the litigation

17  and getting legal advice from these e-mails?

18       A.   Am I aware now?

19       Q.   Well, were you aware in September of '21?

20       A.   Of what again?

21       Q.   Of communications regarding Dr. DiChiara's

22  position regarding her communications with the Deters

23  firm.

24       A.   That they were protected?

25       Q.   Right.

Page 238

1      A.   I don't remember.

2      Q.   Okay.  Would you have consulted with

3  counsel on that?

4      A.   I wish I knew.  I don't remember.

5      Q.   Would you agree that Dr. DiChiara, acting

6  through counsel, would have the right to communicate

7  with SEP and SEH through their counsel?

8      A.   Yes.

9      Q.   And that would be the same as her

10  communicating directly with you or Mr. Colvin,

11  correct, communicating through agents?

12      A.   Yes.

13          MR. BIRKENHAUER:  Chris, whenever you get

14      to a good point, let's take a quick restroom

15      break.

16          MR. WIEST:  Absolutely.  Let's do it now.

17          VIDEO TECHNICIAN:  We're off the record.

18              (OFF THE RECORD)

19          VIDEO TECHNICIAN:  We are back on the

20      record.  The time is 3:22.

21          (Plaintiff's Exhibit 50 was marked for

22  identification.)

23  BY MR. WIEST:

24      Q.   And, Dr. Pritchard, I've got a question on

25  this Exhibit 50.  I realize you're not a party to it,

Page 239

1    but this is a further discussion between Casey Weaver

2    and Dr. Beers about continuing to schedule Amy

3    DiChiara as of September 16th into October.

4    Dr. Beers was in the loop concerning this situation

5    with Dr. DiChiara in sharing information with the

6    Deters firm, correct?

7        A.    I'm sorry.  Say that again.  I apologize.

8        Q.    Dr. Beers, Ann Beers, was in the loop

9    concerning the situation that you and I guess

10   Mr. Colvin were dealing with concerning Dr. DiChiara

11   sharing information with the Deters Law Firm, right?

12       A.    Yes.

13       Q.    And as of September 16th, she indicates

14   that Dr. DiChiara had submitted an exemption request.

15   Per our prior statement, we could continue scheduling

16   beyond October 1st.  Do you see that?

17       A.    Yes.

18       Q.    Would it be fair for me to assume from this

19   that the decision to terminate her employment might

20   have been under discussion but had not been made as

21   of September 16th?

22       A.    I think that's a good assumption.

23       Q.    Okay.

24             (Plaintiff's Exhibit 51 was marked for

25   identification.)

1          Q.   Give you Exhibit 51.  Don't know if you

2    ever seen this before.  Let me just ask.  This is a

3    further exchange between Mr. Guilfoyle and myself

4    dated September 16th.  Mr. Bruns and Mr. Markus are

5    copied, and then there's a response from me at the

6    top on September 16th.  Let me start with

7    Mr. Guilfoyle's communication on Thursday,

8    September 16, 2021, at 2:43 p.m.  You would agree

9    that Mr. Guilfoyle was authorized to communicate to

10   me on behalf of Dr. DiChiara on behalf of SEP and

11   SEH, correct?

12         A.   Yes.

13         Q.   And what he indicates in this e-mail is I

14   tried calling but your voice mail is full.  I assume

15   you will be filing some sort of motion for protective

16   order/motion to quash the subpoena.  That would not

17   waive the privilege, but of course would seek to

18   preserve it.  Let me know what your plan is.  Also, I

19   will forward some pleadings to you shortly from the

20   Boone Circuit Court that may be helpful.  Do you see

21   that?

22         A.   Uh-huh.  Yes.

23         Q.   So we talked about being authorized.  My

24   next question is:  Was this -- were you aware of this

25   e-mail exchange in September of 2021?

1      A.    No.

2      Q.    Were you aware that counsel for SEP had

3  communicated to Dr. DiChiara information that

4  included, quote, that would not waive the privilege

5  but of course would seek to preserve it?  Were you

6  aware that that communication occurred?

7      A.    I'm not sure in this context what this is.

8      Q.    Were you aware that SEP and SEH's counsel

9  were undertaking efforts to help preserve Dr.

10  DiChiara's privilege with respect to the Deters firm

11  to keep Deters from being able to use the information

12  or anything else?

13          MR. BIRKENHAUER:  Objection as to form.

14      You can answer if you can.

15      A.    I really can't because I still don't

16  understand the legal part there we're talking about.

17      Q.    Okay.  Are you aware that SEP and SEH's

18  counsel on behalf of them had indicated that they

19  were assuming that there would be some sort of motion

20  for protective order/motion to quash the subpoena to

21  keep Dr. DiChiara from testifying?

22      A.    No, but you would have to define all

23  that -- define all that stuff for me.

24      Q.    Okay.  Were you aware that on behalf of

25  Dr. DiChiara, her counsel had indicated that we were

Page 242

1    going to shut Mr. Deters down and quash his subpoena?

2        A.    I don't remember that.

3            (Plaintiff's Exhibit 52 was marked for

4    identification.)

5        Q.    Okay.  Exhibit 52 is some additional

6    communication between myself and Mr. Markus and

7    Mr. Guilfoyle.  Were you aware that Dr. DiChiara

8    through counsel had, in fact, caused the subpoena to

9    be withdrawn over privilege grounds?

10       A.    No.

11       Q.    Okay.  You don't dispute, though, that this

12   e-mail and its contents, it was sent to counsel for

13   SEH and SEP?

14       A.    I don't contest that.

15       Q.    Okay.  Let me ask:  The last directive from

16   you to Dr. DiChiara was for her to turn over

17   unredacted e-mails.  Do remember looking at that?

18       A.    Yes.  I asked her to do that.

19       Q.    Okay.  And we've looked at these

20   communications between counsel about whether or not

21   she's going to do that.  And there's no further

22   e-mails from you to her directing that these

23   communications be turned over unredacted, correct?

24       A.    After my second request, no.

25       Q.    Right.  And the assumption that I have, and

Page 243

1    you can tell me if this is correct or not, was that

2    at that point it was being handled through the

3    lawyers and you were aware of that, correct?

4        A.    I think that's true.

5        Q.    Okay.

6        A.    Yeah.  I don't remember, but...

7            (Plaintiff's Exhibit 53 was marked for

8    identification.)

9        Q.    This is 53.  If you look on the second

10   page, it's where I want to begin.  There's an e-mail

11   from Mr. Guilfoyle to me on September 20, 2021, at

12   3:04 p.m. in which he writes:  Chris, I would like to

13   renew my request to produce to me unredacted copies

14   of the e-mails Deters attached to the complaint.

15   Okay?

16       A.    Yes.

17       Q.    Was he authorized to send that on behalf of

18   SEP and SEH?

19       A.    He was our attorney acting on our behalf.

20       Q.    Okay.  So he was authorized, correct?

21       A.    I never know what you mean by authorized.

22       Q.    Well, there's a couple of ways to construe

23   that.  One way is you've got a rogue agent, like

24   Mr. Deters, revealing confidential information.  And

25   the other way is the person was authorized to do it

Page 244

1    by the client.

2        A.    We had hired them as our attorneys in this

3    matter.

4        Q.    So he was authorized, correct?

5        A.    If that's what that means.

6        Q.    Okay.  And in response back, Mr. Guilfoyle

7    has asked what is the basis, legal or otherwise, for

8    this request for Dr. DiChiara, my client, Dr.

9    DiChiara, to essentially waive her attorney-client

10   privilege to produce materials.  Do you see that?

11       A.    Yes.

12       Q.    If I were to represent to you that there

13   was no further pretermination discussions between

14   counsel about this e-mail turnover, you have no

15   reason to dispute that, correct?

16       A.    No.

17       Q.    Was the fact that Dr. DiChiara had not

18   voluntarily relinquished these e-mails, was that a

19   factor in her termination?

20       A.    It may have played a role, but, no, it was

21   not the factor in determining her --

22       Q.    We'll look at the letter in a minute.

23       A.    Okay.

24       Q.    Okay.  Were you aware as of September 20,

25   2021, that she had taken the position that this is

1    all privileged and she's not turning it over to

2    anybody?

3         A.   Was I aware of it?  No.  I'm just still

4    trying to figure out why if she says, hey, I just

5    shared our personal e-mails, sorry, why she wouldn't

6    just share them.  That goes to show us exactly that

7    she only sent our personal e-mails.

8         Q.   Okay.

9              (Plaintiff's Exhibit 54 was marked for

10   identification.)

11        Q.   This is a short exhibit.  This is Exhibit

12   54.  This is notification to Dr. DiChiara that her

13   religious exemption request was approved on

14   September 20th.  You don't dispute that, correct?

15        A.   No.

16        Q.   And so the determination had been made by

17   SEP or SEH that she had a sincerely-held religious

18   belief concerning this vaccine requirement, correct?

19        A.   I don't know if it states why her exemption

20   was passed.  I don't know if it was for a healthcare

21   reason or religious, but -- oh, it says religious

22   exemption.

23        Q.   It says religious.

24        A.   Yes.

25        Q.   Okay.  And so the determination would have

Page 246

1    had been made that it was a sincerely-held religious

2    belief, correct?

3         A.   Yes.

4         Q.   You have no reason to dispute that as you

5    sit here today, do you?

6         A.   No.

7              (Plaintiff's Exhibit 55 was marked for

8    identification.)

9         Q.   Okay.  On October 1st, employee health sent

10   e-mails out to everyone that had received an

11   exemption request advising them that -- well, really

12   two things.  You received an exemption or you were in

13   the grace period and then they needed -- employees

14   needed to do some additional steps, including some

15   testing, correct?

16        A.   Correct.

17        Q.   I take it that that's a form letter that

18   went out to kind of everybody, correct?

19        A.   Yes.

20             (Plaintiff's Exhibit 56 was marked for

21   identification.)

22        Q.   And to that effect, this is a communication

23   to you and Mr. Colvin authored to the system, both

24   SEP and SEH, indicating that everyone was either

25   vaccinated or received an exemption, correct?

Page 247

1      A.    Correct.

2      Q.    Was anyone terminated for not getting

3  vaccinated and not having an exemption?

4      A.    So was anybody terminated for either not

5  being vaccinated or not getting --

6      Q.    Correct.  Being unvaccinated without an

7  exemption.

8      A.    I don't think so.  I'm trying to see if I'm

9  saying that correctly.  So nobody was terminated for

10 not getting the vaccination who had received an

11 exemption.

12     Q.    So I understand that.  Was there anybody

13 that did not get an exemption and was not vaccinated

14 that got terminated?

15     A.    Oh, I'm sure there was.

16     Q.    Okay.  Are you aware of anyone personally?

17     A.    No.  And I don't know if they resigned, but

18 their relationship was terminated.

19          (Plaintiff's Exhibit 57 was marked for

20 identification.)

21     Q.    Okay.  Here's 57.  I want to start on the

22 October 1st chain that starts at 2189.  It's the

23 second page.  This was sent on Friday, October 1,

24 2021, from you to Dr. DiChiara copying Kelley Jump

25 and Casey Weaver.  And you are indicating -- you're

Page 248

1    asking your assistant Kelley to reach out to schedule

2    a meeting Monday, correct?

3         A.   Yes.

4         Q.   This was the termination meeting, correct?

5         A.   Yes.

6         Q.   And you knew on October 1st that you were

7    going to terminate Dr. DiChiara's appointment the

8    following Monday, correct?

9         A.   Well, whenever we did set up the meeting.

10        Q.   Right.

11        A.   Yeah.

12        Q.   Get together after your office hours?

13        A.   Yeah.

14        Q.   Would you agree with me that that was the

15   final -- the discussions were over, the decision had

16   been made as of Friday October 1, 2021, at 3:27 p.m.?

17        A.   Yes.

18        Q.   Who was involved in those final discussions

19   leading up to the termination?

20        A.   I can't tell you specifically.  We would

21   have had HR involved, obviously, and both Donna

22   Dieman and Lea Lowry.  Lea was Donna's boss.  Legal

23   would have been involved.  Operations would have been

24   involved.  Ann Beers and Dan Cole.  There were a lot

25   of considerations to take -- to be taken to figure

Page 249

1    out when to do this, so...

2        Q.    Who in legal?

3        A.    I'm sorry.

4        Q.    Who in legal?

5        A.    Who in legal?  It would have been Ms. Koch.

6        Q.    Dr. DiChiara responds back on Friday,

7    October 1, 2021, and she says:  Who else should I

8    expect to be at this meeting.  And your response back

9    is:  The two of us.  See you tomorrow.  Right, on

10   October 3rd?

11       A.    Yes.

12       Q.    Was that true at the time?

13       A.    Well, I intended for Ms. Dieman to be there

14   to help her with her termination process.

15       Q.    Okay.  But you didn't tell Dr. DiChiara

16   that?

17       A.    Not at that stage, no.

18       Q.    You wanted it to be a surprise, correct?

19       A.    Well, I seriously doubt it was a surprise.

20   Amy sure didn't act surprised when she got there.

21   But, no, I knew I would need Donna's assistance to

22   help.

23       Q.    And instead of -- why not tell her that

24   then on October 3rd?

25       A.    Only reason I can think of is as soon as I

Page 250

1    told her Donna would be there, she would probably

2    know it was a termination and I did not want her to

3    go through the weekend thinking that.

4         Q.    Okay.  There were steps that had to be

5    taken to terminate an employee, correct?

6         A.    Correct.

7         Q.    You've got to shut down Epic access, right?

8    Shut down e-mail?

9         A.    Yes.

10        Q.    You've got to arrange -- if you've got an

11   active physician, that all the charting ends up

12   getting done maybe post termination.  In any event,

13   that's got to be coordinated, right?

14        A.    Yeah.

15        Q.    How long in advance of October 4th had the

16   final decision been made to terminate?

17        A.    I have no memory.  We had to juggle office

18   schedules, make sure of coverage, that she wasn't on

19   call, all of those sorts of things.  So I would say a

20   minimum of a week.

21        Q.    Okay.  You could have delegated this

22   termination to Ann Beers or anyone down the chain,

23   correct?

24        A.    Absolutely.

25        Q.    You didn't, though, did you?

Page 251

1        A.    I did not.

2        Q.    And you didn't because this one was a

3   little personal, correct?

4        A.    No.

5        Q.    It wasn't because she took e-mails

6   involving you and Garren Colvin --

7        A.    No.

8        Q.    -- and shared it?

9        A.    Dr. Beers said this is my job, let me do

10  it.  And I said, no, this is going to end up legal

11  and I'd rather you not have to go through it.  I'll

12  do it.

13       Q.    Okay.  You knew in advance it was going to

14  turn legal?

15       A.    Absolutely.

16       Q.    Why did you know in advance it was going to

17  turn legal?

18       A.    Why would I not think it was going to turn

19  into a legal situation?

20       Q.    Because there had been communications

21  between her counsel and your counsel in advance of

22  the termination.

23       A.    No.  Just my experience.

24       Q.    And what about this, in your experience,

25  made you realize that it was going to turn legal?

1    A.    Part of it was knowing Dr. DiChiara, that

2    she would look for remedies, that she would not just

3    walk away gracefully.

4    Q.    Okay.  Was she supposed to walk away

5    gracefully from a career in a place she'd been

6    employed with for eight plus years?  Would you expect

7    that of anyone?

8    A.    Well, she absolutely knew that what she had

9    done was wrong.  She apologized in a letter.  She

10   shared our private e-mails.  I think she said at the

11   end of our meeting that she understood why I felt the

12   way I did.  So I would have thought, yeah, carry on.

13   Q.    Do you know, was she apologizing because of

14   the fact that somebody that she had trusted documents

15   to in a confidential manner had abused her trust, as

16   she reflected in the letter to you, or was she

17   apologizing because she felt she had done something

18   wrong?

19   A.    I have no way of knowing what she was

20   thinking.

21   Q.    She indicated in the letter -- in the

22   apology letter that she felt betrayed by Mr. Deters,

23   right?

24   A.    She did.

25   Q.    Who attended the termination meeting on

Page 253

1   October 4, 2021?

2         A.   Myself and Donna Dieman and Dr. DiChiara.

3         Q.   Were you aware that that meeting was

4   recorded?

5         A.   I was not.

6         Q.   Was there a problem, from your perspective,

7   her recording that meeting?

8         A.   Well, I don't know that I appreciate it in

9   retrospect, but that was her call, not mine.

10        Q.   Did she violate any policies by recording

11  them?

12        A.   I don't know that she did.

13        Q.   Ms. Dieman took some notes at that meeting?

14        A.   Correct.  That was one of the reasons she

15  was there.

16        Q.   Okay.  I'll talk to you about that.  Let me

17  ask, Dr. Pritchard -- we're going to look at the

18  termination letter in a minute -- that letter was

19  prepared in advance of the meeting, correct?

20        A.   Yes.

21        Q.   Who prepared that letter?

22        A.   Our team.

23        Q.   Who's our team?

24        A.   Well, it would have been legal and working

25  with HR, working with operations leadership, but it

1    was a team exercise.

2         Q.    Okay.  Who made the final decision on that

3    termination?

4         A.    I did.

5         Q.    Had Garren Colvin seen the letter, the term

6    letter, in advance of you presenting it to her?

7         A.    I don't think so.

8         Q.    He was aware that you were going to

9    terminate her employment, though?

10        A.    Yes.

11        Q.    In fact, you had discussed it with him,

12   correct?

13        A.    I made sure to let him know, yes.

14        Q.    Okay.  And he expressed no objection to

15   that whatsoever?

16        A.    Did not.

17        Q.    Who at legal was involved in drafting the

18   letter, the term letter?

19        A.    I don't know.  It was done through Ms.

20   Koch, and so whoever Ms. Koch worked with here at

21   DBL.

22        Q.    Okay.

23              (Plaintiff's Exhibit 58 was marked for

24   identification.)

25        Q.    I want to go through the contents of this

Page 255

1    letter and ask just you if they're accurate.

2         MR. GUILFOYLE:  The notes?

3         MR. WIEST:  The notes at Exhibit 58.

4         MR. BIRKENHAUER:  Have you read it yet,

5    Bob?

6         THE WITNESS:  I have not.  I thought they

7    could just use their transcript, their

8    recording to know if it's accurate.  I don't

9    know.

10        Q.   Just tell me when you're done and I'll

11   start asking.

12        A.   I've read it.

13        Q.   Okay.  I'm going to start with the first

14   sentence.  Dr. Pritchard spoke briefly to Dr.

15   DiChiara about the incident relating to the sharing

16   of company information with outside parties, right?

17   That's what it says?

18        A.   Yes.

19        Q.   And the outside parties was Deters Law,

20   correct?

21        A.   Was Eric Deters.

22        Q.   On behalf of Deters Law, correct?

23        A.   I don't know.  It was him and other trusted

24   friends.

25        Q.   Whoa.  Whoa.  Whoa.  Let's go back.

Page 256

1      A.    And even if it was, I'm fine that we say it

2   was Deters Law.

3      Q.    Okay.  You have no evidence that

4   Dr. DiChiara shared anything from the confidential

5   information perspective with any outside party other

6   than Mr. Deters, correct?

7      A.    I do not.

8      Q.    And so outside parties is really referring

9   to Eric Deters?

10     A.    Yes.

11     Q.    He spoke about the breach of duty and the

12  loss of trust this has created with her relationship

13  with SEP and SEP leadership?

14     A.    Correct.

15     Q.    And in particular, are you referring to

16  yourself?

17     A.    I am to myself specifically and to the

18  organization.  I felt that how could I ever have

19  another business conversation with her going forward

20  without the fear that she -- or the feeling that she

21  would go out and share with other people.

22     Q.    Okay.  Because she had shared information

23  on a confidential basis with a representative of the

24  law?

25     A.    Who was actively suing us --

1      Q.    Okay.

2      A.    -- and she, I'm sure, was aware of.

3      Q.    And so it matters, from your perspective,

4  in terms of who she's consulting with, whether or not

5  they're bringing suits against the organization?

6      A.    Well, you use the word consulting in my

7  mind pretty generally because if she was just

8  checking on her rights of the vaccine, our e-mails

9  had nothing to do with that.

10     Q.    Well, you say that.  Do you know what the

11  evaluation was, if anything, by the attorneys at

12  Deters Law?

13     A.    No.  But she could have shared her e-mails

14  back with us to show us exactly what we'd given

15  him -- what she'd given him.

16     Q.    And you understood at the time that there

17  was a concern about breaching the attorney-client

18  privilege over that?

19     A.    I did not because she stated he was not her

20  attorney and she was not involved in any legal action

21  against us.

22     Q.    Dr. Pritchard, we just looked at a number

23  of communications that included communications

24  between myself and Mr. Guilfoyle on behalf of SEP and

25  SEH that indicated the privileged nature of these

1   communications, correct?

2       A.   Yes, but was that the case on the date that

3   she shared those?

4       Q.   Do you have any reason or any evidence to

5   suggest that was not?

6       A.   Other than she saying this was not my

7   attorney, I was not involved in any legal action, and

8   I have no intent of doing any legal action.

9       Q.   Well, let me back up.  When she said it

10  wasn't the attorney, she only said she wasn't

11  interested in bringing a lawsuit, correct?

12      A.   She did say that.

13      Q.   Did she say otherwise he wasn't the

14  attorney?

15      A.   I don't know.  She said he and other

16  trusted friends.  She referred to him in that way.

17      Q.   Let's go back and look at that.

18      A.   Let's go back and look.

19      Q.   Go back to Exhibit 40.

20      A.   Exhibit what?  I'm sorry.

21      Q.   Forty.  The first paragraph, I think we

22  talked about this before but we'll go through it

23  again, she indicated that she shared the documents --

24  the e-mail exchanges confidentially, correct?

25      A.   Correct.

1      Q.    Okay.  The second paragraph indicates that

2  they were not authorized to be published, correct?

3      A.    Correct.

4      Q.    That they were not authorized to be used as

5  exhibits in a lawsuit, correct?

6      A.    Correct.

7      Q.    And they were used against explicitly

8  stated desires for confidentiality.  That's what she

9  says, right?

10      A.    Correct.

11      Q.    You have no evidence that that wasn't the

12  case, correct?

13      A.    I do not.

14      Q.    That's all she says about those

15  communications, correct?

16      A.    Yes.

17      Q.    Let's look at the third.  This is on

18  Defendants 1002.  And by the way, I want to go back

19  to the first -- I just want to unpack this sentence,

20  this first.  Please know that I did not authorize

21  Deters Law.  She's referring to the law firm,

22  correct?

23      A.    Yes.

24      Q.    She's not just referring to Eric Deters.

25  She's referring to the law firm, correct?

Page 260

1      A.    I think she's referring to them because
2  they're the ones who filed this suit.
3      Q.    Okay.  Right.  Mr. Romeo under the
4  complaint filed the suit, an attorney?
5      A.    Yes.
6      Q.    We don't dispute that he was licensed in
7  the Commonwealth of Kentucky to practice law at the
8  time --
9      A.    We do not.
10      Q.    Okay.  I want to go to the third paragraph,
11  because this is your trusted friends
12  comment that we --
13      A.    Yeah.
14      Q.    -- need to talk about.  Third, I obviously
15  had been in private communication with Deters and
16  other trusted friends elsewhere as I navigated my
17  personal thoughts, right?
18      A.    Yes.
19      Q.    She doesn't say that she had shared with
20  any other trusted friend any documents, does she?
21      A.    She also doesn't say that she shared them
22  with Eric Deters as her attorney.  She shared them
23  with him and other trusted friends.
24      Q.    Well, wait a minute.  She indicates that
25  they were shared confidentially in the very first

1   paragraph, correct?

2          A.   With Mr. Deters, her trusted friend.

3          Q.   No, she doesn't.

4          A.   She also doesn't say my attorney, so which

5   assumption are we allowed to make here?

6          Q.   Well, you had communications from me

7   indicating they were shared on the basis of a

8   privilege prior to your termination of her, correct?

9          A.   Yes.

10          Q.   Do you have any reason to dispute that as

11   you sit here today?

12          A.   With you, I have no reason to dispute that.

13          Q.   Okay.

14          A.   With Eric, yeah, I may dispute that.

15          Q.   Okay.  You're suggesting that Mr. Deters

16   was not consulted concerning her legal rights and

17   privileges?

18          A.   I have no clue.  She said she talked to him

19   and her other trusted friends.

20          Q.   Did you consider asking her about that?

21          A.   No.

22          Q.   Why not?

23          A.   I don't know.  Why did she not consider

24   coming and talking to us in person and explaining

25   what happened?  She did about the vaccines.

Page 262

1      Q.    Well, why didn't you ask her for an

2   in-person meeting to discuss it?

3      A.    I did not have a desire to at that time.

4      Q.    You were mad at her?

5      A.    I was disappointed and felt betrayed.

6      Q.    Personally, correct?

7      A.    No, as the CEO of SEP.  I had no real

8   personal relationship with Amy other than through

9   work.

10      Q.    Okay.  She says I never asked Deters Law to

11   represent her, correct?

12      A.    Correct.

13      Q.    Does that -- and I think we talked about

14   this.  Do you know whether or not a privilege would

15   attach nevertheless in consulting with a lawyer prior

16   to formal representation?

17      A.    She did not consult with a lawyer.

18      Q.    Do you know that?

19      A.    I know Eric Deters is not a member of the

20   bar.

21      Q.    Okay.  Did you know that at -- let me back

22   up.  Did you know it at the time?

23      A.    Absolutely.  Everybody's known that Eric

24   Deters has been disbarred.

25      Q.    Hold on.  Did you know that there were

Page 263

1    attorneys practicing on behalf of Deters Law that

2    were licensed?

3         A.   Yes.

4         Q.   Did you know that Eric was acting on behalf

5    of them in gathering information that they were using

6    in a lawsuit?

7         A.   Yes.  But she stated she met with Eric

8    as -- and other trusted friends.  She never referred

9    to him as her attorney or the representation of a law

10   firm.  She had --

11        Q.   We're not -- right.  We're not dealing with

12   in paragraph 3 the documents, are we?  It doesn't say

13   that, does it?

14        A.   No, it doesn't say it is.

15        Q.   Okay.  Is there anything -- hold on.  Is

16   there anything in this Exhibit 40 where she

17   specifically says I never consulted with Mr. Deters

18   for my legal rights or advice?

19        A.   No.

20        Q.   Is there anything in Exhibit 40 that said

21   she never consulted with Deters Law concerning her

22   legal rights or privileges?

23        A.   No.

24        Q.   And I want to go back.  And I hate to do

25   it, but we're going to have to.  Go look at Exhibit

Page 264

1    49 with me.

2        A.    Okay.

3        Q.    Have you seen Evidence Rule 503 in Kentucky

4    before?

5        A.    No.

6        Q.    Do you have any reason to dispute the

7    contents of it as it's represented in this Exhibit 49

8    e-mail?

9        A.    I have no reason to dispute your e-mail

10   with Mr. Guilfoyle.

11       Q.    Okay.  Are you aware that the evidence

12   rules in Kentucky were passed by the legislature and

13   then adopted by the court?

14            MR. WIEST:  I'm asking his awareness.

15            MR. GUILFOYLE:  He's not a lawyer.

16       Q.    Were you aware of it?

17       A.    No.

18       Q.    There's a general rule of privilege,

19   Dr. Pritchard, that attaches not only between a

20   client and a lawyer, but also representatives of a

21   lawyer.

22            MR. BIRKENHAUER:  Objection.

23       Q.    Do you have any reason to dispute that

24   Mr. Deters was a representative of lawyers?

25       A.    It depends on the situation she was talking

Page 265

1    to him in and I have no clue.

2        Q.    Okay.

3        A.    She does not ever say that she saw him as a

4    representative of an attorney.

5        Q.    Did you ask her?

6        A.    No.  I answered that already.

7        Q.    And Mr. Guilfoyle was informed of that fact

8    as of September 15, 2021, correct, by me, Exhibit 49?

9        A.    Yes.

10       Q.    Do you have any reason to dispute the

11   contents of Exhibit 49 in terms of the position

12   that's being taken in that?

13       A.    I don't dispute the position you're taking.

14       Q.    Okay.  All right.  So we're back to sharing

15   of company information.  And what you're talking

16   about are the e-mails that were shared with

17   Mr. Deters?

18       A.    Yes.

19       Q.    And that were attached to a lawsuit, right?

20       A.    Correct.

21       Q.    A lawsuit that brought Title VII and ADA

22   claims, correct?

23       A.    Correct.

24       Q.    Okay.  And you believe that that was a

25   breach of duty and that caused you to lose trust?

Page 266

1        A.    Absolutely.

2        Q.    What if -- and I'm just curious.  What if

3    it hadn't been Deters?  What if it had been another

4    lawyer --

5        A.    It wouldn't have changed.

6        Q.    -- that had gone out and breached a

7    client's trust on confidentially and released

8    confidential e-mails?

9        A.    I don't think it would have changed

10   anything.

11       Q.    Okay.  Even if the doctor or the physician

12   said you got to keep this confidential, this is

13   confidential, it wouldn't matter at that point.  The

14   fact that it's out is the problem?

15       A.    No.  It's the fact that she shared it.

16       Q.    Okay.  So she's not entitled to share with

17   an attorney information to obtain legal advice --

18       A.    She is --

19       Q.    -- if it's confidential e-mails?

20       A.    But was it pertinent to her question?

21       Q.    So who evaluates whether or not it's

22   pertinent to a question?

23       A.    I think Amy's probably smart enough to know

24   that she doesn't need a personal e-mail from me and

25   Garren to ask if she's able to get an exception, if

1  she can't get one, do we make accommodations for her.

2  Or if she's concerned about a Title VII or ADA,

3  there's no mention of that anywhere in any

4  communication between me and her and Garren.

5      Q.   Well, you would agree with me that a lawyer

6  or a representative of a law firm is entitled to

7  determine what's relevant or not, right, in rendering

8  legal advice?

9      A.   I would think.

10      Q.   Okay.  In response, Dr. DiChiara responded

11  that it was meant to be confidential.  And you

12  responded back to her communications specifically

13  gave permission to feel free to share?

14      A.   That's what we had, yes.

15      Q.   And that was in relation to the publicly

16  available peer reviewed study that we had looked at,

17  right?

18      A.   Was it just the publicly shared?

19      Q.   That was the only place that I saw in

20  Exhibit 3, Doctor.  Are you aware of any others?

21      A.   When did she share our e-mails with him?

22  Was it attached to that?

23      Q.   It was attached to the complaint and it was

24  limited to that study.

25      A.   Yeah.  But do you know it wasn't attached

1   to our e-mails?  I'm assuming if she told me she

2   shared things from us and it all went, that that

3   applied to that.

4          Q.   Did you ask her?

5          A.   I did not.

6          Q.   Why didn't you ask her if it was limited to

7   a publicly available study?

8          A.   I did not, but she did not deny that it was

9   when I said that to her at the meeting.

10         Q.   Did she say anything in response to that?

11         A.   Not that I remember specifically.

12         Q.   Why didn't you ask if it was limited to

13  that or not?

14         A.   I think we were beyond that a month in.

15         Q.   Plainly, the decision was going to be made,

16  regardless of what she said, that she was walking out

17  of that October 4th meeting without her job, correct?

18         A.   The decision definitely had been made

19  October 4th.  That's when we provided her the letter.

20         Q.   Right.  And prior to the end of that

21  meeting and prior to providing her that letter, the

22  decision had been made that she was fired regardless,

23  correct?

24         A.   Correct.

25         Q.   There was nothing she could say in that

Page 269

1   meeting, nothing she could produce to you in that

2   meeting that would change that decision, fair?

3       A.   The intent going in was to terminate her.

4       Q.   Okay.  You then provided her with a letter

5   of termination and informed her that it was effective

6   immediately.  She responded that this is unfortunate.

7   And you said if she had any questions, that you would

8   provide her information.  You got her badge, she had

9   no keys, and then you were going to arrange for chart

10  completion, correct?

11      A.   Correct.

12          MR. BIRKENHAUER:  Are you back on 58,

13      Chris?

14          MR. WIEST:  I'm back on 58.

15          (Plaintiff's Exhibit 59 was marked for

16  identification.)

17      Q.   Let's talk about 59.  We're going to spend

18  some time on this.  Let me start with the easy

19  question.  Page 2 is your signature, correct?

20      A.   I'm sorry?

21      Q.   Page 2 of Exhibit 59 is your signature,

22  correct?

23      A.   Yes.

24      Q.   This was the termination letter that you

25  signed, correct?

1      A.    Correct.

2      Q.    Would you agree with me that every reason

3  that you had to terminate her employment be put in

4  this letter?

5      A.    It's -- yes.  It's what we stated were the

6  reasons for her termination.

7      Q.    Okay.  And there was nothing else that's

8  not contained in this that were the reasons for the

9  termination, correct?

10      A.    Correct.

11      Q.    You had the opportunity to, and I think you

12  indicated, consulted with counsel prior to delivering

13  this letter to her, correct?

14      A.    Correct.

15      Q.    And I think you told me your letter -- or

16  that your lawyer or outside counsel actually drafted

17  the letter, correct?

18      A.    I'm not sure who actually drafted it, but,

19  yes, it would have been either internal or external

20  counsel.

21      Q.    In any event, you did not personally draft

22  this letter, correct?

23      A.    I did not.

24      Q.    I want to go through this letter.  This

25  indicates that -- the first paragraph:  This letter

1    shall serve as written notice that Summit Medical

2    Group, Inc. dba St. Elizabeth Physicians is

3    terminating your employment dated January 1, 2013, as

4    amended by the first amendment to the employment

5    agreement dated January 1, 2015, and the second

6    amendment to the employment agreement dated

7    January 1, 2017, for cause pursuant to

8    Sections 10.2(h), 10.2(m), 10.2(n), and 10.2(q) of

9    the agreement, right --

10        A.    Yes.

11        Q.    -- that's what it says?  And I know we've

12    looked at the employment agreement before and we're

13    going to -- I know we began the day there, but I want

14    to pull that back up with you, at least the 2013

15    version.  Have a look at Exhibit 4 and also get

16    Exhibit 5 out.

17        A.    Okay.  My filing system on 5 is inadequate,

18    so you have to help me out, unless it's on the back

19    of 4.

20        Q.    Five is the code of conduct.

21        A.    That one's evaded us all.

22            MR. WIEST:  We're going to go off the

23        record for five minutes.

24            VIDEO TECHNICIAN:  We are off the record,

25        4:02.

1              (OFF THE RECORD)

2         VIDEO TECHNICIAN:  We are back on the

3     record.  The time is 4:08.

4  BY MR. WIEST:

5         Q.    So, Dr. Pritchard, I want to start with the

6  top of 59, the second paragraph, which you --

7         A.    You say 59?

8         Q.    Yes, sir, Exhibit 59.  It's the termination

9  letter.  You say:  Electronic forms of communication,

10  including e-mail, are the property of SEP pursuant to

11  the electronic forms of communications and

12  information policy, Section 106 of the associate

13  handbook.

14              So I want to look at that policy just real

15  quickly.  That's Exhibit 13, by the way.  All right.

16  There's a discussion about electronic media I think

17  being the property of SEP at 897 -- page 897 of the

18  policy under Subsection D.  And I'm assuming that

19  that's what you're referring to, but I want to

20  confirm.

21         A.    Yes.

22         Q.    Okay.  You say:  By disclosing internal

23  e-mails between us and between you and Garren Colvin

24  to an outside third party without consent or

25  authorization, which e-mails are the property of SEP,

1    you misappropriated SEP property.  Accordingly, SEP

2    is terminating the agreement for cause pursuant to

3    Subsection 10.2(h).  Subsection 10.2(h) says:

4    Misappropriating any funds or property of SEP with

5    the exception of incidental medical supplies.  Did I

6    read that right?

7         A.   Yes.

8         Q.   When you say to an outside third party

9    without consent or authorization, you're referring to

10   Eric Deters and/or Deters Law, correct?

11        A.   Yes.

12        Q.   We talked this morning when we began this

13   deposition that it is acceptable for someone to

14   communicate with a lawyer including to use electronic

15   information to communicate with a lawyer to obtain

16   information about their rights, obligations, or

17   duties, correct?

18        A.   Yes.

19        Q.   Do you have any reason or any evidence that

20   that was not what Dr. DiChiara was doing with respect

21   to Deters Law?

22        A.   There was no information in those

23   discussions that adversely affected her personally at

24   that point.

25        Q.   That wasn't my question.  Let me ask it

Page 274

1    again.

2        A.    Okay.

3        Q.    Do you have any evidence that

4    Dr. DiChiara's communications with Eric Deters and

5    Deters Law wasn't to obtain advice about her rights,

6    duties, or obligations?

7        A.    I do not.

8        Q.    Okay.  We talked -- we went over a number

9    of anti-retaliation policies today, right?

10       A.    Yes.

11       Q.    We looked at the Federal -- the Federal

12   Tort Claims Act, for instance, correct --

13       A.    Yes.

14       Q.    -- that talks about defrauding the federal

15   government?  And we looked at Title VII and ADA,

16   correct?

17       A.    Correct.

18       Q.    And we know that the e-mails Dr. DiChiara

19   used were attached to a lawsuit that included ADA and

20   Title VII claims, correct?

21       A.    Correct.

22       Q.    And I just want to be clear.  If an

23   employee is communicating with a lawyer to further

24   Title VII or ADA claims, is it your position that

25   that is a violation of Subsection 10.2(h), if they

Page 275

1    shared internal e-mails to do so?

2         A.   I'm going to apologize, but ask you to say

3    that again.

4         Q.   Is it your position or SEP's position --

5    was it SEP's position at the time that the employee

6    is sharing e-mails, internal e-mails, with an outside

7    lawyer if it's used in the Title VII and ADA case,

8    that that is a violation of the policies?

9         A.   If those would have been e-mails that had

10   anything in the world to do with Title VII or ADA,

11   but they were not related.

12        Q.   Okay.  Those e-mails that she shared dealt

13   with vaccine efficacy and safety, correct?

14        A.   Correct.

15        Q.   And we looked at the policy that talked

16   about the burden.  And you told me earlier today that

17   if the vaccine was ineffective or was unsafe, those

18   would be issues under Title VII or the ADA, correct,

19   in terms of the burden?

20             MR. BIRKENHAUER:  Objection.  Again,

21        we're getting into legal matters and

22        conclusions.  You can answer the question if

23        you can.

24        A.   I'm going to question that I ever said what

25   you said I said.

1      Q.    Okay.

2      A.    I'm a little lost there.

3      Q.    Okay.  You agree that SEP and SEH have the

4  obligation to accommodate religious and medical

5  exemptions unless it constituted an undue burden on

6  one or both of those organizations, correct?

7      A.    Yes.

8      Q.    Is it your position that data that

9  questions safety or efficacy has absolutely nothing

10  to do with the burden of accommodating religious or

11  medical exemptions?

12      A.    I do not believe that had anything to do

13  with the medical exemptions.

14      Q.    Or religious exemptions?

15      A.    Or religious exemptions.

16      Q.    It has nothing to do with the burden on the

17  organization's safety or efficacy?

18      A.    No.

19      Q.    Did you get that opinion from any of your

20  lawyers?

21      A.    No.

22      Q.    Did you ask?

23      A.    Not that I know of.

24      Q.    Okay.  The next citation in your

25  termination letter, I'm back to Exhibit 59, was that

Page 277

1   your afore-described conduct violated the electronic

2   forms of communication and information policy because

3   of the disclosure of the e-mails was not for

4   appropriate business purposes, and further, was for a

5   purpose that is contrary to SEP's best interest.

6   Again, I read that correctly, right?

7        A.   Yes.

8        Q.   Okay.  When you say your afore-described

9   conduct, you're referring to disclosing internal

10  e-mails between us and between you and Garren Colvin

11  and an outside third party without consent or

12  authorization, right?

13       A.   Correct.

14       Q.   And in particular, you're referring to

15  sharing e-mails with the Deters firm and Eric Deters,

16  correct?

17       A.   We're making an assumption there she shared

18  them with the Deters firm.  I'll say she shared them

19  with Eric Deters.  That's all she said she shared

20  them with.

21       Q.   Okay.  And Mr. Deters was the spokesperson,

22  paralegal, et cetera, representative of the firm.  Do

23  you disagree with that?

24       A.   Para lawyer of the firm?

25       Q.   Para lawyer, all of the above.

Page 278

1          A.    That was a general question.

2          Q.    Do you dispute that, that Mr. Deters was

3     acting on behalf of the firm and the lawyers?

4          A.    I have no clue if he in that situation was

5     acting on behalf of his firm.  I'm not sure Amy knew

6     he was.  I think he probably was.

7          Q.    Okay.  What was contrary -- let me ask:  If

8     someone is sharing information to obtain legal

9     advice, is that contrary to SEP's best interest?

10          A.    No.

11          Q.    If someone is sharing information that is

12     used in furtherance of a Title VII or ADA suit, is

13     that contrary to SEP's best interest?

14          A.    I want to split hairs on that.  No, it

15     would be not if the information she shared had

16     anything to do with Title, you know --

17          Q.    So I understand your position is --

18          A.    Yeah.

19          Q.    -- that safety and efficacy has nothing to

20     do with Title VII and ADA, has nothing to do with the

21     undue burden aspect.  I understand that that's your

22     position, but let's just put that aside for a second.

23     And I'm asking a far more general question.

24          A.    Okay.

25          Q.    Is sharing information that is used in

Page 279

1    furtherance of a Title VII and ADA suit contrary to

2    SEP's best interest?

3         A.   No.

4         Q.   You would agree with me that the Deters

5    firm attached those documents to its lawsuit that

6    brought ADA and Title VII claims?

7         A.   Within my opinion, which may not mean a

8    thing, it had no merit.

9         Q.   Okay.  Well, the merit -- I understand your

10   position is that the Deters firm's lawsuit had no

11   merit, okay, but that wasn't my question.  My

12   question was:  They brought Title VII and ADA claims,

13   correct?  Right?

14        A.   Some associates did -- not Amy.  Some

15   associates did.

16        Q.   No, I understand.  I wasn't referring to

17   associates.  I'm referring to the Deters firm itself

18   bringing the lawsuit --

19        A.   Yes.

20        Q.   -- filing the lawsuit.  And in doing that,

21   they attached these e-mails, that we're referring to,

22   to that lawsuit.  You don't dispute that, correct?

23        A.   I do not dispute that.

24        Q.   And I'm not here to get into what was in

25   Eric Deters' mind because that's an abyss that no one

Page 280

 1    wants to go down, but at the end of the day, the firm

 2    attached those e-mails to that suit that brought

 3    those claims.  You don't dispute that, right?

 4        A.   I do not dispute that.  I also do not

 5    dispute that Amy said she did not share them with

 6    them for that reason and that --

 7        Q.   When did she say that?

 8        A.   In her apology letter.

 9        Q.   Let's go back to that.  I think it's 40.

10        A.   My system has gotten all messed up.  There

11    it is.

12        Q.   You got 40, right?

13        A.   I've got 40.

14        Q.   Where in Dr. DiChiara's Exhibit 40 letter

15    does she say that the e-mails were not provided in

16    furtherance of the lawsuit or the Title VII or ADA

17    claims?

18        A.   Well, I'd still go to the second paragraph

19    and say, first, please know that I did not authorize

20    Deters Law to publicize those e-mails or any other

21    documents that I had authored regarding the vaccines

22    and on the vaccine mandate issued by St. Elizabeth

23    Healthcare.  I certainly do not approve of the use

24    for exhibits and so forth.

25        Q.   Okay.  But she doesn't say that they

1    weren't authorized to be used in furtherance of

2    lawsuits.  She says they weren't authorized to be

3    publicized or used as exhibits, right?

4         A.   That's what she states.

5         Q.   That's what she says.  And you said before

6    that her letter, Dr. Pritchard, said that she wasn't

7    using them in furtherance of the lawsuit at all.  Not

8    just those exhibits, not just publicizing them, I'm

9    asking is that anywhere in this letter?

10        A.   No.

11        Q.   Thank you.  All right.  You say that it

12   violated the confidentiality -- it violated

13   Section 103 of the associate handbook as well as

14   confidentially and nondisclosure agreement because

15   the disclosure constituted the disclosure of private

16   and confidential information pertaining to other

17   associates in the business information of SEP, right?

18        A.   I believe you.  I never knew which

19   paragraph you were on, but yes.

20        Q.   I'm back on the third paragraph in Exhibit

21   59.

22        A.   Okay.

23        Q.   So now we're citing the associate handbook

24   in Sections 103 and I believe 106, correct?

25        A.   Okay.

Page 282

1      Q.   I mean, you agree with that, right?

2      A.   Yes.

3      Q.   And the associate handbook, I want to look

4   at that, that's Exhibit 12, and we'll go to 103 and

5   106.

6      A.   I'm there.

7      Q.   Okay.  You would agree with me that what it

8   says is you are expected to maintain the privacy and

9   confidentiality of patients, associates, and business

10  information, correct?

11     A.   Correct.

12     Q.   But the only thing that deals with a breach

13  of confidentiality and disciplinary action is patient

14  information in that section, correct?

15     A.   I will have to read it.

16     Q.   Please do.

17     A.   I would say the second half of the

18  paragraph is strictly about patients.  I don't say

19  the upper half -- upper portion is.

20     Q.   The bottom half indicates that any release

21  or improper discussion of such information, that's

22  patient information, is a breach of confidentiality

23  and will subject an associate to disciplinary action

24  up to and including termination, right?

25     A.   Once again, I've got to look at that, but

Page 283

1    it's all in the policy.  It's not just patient

2    information.  I think there was the middle part of

3    that paragraph that goes on just about patient

4    information.

5         Q.   Right.

6         A.   It says:  Any release or improper

7    discussion of such information is a breach of

8    confidentiality.  Up above it says:  Patients,

9    associates and business information -- and business

10   information.

11        Q.   Right.  There's an expectation you are

12   expected to maintain the privacy and confidentiality

13   of patients, associates, and business information,

14   right --

15        A.   Correct.

16        Q.   -- I understand what you're saying.  My

17   point is the bottom part that talks about

18   termination.  That's patient information, right?

19        A.   I'm not sure it doesn't talk about

20   termination for the entire paragraph.

21        Q.   Well, it says -- it says any -- let's look

22   at that final sentence, the second final sentence.

23   Any release or improper discussion of such

24   information is a breach of confidentiality, right,

25   and will subject an associate to disciplinary action

1    up to and including termination, correct?

2        A.    Yes.

3        Q.    Okay.  And such information -- a reasonable

4    construction of the policy is that it's referring to

5    the preceding sentence regarding distribution of

6    patient information without the patient's consent and

7    for purposes other than the patient care, correct?

8        A.    I'm getting lost in all the words and

9    trying to read at the same time.

10       Q.    Sure.  Let's go to the second to last

11   sentence in the first full paragraph of 103.

12       A.    I have no issue with you there.

13       Q.    The disclosure of or distribution of

14   patient information without the patient's consent and

15   for purposes other than patient care is strictly

16   prohibited?

17       A.    Correct.

18       Q.    Any release or improper discussion of such

19   information is a breach of confidentiality and will

20   subject an associate to disciplinary action up to and

21   including termination, right?

22       A.    I'm not sure of that last sentence.  Is it

23   a thing for the whole paragraph?

24       Q.    Oh, so now -- this morning you told me such

25   information referred to the preceding sentence.  Now

1    you're telling me --

2        A.    Did I --

3              MR. GUILFOYLE:  The whole paragraph?

4              MR. BIRKENHAUER:  Objection.

5        A.    I don't remember.

6        Q.    Is that correct?

7        A.    I don't know.

8        Q.    You don't know.  Okay.  You agree a

9    reasonable construction of this policy could be that

10   such information refers to the preceding sentence

11   about patient information?

12             MR. BIRKENHAUER:  Objection.  Asked and

13        answered.

14             MR. WIEST:  It wasn't asked and it wasn't

15        answered.

16       A.    I said it refers to the paragraph about

17   confidentiality.

18       Q.    That wasn't my question.  My question was:

19   The sentence about any release or improper discussion

20   of such information, a reasonable construction is it

21   could refer to the prior paragraph, correct?

22             MR. BIRKENHAUER:  Same objection.

23       A.    What do you mean could refer to the prior

24   paragraph?

25       Q.    To the prior sentence about patient --

1        A.    And the sentence above that.  It's all one

2   paragraph.

3        Q.    Let me ask:  I know we talked about it.

4   There's no violation of this policy to have a

5   discussion with counsel, is there, to obtain legal

6   advice about rights, privileges, or duties, correct?

7        A.    Correct.

8        Q.    And there would be similarly no violation

9   of this Section 103 if information were provided in

10  furtherance of a Title VII or ADA lawsuit, correct?

11       A.    I think that's correct.  But to take my

12  private e-mails and provide them to an attorney who's

13  already suing me, that seems a little bit of an

14  issue.

15       Q.    Well, let's talk about that for a minute.

16       A.    I'd be glad to.

17       Q.    What upsets you, in part, here was the fact

18  that there was already a lawsuit, right?

19       A.    No doubt.

20       Q.    Okay.  A lawsuit that included Title VII

21  and ADA claims, correct?

22            MR. BIRKENHAUER:  Objection.  Asked and

23            answered numerous times.

24       Q.    Would you agree?

25       A.    Correct.  But never discussed ADA or

1    whatever else with Amy in any way pertinent to that.

2        Q.    Okay.  But you agree that Amy's e-mails

3    were attached to that lawsuit that bought those

4    claims, correct?

5        A.    Yes.  An amended lawsuit.  I think they had

6    one previously that they weren't attached to.

7        Q.    What do you think she was talking to

8    Mr. Deters about generally?

9        A.    You're asking me to speculate.

10        Q.    Well, I'm asking you what you thought or

11    what you believed -- well, let me back up.  Do you

12    even know what was discussed between her and

13    Mr. Deters?

14        A.    I would have no way of knowing other than

15    what she told us.

16        Q.    Okay.  Would you agree or did you think

17    Dr. DiChiara was assisting Mr. Deters in bringing the

18    lawsuit?

19        A.    I sure think she was assisting him, yes.

20        Q.    Do you think she participated in any manner

21    by providing him the e-mails in the lawsuit?

22        A.    Yes.  And I'll say either knowingly or

23    unknowingly.  But I think, you know, when you know

24    somebody that brought a firm against your employer

25    and you start sharing personal e-mails, that really

1    calls in the loyally aspect of the employment.

2         Q.   So I want to understand that position.  And

3    I'm not going to get into attorney-client aspects of

4    this, but my firm and Mr. Bruns' firm has brought

5    this present lawsuit in relation to Dr. DiChiara.

6    You're aware of that, correct?

7         A.   Yes.

8         Q.   And so you view it as disloyal if a

9    St. Elizabeth Healthcare or SEP employee were to

10   consult with us about other matters?

11        A.   I did not say that.

12        Q.   Well --

13        A.   I may have if they started bringing you

14   information -- well, I can't say that.

15        Q.   Okay.  So what's the difference then?

16        A.   It's all on context and intent, isn't it?

17   So why was she sharing the information?  She says she

18   had a discussion with him and other personal -- close

19   personal friends to discuss her aspects of vaccine

20   and immunizations.  Never did we discuss anything

21   that pertained to exemptions, how the company would

22   handle such things.  So I don't know why she was

23   feeding Mr. Deters that information unless, as she

24   says, she was just asking a close personal friend,

25   hey, what do you think about what's going on.

1      Q.    You knew by mid September that that wasn't

2    the case because there was the communications we

3    looked at between me and Mr. Guilfoyle, correct?

4      A.    Well, I know that was the position that was

5    being taken.

6      Q.    Do you have any evidence that suggests that

7    that position is not correct?

8      A.    No.

9      Q.    Okay.  All right.  And because of the --

10   and I want to be clear.  The other thing that you

11   claim that she violated in 10.2(m) was the violation

12   of 106 of the handbook which is electronic

13   communications, correct?

14     A.    Correct.

15     Q.    What aspect of 106 do you think she

16   violated?

17     A.    She used company e-mails and equipment to

18   communicate to an outside firm.

19     Q.    Okay.  And if she had done so to obtain

20   legal advice, you have no problem with that, right?

21     A.    She still should have done that personally,

22   not through business.  And I'm not sure if it all

23   came from business or personal e-mails, but she --

24   yes.

25     Q.    Okay.  And if she did that in furtherance

Page 290

1   of or to assist or participate in a Title VII or ADA

2   lawsuit, is that a violation of the policy?

3       A.   We have a corporate compliance policy, as

4   we mentioned, so she has a right to do that.  There's

5   no indication she had anything to do with Title VII

6   or ADA.

7       Q.   Besides the fact that her e-mails were

8   attached to a lawsuit that brought ADA and Title

9   VII --

10      A.   Just by happenstance.  I think --

11      Q.   That's your position, correct?

12           MR. GUILFOYLE:  Don't interrupt him.  Let

13      him finish.

14      A.   I mean, that's my position.  I can't

15   remember now what I was going to say, but that's a

16   huge assumption, isn't it?

17      Q.   Dr. Pritchard, do you think it's a huge

18   assumption that e-mails were attached to a lawsuit

19   that brought those claims --

20      A.   Absolutely not.

21      Q.   -- and they were in furtherance of those

22   claims?

23      A.   I think Mr. Deters or any attorney would

24   attach anything they could.  As you said, it's an

25   example of his best work.

1    Q.   I don't think I said that.  I think your

2    counsel said that.

3    A.   No, I actually heard you say that, and I

4    think he did sort of agree.

5    Q.   Okay.  The policy 106 says you are

6    responsible for using the electronic communication

7    systems properly and in accordance with this policy,

8    correct?

9    A.   Correct.

10   Q.   What systems are you referring to

11   specifically?

12   A.   E-mail.

13   Q.   There is an acknowledgement of the ability

14   to use this e-mail system on an associate's own time.

15   That's on the next page, page 6, right?

16   A.   Okay.

17   Q.   Do you have any evidence that Dr. DiChiara

18   utilized the e-mail system on company time to

19   communicate with Mr. Deters?

20   A.   I don't know.

21   Q.   Do you have any evidence that she did?

22   A.   We could look at time stamps on all the

23   e-mails and maybe determine that.

24   Q.   Did you investigate that at the time?

25   A.   I did not.

Page 292

1       Q.    Do you know if anyone did?

2       A.    I do not.

3       Q.    The next paragraph is:  Your unauthorized

4  disclosure of the subject e-mails to a law office

5  which already had sued SEP and which was actively

6  preparing to sue SEP again, and which e-mails related

7  to the subject matter of the lawsuits, constituted

8  disruptive and unprofessional conduct on your part,

9  correct?

10      A.    Yes.

11      Q.    Accordingly, SEP is terminating your

12  agreement pursuant to Subsection 10.2(n), correct?

13      A.    Correct.

14      Q.    And 10.2(n) reads:  Physician engages in

15  conduct that is disruptive, unprofessional -- well,

16  that's what you cite, disruptive and unprofessional,

17  right?

18      A.    Correct.

19      Q.    Okay.  What was disruptive?

20      A.    Well, maybe as an attorney you don't see

21  doing a lawsuit as being disruptive, but somebody

22  trying to conduct their business in the middle of a

23  pandemic trying to defend yourself against frivolous

24  lawsuits is quite disruptive.

25      Q.    Okay.  How is it disruptive?

1      A.   It distracts personnel, manpower.  People

2   had to dedicate themselves to this issue as opposed

3   to other issues.

4      Q.   Would that have been the case regardless of

5   whether or not Dr. DiChiara's e-mails were attached

6   to the suit?

7      A.   Yeah, but she aided to that disruption.

8      Q.   Okay.  She assisted and she helped

9   participate in the bringing of that case, right?

10     A.   Well, I'm still confused if she did or she

11  didn't.

12     Q.   Well, the e-mails are attached, correct?

13     A.   I think she did, yes.  Well, her e-mail

14  said she didn't, so...

15     Q.   And you indicate that the reason that you

16  took issue with this was because Mr. Deters had

17  already sued SEP, right?  You're referring to

18  Beckerich 1?

19     A.   Yes.

20     Q.   And then at the time that Dr. DiChiara

21  provided the e-mails to him, he was actively

22  preparing to sue SEP again, right?

23     A.   Correct.

24     Q.   And you acknowledge, by the way, that her

25  e-mails related to the subject matter of the lawsuit,

1    correct?

2        A.    Let me find where you're looking.

3        Q.    Your words right in the paragraph.

4        A.    Well, I've got -- I'm shuffling so many

5    papers I can't even find --

6        Q.    Exhibit 59.

7        A.    Yeah.  I got to find it again.

8            MR. BIRKENHAUER:  It's right here.

9        A.    Okay.  So, again, Mr. Wiest?

10       Q.    You acknowledge, one, that he had

11   already -- Mr. Deters and his firm already sued

12   SEP --

13       A.    Yes.

14       Q.    -- right, his law office had, and was

15   actively preparing at the time to sue SEP again,

16   right?

17       A.    Correct.

18       Q.    And you acknowledge that the e-mails

19   related to the subject matter of the lawsuits,

20   correct?

21       A.    Yes, that's what we wrote.

22       Q.    The next sentence says:  Your

23   afore-described conduct constituted a breach of your

24   duty of loyalty owed to SEP, right, and you cite

25   10.2(q)?

Page 295

1          A.    Yes.

2          Q.    And the afore-described conduct was the

3    unauthorized disclosure of the subject e-mails to a

4    law office which had already sued SEP and which was

5    actively preparing to sue SEP again which e-mails

6    related to the subject matter of the lawsuits,

7    correct?

8          A.    Yes.

9          Q.    We're going to go into the second page of

10   the termination letter.  You state at the top of that

11   second page:  Finally, it would appear you have been

12   less than forthcoming during SEP's investigation of

13   the foregoing matters.  You represented in your

14   letter of apology dated September 5, 2021, that you

15   had intended your communications with the subject law

16   firm to be confidential.  However, in an e-mail

17   attached to the complaint filed by the law firm, you

18   apparently had advised the recipient of that e-mail

19   feel free to share widely.  We can only presume this

20   e-mail was sent to a representative of said law firm,

21   although we cannot confirm that fact due to your

22   refusal to provide us with unredacted copies of

23   e-mails, as we have requested, correct?

24         A.    Correct.

25         Q.    So you're referring -- and I just want to

Page 296

1    unpack this bit by bit.  You're referring to that

2    e-mail we looked at with the study where she said

3    feel free to share this widely.  That's what you're

4    talking about here?

5         A.   I don't know that we knew exactly what that

6    was attached to at the time.

7         Q.   Okay.  Let's go back and look at that.  And

8    I hate to do this, but I need to.  You knew what was

9    in the lawsuit, correct?

10        A.   Did I?  Yes.  I mean, I knew our e-mails

11   were attached.

12        Q.   Okay.  And the only -- if you look, I want

13   to, if you can, go back to 142.  I'm sorry, in the

14   Deters lawsuit, and I hate to do it again, but --

15             MR. BIRKENHAUER:  What one?

16             MR. WIEST:  142.  Maybe it's easier for

17        counsel to pick it up.  And I've got it here

18        if it's easier.

19             MR. BIRKENHAUER:  All right.  We're

20        looking at 142, Chris.

21        Q.   Okay.  Is this what you're referring to,

22   feel free to share widely?

23        A.   Yeah.  What we don't have is context of

24   what all -- what all this is a part of.

25        Q.   Well, I just want to be clear.  You quote

Page 297

1   feel free to share widely, right?

2        A.   Yes.

3        Q.   In your term letter?

4        A.   Yeah.

5        Q.   And I'm looking at the Deters lawsuit --

6        A.   Yeah.

7        Q.   -- at page ID 142.

8        A.   Okay.  There's this --

9        Q.   Feel free to share widely?

10       A.   Yes.

11       Q.   Is this what you're referring to?

12       A.   I'm referring to that statement she made,

13  yes.

14       Q.   Okay.  And specifically, this e-mail is the

15  publicly available study that's not SEP's

16  confidential information, correct?

17       A.   Yes.

18       Q.   Did you have any -- did you have any

19  evidence at the time that Dr. DiChiara had

20  communicated to Mr. Deters that he could share other

21  things widely?

22       A.   At this time, I do not recollect.

23       Q.   And this paragraph also references

24  consternation with not providing unredacted e-mails,

25  correct?

1        A.    Yes.

2        Q.    And that also weighed into the termination

3   decision, fair, because it's reflected right here?

4        A.    Yeah.  I think it definitely played a role.

5        Q.    And so had she at your assistance waived

6   her attorney-client privilege and provided

7   everything, you might have reconsidered

8   terminating her employment?

9            MR. BIRKENHAUER:  Objection to form.  You

10       can answer if you can.

11       A.    Well, it never occurred, so I can't answer

12   the hypothetical.  But my feeling was that if these

13   are just our e-mails you handed over, then just show

14   us back what you gave him.

15       Q.    Okay.

16       A.    No harm, no foul.  Let's find out.

17       Q.    Okay.  And if you had found out that she

18   had told him to keep it confidential, had expressed

19   her concerns in writing and asked for legal advice,

20   personal legal advice to the Deters firm concerning

21   her religious accommodation, would that have changed

22   your analysis?

23       A.    If we would have known that, I'm sure it

24   would have played into the analysis.  I don't know if

25   it would have changed it.

1      Q.    Okay.  All right.  This also indicates that

2   SEP's not waiving its ability to come up with

3   potentially other reasons for termination?

4      A.    Correct.

5      Q.    As you sit here today, are you aware of any

6   other reasons not reflected in this letter?

7      A.    I think we stated them all.

8      Q.    All right.  I think I'm on 60.

9            (Plaintiff's Exhibit 60 was marked for

10   identification.)

11      Q.    Dr. Pritchard, on the next day after you

12   terminated Dr. DiChiara, a preservation letter went

13   out indicating that she was going to be bringing a

14   lawsuit from me to Mr. Guilfoyle and Mr. Markus.

15   Were you made aware of that?

16      A.    No, not that I remember.  Obviously,

17   eventually I was made aware.  I don't know about that

18   day.

19      Q.    But it doesn't surprise you that she was

20   going to be filing a lawsuit, right?

21      A.    It was expected.

22      Q.    The next day after that you notified the

23   SEP board members of the potential litigation at

24   Exhibit 61, correct?

25      A.    Yes.

1      Q.   As an aside, going back to the preservation

2   letter, were you responsible at all for ensuring that

3   information was preserved for the purposes of the

4   suit?

5      A.   I don't usually communicate that.  Usually

6   our counsel --

7      Q.   That's a legal function?

8      A.   Yes.

9      Q.   Fair enough.

10          (Plaintiff's Exhibit 61 was marked for

11   identification.)

12      Q.   61, you indicate a couple of things in this

13   notification to the board.  You first indicate to

14   your SEP board members, I want to let you know that

15   on October 5th, SEP terminated our relationship with

16   Dr. Amy DiChiara.  Let me ask:  Why was this

17   communicated to the board after the fact as opposed

18   to before the fact?

19      A.   I communicate to the chair of the board

20   before the fact.

21      Q.   Okay.

22      A.   And then he wants me to communicate with

23   others, but usually I communicate with him.

24      Q.   And so I can assume, based on the fact that

25   it was communicated after the fact, that the chair

1   did not believe the rest of the board needed to know?

2          A.    Correct.

3          Q.    When did you inform the board chair?

4          A.    I can't remember what day I called

5   Dr. Dorsch.

6          Q.    Okay.  Did Dr. Dorsch have the ability to

7   overrule you?

8          A.    Well, he -- it's the leadership's role to

9   be in charge of operations.

10         Q.    Okay.

11         A.    But if your board chair tells you, whoa,

12  whoa, let's look at this more, then we're going to

13  whoa, whoa, look at it a little bit more.  But

14  typically it's not their role to make operation

15  decisions.  Their role is more strategic.

16         Q.    Okay.  And Dr. Dorsch did not overrule you?

17         A.    He did not.

18         Q.    You indicate this termination was not

19  related to any position she took regarding the COVID

20  vaccine?

21         A.    Correct.

22         Q.    Why did you want to communicate that to the

23  board?

24         A.    Well, I think it was just fact.  Many

25  people -- a lot of people -- a lot of controversy

1   going on about the vaccine and the situation and I

2   wanted to reassure them that's not why this was done,

3   and it was not.

4        Q.   Because there were others that were

5   concerned about the vaccine at the time and you

6   didn't want people looking for jobs.  Was that part

7   of it, or something else?

8        A.   I think it's just the reality that it

9   wasn't related to the COVID vaccine.

10       Q.   Okay.  You instead say:  The decision to

11   terminate her relationship with us was based on her

12   violation of her contract and that she shared

13   internal information with an outside law firm that

14   sued SEP requiring our position requiring the COVID

15   vaccine.  That was truthful, right?

16       A.   Yes, I wrote it.

17       Q.   Okay.  Then you indicate:  Please keep this

18   information confidential and that we are expecting

19   future legal action.  In your termination meeting

20   with Dr. DiChiara, did she threaten legal action?

21       A.   She did not.

22       Q.   Let me ask:  When you asked the board to

23   keep the information confidential, did you have an

24   expectation that it would be?

25       A.   Yes.

Page 303

1      Q.    Why?

2      A.    I'm not sure I understand why.  We try to

3    keep all matters that involve legal issues

4    confidential, any lawsuits, malpractice or anything.

5      Q.    Did you have an expectation it would be?

6      A.    Yes.

7      Q.    Because you asked, right?

8      A.    Yes.

9      Q.    Did you take any other steps to ensure that

10   they would keep this issue confidential?

11     A.    No.  But we have discussions when everybody

12   comes on the board how important confidentiality is,

13   especially when it comes to HR and personnel matters,

14   that those aren't conversations to be having on the

15   street for entertainment.

16           (Plaintiff's Exhibit 62 was marked for

17   identification.)

18     Q.    Okay.  You communicated on October 7th that

19   Dr. DiChiara's employment was terminated or that she

20   was no longer a member of SEP to Laroy Kendall,

21   Michele Kenner, and Betsy Buschman.  Do you see that?

22     A.    Yes.

23     Q.    You copied Ms. Koch who's sitting here

24   today?

25     A.    Yes.

Page 304

1        Q.    Who was Laroy Kendall?

2        A.    Larry Kendall was the chief medical officer

3    for St. Elizabeth Healthcare.

4        Q.    Who was Michele Kenner?

5        A.    What is her title?  ADP for, I want to say,

6    physician services.  She was his nonphysician

7    counterpart.

8        Q.    Was she with SEP?

9        A.    With SEH.  These are SEH folks.

10       Q.    Okay.  Why were you informing them?

11       A.    Because no longer being a member of SEP,

12   she was no longer covered under our insurance plans

13   or anything such as that, malpractice.  So they had

14   to take their steps to make sure if she continues to

15   practice, she has proper coverage.  It was an

16   independent action.

17       Q.    And who is Betsy Bushman?

18       A.    She runs the medical staff office.

19             MR. WIEST:  We are at 63.

20             (Plaintiff's Exhibit 63 was marked for

21   identification.)

22       Q.    Let me start.  Were you aware that

23   Dr. DiChiara had filed an EEOC charge shortly after

24   her termination?

25       A.    Yeah, I'm sure I did.

Page 305

1      Q.   Did you authorize DBL Law to prepare a

2  response on behalf of Summit Medical Group?

3      A.   Yes.

4      Q.   I want to back up to the termination

5  meeting for just a moment.  You weren't just

6  terminating Dr. DiChiara's employment.  You also were

7  terminating the contract of that employment, correct?

8  It was both?

9      A.   Yeah.  I didn't know those were two

10  separate things.

11      Q.   Okay.  Well, it's the employment and the

12  contract that governs the employment, correct?  Both

13  of those are being terminated, right?

14      A.   Her relationship with SEP was being

15  terminated.

16      Q.   Did SEH have any direct or other business

17  interests in relation to that contract or her

18  employment?

19      A.   No.  Our main thing is that why we notified

20  Dr. Kendall and others, is that they'd asked us if we

21  ever terminated a physician, to let them know.

22      Q.   Okay.

23      A.   Also, they knew very strictly that these

24  were independent things, things that -- because SEP

25  terminated her does not mean she was terminated from

Page 306

1    the medical staff.

2         Q.    Okay.

3         A.    Yeah.  We had no authority over that.

4         Q.    Okay.  And so SEH had no right to direct

5    the termination of her employment or the contract

6    being terminated, correct?

7         A.    SEP had every right to terminate --

8         Q.    No.  No.  SEH.

9         A.    SEH, no.

10        Q.    Okay.  Mr. Colvin, on behalf of SEH, had no

11   right to dictate or control the terms of her

12   employment, correct?

13        A.    No.

14        Q.    Let me ask:  Did Mr. Colvin encourage you

15   in any way to terminate her employment?

16        A.    Not that I recollect.

17        Q.    When you brought it up to him, do you

18   recall anything specifically in terms of your

19   interface with him?

20        A.    I really don't.  I just don't remember him

21   having any objection to her termination.

22        Q.    Did he -- do you remember him nodding or

23   okay or anything like that?

24        A.    He obviously didn't say no or I would

25   have -- there would have been more conversations.

1      Q.   He may have encouraged it.  You just don't

2   remember?

3      A.   I don't think he discouraged it.  I can't

4   remember if he actively encouraged it.

5      Q.   Did he feel betrayed also?

6      A.   I can't -- I have no way of telling how he

7   felt.

8      Q.   Okay.  Did he express to you anything that

9   indicated that he felt betrayed or disappointed by

10  Dr. DiChiara?

11     A.   I don't remember.

12     Q.   Let me ask:  Was DBL, along with

13  Mr. Birkenhauer, entitled and authorized to respond

14  on behalf of SEP?

15     A.   Yes.

16     Q.   You would agree that this was a submission

17  to a government agency?

18     A.   Yes.

19     Q.   And would you agree with me that the

20  expectation was to tell the truth regarding the

21  facts?

22     A.   Yes.

23     Q.   I want to look at the introduction of this

24  just quickly.  And I'm not going to go through all of

25  this with you.  This submission indicates

1    Dr. DiChiara had been a vocal opponent of SEP's

2    employee COVID-19 vaccine requirement since the

3    requirement's inception.

4         A.   Can you ask me where you're -- tell me

5    where you're at.

6         Q.   Yeah.  I'm on Defendants 367.

7         A.   Yes, but which paragraph?

8         Q.   The second full paragraph under

9    introduction.

10        A.   Thank you.

11        Q.   I did read that right, right?  Dr. DiChiara

12   had been a vocal opponent of SEP's employee COVID-19

13   vaccine requirement since the requirement's

14   inception, correct?

15        A.   Yes.

16        Q.   Was that truthful?

17        A.   I sure believe so.

18        Q.   Okay.  Her opposition to the requirement

19   had nothing to do with any concern over employee

20   religious or medical exemptions from, or

21   accommodations to, the vaccine requirement.  Do you

22   see that?

23        A.   I do.

24        Q.   You are aware -- or you were aware as of

25   November 23, 2021, that she had personally submitted

Page 309

1    a religious accommodation request, right?

2        A.    I was not aware.

3        Q.    You were not aware?

4        A.    I don't know any associates who asked for

5    exemptions.

6        Q.    Okay.  But SEP had, right?

7        A.    We had a blinded committee doing that

8    without senior leadership -- I hate to say without

9    senior leadership input, but they were charged with

10   carrying out that function.

11       Q.    Okay.  Someone within SEP knew that she had

12   asked for a religious accommodation, correct?

13       A.    Yes.

14       Q.    And someone within SEP knew that she had

15   received one, correct?

16       A.    And once -- you said in November?  Yes.

17       Q.    Yes.  And so the statement that her

18   opposition to the requirement had nothing to do with

19   any concern over employee religious or medical

20   exemptions from, or accommodations to, the vaccine

21   requirement, that's not true, is it?

22            MR. BIRKENHAUER:  Objection.

23       A.    I think it's absolutely true.  She never

24   expressed to us any concern about exemptions.

25       Q.    She submitted an exemption, right?  We just

1  talked about that.

2      A.    Yeah.

3      Q.    Based on her personal religious beliefs,

4  right?

5      A.    Correct.

6      Q.    And those were determined to be sincere and

7  the exemption was approved, correct?

8      A.    Absolutely.  It worked -- the process

9  worked as it was set up to work.

10     Q.    So her personal objection was based on

11  sincerely-held religious beliefs, correct?

12     A.    No.  The only thing she ever talked to us

13  about or other members of the medical staff was the

14  science, the vaccines aren't appropriate.

15     Q.    Doctor, I'm not going to pull out the

16  religious accommodation request.  You saw it.  You

17  agree we saw it today, right?

18     A.    I agree she applied for one.  I agree she

19  was granted one.  I'll also state that she never ever

20  talked to me or anybody else about that as a concern.

21     Q.    How do you know she didn't talk to anybody

22  else?

23     A.    She may have talked to somebody on that

24  committee that was blinded.  But outside of that, I

25  don't know of her ever talking to a soul.

1      Q.    The committee is part of SEP, right?

2      A.    What?

3      Q.    The committee is part of SEP, correct?

4      A.    The committee was a work group of a

5   combination of SEP and SEH associates to evaluate

6   this.

7      Q.    So SEP was aware of what was going on

8   through that committee, correct?

9      A.    I don't know what you mean.  They were not

10   feeding back information that Chris Wiest applied for

11   a religious or medical exemption and here's the

12   process we took to evaluate that.  That was not -- it

13   purposely was blinded.

14      Q.    Okay.  I mean, there's an acknowledgment on

15   386, if you turn the page --

16      A.    Okay.

17      Q.    -- that she specifically sought a religious

18   exemption and it was granted.  Tell me when you're

19   there.

20      A.    I'm there.

21      Q.    And you acknowledge that that is truthful,

22   right?

23      A.    I've said that how many times now.

24      Q.    Right.  Okay.  I am curious, Dr. Pritchard,

25   did you have an opportunity to review the submission

1   before it went in?

2         A.    No.

3         Q.    Okay.  It would be fair to say you trusted

4   Mr. Birkenhauer to do what he thought was

5   appropriate?

6         A.    I trusted him in collaboration with Katie

7   Koch to make sure this was done properly.

8         Q.    We're getting there.

9               MR. GUILFOYLE:  Really?

10              MR. WIEST:  We are.

11              MR. GUILFOYLE:  You promise?

12              MR. WIEST:  About three more.

13              (Plaintiff's Exhibit 64 was marked for

14   identification.)

15        Q.    Did you -- or were you made aware in mid

16   November of 2021 that Dr. DiChiara had sought relief

17   from the non-compete provisions, thank you, of the

18   employment agreement?

19        A.    I was aware.

20        Q.    And who made the decision not to grant her

21   that relief?

22        A.    Ultimately it was my decision.

23        Q.    And you decided that you were not going to

24   do that, correct?

25        A.    Correct.

Page 313

1      Q.   Why did you decide you were not going to do

2   that?

3      A.   Because she was terminated for cause.

4      Q.   Okay.  Let me ask:  I think we talked about

5   this at the beginning.  You were aware that she was a

6   part-time employee that was homeschooling her

7   children, right?

8      A.   Yes.

9      Q.   Do you know how much work was available to

10  somebody working on a part-time basis within a

11  20-mile -- or outside of a 20-mile radius but within

12  driving distance; do you know?

13     A.   It would have to be an assumption, but I

14  would think it would be fairly easy for a

15  gastroenterologist to find a job.

16     Q.   Okay.  Do you know?

17     A.   Well, I just said it would have to be an

18  assumption on my part, but we would have gladly taken

19  a part-time gastroenterologist wanting to work.

20     Q.   Okay.  There was a letter that SEP sent out

21  after her termination informing the patients.  Are

22  you familiar with that?

23     A.   Yes.

24     Q.   Did you review that?

25     A.   I don't remember.  They're pretty standard.

Page 314

1        Q.   Okay.

2             (Plaintiff's Exhibit 65 was marked for

3    identification.)

4        Q.   I'm going to hand you 65.  There was no

5    update in Exhibit 65 of where Dr. DiChiara was

6    setting up her practice, correct?

7        A.   I don't see that there's any comment.  We

8    usually make it a practice to provide that if we have

9    that information.

10       Q.   Okay.  You would agree that patients

11   ultimately have the right to chose their provider,

12   correct?

13       A.   Yes.

14       Q.   Okay.  Just a second.

15            (Plaintiff's Exhibit 66 was marked for

16   identification.)

17       Q.   Hand you 66.  These are the interrogatories

18   and they were filed in part on your behalf, correct?

19       A.   Correct.

20       Q.   Can you go back to exhibit -- or, I'm

21   sorry, Interrogatory 14.  It's on the last page of

22   this -- second to last page, not the signature page.

23   Ignore that.  There's an indication that -- in

24   Interrogatory 14, that defendants state that Dr.

25   Pritchard and Mr. Colvin verbally communicated

Page 315

1   regarding the plaintiff in or around September 2021?

2        A.   Correct.

3        Q.   Okay.  Is there any reason why that's not

4   more detailed, that response?

5        A.   I don't think we have specific records or

6   minutes or anything to indicate specifically when we

7   spoke.

8        Q.   Okay.  Have we talked about all of those

9   communications today that you recall or have any

10  recollection of regarding Dr. DiChiara?

11       A.   Yes.

12       Q.   Okay.  There's nothing that you remember,

13  sitting here now, that we've looked at a document or

14  that's jogged your memory?

15       A.   No.

16            MR. WIEST:  Give me just a second.  We're

17       going to go and take a break and we may be

18       done, but let me confer with Mr. Bruns.

19            VIDEO TECHNICIAN:  We're off the record.

20       The time is 5:00.

21                 (OFF THE RECORD)

22            VIDEO TECHNICIAN:  We are back on the

23       record, 5:07.

24            MR. WIEST:  I think counsel had a

25       discussion off the record about the prior

Page 316

1    request to seal and I think there's an

2    agreement that that is withdrawn, correct?

3         MR. BIRKENHAUER:  Yes.  The defense's

4    prior motion to seal from earlier in the day

5    is withdrawn and those portions can remain in

6    the normal public transcript.

7         MR. WIEST:  We also had a discussion

8    whether or not the defendants are going to be

9    relying on an advice of counsel defense and it

10   indicated that they are not.  And in light of

11   that, we're not going to inquire about any

12   communications with counsel in advance of this

13   employment action in light of that

14   representation; is that fair?

15        MR. BIRKENHAUER:  Yes.  And I'm

16   confirming that the defense is not relying on

17   the advice of counsel defense.

18        MR. WIEST:  We'll go off the video, and

19   then we're going to ask some questions that we

20   want under seal.

21        VIDEO TECHNICIAN:  We are off the video

22   record.

23

24

25

Page 317

1

2

3

4

5                    TESTIMONY UNDER SEAL

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 318

1

2

3

4

5                    TESTIMONY UNDER SEAL

6

7

8

9

10

11

12                    (Witness excused.)

13           (Deposition concluded at 5:10 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 319

```
1                               )

2    COMMONWEALTH OF KENTUCKY    )

3                               )

4         I, Mindy Davis, Notary Public for the

5    Commonwealth of Kentucky, do hereby certify:

6         That the witness named in the deposition, prior

7    to being examined, was by me duly sworn;

8         That said deposition was taken before me at the

9    time and place therein set forth and was taken down

10   by me in shorthand and thereafter transcribed into

11   typewriting under my direction and supervision?

12        That said deposition is a true record of the

13   testimony given by the witness and of all objections

14   made at the time of the examination.

15        I further certify that I am neither counsel for

16   nor related to any party to said action, nor in any

17   way interested in the outcome thereof.

18        IN WITNESS WHEREOF I have subscribed my name

19   and affixed my seal this 14th day of August, 2023.

20

21                  /s/Mindy Davis

22                  MINDY DAVIS

23                  Notary Public

24                  My Commission expires: 05/28/24
                                           KYNP7379
25
```