Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION AT COVINGTON

CASE NUMBER: 2:22-cv-00111-WOB-EBA


DR. AMY DICHIARA,                    PLAINTIFF,


    vs.


SUMMIT MEDICAL GROUP, INC.,
et al.,                              DEFENDANTS.




* * * * * * * *

DEPONENT:        JACOB JOSEPH BAST

DATE:            September 8, 2023

* * * * * * * *


LEE ANN GOFF

COURT REPORTER



B a r l o w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

1   The videotaped deposition of JACOB JOSEPH BAST,

2 taken for the purpose of discovery and/or use as

3 evidence in the within action, pursuant to notice,

4 heretofore taken at the office of Dressman Benzinger

5 LaVelle, 109 East Fourth Street, Covington, Kentucky

6 41011, on September 8, 2023, at 9:13 a.m., upon oral

7 examination, and to be used in accordance with the

8 Federal Rules of Civil Procedure.

9

10      * * * * * * * *

11      APPEARANCES

12

13 REPRESENTING THE PLAINTIFF:

14 Christopher Wiest, Esq.
   Chris Wiest, Atty at Law, PLLC
15 25 Town Center Boulevard
   Suite 104
16 Crestview Hills, Kentucky 41017
    and
17 Thomas B. Bruns, Esq.
   Bruns, Connell, Vollmar & Armstrong, LLC
18 4750 Ashwood Drive
   Suite 200
19 Cincinnati, Ohio 45241

20 REPRESENTING THE DEFENDANTS:

21 Nicholas C. Birkenhauer, Esq.
   Dressman Benzinger LaVelle
22 109 East Fourth Street
   Covington, Kentucky 41011
23

   ALSO PRESENT:  Katie Koch, Esq.
24
      * * * * * * * *
25

1                         I N D E X

2

3    Examination of JACOB JOSEPH BAST              Page

4    BY MR. WIEST:                                    6

5

6

7                       E X H I B I T S

8

9    Exhibit                                        Page

10   Plaintiff's Exhibit Number 71                   69

11   Plaintiff's Exhibit Number 72                   73

12   Plaintiff's Exhibit Number 73                   74

13   Plaintiff's Exhibit Number 74                   76

14   Plaintiff's Exhibit Number 75                   78

15   Plaintiff's Exhibit Number 76                   80

16   Plaintiff's Exhibit Number 77                   81

17   Plaintiff's Exhibit Number 78                  208

18   Plaintiff's Exhibit Number 79                  209

19   Plaintiff's Exhibit Number 80                  216

20   Plaintiff's Exhibit Number 81                  219

21   Plaintiff's Exhibit Number 82                  225

22   Plaintiff's Exhibit Number 83                  226

23   Plaintiff's Exhibit Number 84                  227

24   Plaintiff's Exhibit Number 85                  229

25   Plaintiff's Exhibit Number 86                  232

Page 4

 1    Plaintiff's Exhibit Number 87                   239

 2    Plaintiff's Exhibit Number 88                   241

 3    Plaintiff's Exhibit Number 89                   244

 4    Plaintiff's Exhibit Number 90                   244

 5    Plaintiff's Exhibit Number 91                   247

 6    Plaintiff's Exhibit Number 92                   247

 7    Plaintiff's Exhibit Number 93                   247

 8    Plaintiff's Exhibit Number 94                   247

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          VIDEOGRAPHER:  We are on videotape

2     record.  Today is Friday, September the 8th,

3     2023.  The time is 9:13 a.m.  We're here today to

4     take the deposition -- a 30(b)(6) deposition of

5     Summit Medical Group, Inc. DBA St. Elizabeth

6     Physicians, Jacob Bast, in the case styled Dr.

7     Amy DiChiara, Summit -- versus Summit Medical

8     Group, Inc., et al., in the United States

9     District Court for the Eastern District of

10    Kentucky, Northern Division at Covington.  Case

11    Number 2:22-cv-00111-WOB-EBA.

12          Would the attorneys now introduce

13    themselves and state who they represent.

14          MR. WIEST:  My name is Christ Wiest.

15    Along with Mr. Bruns, we represent Dr. Amy

16    DiChiara in this matter.

17          MR. BIRKENHAUER:  And Nick Birkenhauer

18    and Katie Koch present today for the defendants.

19          VIDEOGRAPHER:  And now would the court

20    reporter please swear in the witness.

21               (Witness sworn.)

22          MR. WIEST:  And Mr. Birkenhauer, for the

23    record, before we get -- and I'm going to begin,

24    by the way, with the notice of deposition like I

25    always do in a 30(b)(6), but we spoke prior to

1    this and my understanding is that for topics 9,

2    10, 11, 12, 13, 14, and 15 on the topic list,

3    we'll be keeping those open for the SEP -- or

4    Summit Medical Group deposition.

5             And that will be covered by the same

6    witness that is going to be the corporate

7    representative for St. Elizabeth Medical Center.

8             MR. BIRKENHAUER:  Yes.  Chris, that's

9    correct.

10                       * * * * *

11                  JACOB JOSEPH BAST

12   called on behalf of the Plaintiff, after having been

13   first duly sworn, was examined and testified as

14   follows:

15                  CROSS-EXAMINATION

16   BY MR. WIEST:

17        Q.   And with that, Mr. Bast, we talked about

18   this just a minute or two ago, but we've got some

19   ground rules today.  And I'm going to start with

20   some acronyms just for the record.  Summit

21   Medical Group, Inc. I'm going to call -- which

22   does business as St. Elizabeth Physicians, I'm

23   going to call SEP today; correct?

24        A.   Correct.

25        Q.   And St. Elizabeth Medical Center, Inc.,

1    I'm going to called SEH; correct?

2        A.    Correct.

3        Q.    And those are standard acronyms that

4    folks use throughout both organizations?

5        A.    That is correct.

6        Q.    A couple other ground rules.  This is

7    not a marathon, I'm not here to make you

8    uncomfortable, so if you need a break at any

9    time, let me know.  And as long as there's not a

10   question pending, we can take a break at any

11   time.

12       A.    Good.  Thank you.

13       Q.    It is likely that I will ask one or more

14   bad questions today.  If that happens, I just

15   need you to tell me that you do not understand

16   and I will rephrase.  If I ask something that

17   assumes something that's incorrect, you need to

18   let me know that, too.  If you answer, I'm going

19   to assume that the premise of the question is

20   correct and that you understand it; okay?

21       A.    Fair enough, yes.

22       Q.    All right.  I'm going to hand you what

23   I've marked as Exhibit 1A, which is the notice of

24   deposition for SEP.  And what I am interested in

25   is there is a list of topics that are -- it says

Page 8

1      Exhibit A, Topic List, SEP/St. E.  Tell me when

2      you're there.

3           A.   I am there.

4           Q.   We just talked about 9, 10, 11, 12, 13,

5      14, and 15 that will be spoken to for someone

6      else -- or by someone else.  But for the

7      remaining topics on this list, in other words, 1

8      through 8 and 16 through 45, you are prepared to

9      speak to those today; correct?

10          A.   Yes, I am.

11          Q.   Can you tell me generally -- and I'm not

12     interested in any communications that you've had

13     with your counsel, put that aside, don't tell me

14     about that -- what did you do to prepare for your

15     deposition today besides speak with your

16     attorneys, either in-house or out of house.

17     Don't talk about that, but anything else?

18          A.   There were a significant number of

19     documents that I had not previously seen that I

20     had been given to review in preparation for this

21     deposition as the corporate representative for

22     SEP.

23          Q.   Can you tell me about what documents you

24     reviewed?

25          A.   They were numerous, but the non --

1  noncomplete list would be:  Policies and

2  procedures of the organization.  Compensation

3  statements for Dr. DiChiara.  The employment

4  agreement for Dr. DiChiara.  The termination

5  letter for Dr. DiChiara.  Emails that had been

6  exchanged between Dr. DiChiara and Dr. Bob

7  Prichard and Garren Colvin.  The, the suit that

8  is -- that has been filed by Dr. DiChiara and any

9  responses to that to date.  I'm sure there are

10  others.  It was a box of papers, but...

11     Q.  Okay.  Do you know that all of them have

12  a mark on them that either had a defendant's mark

13  or a DiChiara mark, and it was numbered, or were

14  there document -- were there documents besides

15  those that you looked at?

16     A.  All of the documents I had had a stamp

17  labeled exhibit with a written number on them.

18     Q.  Okay.  So they've already been an

19  exhibit in this case.  Okay.  That's helpful.

20        Did you speak with anyone else within

21  the organization to prepare to testify today?

22     A.  I did not.

23     Q.  Okay.  All right.  I want to begin just

24  with your background briefly as the corporate

25  representative.  My understanding is that you are

1    the chief operating officer for SEP.

2        A.    That's correct.

3        Q.    And you were the chief operating officer

4    for SEP in all of calendar year '21 -- 2021, and

5    you've been the chief operating officer since

6    then; fair?

7        A.    That's correct.

8        Q.    Okay.  Can you tell me just generally,

9    what are your duties as the chief operating

10   officer?

11       A.    Day-to-day operations of the

12   organization, oversight of the five clinical

13   divisions of SEP as well as our administrative

14   division.  The only aspect of St. Elizabeth

15   Physicians infrastructure that I don't have

16   direct authority over is the revenue cycle and

17   finance areas --

18       Q.    Okay.

19       A.    -- which report to our CFO.

20       Q.    And you report to the SEP CEO?

21       A.    That is correct.

22       Q.    Do you attend SEP board meetings?

23       A.    I do.

24       Q.    Okay.  Do you attend SEH board meetings?

25       A.    I do not.

Page 11

1        Q.    Okay.  Have you ever attended an SEH

2    board meeting?

3        A.    I have on less than a handful of

4    occasions in my 12-year tenure at St. Elizabeth.

5        Q.    And I suppose that would be where you

6    were invited to do so to speak to some particular

7    topic?

8        A.    That is exactly the case.

9        Q.    Okay.  I want to back up just a little

10   and talk about the relationship and the ties

11   between SEP and SEH.  And I think a good place to

12   start is, you will see an exhibit in front of you

13   that's been marked Exhibit 67.  That is the

14   Amended and Restated Bylaws of SEP.

15       A.    Um-hmm.

16       Q.    Let me begin -- you've seen this

17   document --

18       A.    I have.

19       Q.    -- before?  I want to talk about some of

20   the provisions within this document.  The -- the

21   first provision is actually in Article II in

22   which it indicates that the corporation is

23   sponsored by St. Elizabeth Medical Center;

24   correct?

25       A.    That is correct.

1          Q.    And my understanding is that the sole

2     member of SEP is St. Elizabeth -- is SEH?

3          A.    That is correct.

4          Q.    And we see that in Article III; correct?

5          A.    Yes.

6          Q.    Section 1?

7          A.    I see that.

8          Q.    Article III, Section 2 allows the board

9     of trustees of SEH to take meaning -- or take

10    action as the sole member of SEP.  You'd agree

11    with that; correct?  It's Section 2.

12         A.    And I'm --

13         Q.    Yeah.

14         A.    -- reviewing that right now.  Yes.

15         Q.    Article IV, the directors.  The SEH CEO

16    is an ex officio member of the SEP board;

17    correct?

18         A.    That is correct.

19         Q.    And there are reserved powers in Section

20    V of this agreement that starts on page 5

21    regarding reserved powers to both -- and we're

22    going to go through them individually.  Some are

23    reserved to the SEH CEO and some are reserved to

24    the SEH board; correct?

25         A.    Yes.

1          Q.    Let's talk about what's what, and I do

2     want to go through it.

3          A.    Okay.

4          Q.    The annual capital and operating

5     budgets, including expenditures, are a reserved

6     power of the SEH board; correct?

7          A.    With one clarification.  The

8     expenditures for information systems.

9          Q.    Okay.  Well, let's look at that.

10         A.    Okay.

11         Q.    It says, annual capital and operating

12    budgets, including, but not limited to,

13    expenditures for information systems; right?

14         A.    Correct.

15         Q.    And so the entire operating budget has

16    to be approved by the SEH board every year;

17    correct?

18         A.    That is correct.

19         Q.    The SEH board also sets physician and

20    provider compensation formulas; correct?

21         A.    Correct.

22         Q.    And so that's another reserved power

23    that, that the -- I'm going to call them the

24    parent organization.  You would agree with me as

25    the sole member, they are the parent

Page 14

1      organization, correct, the SEH is?

2           A.   I'm not familiar enough with corporate

3      structure --

4           Q.   Okay.

5           A.   -- and law to define them as a parent

6      operation.  We don't operate with that construct.

7           Q.   Okay.  SEH board has to approve the

8      physician and provider compensation formulas;

9      right?

10          A.   The -- the formulas they do, yes.

11          Q.   Okay.  And the formulas drive how

12     providers are paid; correct?

13          A.   That is correct.

14          Q.   Loans, capital leases, or credit

15     facilities in any fiscal year are also

16     approved -- or reserved to the SEH board;

17     correct?

18          A.   That is correct.

19          Q.   The acquisition, sale or conveyance of

20     capital assets, including real property, is also

21     reserved to the SEH board?

22          A.   That is correct.

23          Q.   The acquisitions, alliances, and joint

24     ventures with other healthcare providers is also

25     reserved to the SEH board?

1          A.   Correct.

2          Q.   Now we've got one that is to the SEH

3    CEO.  And the SEH CEO is the -- he's got the

4    reserved power for the selection, employment,

5    termination, and compensation of the president

6    and CEO of SEP?

7          A.   That is correct.

8          Q.   For -- with respect to this lawsuit,

9    Garren Colvin had the sole ability regarding the

10   selection, employment, termination, and

11   compensation of Dr. Prichard, who is the SEP CEO;

12   correct?

13         A.   That's correct.

14         Q.   Amendments to the bylaws or articles of

15   incorporation of the corporation of SEP is also a

16   reserved power to the SEH board?

17         A.   That's correct.

18         Q.   The dissolution, merger or sale of

19   substantially all of the assets of SEP is also

20   reserved to the SEH board; correct?

21         A.   Correct.

22         Q.   The contractual relationships with other

23   physician groups and healthcare providers are

24   also reserved to the SEH board?

25         A.   Correct.

Page 16

1          Q.    Contracting for physician services with

2     managed care companies or others payers, also

3     reserved to the SEP board?

4          A.    Yes.

5          Q.    And the establishment of any

6     compensation for services as a member of the

7     board of SEP is also reserved to the SEH board?

8          A.    Yes.

9          Q.    SE -- SEH board.  And then finally, the

10    12th reserved power is adopting or materially

11    modifying any strategic plan for SEP is reserved

12    to the SEH board; right?

13         A.    Yes.

14         Q.    The -- and by the way, these -- this

15    Exhibit 67, this was the provision of the bylaws

16    that was active throughout -- in the entire

17    calendar year of 2021; correct?

18               You can look -- the last page has the

19    date of adoption.  I'm not tricking you.

20         A.    I'll answer yes, because --

21         Q.    Okay.

22         A.    -- any -- anything that may have changed

23    since then did not pertain to the reserved

24    powers.

25         Q.    Okay.  Is this the current Amended and

Page 17

1    Restated Bylaws as far as you're aware?  And I

2    will tell you the date on this last page looks

3    like it was 9/28/2020.

4            Are you aware of any amendments since

5    then?

6        A.   I am not aware of any amendments to the

7    bylaws since then.

8        Q.   Okay.  All right.  I want to talk about

9    some other day-to-day relationship issues between

10   SEH and SEP.  SEH owns the hospital properties

11   themselves; correct?

12       A.   SEH owns the hospital properties,

13   correct.

14       Q.   And SEP physicians practice within those

15   hospital properties; correct?

16       A.   In some cases, yes.

17       Q.   Okay.  In, in cases such as Dr. DiChiara

18   that had a surgical specialty or component, she

19   would have practiced within SEH for purposes of

20   doing, for instance, colonoscopies?

21       A.   So Dr. DiChiara practiced in -- her

22   procedures were performed in two different

23   environments.

24       Q.   Okay.

25       A.   In some cases they were performed in

Page 18

1    hospital-owned facilities.  In another case they

2    were performed in a joint venture ambulatory

3    surgical center that has a, a restricted license

4    for performing endoscopies.

5        Q.   And who were the members of the joint

6    venture?

7        A.   The members of the joint venture were

8    AmSurg, I'm not aware of their official corporate

9    name, I apologize, and SEPS, which is a

10   subsidiary corp of St. Elizabeth Healthcare, as I

11   understand it.

12       Q.   Okay.  Who is AmSurg?

13       A.   Pardon me?

14       Q.   Who is AmSurg?

15       A.   AmSurg is a private, for-profit

16   healthcare company based out of Nashville.  Part

17   of their line of business is providing ambulatory

18   surgery center joint venture opportunities for

19   physicians.

20       Q.   As Dr. DiChiara or other members of the

21   GI group within SEP would perform procedures

22   within the SEH hospitals, you would agree that

23   they were entitled to and did provide orders that

24   nurses and pharmacists that were employed by SEH

25   followed; correct?

Page 19

1          A.    Would you restate it just to make sure I
2     understand it?
3          Q.    Certainly.  As Dr. DiChiara or others
4     within the gastro group at SEP were performing
5     procedures at SEH facilities, they were giving
6     orders that SEH nurses or SEH pharmacists
7     employed within the hospital system would follow;
8     correct?
9          A.    Correct.
10         Q.    The -- SEH credentials SEP physicians to
11    be able to practice within the hospital; correct?
12         A.    That is correct.
13         Q.    And that was true for Dr. DiChiara;
14    correct?
15         A.    Yes.
16         Q.    You would agree with me that if an SEP
17    physician loses their hospital credentials with
18    SEH, that is grounds under the employment
19    agreement for termination; correct?
20         A.    That is my understanding of the
21    agreement, yes.
22         Q.    SEH, if -- if SEH were to otherwise
23    prohibit, not just credentials but were to
24    otherwise prohibit an SEP physician from coming
25    onto their property, that would also effectively

Page 20

1    end her -- or end their employment; correct?

2        A.   I would have to understand the nature of

3    the reason why they were not allowing them to

4    come onto their property, but -- yeah, I would

5    have to understand the nature of the reason why.

6        Q.   If Mr. Colvin, as the CEO, decided that

7    a particular physician was a problem and said

8    they're not allowed on our facilities anymore,

9    that would effectively end their employment with

10   SEP; correct?

11       A.   My understanding is that Mr. Colvin

12   actually doesn't have the authority to make that

13   decision.  That's a -- that would be a medical

14   staff decision.

15       Q.   Okay.

16       A.   But I will not profess to be an expert

17   of the medical staff bylaws at St. Elizabeth

18   Healthcare.

19       Q.   Okay.  SEH, at least on hospital

20   facilities, provides the space for the SEP

21   physicians to do their work; correct?

22       A.   Yes.

23       Q.   And that was true for Dr. DiChiara when

24   she was performing procedures within the SEH

25   hospitals; correct?

1        A.    Yes.

2        Q.    SEH patients are treated by SEP

3    physicians; correct?

4        A.    Yes.

5        Q.    And that was also true for Dr. DiChiara

6    when she was performing procedures within SEH?

7        A.    Yes.

8        Q.    SEH, through their medical staff, sets

9    rounding or physician coverage that SEP provides;

10   correct?

11       A.    The medical staff bylaws require that --

12   what were the terms you used?  Rounding and --

13       Q.    Rounding or physician coverage levels.

14       A.    They require that specialties provide

15   for that, but they don't mandate what those

16   rounding or coverage schedules are.

17       Q.    So I want to make sure I understand your

18   testimony.  Is it the case that they are setting

19   a certain level of coverage that the specialties

20   then provide, or is it they're just generally

21   saying we need coverage for X specialties and

22   then -- and then the determination of how much is

23   made by SEP?

24       A.    The medical staff determines that

25   coverage is needed for that particular service.

Page 22

1        Q.    Okay.

2        A.    How a particular specialty, in this case

3    gastroenterology, provides that coverage is up to

4    the SEP group to determine.

5        Q.    Okay.  SEH sets policies through medical

6    staff or otherwise that SEP physicians must

7    comply with; correct?

8        A.    While practicing in the hospital

9    facilities, that is correct.

10       Q.    Okay.  Does SEH arrange any payments to

11   SEP for physician services?

12       A.    Yes.

13       Q.    Okay.  And I take it -- and let me

14   just -- let's just talk about a -- I don't think

15   it's actually a hypothetical, I'm sure it

16   actually occurred.

17            Dr. DiChiara goes in to do a colonoscopy

18   at an SEH facility.  There's a -- I don't know if

19   they're being done in an operating room or, or

20   maybe it's something that's a little bit lower

21   level of facility, but in any event, within an

22   SEH facility.  SEH, of course, has to have the

23   nurses, the -- the facilities there, and somebody

24   is billing for that service.

25            Do you know when the bill goes out --

Page 23

1    and I know that there's a lot of Medicare or

2    Medicaid patients, let's just say that it was one

3    of those.

4            Is there one bill that is sent for all

5    of that procedure, including the physicians, the

6    nurses and everything to Medicare or Medicaid, or

7    are there multiple bills that go out?

8        A.    There would be separate bills.

9        Q.    So one from SEP and one from SEH?

10       A.    Correct.

11       Q.    Okay.  How does the money flow then from

12   SEH to SEP?

13       A.    For the provision of a procedure?

14       Q.    Yes.

15       A.    There is no flow of money between the

16   two.  So one would bill for the facility fee --

17   SEH would bill for the facility fee --

18       Q.    Okay.

19       A.    -- and collect from, whether it's the

20   payer source or the patient responsibility for

21   that.  SEP would separately bill for the

22   professional services of the physician and

23   collect for that.

24       Q.    Are the actual staff that are submitting

25   those bills to Medicare or Medicaid different?

Page 24

1        A.    Yes.

2        Q.    Okay.  And so if it's an SEP bill, those

3    are -- it's an SEP employee that's sending that

4    bill?

5        A.    That is correct.

6        Q.    Okay.  And if it's an SEH bill, then

7    it's an SEH employee that's sending that bill?

8        A.    That is correct.

9        Q.    Okay.  Is there money flow between SEP

10   and SEH?

11       A.    Yes.

12       Q.    How and for what?

13       A.    In a few different ways.  There -- we --

14   we have a master services agreement between the

15   two organizations that provides for -- for lack

16   of a better term, the leasing of services or

17   people between the two organizations.  We also,

18   we being SEP, receive what is termed as a market

19   adjustment payment from the hospital in support

20   of the medical group.

21       Q.    Okay.  What -- and I -- and it hasn't

22   been produced to me, but what generally are the

23   contents, if you're aware, of that master

24   services agreement?

25       A.    Trying to -- there's a number of things.

1    I'm trying to think of a good example here.   So

2    information services or information technology is

3    provided to both organizations through the

4    central department that is housed within the SEH

5    infrastructure.   So there is a component of that

6    master services agreement where SEP provides

7    payment to SEH for the information technology

8    support that's provided to SEP.

9         Q.   Okay.   What else?

10        A.   I can continue to think of a few

11   examples, but it's -- it's a long list that I can

12   commit to not knowing the entire list without

13   reviewing the agreement.

14             MR. WIEST:   So I -- without getting into

15   it, I think this was probably responsive to a

16   discovery request.   I don't know if we can get it

17   on a break, but I need to ask him about it.   And

18   I don't know if you can get that from the client

19   on a break or maybe Katie has it, I don't know.

20   But we want to see that master services

21   agreement.

22             MR. BIRKENHAUER:   Okay.   We can check.

23   BY MR. WIEST:

24        Q.   I want to talk about the leasing of --

25   you said it was leasing of services and people.

Page 26

1    What generally is -- is that?

2        A.   Well, I -- I mentioned the information

3    technology as one example.

4        Q.   Okay.

5        A.   That's -- as a people example, the CEO

6    of St. Elizabeth Physicians is an employee of St.

7    Elizabeth Healthcare.  And SEP leases that FTE

8    from SEH.

9        Q.   And pays for it, I take it?

10       A.   Pardon me?

11       Q.   And pays for it?

12       A.   Yes.  Yeah.

13       Q.   Okay.

14       A.   That's -- the lease arrangement includes

15   consideration for that.

16       Q.   The -- you indicated that there's a

17   market adjustment payment.

18       A.   Yes.

19       Q.   What is that?

20       A.   So it's -- it's little known to the

21   public that a medical group operating within an

22   integrated delivery system structure, such as St.

23   Elizabeth Healthcare, in the health system and,

24   and its relationship with SEP, will operate at a

25   loss.  Medical groups that operate independent of

Page 27

1    any health system structure typically have other

2    revenue-generating services such as imaging or

3    lab or surgery centers that help to cover that

4    loss.

5            But if we're talking about just

6    physician services, which is what SEP provides,

7    the income statement of SEP without that market

8    adjustment would be a loss.  And so -- and this

9    is a -- this is a practice that is inherent to an

10   integrated delivery system model where that

11   strategic support, or in our case we term it

12   market adjustment, paid from the hospital to the

13   medical group in order to cover that loss.

14       Q.   And so if I understand your testimony,

15   for instance, I'm aware that hospital pharmacy is

16   a profit center; right?  The drugs that are being

17   pushed through the hospital for patient care is

18   a -- is a profit generator.  And I take it

19   because the physicians are necessary to provide

20   the service, it -- you cannot have a physician

21   group operating at a loss; correct?

22           And so this is an SEH effort to make

23   whole the physician group so that they can

24   continue to operate; fair?

25       A.   That's a fair statement, yes.

Page 28

1       Q.   Okay.  One of the things I am aware of
2    is that SEH and SEP share outside counsel;
3    correct?
4       A.   Yes.
5       Q.   Are business licenses shared between SEP
6    and SEH?
7       A.   May I have an example of a business
8    license?
9       Q.   I'll give you -- so driving down the
10   hill, we see SEH's Covington hospital.
11      A.   Um-hmm.
12      Q.   And to operate any business in Kenton
13   County, you have to have a -- for instance, an
14   occupational license.  Do you know whether that
15   occupational license for SEP and SEH is shared?
16      A.   The -- the honest answer is I don't
17   know.
18      Q.   Okay.
19      A.   We operate as two separate 501(c)(3)
20   organizations however.
21      Q.   Okay.  Dr. Prichard, in 2021, was an
22   officer of both SEP and SEH; correct?
23      A.   Correct.
24      Q.   And we talked about common ownership,
25   SEH is the only member of SEP?

Page 29

1          A.    That is correct.

2          Q.    Do you know, does the code of conduct of

3     SEH apply to SEP?

4          A.    SEP has its own code of conduct.

5          Q.    I understand they've got their own

6     separate code of conduct.  Does the SEH code of

7     conduct apply to SEP physicians while they're

8     performing services in the hospital?

9          A.    I don't know.

10         Q.    Okay.  Are there any common contracts

11    that SEH and SEP share?

12         A.    Yes.

13         Q.    Other than legal services, because we

14    covered that, what else?

15         A.    The predominant example would fall into

16    the category of information systems.

17         Q.    Okay.

18         A.    I believe there are some marketing

19    contracts that are shared as well, for example,

20    website services.

21         Q.    The information systems, I understand

22    every single employee of either SEH or SEP all

23    have a stelizabeth.com email address.

24         A.    That's correct.

25         Q.    I understand that there's also shared

1    marketing.   In other words, SEH and SEP are being

2    marketed together; correct?

3         A.   Marketing is supported out of a central

4    department, but there are occasions where there

5    are separate marketing materials for each

6    organization.

7         Q.   So as I understand what you're saying,

8    there is a common person who is doing marketing

9    for both, but the specifics of a particular piece

10   of marketing material may differentiate between

11   the organizations?

12        A.   That's a fair representation.   I'll

13   clarify by saying that the marketing department

14   actually does divvy up responsibility --

15        Q.   Okay.

16        A.   -- based on the different organizations.

17   So SEP does have dedicated personnel within the

18   marketing department to specifically support the

19   medical group.

20        Q.   Do they all report to the same person

21   though?

22        A.   They do.

23        Q.   Okay.   I spent some time -- and we're

24   going to look at some websites from SEP and SEH

25   later this morning, but I spent some time on both

1      organizations' websites.  And one of the things

2      that I discovered was that the human relations

3      function of both organizations is on Dolwick,

4      which is the SEP's headquarters, and my --

5      correct?  Let me start with that.  We'll look at

6      a website in a minute.

7          A.   Just to clarify the question, are you

8      asking if both human resources departments reside

9      at Dolwick?

10         Q.   In the same suite, yes.

11         A.   They are not in the same suite.

12         Q.   We'll talk about that and we'll look at

13     that in a -- in a minute.

14              They're both on -- you would agree

15     they're both at Dolwick?

16         A.   "They" being?

17         Q.   SEH and SEP's human resources personnel.

18         A.   Yes.  They both have offices on Dolwick

19     Drive.

20         Q.   Do they report to the same people?

21         A.   They do not.

22         Q.   Okay.  There -- if I were to go on SEP's

23     website, there would be links to SEH; correct?

24         A.   Yes.

25         Q.   And if I go on SEH's website, there's

Page 32

1    links to SEP?

2         A.   Yes.

3         Q.   The -- other than the CEO, are there

4    other shared employees of both organizations?

5         A.   Yes.

6         Q.   Who?

7         A.   I am employed by St. Elizabeth

8    Healthcare.  And the chief financial officer of

9    SEP is employed by St. Elizabeth Healthcare.

10        Q.   Okay.  Anyone else?

11        A.   Vice president of transformation for SEP

12   is employed by St. Elizabeth Healthcare.

13        Q.   Okay.  And I understand you said you

14   are, but I just -- from a functional standpoint,

15   the COO of SEP, the CFO of SEP, and the vice

16   president of transformation are all employed by

17   SEH?

18        A.   That's correct.

19        Q.   Okay.  Anyone else?

20        A.   Not to my knowledge.

21        Q.   Okay.  Are there intercompany promotions

22   or transfers between SEH and SEP?

23        A.   Of personnel?

24        Q.   Yes.

25        A.   That does occur.

Page 33

1          Q.   And one of the things I looked at was
2     the recruiting functions on both organizations'
3     websites.  And it looks like there is internal
4     recruiting and external recruiting, correct, that
5     goes on?
6          A.   Yes.
7          Q.   In other words, if I am an SEP employee,
8     there are job postings that are available to me
9     within SEP for an intercompany transfer; correct?
10         A.   If you're an SEP employee and you're
11    looking at SEP opportunities, it wouldn't -- it
12    would be an intracompany transfer.
13         Q.   Intra, okay.
14         A.   Yes.
15         Q.   Are there transfers that occur between
16    SEP and SEH?
17         A.   There are.
18         Q.   How frequent is that?
19         A.   I don't know.
20         Q.   Are the internal job opportunities made
21    available to both organizations?
22         A.   If an employee of one of the companies
23    is interested in a position at the other company,
24    it would be considered an outside employment.  So
25    those job opportunities are made available on the

Page 34

1    website.

2         Q.   Okay.

3         A.   Maybe an example is the best.  So if an

4    SEP employee were interested in an SEH job, they

5    would become aware of that through the website

6    posting on the SEH website and would apply just

7    like anyone else from outside of the

8    organization.

9         Q.   Okay.

10        A.   It's not considered an internal

11   transfer.

12        Q.   Would they have made available to

13   them -- are there some job postings that are only

14   an internal hire?  In other words, do you try and

15   hire first from within before you go looking

16   without?

17        A.   There are occasions where that takes

18   place.

19        Q.   Is that also made available within SEH

20   and SEP?  In other words, can an SEH employee

21   look at an SEP posting, an internal posting?

22        A.   If it's an internal posting, they can't.

23        Q.   Okay.  All right.  You would agree, and

24   I'm just -- and if I'm a little repetitive, I'm

25   just trying to pin down specifics.

Page 35

1              From July 1 to October 31 of 2021, and

2       really until the end of 2021, Dr. Prichard was

3       the CEO of SEP; correct?

4              A.    Correct.

5              Q.    We talked about this, he was also an

6       officer of SEH during that same period?

7              A.    He held the title of chief clinical

8       information officer.  Whether or not he was an

9       officer of the corporation, I am not sure.

10             Q.    Okay.  And he was employed by SEH, you

11      told me before?

12             A.    Correct.

13             Q.    You would agree that from July 1, '21 to

14      August 31st of '21, Garren Colvin was the CEO of

15      SEH; correct?

16             A.    Correct.

17             Q.    He was also a -- in that function, an ex

18      officio board member of SEP; correct?

19             A.    That is correct.

20             Q.    He had reserved powers regarding SEP;

21      correct?

22             A.    He has one reserved power, yes.

23             Q.    Okay.  And as a member of the SEH board,

24      he has additional reserved powers that he can

25      exercise if the whole board of SEH agrees with

Page 36

1    him, or at least the majority of them; correct?

2         A.   If the board of trustees exercise that,

3    yes.

4         Q.   Okay.  All right.  This is a good seg, I

5    think, into our first exhibit that I wanted to

6    talk about with you.  And I'm going to start just

7    briefly at Exhibit 3.

8         A.   Okay.

9         Q.   It's in the binder.  This is an SEP

10   employment agreement request.  Do you see that --

11        A.   I do.

12        Q.   -- for Dr. DiChiara?

13        A.   Yes.

14        Q.   It was the case that these employment

15   agreements, and we're going to look at hers in a

16   minute at Exhibit 4, were drafted by SEP;

17   correct?

18        A.   Yes.

19        Q.   Let's look at Exhibit 4.  I spent a, a

20   lot of time going over with Dr. Prichard this

21   agreement.  And I guess -- let me begin with

22   this:  Are you familiar with his testimony?

23        A.   I am not.

24        Q.   Okay.  All right.  Then I will -- let me

25   ask you this:  Who do you think would have more

Page 37

1    intricate knowledge of the terms and conditions

2    of this agreement, him or you?

3        A.   Him.

4        Q.   Okay.  Would you defer to him if there

5    was a disagreement between you?

6        A.   Yes.

7        Q.   All right.  I'm not then going to spend

8    a ton of time on the details of this, because

9    I've already gotten that and I've talked to Dr.

10   Prichard about it.  Let me back up just a little

11   bit.

12            Did you have any involvement with the

13   decision to terminate Dr. DiChiara's employment?

14       A.   I did not.

15       Q.   Were you aware that it was coming prior

16   to it occurring?

17       A.   I don't believe I was.

18       Q.   No one had discussed it with you prior

19   to -- and I know that you were on the -- we're

20   going to look at it later, the -- after the

21   termination occurred, Dr. Prichard informed the

22   SEP board, right, by email that it had happened;

23   correct?

24       A.   Yes.

25       Q.   Were you aware that it had -- it had

Page 38

1    happened before that email went out?

2         A.   I do not recall for sure.

3         Q.   Okay.  It would not be something that

4    Dr. Prichard would have consulted you about;

5    correct?

6         A.   He would not have consulted me about the

7    decision to terminate Dr. DiChiara.

8         Q.   Okay.  Would it have been something that

9    he would have informed you about prior to it

10   occurring?

11        A.   In other cases that would have been

12   common practice.  It did not occur in this case.

13        Q.   Do you know why?

14        A.   I do not, but I will offer up that at

15   that period in everything we were dealing with --

16   we were dealing with an unprecedented pandemic

17   and we had to divide up job responsibilities more

18   than we might otherwise typically have done.  And

19   so while I was in the process of setting up

20   public vaccination clinics, public testing

21   clinics, respiratory response clinics, trying to

22   deal with a work force issue and maintaining work

23   force and caring for the patients, a lot of the

24   things that we sometimes would have interacted on

25   but solely fell to his decision-making, I -- I

Page 39

1    was not involved in during this time.

2         Q.   Okay.  After the termination, was it

3    discussed at all within or amongst the SEP board?

4         A.   I'm not aware of any discussion that

5    took place with the SEP board.

6         Q.   After it occurred, did you have any

7    discussion about it with Dr. Prichard?

8         A.   I do not have a specific recollection of

9    a discussion, but it would not be unheard of in

10   our verbal weekly meetings that he and I would

11   have for him to have shared that information with

12   me, that he had made the decision to do that.

13        Q.   Said another way, you don't remember him

14   saying anything about it, but it would not have

15   been uncommon for something like this to have

16   been briefly discussed?

17        A.   So Dr. Prichard and I had weekly

18   one-on-one meetings, as you might expect.  And so

19   it would not have been uncommon after he had made

20   the decision and took the action to have shared

21   that information with me, but I do not

22   specifically recall it.

23        Q.   Have you had any discussions with Garren

24   Colvin about the termination of Dr. DiChiara?

25        A.   No.

1    Q.   Okay.  I do want to go through, and I'm

2    not going to spend a lot of time on this Exhibit

3    4, but let me start with this:  As the corporate

4    rep, Exhibit 4 is her employment agreement,

5    correct, with Dr. DiChiara?

6    A.   Yes.

7    Q.   And there's a couple of things that I

8    did want to cover within it.  First of all, under

9    4.1 -- well, actually under -- on page 2, number

10   1, SEP is employing Dr. DiChiara; correct?

11   A.   Correct.

12   Q.   It is an employment relationship, it's

13   not an independent contractor relationship;

14   correct?

15   A.   That is correct.

16   Q.   The general duties are for the physician

17   to be employed as a physician and devote all of

18   his or her professional and vocational time,

19   attention, and best efforts to render

20   professional patient care services; correct?

21   A.   Yes.

22   Q.   Under 4.2, the physician is only

23   permitted to maintain membership on the medical

24   staff of Saint -- of SEH; correct?

25   A.   Correct.

Page 41

1      Q.    And, in fact, the physician is only

2   permitted to admit patients to SEH except in

3   circumstances in which it's not in the patient's

4   best interest, it would violate a third-party

5   payer restriction, or it's contrary to patient

6   preference; correct?

7      A.    That is correct.

8      Q.    There's a 4.3 conflict of interest

9   regarding outside compensation or employment.

10  And anything with respect to SEH is allowed;

11  right?

12     A.    Would you restate that, please?

13     Q.    Yeah.  Under the conflict of interest

14  provision.

15     A.    Yeah.

16     Q.    And I'm looking at the particular

17  provision, However nothing contained herein shall

18  prohibit physician from performing medical staff,

19  committee, or teaching appointments associated

20  with SEP or SEH; right?

21     A.    (Witness nodded head.)

22     Q.    And so activities within SEH is not

23  permitted -- or is permitted under the conflict

24  of interest provision; correct?

25     A.    Yes.

Page 42

1          Q.   Outside activities other than with SEP

2     or SEH cannot be done without express written

3     consent; correct?

4          A.   That is correct.

5          Q.   There's some representations and

6     warranties and then there's a confidentiality

7     provision in 4.5; correct?  And I do want to talk

8     about that with you just for a minute.

9          A.   Okay.

10          Q.   4.5(a) talks about patient names and

11     records; correct?

12          A.   It does.

13          Q.   4.5(b), again, is more names of

14     patients; correct?  In other words --

15          A.   Yes.

16          Q.   -- any document that reflects patient

17     name?

18          A.   Yes.

19          Q.   (c) is price lists, fee schedules,

20     reports or other documents disclosing the fees

21     charged; correct?

22          A.   Correct.

23          Q.   (d) is, All or any portion of any phase

24     of any financial information, business plans,

25     medical services, accounting data, or other

Page 43

1        financial or business information which has not

2        been published or disseminated outside of SEP or

3        not otherwise become a matter of general public

4        knowledge; correct?

5            A.   Yes.

6            Q.   What specifically is the -- is the

7        nature of business information that's being kept

8        confidential under this provision?  Is it

9        anything?

10           A.   I would have to defer to our policy

11       documents on that.

12           Q.   Okay.  And then (e) is any employee

13       payroll, fringe benefit, salary, bonus,

14       commission or other compensation matters;

15       correct?

16           A.   Yes.

17           Q.   And then there's a carve out and it

18       says, if the physician needs to provide to their

19       legal counsel, their accountants, or their tax

20       preparers information that may otherwise be

21       confidential, they can do so, correct, with a

22       proviso, and the proviso is that those

23       professionals need to keep to the same

24       confidentiality restrictions?

25           A.   Yes.

Page 44

1      Q.   Let me ask, is it a violation of this

2   policy if someone breaks into SEP's offices and,

3   and steals confidential information that's in a

4   physician's office?  Does the physician violate

5   the policy?

6      A.   If a physician breaks into another

7   physician's office?

8      Q.   No.  If an outside party goes and takes

9   confidential information.

10     A.   Well, if an outside party does it, then

11  I would not see -- this contract applies to Dr.

12  DiChiara.

13     Q.   Okay.  You would agree with me what this

14  provision requires is reasonable steps by her to

15  maintain confidentiality; correct?  And so if a

16  third party goes and breaks into her office,

17  that's not on her; right?

18     A.   I would agree with that.

19     Q.   One of the things that I'm wondering,

20  you would agree that this entire agreement is

21  subject to legal requirements; correct?

22     A.   Yes.

23     Q.   One of the things that is a huge issue

24  in healthcare, for instance, is the False Claims

25  Act; correct?

Page 45

1        A.    (Witness nodded.)

2             MR. BIRKENHAUER:  You've got to answer

3    verbally.

4        A.    Correct.

5        Q.    And the reason for that is there are

6    significant consequences if there's, for

7    instance, fraudulent billing of the federal

8    government; right?

9        A.    Correct.

10        Q.    From a healthcare provider standpoint,

11    that could be fatal to the organization because

12    it could ultimately result in debarment, in other

13    words, you're cut off from federal funding;

14    correct?

15        A.    Correct.

16        Q.    And so compliance with that law is very,

17    very important; correct?

18        A.    Yes.

19        Q.    And the False Claims Act in particular

20    allows an employee to disclose confidential

21    information to the federal government or in the

22    context of a lawsuit; correct?

23        A.    Would you restate that?

24        Q.    The False Claims Act allows an employee

25    who is aware of, for instance, fraudulent

Page 46

1    billing, to report it to the federal government;

2    correct?

3         A.   Yes.

4         Q.   And allows them to bring a lawsuit about

5    it as well; correct?

6         A.   Yes.

7         Q.   You would agree that that would not be a

8    violation of this agreement because it's a

9    requirement that's provided by law; correct?

10        A.   Yes.

11        Q.   The same is true, incidentally, with

12   respect to information related to either Title

13   VII, religious or race discrimination, or the

14   Americans with Disabilities Act, in other words,

15   disability type information; correct?

16        A.   Yes.

17        Q.   The -- I don't -- I want to get into the

18   termination provisions with you at 10, and I'm --

19   and I've spent even more time with Dr. Prichard

20   on this, but I want to generally talk about

21   paragraph 10.  It's on page 7 and we're just

22   going to go through it quickly.

23             There's two options for termination.

24   One is a without cause termination under Section

25   10.1; correct?  It says termination without

1    cause?

2        A.   Correct.

3        Q.   And then there's a Section 2, SEP's

4    right of termination for cause; correct?

5        A.   Correct.

6        Q.   And I suppose we could get into --

7    physician also has the right to terminate for

8    cause under 10.3?

9        A.   Correct.

10        Q.   And then there's an automatic

11    termination under 10.4.  On the SEP's right of

12    termination for cause, some of the provisions

13    require notice and an opportunity to cure;

14    correct?

15        A.   I --

16        Q.   And let me give you -- I can give you a

17    couple of examples.  A -- in other words, 10.2(a)

18    says, a breach of Section 4, Exhibit A, or a

19    breach of any material term of this agreement by

20    physician if such breach is not cured within 30

21    days after written notice from SEP.

22            In other words, there's a right to cure

23    under (a); right?

24        A.   Yes.

25        Q.   (b), you lose your license, there's no

Page 48

1       right to cure; right?  You lose your medical

2       license?

3            A.   Correct.

4            Q.   (c) is a reduction, suspension of

5       clinical privileges or other adverse or

6       corrective action imposed by SEH or their medical

7       staff; correct?

8            A.   Correct.

9            Q.   I know we talked about this before, but

10      10(c) indicates that SEH does have the right to

11      impose corrective action, and that would be

12      grounds for termination without cause and without

13      the right to cure.  That's 10(c) -- 10.2(c);

14      correct?

15           A.   That's how it reads.

16           Q.   Okay.  (d) is a physician resigns from

17      the medical staff without written approval.

18      That's a for cause, no right to cure; right?

19           A.   Correct.

20           Q.   (e) is if you're convicted of a

21      misdemeanor, felony, or DUI; right?

22           A.   Correct.

23           Q.   (f), and you have the right to cure here

24      under 10.2(f), physician's repeated neglect of

25      duties under this agreement after written notice;

Page 49

1    right?

2         A.   Correct.

3         Q.   (g) is a new regulation or regulatory

4    provision comes in that restricts or adversely

5    affects the physician's ability to utilize SEH's

6    services or products for SEP's patients, so

7    that's going to -- that's without -- without the

8    right to cure, 10.2(g); right?

9         A.   Correct.

10        Q.   10(h) is misappropriating any funds or

11   property of SEP with exception of incidental

12   medical supplies.  That's 10.2(h).

13             Do you know why there was an exception

14   for incidental medical supplies?

15        A.   I do not.

16        Q.   And there's no right to cure under

17   10.2(h); correct?

18        A.   Correct.

19        Q.   Is property defined in the agreement?

20        A.   I would have to review the entire

21   agreement to know.

22        Q.   Okay.

23        A.   I'm not aware.

24        Q.   (i) is a positive drug test.  No right

25   to cure; right?

Page 50

1       A.    Correct.

2       Q.    (j) is if you're no -- if SEP is no

3    longer able to provide professional liability

4    insurance; correct?

5       A.    Correct.

6       Q.    Is the liability insurance for SEP's

7    physicians, is that something that SEP procures

8    for them?

9       A.    It is.

10       Q.    Is that a shared -- by the way, is that

11    self insurance or is that -- is there an outside

12    provider for that?

13       A.    It -- it varies depending on the

14    physician, but the majority of the physicians are

15    covered under a self insured trust.

16       Q.    Okay.  Is that trust also applicable to

17    SEH's insurance?

18       A.    Yes.

19       Q.    And so is it -- is it a common trust

20    that SEH and SEP share for insurance services?

21       A.    Yes.

22       Q.    Okay.  10.2(k), if the physician is

23    suspended or terminated from participation in any

24    government payer plan.  In other words, if the

25    federal government cuts you off for Medicaid or

Page 51

1  Medicare, that's a ground for termination; right?

2       A.   Correct.

3       Q.   And I know we talked about this with the

4  prior witnesses, but the vast majority of the

5  patients that SEP and SEH treats are Medicare or

6  Medicaid; correct?

7       A.   That is correct.

8       Q.   I think it's somewhere around 70 percent

9  or maybe more; correct?

10      A.   It's -- yes, that's generally correct.

11      Q.   Okay.  (l) is if there is a board

12  certification requirement that the physician

13  fails to meet, that's grounds for termination,

14  right, without cure?

15      A.   Correct.

16      Q.   (m) is upon investigation by SEP,

17  physician is deemed by SEP to be disruptive

18  pursuant to the medical staff code of conduct,

19  policy of SEP or SEH, or as otherwise solely

20  determined by SEP, physician violates SEP or SEH

21  policies or procedures; correct?

22      A.   Correct.

23      Q.   And so if I understand (m), there is a

24  violation of either an SEP or an SEH policy or

25  procedure will be grounds to trigger that;

Page 52

1        correct?

2            A.    That is how it reads, yes.

3            Q.    What is the meaning of disruptive?

4            A.    I would see disruptive as anything that

5        interrupts the otherwise course of action that's

6        already underway.

7            Q.    Does it have to be significant

8        disruption or is it anything that's even minor or

9        trivial is going to be sufficient?

10           A.    I think it would be left up to the

11       circumstance to determine.

12           Q.    What would be the factors of that

13       circumstance?

14           A.    I think we would take into account the

15       significance and nature of the disruption at the

16       time that it took place.

17           Q.    Okay.  How significant does it have to

18       be?

19           A.    That's a subjective question.

20           Q.    Who makes that determination?

21           A.    Well, ultimately in the terms of a

22       termination, it would be the SEP president and

23       CEO.

24           Q.    Okay.  (n) is the physician engages in

25       conduct that is disruptive, unprofessional,

Page 53

1    unethical, fraudulent, or inconsistent with SEP's

2    core values or constitutes a threat to the

3    health, safety or welfare of any person.

4              I think we just talked about disruptive;

5    right?

6         A.   We did.

7         Q.   How about unprofessional?  What -- what

8    is unprofessional?

9         A.   Unprofessional would be acting in a

10   manner contrary to the terms outlined in the

11   employment agreement, code of conduct, any other

12   confidentiality or similar agreements that had

13   been entered into by an individual.

14        Q.   How about unethical?

15        A.   I would defer to our corporate

16   responsibility policy for that, where it does

17   outline our responsibility to uphold ethical

18   business practices.

19        Q.   Okay.  Fraudulent?  What's that?

20        A.   Bear with me.

21        Q.   Sure.

22        A.   I didn't anticipate needing to bring my

23   dictionary today.

24        Q.   Well, and, you know, that's a great

25   answer is you would defer to the dictionary terms

Page 54

1       for any of these.  I think that would be an

2       appropriate answer if that, in fact, is the

3       truth.  But, you know, that's why I'm asking.

4           A.   I would say dishonest, deceitful.

5           Q.   Okay.  (p) is any other conduct,

6       disruptive behavior, insubordinate behavior or an

7       action by physician that SEP determines in good

8       faith jeopardizes the proper operation or

9       reputation of SEP; right?

10          A.   Correct.

11          Q.   And that has -- that has a right to

12      cure, right, under (p)?  If the conduct or

13      activity continues to occur after written notice?

14          A.   Correct.

15          Q.   (q) is SEP makes a determination in good

16      faith that the physician has prepared a fiduciary

17      obligation or duty of loyalty; right?

18          A.   Yes.

19          Q.   What does that mean?

20          A.   Which one?

21          Q.   (q).

22          A.   Fiduciary obligation or --

23          Q.   Yeah.

24          A.   -- or duty of loyalty?

25          Q.   Well, let's -- we can do -- we'll

Page 55

1   separate them.  Fiduciary duty?

2       A.   So I think fiduciary duties are commonly

3   understood.  Duty of loyalty to me serves as a

4   betrayal of the organization.

5       Q.   That's different than a perceived

6   betrayal of any particular person within the

7   organization; correct?

8       A.   Yes.

9       Q.   And we talked about it, you -- I think

10  you told me before, the law -- if there's a legal

11  requirement, that's going to supersede anything

12  in this contract in terms of how it's interpreted

13  and enforced; correct?

14      A.   Correct.

15      Q.   All right.  As I understand this

16  agreement, there is also a Section 11, covenant

17  not to compete.  And if it's terminated without

18  cause, then the physician is entitled to engage

19  in private practice; correct?

20      A.    If it's terminated without cause by SEP,

21  that is correct.

22      Q.   Or the physician, there -- without

23  cause, 11.3?

24      A.   I would have to read --

25      Q.   Yeah, look at 11.3, page 12.  If the

Page 56

1    physician terminates without cause, the physician

2    is entitled to engage in private practice;

3    correct?

4         A.    Under the terms set forth in 11.3.

5         Q.    Right.

6         A.    It's not a carte blanche exemption.

7         Q.    Right.  It has to be private practice.

8    You can't join another hospital group; right?

9         A.    It has to be fewer than a certain number

10   of colleagues within the practice.

11        Q.    Right.  If SEP terminates without cause,

12   the noncompete does not apply.  That's 11.1(a);

13   correct?  It's on page 11.

14        A.    That's correct.

15        Q.    And then if the physician terminates for

16   cause, then that also is not going to trigger the

17   noncompete; correct?

18        A.    Correct.

19        Q.    I want to go back to -- if you can go

20   back to page 20, there's some applicable

21   standards.  And this is actually part of Exhibit

22   A.  As in this -- let me back up a minute.

23   Exhibit A, paragraph 6, and we're going to talk

24   about this later today, it's on page 17.

25              When Dr. DiChiara started, she was on a

1    0.5 FTE status; correct?

2       A.   Yes.

3       Q.   And you indicated you've reviewed some

4    financial statements.  We're going to look at

5    those later today, too.  Those indicate

6    generally, not always, when she was on that 0.5

7    FTE status; correct?

8       A.   I would have to double-check the

9    statements to see if they actually reflect her

10   FTE status.

11      Q.   They did for a period of time and then

12   they didn't, but we'll look at them later.

13           And then ultimately she bumped up to .6.

14   You were aware of that; correct?

15      A.   That is my recollection.

16      Q.   Do you know when that occurred?

17      A.   I do not remember.

18      Q.   Okay.  I want to go back to page 20.

19      A.   Okay.

20      Q.   8(a) indicates that the physician shall

21   perform all services hereunder in a cooperative,

22   ethical, collegial and non-disruptive manner and

23   in compliance with all relevant federal and state

24   laws, regulations and standards governing the

25   practice of medicine; correct?

Page 58

1          A.    That is correct.

2          Q.    And we talked about that.  The law is

3     the overarching requirement; right?

4               Generally, and I know we're going to

5     look at compensation statements soon, but

6     generally how are physicians compensated within

7     SEP?

8          A.    So the physician compensation model

9     really is constructed in two key parts.  The

10    first is one based on productivity.  And that

11    productivity is calculated based on a standard

12    formula.  The formula is comprised of two

13    components itself, a work value component, which

14    is calculated based on work relative value units,

15    or work RVUs.  Those are a standardized unit of

16    measure defined by Medicare's relative -- or

17    resource-based relative value scale.

18               So the procedure codes that are utilized

19    to determine what procedures have been performed,

20    each are assigned a work RVU unit of measure in

21    that standardized model.  And so depending on

22    what procedure, including office exam procedures,

23    which have a code -- they're referred to as CPT

24    codes.  They each have a unit of measure assigned

25    to them that is standardized across the entire

Page 59

1    country.

2           So once she performs that code, there is

3    a cumulative number of work RVUs that she

4    performs in a given period.  That then is

5    multiplied by the second piece of the formula,

6    which is a conversion factor, or a rate of pay.

7    That is a dollar amount per work RVU that we

8    define, based on nationally published benchmark

9    survey data.

10          We actually use a blended survey

11   comprised of three different nationally

12   recognized resources of third-party data in order

13   to ensure that we're remaining market competitive

14   in our pay, as well as compliant with our role in

15   reasonable compensation.  So the cumulative

16   number of work RVUs multiplied by that conversion

17   factor comprises the productivity component of a

18   physician's compensation.

19          The second main component of the

20   physician's compensation then is what we refer to

21   as provider value-based incentive.  It's an

22   incentive program.  15 percent of a physician's

23   compensation could be added to the productivity

24   component.  So it's up to 15 percent could be

25   added to the productivity component based on

Page 60

1    performance against a set of measures that are

2    defined annually by the board of directors of

3    SEP.

4            Those measures are broken down into

5    various categories that change from time to time,

6    but they're generally comprised of citizenship,

7    like attendance of provider meetings, quality

8    outcome metrics, as well as service related

9    metrics or patient satisfaction metrics, those

10   types of things.

11       Q.   So let me unpack this.

12       A.   I thought I did a good job at that.

13       Q.   You -- you did a good job.  And Mr.

14   Bruns and I have done some FCA work and so we're

15   familiar with CPT codes.  And as I understand it,

16   the CPT goes into Medicare or Medicaid and, and

17   there's a reimbursement that occurs to a provider

18   for the particular service that's being provided.

19   And those are -- and what that service is, that's

20   defined by the federal government.

21           And as I understand what you're telling

22   me, and tell me if this is wrong or not, you're

23   looking at how many of the procedures for any

24   particular CPT code that the physician is doing;

25   correct?  That's one component of the wRVU.

Page 61

1        A.    Yeah.

2        Q.    And then the second component of that is

3    that you're giving the physician a -- pay for

4    that particular procedure; right?

5        A.    I have to say you lost me there.

6        Q.    Okay.  So you're defining for each CPT

7    code how much the physician is going to be paid

8    for that particular service every year?

9        A.    That's not how we do it.

10        Q.    Okay.

11        A.    So we define a rate of pay per work RVU,

12    not based on a particular CPT code.

13        Q.    Okay.

14        A.    So the CPT codes each have their own

15    associated work RVU value.  The sum of those

16    values over a year multiplied by the conversion

17    factor is what equals the productivity component

18    of the physician's pay.

19        Q.    Okay.  So for Dr. DiChiara, or another

20    gastro doc, there could be an office visit and

21    they get a certain reimbursement for the office

22    visit; right?

23        A.    They receive a certain work RVU value

24    for that office visit.

25        Q.    Okay.  And then they may get a higher

Page 62

1      RVU, or W --

2           A.    wRVU.

3           Q.    wRVU for, for instance, a colonoscopy?

4           A.    That's correct.

5           Q.    And, and a wRVU -- do I have that right,

6      wRVU?

7           A.    Yes.

8           Q.    A wRVU, if I understand what you're

9      telling me, is a common denominator, if you will,

10     to get a particular procedure into comparables.

11     In other words --

12          A.    It's a universally defined value.

13          Q.    Okay.

14          A.    It's not a value that we contrive.

15          Q.    Okay.

16          A.    It's defined by Medicare and Medicaid

17     services.

18          Q.    Okay.  And then you're going out to the

19     market to figure out what the standard or what's

20     competitive in this market -- I'm assuming

21     greater Cincinnati market -- for comparable

22     services to make sure that you're competitive and

23     attracting and retaining physicians?

24          A.    Yes.  We, we utilize third-party vendor

25     survey data in order to benchmark at a national

Page 63

1       level, and specialty specific, the rate of pay

2       associated with each W -- work RV -- or each

3       wRVU.

4              Q.   Okay.  And do you do that annually?

5              A.   We do review that annually.

6              Q.   And I take it this is one of those

7       reserved powers that ultimately gets approved by

8       the SEH board.  In other words, you folks do your

9       internal analysis on what you think is

10      appropriate compensation and then, I'm assuming,

11      tell me if this is wrong, you're sending that

12      analysis with a recommended pay formula to the

13      SEH board for approval?

14             A.   Not -- not correct.

15             Q.   Okay.  Tell me where I'm wrong.

16             A.   So the reserved power of the board of

17      trustees of SEH is to set the physician

18      compensation formula.

19             Q.   Right.

20             A.   So if we're not changing the formula, it

21      does not require the approval of the board of

22      trustees.  All that's being changed is the rate

23      based on market data, or if CMS were to change

24      the values assigned to a particular CPT code.

25      The formula itself remains the same.

1      Q.   Okay.

2      A.   It's the number of work RVUs times the

3  conversion factor.

4      Q.   Now I understand.  And then the board

5  every year is setting the value-based component

6  of the pay as well?

7      A.   That is correct.

8      Q.   Based on, I'm assuming, whatever the

9  board believes is appropriate priorities for the

10  organization that year to incentivize doctors to

11  do the things that the board wants them to do?

12      A.   That is a fair assumption.

13      Q.   Okay.  There is -- this is in writing

14  and it's pretty confusing to me, and I think

15  you've done a good job of unpacking it.  At 23 to

16  twenty -- I believe 27 of Dr. DiChiara's initial

17  employment contract; correct?

18      A.   Correct.

19      Q.   The -- just briefly, there is a SEH code

20  of conduct at five -- at Exhibit 5.  By the way

21  I'm done, thankfully, with the employment

22  agreement.

23      A.   Okay.

24      Q.   We looked at Dr. DiChiara's contract

25  that required compliance with the SEH code of

Page 65

1    conduct; correct?

2         A.    There are a number of policies and

3    procedures.

4         Q.    All right.  10.2(m), we talked about

5    upon investigation by SEP, the physician is

6    deemed by SEP to be disruptive, pursuant to the

7    medical staff code of conduct policy by SEP or

8    SEH.  And so my -- I guess let me ask, is this

9    code of conduct -- was this code of conduct

10   applicable to Dr. DiChiara?

11        A.    I don't know.

12        Q.    Okay.  Do you know who would?

13        A.    No.

14        Q.    Okay.  Exhibit 6 was Dr. DiChiara's

15   confidentiality and nondisclosure agreement.

16   This began -- began with, As an employee I am

17   responsible for maintaining the confidentiality

18   of information relating to patients, physicians,

19   and fellow employees.  Unless it is necessary to

20   complete my job responsibilities, information

21   about the condition, performance, or personal

22   affairs of patients/physicians or other employees

23   will not be repeated or discussed.

24             And then there's a definition and a list

25   of confidential information including, but not

1    being limited to, information about a patient's

2    condition/treatment, clinical data, employee

3    records, marketing plans, product or service

4    plans, strategies/forecasts, patient lists and

5    financial information.

6         Did I read that correctly?

7    A.   You did.

8    Q.   Let me -- let me go back just briefly to

9    the employment agreement at 4.  Do you know or

10   have any knowledge of how Dr. DiChiara

11   interpreted the provisions of the Exhibit 4,

12   employment agreement?

13   A.   No.

14   Q.   Do you agree that she would be entitled

15   to use any reasonable dictionary definition to

16   define any term in the agreement that's

17   undefined?  I mean, because we talked about this,

18   SEP drafted the agreement; right?

19   A.   That is correct.

20   Q.   SEP could put any provision that it

21   wanted into, including definitions within the

22   agreement; correct?

23   A.   Correct.

24   Q.   And so if it doesn't define the term,

25   you'd agree Dr. DiChiara can use any reasonable

Page 67

1    dictionary definition to define a term in this

2    agreement; correct?

3         A.   Yes.

4         Q.   Okay.  By the way, this confidentiality

5    policy, that was also drafted by SEP; correct?

6         A.   Yes.

7         Q.   There's another, by the way.  There's a

8    second page, it looks like it's been updated.

9    You would agree that SEP was entitled to update,

10   define terms, or change terms of this agreement

11   as a condition of employment; correct?

12        A.   Yes.

13        Q.   Dr. DiChiara would be entitled to read

14   it and rely on any dictionary definition in

15   construing its terms; correct?

16        A.   She could rely on anything she wants.

17        Q.   Okay.  There is -- 7 and 8, and I just

18   want to get into this briefly.  There is a

19   retention bonus loan program and a promissory

20   note.  Can you tell me just briefly about that

21   program?

22        A.   I was not familiar with Dr. DiChiara's

23   particular program, but did review the documents

24   in preparation for today.

25        Q.   Okay.

Page 68

```
 1        A.   It appears her particular program was

 2   one in which, if I read it correctly, at the

 3   conclusion -- let me review it briefly once more.

 4        Q.   Yeah.  Let me make this easier for you,

 5   sir.  I asked Dr. Prichard about it and he gave

 6   me substantive testimony on it.  Would you defer

 7   to his --

 8        A.   I would defer to him.

 9        Q.   Thank you.  We'll move past it then.

10             MR. BIRKENHAUER:  Hey, Chris, when you

11   get a second.

12             MR. WIEST:  We'll do a break.

13             MR. BIRKENHAUER:  Quick bathroom break.

14             MR. WIEST:  Absolutely.

15                  (Brief recess.)

16             VIDEOGRAPHER:  We are back on the

17   record.  The time is 10:48.

18   BY MR. WIEST:

19        Q.   All right.  Mr. Bast, I have just a -- I

20   want to go through a couple of exhibits with you

21   really quickly.  9, 10 and 11 were all amendments

22   to Dr. DiChiara's employment agreement.  And what

23   changed was the compensation formula in each of

24   those.  But the other terms that we looked at

25   before in terms of the noncompete, the
```

Page 69

1     termination provisions, et cetera, those all

2     stayed the same; correct?

3         A.   Anything not addressed in the amendments

4     would stay the same.

5         Q.   Okay.  You would agree with me that it

6     would not be a violation of the employment

7     contracts for an employee to exercise rights that

8     are allowed or protected by law; correct?

9         A.   Correct.

10        Q.   And you would agree with me that no one

11    person within SEP, even the CEO, is synonymous

12    with the organization itself in terms of loyalty

13    or things like that; correct?

14        A.   Correct.

15        Q.   Okay.  I want to look at a couple of new

16    exhibits with you, and I am marking this as 71.

17            (Plaintiff's Exhibit Number 71

18            was marked for identification.)

19        Q.   I'll hand it to your -- here, I've got

20    one marked for you.  I told you I had done some

21    surfing on the web and you would agree 71 is a

22    copy of a printout from some of SEP's website;

23    correct?

24        A.   It would appear that way.

25        Q.   Okay.  I mean, you've been on the SEP

Page 70

1      website; correct?

2          A.   Yes, I have.

3          Q.   Okay.  You have no reason to doubt that

4      this is, in fact, a printout from SEP's website;

5      correct?

6          A.   No.

7          Q.   Okay.  A couple of questions.  Do you

8      agree with SEP's website statement that St.

9      Elizabeth Physicians is the multispecialty

10     physician organization of St. Elizabeth

11     Healthcare, one of the largest and most respected

12     medical providers in the greater Cincinnati

13     region?

14         A.   I would agree with that statement.

15         Q.   Okay.  There is a list of providers, it

16     indicates that SEP has 695 providers and more

17     than 2,200 non-provider associates.

18              Do you see that?

19         A.   I do.

20         Q.   Do you agree with those numbers?

21         A.   While they fluctuate from time to time,

22     they are generally correct.

23         Q.   Let me ask generally, SEP had more than

24     a thousand employees throughout 2020, 2021, 2022,

25     and the present; correct?

Page 71

1        A.   Correct.

2        Q.   Okay.  There is also a -- if you go to

3    the second to the last page, there is a link for

4    patients and it says, as a patient of St.

5    Elizabeth Physicians, your customized care is

6    supported by our state of the art electronic

7    medical record system.  It all starts with your

8    personalized electronic medical record, the

9    information can be accessed by providers at any

10   St. Elizabeth Physicians location or St.

11   Elizabeth Healthcare facility through our secure

12   internal network; correct?

13       A.   Correct.

14       Q.   And so there is -- we talked about this

15   before, there is shared information technology

16   systems that run between both organizations;

17   correct?

18       A.   Correct.

19       Q.   Does that include the MyChart

20   application?

21       A.   Yes.

22       Q.   And I take it, is there a shared E-P-I-C

23   or Epic system that both organizations use?

24       A.   This is where my technical expertise is

25   being tested, so I think --

Page 72

1        Q.    Okay.

2        A.    -- that it would be generally safe for

3    me to say I'm not exactly sure.  I'm aware of the

4    fact that there are different versions of

5    in-patient or hospital-based Epic and ambulatory

6    Epic.

7        Q.    Okay.

8        A.    The information can be accessed by

9    providers on a need-to-know basis in the care of

10   patients in any care environment, but I believe

11   that the records are maintained separately.

12       Q.    Separately where?  Who's maintaining the

13   records?

14       A.    I don't know the details of that.

15       Q.    Is SEH maintaining the records?

16       A.    The Epic system is maintained by that

17   centralized information technology department.

18       Q.    Okay.  That both SEP and SEH use?

19       A.    That's correct.

20       Q.    And I take it that SEP physicians and

21   SEH employees are all charting to the same

22   system; correct?

23       A.    They're all using Epic, yes.

24       Q.    Right.  Generally speaking, I'm not

25   getting into specifics, but if you pull a medical

Page 73

1    record for SEH, it's going to have SEP physicians

2    making entries into that system; correct?

3         A.    That can occur, yes.

4         Q.    Okay.  Not only can it occur, that does

5    occur?

6         A.    It does occur, yes.

7         Q.    Right.  All right.  Let's look at 71.

8         A.    This was marked as 71.

9              MR. BIRKENHAUER:  I think we're on 72

10   now.

11        Q.    Oh, 72, thank you.

12             (Plaintiff's Exhibit Number 72

13             was marked for identification.)

14        Q.    And I think we talked about some of

15   this.  72 is another printout from SEP's website;

16   correct?

17        A.    It appears to be the case, yes.

18        Q.    The website has links to SEH; correct?

19        A.    Correct.

20        Q.    And, in fact, in this instance, this, I

21   will represent to you, was the career tab of the

22   SEP website.  There's a cross link to careers

23   with SEH that's on that website; correct?

24        A.    Yes.

25        Q.    There's an HR team phone number at the

Page 74

1    bottom of this.  Do you know if that is also the

2    phone number for SEH's HR?

3        A.    May I ask which page you're referencing?

4        Q.    The last page.

5        A.    The last page.

6        Q.    If you are trying to follow up on your

7    application, we encourage you to contact the HR

8    team.

9        A.    I do not know to which department that

10   number goes.

11       Q.    Okay.  73.

12           (Plaintiff's Exhibit Number 73

13           was marked for identification.)

14       Q.    This is another, and this is from the

15   about tab of SEP's website; correct?

16       A.    I'm not sure which tab it's from, but it

17   does appear to be from the SEP website.

18       Q.    Okay.  And it says, St. Elizabeth

19   Physicians, the multispecialty physician

20   organization of St. Elizabeth Healthcare, is one

21   of the oldest, largest and most respected medical

22   providers in the greater Cincinnati and northern

23   Kentucky region.

24           That statement is correct; right?

25       A.    That is what's written here, yes.

Page 75

1          Q.    There's a story and stats that's below

2     that in which it indicates that there's

3     integration or that SEP is integrated within a

4     five hospital health system.

5          Do you see that?  It's on the second

6     page.

7          A.    Yes.

8          Q.    What does that mean?

9          A.    It means that we share patients across a

10    continuum of care.

11         Q.    Okay.  Other than sharing patients,

12    how -- is there other integration?

13         A.    The intent of this statement is to

14    demonstrate that the patients are integrated

15    across the continuum of care.

16         Q.    Okay.  Is there other integration beyond

17    what we've already talked about today?

18         A.    Not that I can put my finger on.

19         Q.    Okay.  We're going to get into some more

20    details about Dr. DiChiara and benefits, but I

21    want to hand you what I've marked as Exhibit

22    63 -- or, I'm sorry, 73.

23              MR. BIRKENHAUER:  I think that's 74

24    actually, Chris.

25              MR. WIEST:  74.  Let's re-mark that 74.

Page 76

1      She'll sticker over it or write over it,

2      whatever.

3              (Plaintiff's Exhibit Number 74

4              was marked for identification.)

5      Q.    Have you -- let me start with just a

6      general question.  74 is also from the SEP

7      website.  Are you familiar with it?

8      A.    It appears to be from SEP's website.  I

9      can't say that I have visited this particular

10     page of late.

11     Q.    Okay.  There's -- are there shared

12     benefits between SEP and SEH?

13     A.    The benefit offerings are offered to

14     employees based on the employer.  But we have

15     worked over the years, in most circumstances, to

16     align the benefit offerings.

17     Q.    Okay.  Well, there's a, a mention on the

18     second page of discounts at St. Elizabeth

19     Hospitals and Physicians.

20     A.    Yes.

21     Q.    Are the discounts the same?

22     A.    For both sets of employees?

23     Q.    Yes, sir.

24     A.    They are.

25     Q.    And so there's cross-discounting that

Page 77

1    goes on and, and benefits provided to both sets

2    of employees?

3         A.    Yes.

4         Q.    Are those charged back to either

5    organization or are they just a common benefit

6    that's offered to both?

7         A.    They're a common benefit.

8         Q.    Okay.  There's a discussion on the third

9    page about pharmacy discounts at hospital

10   pharmacies to SEP associates or employees.  Is

11   that another one of those common benefits as

12   well?

13        A.    Yes.

14        Q.    Okay.  Are there other common benefits

15   that are offered to both SEP and SEH employees?

16        A.    That are not listed here?

17        Q.    Well, or that -- that do not include the

18   discounts at the hospitals or the discounts at

19   the pharmacies.  They could be listed here, I

20   mean, I'm...

21        A.    Maybe you could restate the question.

22        Q.    Are there other benefits, whether listed

23   here or not, other than the hospital discounts or

24   the pharmacy discounts, that are common to both

25   SEP and SEH?

Page 78

1        A.    As I'm reviewing this list, the benefit

2    offerings to both companies are the same as

3    what's listed here.

4        Q.    Okay.

5        A.    I think what's worth noting though is

6    that this -- this is how the benefits are

7    structured for each employer, just as if an

8    employer would set up discounted benefits for

9    using Walgreen's versus Kroger pharmacy.  So

10   it's -- it's a health benefit structure that's

11   afforded to SEP employees and it happens to also

12   be the same structure that's offered to SEH

13   employees.

14       Q.    Okay.  Here's 75.  This is another

15   printout from SEP's website; correct?

16            (Plaintiff's Exhibit Number 75

17            was marked for identification.)

18       A.    It appears to be so, yes.

19       Q.    There is a discussion about joining our

20   team at St. Elizabeth and you'll soon discover

21   we're a mission-based organization that actually

22   walks the talk.

23            Do you see that?

24       A.    I do.

25       Q.    And then in the orientation, there's --

Page 79

1      it says, as a new associate, you know how

2      overwhelming your first days of work can feel.

3      At St. Elizabeth we over a corporate orientation

4      that teaches you about the organization, our

5      policies and practices.

6                Do you see that?

7      A.    I do.

8      Q.    Is there a common orientation that is

9      shared for new employees by both SEP and SEH?

10     A.    No.

11     Q.    So there are different orientations for

12     each organization?

13     A.    Yes.

14     Q.    Okay.  Are the policies that they go

15     over the same?

16     A.    No.

17     Q.    Are some of the policies they go over

18     the same?

19     A.    They are not the same policies.

20     Q.    So totally different policies for each?

21     A.    Correct.

22     Q.    And there's no SEH policies that are --

23     that are given to SEP employees to review?

24     A.    Correct.

25     Q.    Okay.  Where -- where are the separate

Page 80

1    SEP policies?  Where are they kept?  Are they

2    kept in a common place?

3         A.   They are.

4         Q.   Where?

5         A.   They're -- the reason I'm hesitating is

6    we're actually in the process of moving them.

7    Their ultimate location will be on a third-party

8    vendor resource that's utilized for storing and

9    maintaining policies and their histories by the

10   name of policy stat.  I'm not sure that

11   conversion has taken place yet though.

12        Q.   Okay.  There's a mention about internal

13   transfers.  It says, we're eager for you to grow

14   and explore new areas of interest.  Once you work

15   for one year in a specific department, you're

16   eligible for a transfer.  Is that specific to

17   SEP?

18        A.   It is.

19        Q.   Okay.  I'm going to hand you 76.

20             (Plaintiff's Exhibit Number 76

21             was marked for identification.)

22        Q.   This is actually an SEH website

23   printout.  Have you seen it before?

24        A.   I actually can't say I have seen this

25   particular part of the SEH website.

1          Q.    Okay.  Well, let me go back to page 3,

2     I've got a question about it, nevertheless.

3               This has the SEH human resources and the

4     SEP human resources both at 1360 Dolwick Drive,

5     Suite 105A.  Do you see that?

6          A.    I do see that.

7          Q.    Do you have any reason to believe that

8     that is not, in fact, a common address for both

9     HR departments?

10         A.    What I can -- I can't speak to how the

11    building has delineated suite numbers.  What I

12    can say definitively is that they are in separate

13    suites.

14         Q.    Okay.

15         A.    There are separate entrance doors and

16    they do -- the suites do not connect to each

17    other.

18         Q.    Okay.  And so if I wanted to go and

19    visit SEH's HR, I would have to go through a

20    different door to get to SEH's HR versus SEP's

21    HR?

22         A.    That is correct.

23         Q.    Okay.  All right.  I'll hand you 77.

24              (Plaintiff's Exhibit Number 77

25              was marked for identification.)

Page 82

1          Q.   It would help if I wrote on the exhibit

2     sticker instead of the top right corner.

3               This is an HR listing under the

4     careers.stelizabeth.com website.  Have you seen

5     this before?

6          A.   I don't believe I have.

7          Q.   Okay.  You don't dispute that there's

8     links to both SEP and SEH on this particular

9     website, do you?

10         A.   It appears -- it's very difficult from a

11    hard copy piece of paper to know what is a link

12    and what isn't.

13         Q.   Okay.

14         A.   But it does appear on page 3 that there

15    are some links that would take you to SEP's

16    pages.

17         Q.   Okay.  And there's a fraud warning, I

18    don't know if you've seen this on the fourth

19    page, that talks about being advised any job

20    offers, correspondence or requested documentation

21    will always be sent from a corporate St.

22    Elizabeth email address.  All emails from St.

23    Elizabeth Healthcare will have @stelizabeth.com

24    at the end of the email address.

25               Do you see that?

Page 83

1        A.    I do see that.

2        Q.    That is exactly true for emails from

3   SEP; correct?  Same email extension?  We talked

4   about that before.

5        A.    Yes.

6        Q.    Moving along.  There we go.  12 is the

7   associate handbook.  Mr. Bast, I asked Dr.

8   Prichard a number of questions about this

9   document.  Would you defer to his testimony as

10  the corporate representative?  And if not, I'll

11  ask you the questions.

12       A.    I think I'm here in the capacity as

13  corporate representative, I'll take the

14  questions.

15       Q.    Okay.  That's what we'll do then.  This

16  is -- Exhibit 12 is an SEP document; correct?

17       A.    Yes.

18       Q.    And was this the handbook that was in

19  effect in 2021?

20       A.    I can't speak for exact timing of any

21  edits, but substantially, yes.

22       Q.    Okay.  There is a 103, confidentiality

23  requirement, regarding the privacy and

24  confidentiality of patients, associates, and

25  business information.  It's on page 5.

Page 84

1        A.    Yes.

2        Q.    You would agree that it indicates the

3    disclosure of or distribution of patient

4    information without the patient's consent and for

5    purposes other than patient care is strictly

6    prohibited; right?  It says that?

7        A.    I do agree that that is one of the

8    sentences in the paragraph.

9        Q.    And then the very next sentence says,

10    any release or improper discussion of such

11    information is a breach of confidentiality and

12    will subject an employee to disciplinary action

13    up to and including termination.  That's the next

14    sentence; correct?

15        A.    That is the next sentence.

16        Q.    Such information refers to the

17    disclosure or distribution of patient

18    information; correct?

19        A.    Being the last sentence of the

20    paragraph, it refers to the entire paragraph.

21        Q.    Is a reasonable construction of such

22    information referring to the preceding sentence?

23        A.    State that again, please.

24        Q.    Is it the -- is a reasonable

25    construction of such information, the reference

Page 85

1    to the prior sentence?

2         A.    The word construction is throwing me.

3         Q.    Is a reasonable interpretation of such

4    information to refer to only the preceding

5    sentence?

6         A.    Not only the preceding sentence.

7         Q.    So it's not reasonable to assume that

8    such information is only referring to the

9    preceding sentence?

10        A.    It's not reasonable in my estimation.

11        Q.    Okay.  Let me ask, you would agree that

12   if such information is sent outside of SEP, it's

13   no longer confidential; correct?

14        A.    I would not agree that simply by sending

15   it outside of SEP, that it's no longer

16   confidential.

17        Q.    Or information that is sent outside of

18   SEP, you don't think it's -- does it stop being

19   confidential at that point?

20        A.    It has breached confidence.

21        Q.    Okay.  How about if it -- if information

22   is originally sent to, to individuals outside of

23   SEP?

24        A.    It would depend on the nature of the

25   information.

Page 86

1          Q.    Okay.  Such as what?

2          A.    If it's publicly available through

3     marketing materials or such, I would not consider

4     it confidential.  If it's direct communication

5     that is of a business or patient care nature,

6     either with a patient or via email, for example,

7     then I would consider that to be confidential

8     information that has been breached.

9          Q.    Okay.  This refers to maintaining

10    privacy and confidentiality of patients.  That's

11    referring to SEP's patients; correct?

12         A.    It would -- it would refer to any

13    patient.

14         Q.    Okay.

15         A.    That -- yes.

16         Q.    That's treated by SEP physicians?

17         A.    Correct.

18         Q.    SEP associates.  In other words, other

19    employees of SEP; correct?

20         A.    Correct.

21         Q.    Or SEP's business information.  What is

22    SEP's business information?

23         A.    It would be any information pertaining

24    to the dealings -- the business dealings of SEP

25    in any form, written, verbal, email.

Page 87

 1          Q.    Okay.  There is an electronic

 2     communication provision at 106.

 3          A.    Yes.

 4          Q.    It says, all company electronic

 5     communication systems, including but not limited

 6     to email, voice mail, and network services are

 7     the property of St. Elizabeth Physicians or St.

 8     Elizabeth Healthcare.

 9                How is one to know whether the

10     information is SEP's or SEH's?

11          A.    I don't know that.

12          Q.    Okay.  It says, SEP may inspect or

13     monitor those systems; correct?

14          A.    Correct.

15          Q.    And you're responsible for using the

16     electronic communication system properly and in

17     accordance with this policy; correct?

18          A.    Yes.

19          Q.    And then there's a proviso on page 6

20     that all associates are required to use these

21     business tools in an appropriate way to meet the

22     standards of their position.  Any personal use

23     should be on an associate's own time; correct?

24          A.    It does say that.

25          Q.    So it does allow for personal use as

Page 88

1    long as it's on the associate's own time;

2    correct?

3         A.   That is how it reads.

4         Q.   How is one to determine for an employed

5    physician -- in other words, I've got a doctor, I

6    don't have a staff member that's paid hourly,

7    because you would agree with me with a staff

8    member that's paid hourly, it's easy to determine

9    when they're on their own time and when they're

10   not; right?

11        A.   Yes.

12        Q.   They're on the clock or they're off?

13        A.   Correct.

14        Q.   The physician, they're compensated on a

15   salary basis; correct?

16        A.   No.  They're compensated on the

17   compensation formulas I spoke to earlier.

18        Q.   On the compensation formula.  So how do

19   we know when the physician is on the clock or

20   off?

21        A.   We don't.

22        Q.   Okay.  There is a 110, equal employment

23   opportunity; correct?

24        A.   Yes.

25        Q.   And that indicates that there is

Page 89

1    protection according to federal, state and local

2    laws and that SEP is going to comply with those

3    laws; correct?

4        A.    Correct.

5        Q.    All right.  I think that's it on this

6    one.  Let's look at 13.  Exhibit 13.  There's an

7    electronic forms of communication policy?

8        A.    Yes.

9        Q.    Let me ask generally in writing a

10   policy -- sir, by the way, your signature, top

11   left; right?

12       A.    That is correct.

13       Q.    In writing a policy, you would agree

14   that there is a difference between the terms

15   should or shall or shall not or may not; correct?

16       A.    Yes.

17       Q.    The -- does this policy allow employees

18   to, for instance, send emails to private email

19   addresses?

20       A.    I would have to review it in detail.  I

21   don't believe it prohibits sending to private

22   email addresses.

23       Q.    Okay.  Has anyone ever been fired for

24   sending emails to private email addresses?

25       A.    For the express purposes of having sent

Page 90

```
1        to a private email address, I'm never aware of

2        that happening.

3             Q.    Would you agree that generally SEP

4        employees have the right to consult an attorney?

5             A.    Yes.

6             Q.    Would you agree that generally SEP

7        employees -- that includes being able to consult

8        an attorney or their representatives regarding

9        employment rights or liabilities or obligations?

10            A.    Yes.

11            Q.    And I take it, because we want SEP

12       employees to comply with the law, that if they're

13       unsure, there would be nothing improper with

14       consulting with an attorney or their

15       representative; correct?

16            A.    Correct.

17            Q.    Okay.  I want to ask -- you'll see some

18       SEH policies at 15, 16, 17, 18, 19, and 20, and

19       21.  Do you know if these policies apply to SEP

20       physicians?

21            A.    They do not.

22            Q.    None of them do?

23            A.    Well, having not reviewed them before --

24            Q.    Well, let's go take a look.

25            A.    Okay.
```

Page 91

1          Q.    And if you don't know, that's okay.

2          A.    Because generally speaking, the only SEH

3    policies that would apply to SEP physicians are

4    those that have to do with the clinical delivery

5    of care to patients in the hospital facilities.

6    So accreditation standards with Joint Commission

7    or the medical staff policies.

8          Q.    How about FCA compliance at 15?

9          A.    No.

10         Q.    So when it says applicability, St.

11   Elizabeth Healthcare systemwide -- do you see

12   that on the top right?

13         A.    Yes.  So the -- within St. Elizabeth,

14   both organizations, system is synonymous with SEH

15   only.

16         Q.    Okay.

17         A.    System does not reference St. Elizabeth

18   Physicians.  That's just nomenclature within the

19   two organizations.

20         Q.    And so systemwide never refers to both?

21         A.    Correct.

22         Q.    Okay.  All right.  Did I ask you all the

23   way through 21, none of those apply to SEP

24   individuals or employees?

25         A.    Through 20 --

Page 92

1          Q.    Okay.

2          A.    -- I would confidently say yes.  21, I

3     would have to review because of the potential

4     that it includes photography, filming,

5     broadcasting while delivering patient care.  So

6     if it has to do with anything with regard to the

7     care delivery while in the hospital, then I would

8     see it as applying.

9          Q.    So would -- let's go back to 15.  15 is

10    FCA whistleblower protections.  If an SEP

11    physician becomes aware that there's SEH

12    fraudulent billing practices, are you saying that

13    15 would not apply to that SEP physician?

14         A.    Again, not being familiar with the exact

15    wording of this policy, because they're not an

16    employee of SEH, I would consider them a third

17    party reporting that activity.  SEP maintains its

18    own policies of a similar nature.

19         Q.    Let me ask, we talked when we began this

20    deposition that the SEP CEO, the SEP COO, which

21    is yourself, the CFO, are actually SEH employees?

22         A.    That's correct.

23         Q.    Would these policies have applied to

24    you, to Dr. Prichard, to the CFO?

25         A.    Yes.

Page 93

1          Q.    Okay.  Are you then not subject to the
2     SEP policies?
3          A.    I don't know.
4          Q.    Okay.
5          A.    I comply with the SEP policies, but from
6     the employment law standpoint, I don't know.
7          Q.    Okay.  There was a discussion in Dr.
8     DiChiara's employment contract about her need to
9     comply with SEH policies.  Do you recall that?
10     We can go back and look if you need to.
11          A.    Let's go back and look at it.
12          Q.    Let's go back and look.  It's Exhibit 4.
13          A.    Before we go back, may I address, again,
14     a thought I have on your previous question?
15          Q.    Which question?
16          A.    About my compliance with SEH and SEP
17     policies.
18          Q.    Sure.
19          A.    Because I am leased by SEP from SEH, I
20     would amend my statement to say that I would
21     interpret there is a requirement for me to comply
22     also with SEP policies.
23          Q.    You have to comply with both?
24          A.    Yeah.
25          Q.    Okay.  Let's go back to 10.2(m).  It's

Page 94

1      on page 9.

2            A.    Okay.  I'm there.

3            Q.    This is a ground for termination.  It

4      includes -- and there's, upon investigation by

5      SEP, physician is deemed by SEP to be disruptive

6      pursuant to the medical staff code of conduct

7      policy of SEP or SEH.  That's referring to the

8      medical staff code of conduct; right?

9            A.    Correct.

10            Q.    Or as otherwise solely determined by

11      SEP, physician violation SEP or SEH policies or

12      procedures.

13            A.    That is how it reads.  In practice, the

14      SEH procedures in this case would, as I stated

15      earlier, be those regarding the delivery of

16      clinical care.

17            Q.    Okay.

18            A.    Or compliance with clinical

19      accreditation standards, such as with Joint

20      Commission.

21            Q.    Okay.  All right.  Let me grab these

22      policies.  It would help if I would keep them in

23      order.  16 -- what was the last -- I'm sorry.

24      No, it was -- I'm on 22.

25                  Can you turn to Exhibit 22 just briefly?

Page 95

1          A.   You bet.

2          Q.   Just briefly, you're aware that Garren

3     Colvin, as the president and CEO of SEH, was

4     entitled to set the terms and conditions of Dr.

5     Prichard's employment, correct, as the CEO of

6     SEP?

7          A.   Correct.

8          Q.   Okay.  All right.  23.  Let me ask, sir,

9     were you involved at all, before we get into

10    these questions, in the development or

11    implementation of the COVID-19 vaccine mandate by

12    SEP or SEH in the summer -- maybe late summer of

13    2021?

14         A.   I was a part of a group of leaders that

15    jointly participated in making that decision.

16         Q.   Okay.  Who was part of that group?

17         A.   I will not be able to recite all of

18    them.  But it comprised key executive leadership

19    from both organizations and, most importantly,

20    key clinical physician subject matter experts.

21         Q.   Who was that?

22         A.   Including infectious disease physicians,

23    mainly Chad Peterson and Dora Savani.  We also

24    had key critical care physicians or hospital

25    based physicians that are caring for COVID.  I

Page 96

1    can't recollect exactly the names of the

2    individuals involved.

3              The point being, we wanted to make sure

4    that we had the clinicians who had the expertise

5    to interpret the data and who were in the process

6    of caring for the patients aiding the leadership

7    in making the right decisions for our patients

8    and our community.

9        Q.   Do you know how many people were part of

10   those discussions?

11       A.   Not exactly.

12       Q.   How long had those discussions

13   occurred -- let me back up a little bit.  The

14   mandate or the vaccine requirement was announced

15   on August 5th of 2021; correct?

16       A.   That, that is --

17       Q.   I'll show you emails in a second.

18       A.   That's fine.

19       Q.   I'm not playing games or misrepresenting

20   anything to you.

21       A.   I'm just not necessarily good with

22   memorizing dates, but that was the general time

23   frame.

24       Q.   Okay.  How long prior to that had the

25   vaccine requirement been under discussion?

1      A.    I'm really not sure.  It had been asked

2    and answered on a number of occasions months

3    prior.  And really, we had made the determination

4    that we were not going to take action on that

5    until clinical experts provided the advice that

6    we needed to do so.

7      Q.    Okay.  When, do you recall, the clinical

8    experts -- and I take it when you say clinical

9    experts, you're referring to Dr. Chad Peterson

10   and Dr. Dora Savani?

11     A.    We took a tiered approach to it, so we

12   relied first on recommendations made by the

13   Centers For Disease Control and Prevention, which

14   aligned with the World Health Organization

15   advisories, coupled with Dr. Steven Stack, who at

16   the time was the Commissioner for Public Health

17   in the Commonwealth of Kentucky.  So those

18   advisories were then interpreted for us by our

19   internal experts, the aforementioned.  And then a

20   determination made to make the decision.

21     Q.    Were you involved in reviewing any CDC

22   statements concerning vaccines in advance of that

23   directive?

24     A.    For my personal interest, I often did

25   review them.  But the interpretation of them and

Page 98

1      the advice lent to the leadership decision-making

2      was left to our clinical experts.

3           Q.   And other than that Dr. Peterson and Dr.

4      Savani, who else?

5           A.   As I mentioned before, I don't remember

6      exact names of participants, but I know we had

7      deliberately made a point of including critical

8      care and pulmonology physicians -- physicians.

9           Q.   Dr. Mandapakala?

10          A.   Yes.  So Chi Mandapakala likely would

11     have been one of those physicians.

12          Q.   Anyone else that you -- as you sit here

13     today that you recall?

14          A.   I'm afraid to do so would be -- would be

15     speculative.

16          Q.   Okay.

17          A.   I do not specifically recall.

18          Q.   Do you recall generally how large the

19     group was that was undergoing these discussions?

20          A.   I'm visualizing faces on our Teams

21     calls.

22          Q.   Okay.

23          A.   Roughly 15 to 20.

24          Q.   Okay.  And you answered the next

25     question.  These were Teams meetings?

Page 99

1      A.   Well, being the nature of the situation

2    we were dealing with and avoiding personal

3    contact when possible, the majority of them were

4    Teams meetings, yes.

5      Q.   Okay.  Exhibit 23 is a CDC release dated

6    July 30th, 2021.  Have you seen this before?

7      A.   I can't say for certain whether or not I

8    have.

9      Q.   Was --

10     A.   I read a lot of CDC documents during

11   that time frame.

12     Q.   Was there any discussion or anything you

13   recall being discussed in the end of July 2021

14   regarding the CDC coming out with findings that

15   COVID-19 viral loads were similar -- similarly

16   high in vaccinated and unvaccinated individuals?

17     A.   I can't say specifically I recall that

18   particular finding and recommendation at that

19   time frame.  The information was changing so

20   routinely, which is why we had to rely on our

21   clinical experts to help us interpret it and make

22   the decision.

23     Q.   So one of the things the CDC says in

24   this release is that as a consequence of the

25   finding, including that the vaccinated

Page 100

1    individuals may be spreading the virus, they were

2    recommending a masking requirement as well.

3              Do you recall that?

4        A.    I do vaguely recall that, yes.

5        Q.    Okay.  Look at Exhibit 24 with me.  This

6    is an email that was issued jointly by Mr. Colvin

7    and Dr. Prichard.

8              Did you have any input on this

9    particular email?

10       A.    Apart from any involvement on that team

11   I mentioned earlier, I had no direct input into

12   the writing of this email.

13       Q.    Okay.  Do you recall, as you look at

14   this email, providing any data concerning

15   this email?

16       A.    No, I would not have provided any data.

17       Q.    Mr. Colvin's testimony was that he

18   primarily was responsible for drafting this email

19   and getting information regarding it, and Dr.

20   Prichard -- it was sent from both of them.  I

21   mean, you see both of their names on it.

22       A.    I do.

23       Q.    Do you have any reason to dispute that

24   testimony?

25       A.    I don't have any reason to dispute that.

1        Q.    I asked Mr. Prichard and Dr. Colvin --

2    I'm sorry.  Scratch that, reverse it.

3            I asked Mr. Colvin and Dr. Prichard

4    about statements that were made in this email and

5    the accuracy of it.  As you sit here today, do

6    you have any reason to dispute their testimony?

7            Do I need to ask you about the

8    statements and whether they're true?

9        A.    I'm not aware of the details of their

10   testimony, but I know them both to be truthful

11   and honest people so I have no reason to dispute

12   it.

13       Q.    Do you know what data, if any, they

14   relied on to make the statements that these

15   vaccines have been proven safe and effective at

16   providing long-lasting protection against COVID?

17       A.    Specific data, I do not.

18       Q.    Did you do any inquiry regarding that

19   specific data in advance of your testimony here

20   today?

21       A.    Personally, I did not.

22       Q.    Okay.  There's another statement about

23   healthcare systems throughout the region and

24   nation are experiencing a rapid increase in COVID

25   inpatient volumes and community prevalence.

1              Are you aware of any particular data to

2       back that up?

3         A.   Again, specific data, no.  But as the

4       data was made available to us and released from

5       the CDC and other organizations, that was the

6       nature of healthcare of that day.  We also did

7       monitor our hospitalizations and mortality rates

8       within our own facility, so to that extent, I was

9       aware of it.  But once again to emphasize, I was

10      not one that was individually responsible for

11      interpreting the clinical data and providing

12      advice.

13        Q.   Did you go back in advance of your

14      testimony today to review any particular

15      inpatient volume data?

16        A.   No.

17        Q.   Okay.  There's a statement that the

18      severity of the illness for the unvaccinated

19      hospitalized COVID patients is rising.  Do you --

20      are you familiar with any particular data to

21      support that statement?

22        A.   In the context of new variants being

23      discovered, I, I --

24        Q.   So I understand Delta came out, that's a

25      new variant.

Page 103

1       A.   Right.

2       Q.   But this statement, I want to focus in

3    on this particular statement in the email.

4       A.   Okay.  So you're at the bottom of the

5    second paragraph?

6       Q.   With -- yeah.  With the COVID Delta

7    variant, the severity of illness for unvaccinated

8    hospitalized COVID patients is rising.  That's

9    the sentence I'm focusing on right now.

10           What specifically is that referring to?

11      A.   At the time, I do recall that we were

12    tracking patients within the facilities,

13    including stratifying by whether or not they were

14    in an ICU or a regular acute care bed, based on

15    their vaccination status.  So we were able to

16    demonstrate that there were more patients with

17    higher severity of illness as indicated by their

18    placement in an intensive care unit that were

19    unvaccinated than vaccinated.  I can only

20    speculate that that's -- that's part of the

21    contribution to that statement.

22      Q.   Was anyone tracking whether the

23    unvaccinated patients had had prior infection?

24      A.   I do not recall that being part of it.

25      Q.   Okay.  It indicates that this is the

Page 104

1    most aggressive variant that we've seen to -- by

2    the way, let me back up a minute.

3            How did SEP or SEH make the

4    determination that it was the Delta variant -- or

5    the people had the Delta variant in the ICU

6    versus a prior variant.  Was that testing done?

7        A.   That testing was not -- the results of

8    that testing were not run at SEH.  And, in fact,

9    not any individual facility.  The variant level

10   testing was done at the state health department.

11       Q.   Okay.

12       A.   So the state health department would

13   determine sampling for various institutions

14   across the Commonwealth and those would be

15   submitted.  But just as with the flu or other

16   infectious diseases that we deal with on a

17   regular basis, once it's determined that the

18   preponderance of cases are a particular variant

19   or strain, then the clinical judgment is such

20   that that's likely what's being dealt with.

21       Q.   So was the state health department

22   coming in and sampling the ICU patients to figure

23   out it was Delta variant in the ICU?

24       A.   I can't say specifically which patients

25   were sampled.

Page 105

1        Q.    Okay.  All you know for sure is they had

2    come in and the majority of people that were

3    positive for COVID were Delta variants?

4        A.    I can't even speak to whether or not --

5    I can't speak to any of the specific results from

6    SEH.  And to my knowledge, that was not even

7    published on an institutional basis.

8        Q.    So this is just generally in the state

9    that Delta was prevalent?

10        A.    Correct.

11        Q.    Okay.  What would be the basis then that

12    the Delta variant is the most aggressive variant

13    that we have seen to date?

14        A.    So keeping in mind I did not write this

15    email and I'm not privy to all of the information

16    that led to its drafting, it was commonly

17    considered at the time, and generally understood

18    and reported publicly and widely in all of the

19    media sources that Delta was the most aggressive

20    variant that we had seen to date.

21        Q.    There's a statement about the CDC

22    reporting 99.5 percent of COVID deaths occurring

23    among nonvaccinated people.

24              Do you know what particular statement is

25    being relied upon for that?

1          A.    I do not.

2          Q.    Do you know whether or not the

3     percentage that is reflected in that statement

4     was from the start of COVID or was as of that

5     date?

6          A.    I do not.

7          Q.    Okay.  There is a statement in here

8     that, consistent with our practice for other

9     required vaccines, associates can request an

10    exemption for medical or sincerely-held religious

11    reasons; correct?

12         A.    Correct.

13         Q.    And at the time, at least as of August

14    5th, the details and process had not yet been

15    done.  It was being finalized, according to this

16    email; correct?

17         A.    That is correct.

18         Q.    Okay.  There's also a mention about

19    universal masking; correct?

20         A.    Correct.

21         Q.    Do you know if whomever drafted this

22    email was aware and was merely implementing the

23    July 30th, 2021 CDC statement that we looked at?

24         A.    I can't speak to what they were aware

25    of.

1          Q.    Okay.  Were you part of any discussions

2     about religious or medical exemption processing?

3          A.    Apart from the decision to require the

4     vaccine and a forward to that exemption process,

5     the details, no, I was not involved with.

6          Q.    So said another way, what standards were

7     going to be applied about what would be accepted

8     or not accepted from an exemption standpoint,

9     that was not something you were involved in?

10         A.    Correct.

11         Q.    Were you involved or did you receive any

12    information about the number of exemptions that

13    had been requested or had been granted, or was

14    that also black boxed, for lack of a better term,

15    from your perspective?

16         A.    At the time it was black boxed.

17         Q.    Okay.

18         A.    In preparation for this deposition, I

19    have -- I received the information that during

20    the course of this event, 1155 exemptions were

21    requested and only 53 were denied, for 95.4

22    percent of the exemption requests being granted

23    in the organization.  But prior to that, I had no

24    knowledge of who had requested an exemption or

25    who had been granted an exemption.

1        Q.   Those percentages that you reflected, do

2    you know when those exemptions were granted?   In

3    other words, were they granted in late September?

4    Were they granted in August?   Do you know when?

5        A.   Well, it would have varied throughout

6    time from when the process for requesting

7    exemption had been put in place, which would have

8    been at some time after August 5th, until the

9    deadline for submitting an exemption request.

10        Q.   What was that deadline?   Mid September?

11        A.   It was mid September.

12        Q.   Okay.   Do you know --

13        A.   15th?   I would have to reference the

14    materials.

15        Q.   Okay.   Do you know whether or not

16    exemption adjudications were being held to see

17    how many there were in total before they were

18    adjudicated?

19        A.   To my knowledge, exemptions were being

20    processed as they were received.

21        Q.   Okay.   Was that information on the

22    aggregate disseminated at all to the work force?

23        A.   It was not.

24        Q.   And so outside of the executive team, no

25    individual would know how many exemptions were

1    requested, how many had been granted, denied, or

2    anything like that?

3         A.    Frankly, I'm not sure if anyone else on

4    the executive team is aware of the numbers that I

5    just shared, as I just became aware of them in

6    preparation for today's deposition.

7         Q.    For today, okay.  So this was not a

8    status email that was going out to the executive

9    team about the exemption tracking --

10        A.    Correct.

11        Q.    -- fair?  Okay.  All right.  Let's look

12   at 25.  This is the actual vaccination policy;

13   correct?

14        A.    This is St. Elizabeth Healthcare's

15   vaccination policy.  There is one also for SEP.

16        Q.    There is?

17        A.    (Witness nodded head.)

18        Q.    Okay.  Is it the same?

19        A.    I believe that the intent was for the

20   content of the policies to be substantially the

21   same, if not identical.

22        Q.    Is the SEP policy in writing?

23        A.    It is.

24             MR. WIEST:  You know what's coming.  I,

25   I should have gotten this in discovery.  I

1    mean --

2                MR. BIRKENHAUER:  I believe you have.

3                THE WITNESS:  Papers that I reviewed,

4    for what it's worth, leading up to this, did have

5    an exhibit stamp on them for that policy.

6                MR. WIEST:  Okay.  Let's take a break.

7                MR. BIRKENHAUER:  Sure.

8                VIDEOGRAPHER:  We are off the record,

9    the time is 11:40.

10                    (Brief recess.)

11                VIDEOGRAPHER:  Back on the record,

12    11:41.

13   BY MR. WIEST:

14        Q.   To close the loop on this, your

15    testimony is Exhibit 25 did not apply to SEP.

16    This was an SEH only policy?

17        A.   Correct.

18        Q.   Okay.  Dr. DiChiara asked for a meeting

19    with herself, Dr. Prichard, and Mr. Colvin.  And

20    I know that there's communications about that.

21    Do you happen to have any knowledge about that

22    meeting, its contents, what was discussed, why

23    they held that meeting?

24        A.   Only as I -- as I reviewed documents in

25    preparation for today's deposition.

1    Q.   Would you agree that in terms of -- by

2    the way, in preparing for today's deposition, did

3    you have occasion to review either the testimony

4    of Dr. Prichard or the testimony of Mr. Colvin?

5    A.   No.

6    Q.   Okay.  I take it that you would defer to

7    them about their reasons for having that meeting

8    and the contents of it --

9    A.   Absolutely.

10    Q.   -- in terms of testimony?

11    A.   Yes.

12    Q.   Okay.  At 27, there is a couple of

13    things that is going on.  The first page of it is

14    Dr. Prichard sending a letter that Dr. DiChiara

15    had authored to Chad Peterson, Dr. Mandapakala

16    and, I believe -- yeah, Dr. Savani as well.

17         And is that because they were the

18    subject matter experts regarding vaccine issues?

19    A.   I can't speak to why Bob --

20    Q.   Okay.

21    A.   -- forwarded it to them.

22    Q.   You would --

23    A.   They were among those who were our

24    experts though.

25    Q.   You would defer, in terms of the

1    reasonings Dr. Prichard took action or didn't

2    take action in this instance, to Dr. Prichard's

3    testimony?

4         A.   I would.

5         Q.   Okay.  Have you had occasion to review

6    Dr. DiChiara's letter dated August 16th that's

7    attached to this email?

8         A.   Only in preparation for today, yes.

9         Q.   So I understand it got sent to the SEP

10   board at or around the time of, of this meeting

11   in August of '21.  You didn't review it at that

12   time?

13        A.   No.

14        Q.   Did anyone on the SEP board discuss that

15   letter?

16        A.   Not in my presence.

17        Q.   Okay.  And not in a board meeting?

18        A.   Not in a board meeting.

19        Q.   Okay.  Do you have any reason to believe

20   or disbelieve any of the statements Dr. DiChiara

21   has made in her letter?

22        A.   I am not a clinical expert.

23        Q.   Okay.

24        A.   So I'm not equipped to evaluate it in

25   either capacity.

Page 113

1          Q.   And I take it if you were to ask

2    someone, you would probably ask the same people

3    Dr. Prichard did, Dr. Savani, Dr. Peterson, maybe

4    Dr. Mandapakala?

5          A.   Most likely.

6          Q.   Okay.  All right.  Exhibit 28 was the

7    communication to the board -- the SEP board.  And

8    I think I understand your testimony, there was no

9    follow-up other than this being sent to the SEP

10   board; correct?

11         A.   To my recollection, that's correct.

12         Q.   Okay.  We are moving.

13              All right.  Did you have any

14   communication about Dr. DiChiara's letter or the

15   evaluation of it with Dr. Prichard, with Dr.

16   Mandapakala, Dr. Peterson, or Dr. Savani?

17         A.   No.

18         Q.   If -- if we had testimony from Dr.

19   Prichard about those interactions, you would

20   defer to him?

21         A.   Without knowing what he said, I can't

22   say that I would defer to him on that.

23         Q.   Okay.  Well, let me -- how about just

24   the plain contents at exhibits -- let's start

25   with 29 where -- other than what's in this email,

Page 114

1    you don't have any knowledge on the contents of

2    Exhibit 29, do you?

3        A.    No.

4        Q.    Exhibit 30 was communication with Dr.

5    Mandapakala, same with 31.   Same there?

6        A.    Correct.   The first time I saw these was

7    in preparation for today.

8        Q.    Okay.   Did you talk to Dr. Mandapakala,

9    Dr. Peterson, or Dr. Savani in advance of your

10   preparation today?

11       A.    I did not.

12       Q.    Exhibit 32, same question.   In terms of

13   the altering of the approach, was that ever

14   discussed in August with the SEP board in terms

15   of the vaccine mandate?

16       A.    Not to my recollection, no.

17       Q.    Okay.   Has Dr. Prichard ever discussed

18   with you possibly changing the stance or the

19   approach regarding the vaccine mandate?

20       A.    No.

21       Q.    34 is an email exchange between Gary

22   Blank and JoAnn Reis.   You don't have any

23   knowledge and you're not going to speak to that,

24   do you?

25       A.    No.

1    Q.    Okay.  I want to look at 33 with you for

2    just a moment.  Mr. Deters, Eric Deters, had in

3    August of '21 -- I'm going to be as kind as I can

4    about this -- had gone -- undertaken a campaign

5    regarding the SEP and SEH's mandate; fair?

6    A.    That was very kind.  Yes.  Fair.

7    Q.    There was knowledge of him having done

8    so within SEP and SEH; correct?

9    A.    Yes.

10    Q.    And was Mr. Deters' actions or

11    statements the subject of any discussion within

12    the SEP board?

13    A.    I do not recall any discussions about

14    Mr. Deters at the SEP board.

15    Q.    Was Mr. Deters or any of his actions or

16    statements the cause for discussion between you

17    and Dr. Prichard?

18    A.    Yes.

19    Q.    And what generally do you recall about

20    those discussions?

21    A.    Generally it was an exchange of content

22    that I had observed in watching some of his

23    videos or knowledge of the protests he had

24    arranged.  But nothing that led to any sort of

25    decision-making process.

1        Q.   Were you assigned to watch him or

2    monitor his videos?

3        A.   I was not.  No, that was my choice.

4        Q.   How did you have occasion to learn about

5    it as he was doing it?

6        A.   I became aware of his video postings, I

7    don't recall from whom, and then out of my own

8    interest sought them out.

9        Q.   Were you watching every time he was

10   releasing one?

11       A.   No.

12       Q.   How many of those videos do you think

13   you watched?

14       A.   Maybe three or four.

15       Q.   What was your general takeaway?

16       A.   That he was grossly misinformed.

17       Q.   He was making statements that you do not

18   believe had a basis in fact.  Would that be fair?

19       A.   He did make statements that I believed

20   did not have a basis in fact.

21       Q.   Okay.

22       A.   Correct.

23       Q.   He filed suit on what I'm going to call

24   Beckerich 1 in the Boone Circuit Court.  And when

25   I say he filed suit, let me be clear, I'm going

1    to generally refer to Mr. Deters today as Mr.

2    Deters.  But when I do so, it could be the Deters

3    firm which carried his name and for which he was

4    the spokesman and paralegal, or the

5    representative of the attorney at times.

6              When I'm referring to Mr. Deters, I am

7    lumping it in with the Deters firm, because I'm

8    assuming that everyone was generally lumping it

9    in -- those -- those terms were synonymous; fair?

10        A.   My personal belief is I would not

11   consider them synonymous.

12        Q.   Okay.  In what way?

13        A.   In that Mr. Deters does not carry a

14   license to practice law in the Commonwealth of

15   Kentucky.

16        Q.   Okay.

17        A.   And I am not clear on his formal

18   capacity to represent the Deters Law Firm.

19        Q.   Okay.  Well, let's look at Exhibit 33

20   then.

21        A.   Okay.

22        Q.   By the way, were you or did anyone else

23   at SEP get on the email list for Mr. Deters?

24        A.   No.  Well, I can't speak to anyone else

25   at SEP.  I did not.

Page 118

1          Q.    Was anyone assigned to do that?

2          A.    No.

3          Q.    Are you aware of anyone that was

4     assigned at SEH to monitor that?

5          A.    I am not aware of that.

6          Q.    Okay.  Have you ever seen any emails

7     from Mr. Deters?

8          A.    I -- I have not seen any emails from Mr.

9     Deters.

10         Q.    Other than in preparation perhaps for

11    today?

12         A.    Correct.

13         Q.    Let's look at 33.  This is how he was

14    signing his emails in '21, unless you have cause

15    to dispute it.

16               He said he was a retired Ohio lawyer in

17    2013.

18         A.    So for the record, this is the first

19    time I'm seeing this document.

20         Q.    It is?

21         A.    Yes.

22         Q.    You've not seen it before today?

23         A.    I have not seen it before today.

24         Q.    Okay.  He was a retired Kentucky lawyer

25    in '21.  No current law license.  And he says,

1    all information Eric Deters provides here by

2    phone, text or in person is either general

3    information or the relaying of law or case

4    specific information under the supervision of an

5    attorney.  He may also offer his personal opinion

6    to friends on matters who have no client

7    relationship with Deters Law.  He's the office

8    manager.  He's the spokesman on official firm

9    matters.  Paralegal and victim's advocate.

10         Do you have any reason to believe that

11    those statements that he's making about himself

12    are not true?

13    A.   Seeing that I am privy to a lot of

14    information that Mr. Deters has shared publicly

15    that is not founded in fact, I can't speak

16    confidently as to whether or not this is factual.

17    Q.   And the reason that you make that

18    statement is you're referring to the things he

19    was saying about SEP or SEH.  And you knew

20    that -- you knew personally because you were in

21    -- you were subject to the discussions, that

22    things he was saying, at least some of it, was

23    not true?

24    A.   That and statements contradictory to the

25    medical experts at the time as well.

Page 120

1       Q.   You're talking about the vaccine

2   statements that he was making was contrary to

3   what you were hearing from Dr. Savani, Dr.

4   Peterson, and Dr. Mandapakala?

5       A.   And the Centers For Disease Control and

6   Prevention and the World Health Organization and

7   Dr. Steven Stack as well, yes.

8       Q.   Okay.  Have you ever dealt with a

9   situation where physicians have differing

10  opinions?

11      A.   Sure.

12      Q.   That's not uncommon; correct?

13      A.   It's not uncommon.  I wouldn't say it's

14  common.

15      Q.   The nature of medicine is, in fact, the

16  practice of science in part; correct?  Or in

17  large part?

18      A.   Yes.

19      Q.   And that's why we have things like peer

20  reviewed studies where physicians review each

21  other's work and see if work -- or conclusions

22  are valid; correct?

23      A.   That is correct.

24      Q.   Were there differing opinions that

25  you're aware of concerning COVID-19 in 2020,

Page 121

1      2021, and the like?

2             A.    In general?

3             Q.    Let's go generally.

4             A.    Yes, I am aware there were differing

5      opinions about it.

6             Q.    Conflicting opinions in fact at times;

7      correct?

8             A.    Yes.

9             Q.    Conflicting medical opinions at times;

10     correct?

11            A.    Generally, yes.

12            Q.    Have you been privy to any instance in

13     which the CDC or the FDA had an original opinion

14     about something and then changed as a consequence

15     of studies and science?

16            A.    Yes.

17            Q.    Do you know whether or not the

18     statements that Mr. Deters was making, and I'm

19     speaking generally, were the subject of

20     reasonable medical or scientific debate or were,

21     for lack of a better term, just completely off

22     the charts?

23            A.    I would not profess to know precisely

24     the origins of his information.

25            Q.    Okay.  Were you familiar with Mr. Deters

1    prior to his interactions with SEH and SEP in

2    August or September of '21?

3         A.   By name and reputation only.

4         Q.   And I need to ask.  Generally, what was

5    your understanding of his name or his reputation?

6         A.   Well, he had filed a number of lawsuits

7    on behalf of clients over the years against both

8    SEP and SEH, a number of which were felt to be

9    unfounded.

10         Q.   Frivolous?

11         A.   Frivolous would be a fair word.

12         Q.   Okay.  He, in this statement, talks

13    about getting a letter from the board of trustees

14    of St. Elizabeth.  Were you familiar with this

15    communication at all?  I think you said you were

16    not?

17         A.   I was not.

18         Q.   There's a letter that's attached to

19    this, and I think the better -- the better place

20    to probably look may be Exhibit 34.  I'm not

21    talking about the top, the communication between

22    Gary Blank and JoAnn Reis, I'm looking at the

23    bottom.

24              Did you receive an email from Dr.

25    Grunkemeyer?

Page 123

1          A.    I was a recipient of this email.

2          Q.    Okay.  And this was a letter that was

3     signed by physicians and providers; correct?

4          A.    That is correct.

5          Q.    Was this physician letter discussed at

6     all within the SEP board?

7          A.    I do not recall any occasion on which it

8     was discussed at a board meeting.

9          Q.    Okay.  How about between the members of

10    the board?

11         A.    Not to my recollection, no.

12         Q.    How about between you and Dr. Prichard?

13         A.    Yes.

14         Q.    And what was the nature of those

15    discussions?

16         A.    Initially surprise.

17         Q.    In what way?

18         A.    We have considered ourselves to be an

19    extremely transparent and physician centric

20    culture within our medical group.  And this is

21    the first occasion in which I could recall,

22    before or since, that legitimate concerns of

23    providers were not just brought to leadership to

24    address and instead they felt compelled to

25    present a, for all intents and purposes, public

1    letter.

2        Q.    Do you know who made the letter public?

3        A.    Apart from the email that I received

4    from Dr. Grunkemeyer, I'm not aware of --

5        Q.    Okay.

6        A.    -- who made it public.

7        Q.    When you say public, who was on the

8    recipient list, do you recall?

9        A.    We could refer to -- I believe at least

10   one of the documents I reviewed had the recipient

11   list.  It was somewhat of a hodgepodge in that it

12   included members of both SEP and SEH's executive

13   team, but not the complete lists, members of the

14   SEP and SEH boards, but not the complete lists.

15       Q.    What was Dr. Prichard's general reaction

16   to the Grunkemeyer letter or the objections?

17       A.    Again, I think we both were initially

18   surprised.  And then I think our follow-up to

19   that then was to try and communicate as to the

20   reasoning behind the -- the approach that was

21   taken and facilitate an opportunity to talk

22   through the organizational approach to what we

23   were doing and why we were doing it.

24       Q.    You indicated that you were aware of

25   protests.  Let me just talk about that for a

Page 125

1    little bit.  Mr. Deters and others were

2    organizing protests; correct?

3         A.   I'm aware that Mr. Deters did.  I'm not

4    aware or recall if anyone else was the organizer

5    of protests.

6         Q.   Okay.  Those protests began outside of

7    SEH in Edgewood?

8         A.   There's two in particular that I recall.

9    One was outside of SEH in Edgewood and one was

10   outside of Mr. Colvin's --

11        Q.   Personal residence --

12        A.   -- residence.

13        Q.   -- that followed; correct?

14        A.   I don't remember the order.

15        Q.   Okay.  How was that taken?

16        A.   Well, it wasn't generally thought of

17   well, but it was people exercising their rights

18   to do that.  They're -- people are entitled to

19   their own feelings and expression of those as

20   long as it's done in a legal manner.  But knowing

21   that we were doing everything we could to follow

22   the advice of the clinical experts in order to

23   provide the best care and support we could to our

24   associates, our providers, our patients and our

25   community, it -- we didn't like it because we

1    felt that we were doing what we could and what we

2    were doing that was right in the face of the, the

3    known science and advice that was provided to us

4    at the time.

5        Q.   Were the protests disruptive?

6        A.   For the most part I don't believe so.

7    But I was not present at either of those, so I --

8    I can't speak specifically to it.

9        Q.   Okay.  Was -- was the protest at Mr.

10   Colvin's house something that you discussed with

11   Dr. Prichard?

12       A.   Apart from the knowledge of it taking

13   place, no.

14       Q.   Okay.  Did you have any personal

15   discussions with Mr. Colvin concerning the

16   vaccine mandate or the protests or Mr. Deters?

17       A.   No.  Apart from, I think in passing I

18   told him that I was thinking about him.

19       Q.   Okay.

20       A.   But no, no discussions about any of

21   those topics with him personally.

22       Q.   Your offices, are they on Dolwick?

23       A.   My office is at Dolwick Drive, yes.

24       Q.   Okay.  And Mr. Colvin, I believe, is

25   over at Edgewood?

1        A.    That's correct.

2        Q.    Okay.  Dr. Prichard had an office at

3   both?

4        A.    That is correct.

5        Q.    Okay.  I want to back up just a little

6   bit.  I want to talk about Beckerich 1, that was

7   the Boone Circuit filing that your counsel then

8   removed to federal court.

9             When did you first learn about Beckerich

10  1?

11       A.    I can't say specifically when I first

12  learned of it.

13       Q.    Okay.  In or around the time that it was

14  filed?

15       A.    That would be -- that would be generally

16  the course of action that's taken when suits are

17  filed against the organization, that it -- that

18  it would be passed along to me informationally.

19       Q.    Okay.  From a resource standpoint, that

20  was something, I take it, that the attorneys were

21  going to handle?

22       A.    That's correct.

23       Q.    I don't want to get into attorney advice

24  or attorney handling and so I'm not asking for

25  that.  But generally was the filing of Beckerich

1    1 disruptive to the organization?

2        A.    To the extent that anything of that

3    nature that came to fruition during this

4    otherwise chaotic time in our operational

5    dealings, and it requiring a deviation of some

6    resources from the normal course of our day,

7    you -- you could say that there was some

8    disruption there.  But because of the fact that

9    our legal counsel did most of the dealing with

10   that, it would be a minor one.

11       Q.    Okay.  What resources, if you're aware,

12   were devoted towards Beckerich 1?

13       A.    I couldn't speak to that specifically.

14       Q.    Did it take up any of your time or Dr.

15   Prichard's time that you're aware of to deal

16   with?

17       A.    I can't speak to Dr. Prichard's time,

18   but it did not take up much or any of my time.

19       Q.    Okay.  Do you have any supervisory role

20   over any of the legal function, internal or

21   external, regarding SEP?

22       A.    So no, no supervisory role.

23       Q.    Okay.  Ms. Koch, who's sitting here, she

24   doesn't report to you?

25       A.    No.

Page 129

1      Q.    Okay.  Who does she report to?

2      A.    She reports to Lisa Frey, general

3    counsel.

4      Q.    Okay.  Ms. Koch is the legal counsel for

5    SEP?

6      A.    She is the -- she, as part of her role,

7    is assigned to provide internal lead counsel to

8    SEP.

9      Q.    Okay.  And -- but she reports to the SEH

10   general counsel?

11     A.    That's correct.  You caught me saying

12   SEP.  I've never said that.

13     Q.    What do you call it, SEP?

14     A.    SEP.

15     Q.    Okay.

16     A.    It's fine.

17     Q.    I'm happy to use whatever nomenclature

18   you want --

19     A.    No.

20     Q.    -- so we're all talking about the same

21   thing.

22           Okay.  All right.  When Deters dismissed

23   Beckerich 1, was that the subject of discussion

24   within the organization?

25     A.    No, not within the organization.  And my

1    awareness was simply just that I was aware of it.

2        Q.    Just that -- you just were informed he

3    had dismissed it?

4        A.    Correct.

5        Q.    Okay.  35, if you look at 35, there was

6    an email Dr. Prichard began, Dr. Beers forwarded,

7    regarding provider support for the vaccine

8    requirement.  Were you -- do you recall that

9    occurring?

10            And I will tell you, I think you are

11    included on the initial email that starts at

12    defendant's 2144, it goes into 2145.  You'll see

13    you're copied.  You're copied on this bottom of

14    the second page, 2144.

15        A.    Okay.  I do see that now.  Let me review

16    it because --

17        Q.    Yes.

18        A.    -- this was not in the papers that I

19    reviewed --

20        Q.    That's fine.

21        A.    -- in preparation for today.

22        Q.    Please.  And just so you know, I'm just

23    starting on the -- I'm only going to ask you

24    about the part that starts at the very bottom of

25    2144, the part you were actually copied on.

1        A.    Okay.

2        Q.    It goes into 2145.

3        A.    Okay.

4        Q.    This was a request, or an invitation, if

5    you will, that if providers wanted to support the

6    vaccine requirement, they could issue a statement

7    of support; correct?

8        A.    Yes.

9        Q.    Was this an email that Dr. Prichard had

10   discussed with you before it went out?

11       A.    I do not recall discussing it.  And in

12   fact, while I do recall it now, looking at this,

13   had it not been for this document in front of me,

14   I would not have remembered this correspondence.

15       Q.    Okay.  You don't recall any discussions

16   about it?

17       A.    I don't recall any discussions about it.

18             MR. WIEST:  Okay.  Do you know what I'm

19   thinking?  It's 12:07, do you want a lunch break?

20             MR. BIRKENHAUER:  How long do you think

21   you'll be going?

22             MR. WIEST:  I mean, it's going to be a

23   while.

24             MR. BRUNS:  Yeah.

25             MR. WIEST:  I mean, it's going to be a

Page 132

1        full -- it's a whole day with him, so yeah.

2                    MR. BIRKENHAUER:  Let's take it.

3                    MR. WIEST:  Yeah, I figured.

4                    MR. BIRKENHAUER:  Okay.

5                    MR. WIEST:  I mean, we're not even into

6        the financial stuff yet, so...

7                    MR. BIRKENHAUER:  Right.  Yeah.

8                    MR. WIEST:  Yeah.

9                    MR. BIRKENHAUER:  Fair enough.

10                        (Brief recess.)

11                    VIDEOGRAPHER:  We are back on the

12        record.  The time is 1:16.

13   BY MR. WIEST:

14        Q.   Mr. Bast, before I get into the St.

15        Elizabeth Physicians vaccine policy that your

16        counsel alerted me was attached to your EEOC

17        response, and I guess I missed it because it was

18        part of that and something else.  There was some

19        discussion he and I had on break about -- we

20        talked about this master agreement between SEP

21        and SEH.  And it's my understanding that that

22        agreement is in the negotiation process, but it

23        is not yet finalized?

24        A.   I have come to that understanding as

25        well, that we are still in draft form.  It's --

Page 133

1    it's something that I believed at the time had

2    been executed, but it simply represents the

3    practice that has been in place.

4        Q.   Can you -- other than what we've talked

5    about, can you articulate the back and forth

6    between these organizations as you sit here today

7    from a practice perspective?  Even if it's an

8    informal -- other than what we've talked about?

9        A.   So we talked, I think, about information

10   technology earlier.  Some of the other services

11   that come to mind that are leased by SEP from SEH

12   are -- is marketing services.  Facilities is a

13   big one -- facility administration.  Those are

14   the big ones that come to mind.  And so those are

15   services that are provided by a centralized

16   department that is housed within SEH.

17            In my mind, I've always viewed it such

18   as those are services that independent medical

19   groups might contract with an outside vendor for.

20   And in our case, our vendor just happens to be

21   SEH.

22       Q.   Okay.

23       A.   And so those services are provided to

24   SEP through that agreement.

25       Q.   Okay.  Anything else other than

Page 134

1    marketing, facilities, IT?

2         A.    Obviously I've been thinking about it

3    since -- since it's come up and nothing else

4    comes to --

5         Q.    Okay.

6         A.    -- mind offhand.

7         Q.    If you recall anything else before we

8    adjourn this deposition, let me know.

9         A.    Fair enough.

10         Q.    This is Exhibit 25A, which is the SEP

11   vaccination policy for COVID-19.

12              Let me start with this:  Is this policy

13   still in place?

14         A.    It is.

15         Q.    And so SEP still requires the COVID-19

16   vaccine?

17         A.    It does.

18         Q.    Okay.  There on the second page, it

19   looks like you are the responsible party and the

20   approved-by person for this policy.

21         A.    That's correct.

22         Q.    Okay.  The -- let me start with this

23   question:  There's a purpose statement on this

24   that says, consistent with its duty to provide

25   and maintain a workplace that is free of

Page 135

1    recognized hazards, St. Elizabeth Physicians has

2    adopted a required COVID-19 vaccination policy

3    for associates.

4         Do you see that?

5    A.   I do.

6    Q.   If the CDC statement that we looked at

7    before at Exhibit twenty -- I think it was 23, is

8    true and the viral loads were the same for the

9    vaccinated and the unvaccinated and the disease

10   was being spread by both the vaccinated and

11   unvaccinated and, hence, the mask recommendation.

12   I mean, you would admit that a vaccine policy and

13   this vaccination policy in particular would not,

14   in fact, keep the workplace free of recognized

15   hazards?

16   A.   I would not agree with that statement.

17   I think that while we have learned over time that

18   transmissibility may not have been as impacted as

19   originally intended by the vaccine, both -- being

20   vaccinated both helps to reduce the viral load of

21   the vaccinated person, and if they do contract

22   the disease, it has been shown to reduce the

23   severity of the symptoms.  So I would not agree

24   that it doesn't help to provide a workplace free

25   of recognized hazards.  It certainly aids in

Page 136

1    accomplishing that.

2        Q.   Okay.  But there is a difference between

3    aiding and accomplishing it, and actually making

4    sure that it's free of recognized hazards;

5    correct?

6        A.   I would agree with that, but this

7    statement is not claiming that it makes it free,

8    it's saying it's consistent with its duty to

9    provide and maintain a workplace.  This is a tool

10   that's being put in place to accomplish that.

11       Q.   What evidence do you have that the

12   vaccine is helping to reduce the viral load?

13       A.   I do not have any on hand in front of me

14   right now.  But again, upon the advice of our

15   clinical experts over time, that has been the

16   understanding that's been delivered to us.

17       Q.   So if we wanted to dig into that

18   statement, I would need to ask maybe Dr. Savani

19   about it?

20       A.   She would be one person that certainly

21   could be a clinical expert on it.

22       Q.   Dr. Chad Peterson?

23       A.   I would say he would be as well.

24       Q.   Anyone else?

25       A.   Being our infectious disease experts, I

Page 137

1        would probably say they are the two best ones.

2            Q.    Okay.  This talks about Employee Health

3        handling the exemptions; correct?

4            A.    Yes.

5            Q.    Is Employee Health an SEH function or an

6        SEP function?

7            A.    Employee Health is a service that serves

8        both organizations.

9            Q.    Okay.  Is that one of those that are

10       part of that agreement?

11           A.    I -- I can't speak definitively that

12       they are.

13           Q.    Okay.  Who are -- who is Employee Health

14       actually employed by?

15           A.    They're employed by SEH.

16           Q.    Okay.  And so they were the ones that

17       were going to handle the exemptions to not only

18       the SEH vaccine policy we looked at earlier, but

19       the SEP vaccine policy as well?

20           A.    It's my recollection that they helped in

21       the tracking of that, but there was a, a -- not

22       committee, but a panel represented by both

23       organizations that evaluated the exemption

24       requests.

25           Q.    So it was a joint function of both

1        organizations that were evaluating these --

2              A.    Correct.

3              Q.    -- requests?  Okay.  All right.

4                    Do you know, sitting here today, what

5        Dr. DiChiara knew or did not know about Eric

6        Deters prior to September 3rd of 2021?

7              A.    No.

8              Q.    You have no idea; correct?

9              A.    I have no idea.

10             Q.    Let's look at Exhibit 36.  I'm going to

11       refer to this as Beckerich 2, which is the

12       September 3rd, 2021 filing.  And before I get

13       into some specifics on this, do you know, sitting

14       here today, how many vaccine exemption requests

15       had been requested within SEH or SEP prior to

16       October 22, 2021?

17             A.    I do not know date specific, no.

18             Q.    Okay.  How about --

19             A.    In total I do.

20             Q.    Right.  In total, but not by dates?

21             A.    But not by dates.

22             Q.    Okay.  And so you would not similarly

23       know how many had been granted by dates; correct?

24             A.    Correct.

25             Q.    And I -- it would be equally true for

Page 139

1    how many had been processed, granted or sought on

2    September 2nd; correct?

3        A.    That's correct.

4        Q.    Okay.  When you know totals, you're

5    talking about total throughout what I'm going to

6    call the announcement of the policy through the

7    deadline to comply?

8        A.    Correct.

9        Q.    Okay.  All right.  Those will be

10   questions for someone else.

11           Let me ask, prior to your preparation to

12   testify, had you reviewed Beckerich 2, which is

13   marked as Exhibit 36?

14       A.    This is the actual suit?

15       Q.    Yes, sir.

16       A.    Did your question include prior to a

17   certain date?

18       Q.    Prior to your preparation to testify --

19       A.    Oh, prior to --

20       Q.    -- as the corporate representative.

21       A.    I don't believe so.

22       Q.    I know we talked before about Nuremberg

23   Code, and I think you mentioned that and some

24   other things that might have been in this

25   lawsuit.

Page 140

1            Prior to your preparation, you were

2     unaware of the contents of the suit; would that

3     be fair?

4          A.   Well, I don't remember using the term

5     Nuremberg Code at all.  I think --

6          Q.   Okay.

7          A.   -- that's a term that you used.

8          Q.   Okay.  It might have been your counsel

9     that used it.

10         A.   Maybe.

11              MR. BIRKENHAUER:  Next time.

12         Q.   Okay.

13         A.   No.  I -- I had a rough understanding of

14    what the contents were, but I don't recall

15    actually reading through it.

16         Q.   What was your understanding of the

17    contents of it?  And I'm not going to -- we're

18    going to dig into the specifics, we're going to

19    look at it, but I want to know what -- what your

20    understanding of the contents were?

21         A.   My understanding of it is that a class

22    of individuals were claiming that their

23    individual rights, and I can't remember if it was

24    under Title VII or the ADA or both, were being

25    violated by St. Elizabeth Physicians and St.

Page 141

1    Elizabeth Healthcare instituting of the vaccine

2    mandate.

3         Q.   And had you talked about Deters'

4    allegations in those general terms with Dr.

5    Prichard in, say, September or late August of

6    '21?

7         A.   I don't have a specific recollection,

8    but again in our one-on-one verbal meetings,

9    it's -- it's likely something that we would have

10   talked about in some form or fashion.

11        Q.   Did Beckerich 2, which is the complaint

12   that's marked Exhibit 36, or the handling of it

13   create interruption within SEP?

14        A.   Again, to the extent that I think that

15   there are resources that were utilized to have to

16   address this complaint, most of which admittedly

17   were our legal counsel resources -- but again,

18   anything that creates a distraction or disruption

19   to what we were trying to deal with at the time

20   in responding to the COVID crisis, yes, I would

21   agree there was some disruption caused as a

22   result of that.

23        Q.   Can you quantify that for me?

24        A.   I, I think I used the term minimal --

25        Q.   Okay.

Page 142

1          A.    -- with the previous question, and I

2     would say the same with this here.

3          Q.    Okay.  Do you know how often, and we're

4     going to look at an exhibit on this in a couple

5     minutes, how often SEP or SEH was a party to

6     litigation in state or federal court prior to

7     September of 2021?

8          A.    I can't say specifically prior to

9     September of 2021, but in preparation for today,

10    I did acquire some numbers.  So between 2019 and

11    2021, the number of cases that SEP was actively

12    defending ranged from 37 to 41.

13         Q.    Was SEP ever a plaintiff?

14         A.    No.  Not in my tenure.

15         Q.    Okay.  How about SEH?

16         A.    I do not --

17         Q.    Do you know how often they were?  If I

18    were to represent to you, and I'm not just going

19    to represent to you, I'm going to pull out an

20    exhibit in a couple minutes, that over three --

21    SEH or SEP was a party to over 3,000 lawsuits in

22    the 10 years prior to September of '21, would you

23    have any reason to dispute that?

24         A.    I -- I would not have any way to confirm

25    or deny it.

Page 143

1      Q.    I'm going to allow you to confirm in a

2   couple minutes.

3      A.    Okay.

4      Q.    We're going to look at a CourtNet

5   printout.  But were those lawsuits disruptive to

6   either organization as far as you're aware?

7      A.    Again, I would say that each and every

8   one of them to some extent caused a disruption in

9   that it, it -- it re-tasked resources that could

10  have been applied to other things.

11     Q.    Was the -- was it the fact of needing to

12  respond to the lawsuit that was disruptive then?

13     A.    Would you restate that?

14     Q.    Sure.  Was it the fact of needing to

15  respond to the lawsuit that was disruptive?

16     A.    No, I think the -- if you're talking

17  about any initial response, that was left up to

18  legal counsel to do.

19     Q.    Okay.  You're talking about any

20  follow-on resources to need to deal with the

21  substance of the suit?

22     A.    Correct.

23     Q.    Okay.  Are you aware of any specific

24  resources dealing with the substance of that with

25  respect to Beckerich 2, that Exhibit 36?

Page 144

1        A.    Not off the top of my head, I am not.

2        Q.    Okay.  I want to -- I'm not going to go

3    through all of the contents of this suit with

4    you, other than I think you just talked about

5    this and so I think it's pertinent.  If you could

6    go back to page ID -- if you'll look, when you --

7    on a federal lawsuit, there's a marker on the top

8    right, it's got a page ID.

9        A.    I see that.

10       Q.    If you could go back to 60 for me.

11       A.    Six zero?

12       Q.    Yes, sir, six zero.

13       A.    Okay.

14       Q.    The cause of action, I, was a violation

15   of the Rehabilitation Act and the Americans with

16   Disabilities Act relative to medical exemptions;

17   correct?

18       A.    I'm just not seeing the specifics about

19   medical exemptions.

20       Q.    437.

21       A.    Okay.  That is how it states.

22       Q.    Okay.  Count II on the following page at

23   61 is violation of Title VII of the Civil Rights

24   Act related to religious exemptions; correct?

25       A.    That is what it states, yes.

Page 145

1        Q.    Okay.  Those were the very first two

2    counts relative to this suit; correct?

3        A.    Yes.  They're listed as counts I and II.

4        Q.    And you would agree with me that's the

5    subject matter of this suit; correct?

6        A.    To my understanding, having read through

7    it in preparation for today, yes.

8        Q.    Okay.  There are some exhibits I want to

9    talk about with you to this suit, and I want you

10   to go back -- the first exhibit starts at page ID

11   101.

12       A.    Okay.

13       Q.    This is the Grunkemeyer letter; correct?

14       A.    Yes, it does appear to be that letter.

15       Q.    And I know it wasn't just Dr.

16   Grunkemeyer, even though he is listed twice on it

17   and he's the only person who is, but I will

18   represent to you that he was -- I mean, we looked

19   at the transmittal where he transmitted it to --

20   you said it was a hodgepodge of board and

21   executive officers; correct?

22       A.    I did use the term hodgepodge, yes.

23       Q.    You did.  Okay.  The -- was the fact

24   that this letter was included separately

25   disruptive from the lawsuit?  Did that make it

1    more disruptive?

2        A.   I don't know that this letter itself

3    made the lawsuit more disruptive.  The letter

4    itself was disruptive.

5        Q.   How was the letter itself disruptive?

6        A.   Again, I think that in particular

7    this -- this came as a surprise to us in a

8    culture where we prided ourselves on working

9    through these issues with our providers.  And so

10   for a blanket statement like this to be sent to

11   the aforementioned hodgepodge and, and eventually

12   reaching a broader audience just was not

13   concurrent with our -- with the culture that we

14   prided ourselves on.

15       Q.   So the physicians that signed this

16   letter, and I want to be clear, violated the

17   corporate culture of SEP?

18       A.   Well, the culture -- I mean, there is no

19   policy to violate there, but yes, it was not

20   congruent with the transparent and collegial

21   culture that we pride ourselves on having.  And

22   while some of it I was not fully aware of or at

23   least not intimately involved in between some of

24   the correspondence that followed in an attempt to

25   identify other SEP physician opinions on this

1    matter that we talked about earlier, the email

2    that went from Dr. Prichard to other members of

3    SEP is -- that is an example of some of the

4    disruption that was caused.

5         Q.   From SEP's perspective, they would have

6    preferred that these physicians not voice their

7    concerns over this vaccine policy?  Is that what

8    you're saying?

9         A.   Well, there is no violation of policy

10   per se in how they did this, especially noting

11   the fact that the signatories of this letter

12   included non-SEP employed physicians and

13   providers.

14        Q.   Right.

15        A.   Your question stated would it be our

16   preference.  Yes, our preference would be that

17   another course were taken in order to express

18   their concerns.

19        Q.   Did this -- the sending of this letter

20   at Exhibit 1 on the Deters lawsuit, did that

21   anger Dr. Prichard?

22        A.   I never sensed any anger from him --

23        Q.   Okay.

24        A.   -- as a result of it.

25        Q.   Let me ask -- if you don't mind, I'm

Page 148

1          going to back up just a little bit.

2                    At exhibit -- the same exhibit, page ID

3          93.

4              A.    Okay.

5              Q.    This was signed by Dominick Romeo, who

6          was at the time a licensed attorney in the

7          Commonwealth of Kentucky; correct?

8              A.    That does appear to be the case.

9              Q.    But you have no reason to dispute that;

10         correct?

11             A.    I have no reason to dispute it.

12             Q.    And Mr. Romeo indicates that he is

13         practicing law for or with Deters Law; correct?

14             A.    Yes.

15             Q.    At the same address that Mr. Deters uses

16         for his communications, 5427 Madison Pike;

17         correct?

18             A.    Would you remind me which?

19             Q.    Where his address is?

20             A.    Which previous address that we had?

21             Q.    Sure.

22             A.    Clearly my memorization skills are not

23         as good as yours.

24             Q.    I don't know that we've got an exhibit

25         that has that.  But, I mean, do you have any

Page 149

1    reason --

2        A.   I think there was that email from Mr.

3    Deters that listed all of his affiliations that

4    we reviewed.

5        Q.   Yeah, it said that he was with the firm,

6    but it -- I don't think it has the address on it.

7        A.   Doesn't have his address.  Then I, I --

8    I don't have any reason to dispute it, but I

9    can't confirm that it's the same address.

10       Q.   Okay.  Do you know whether or not Mr.

11   Deters was assisting Mr. Romeo in preparing or

12   getting together the materials for this lawsuit?

13       A.   I have no firsthand knowledge that he

14   did.

15       Q.   Or did not.

16       A.   Or any --

17       Q.   Either way; right?

18       A.   I don't have any knowledge either way.

19       Q.   Okay.  There is, attached to this -- as

20   an aside, do you know the standards under which

21   medical or religious exemptions were being

22   evaluated?

23       A.   I don't.

24       Q.   That would be one of those questions, I

25   take it, that would be more appropriately

Page 150

1    directed -- the topics that we're reserving for

2    the -- for the other witness; correct?

3        A.   For what?  I'm sorry.

4        Q.   For the other witness for SEH.

5        A.   Yes.

6        Q.   Okay.  Exhibit 2 has Dr. DiChiara's

7    letter that's attached, I believe.  It starts at

8    page ID 106.

9        A.   Yes.

10       Q.   Goes through page ID 132.  This letter

11   was put in general circulation to the -- to the

12   board; correct?

13       A.   I do believe we established that

14   earlier, yes.

15       Q.   Was there anything inappropriate with

16   Dr. DiChiara penning this correspondence?

17       A.   No.

18       Q.   Okay.  Exhibit 3, these are some emails,

19   it looks like the first one is between Dr.

20   DiChiara and Mr. Colvin.

21       A.   Would you mind giving me a page ID,

22   please?

23       Q.   Yeah, why don't we start at 134, yeah.

24       A.   Okay.

25       Q.   And I just kind of want to go through

Page 151

1    this kind of in, in order.  I think the easiest

2    thing to do would just to be to go from the top.

3    So 134 is an email, it looks like, between Dr.

4    DiChiara and Mr. Colvin.

5            Do you know whether or not, sitting here

6    today, Dr. DiChiara provided this particular

7    email to Mr. Deters?  It looks like it's 134 to

8    136.

9        A.   In preparation for today's deposition,

10   which this is the first time I've seen these

11   emails --

12       Q.   Okay.

13       A.   -- in any form or fashion.  It, it -- I

14   became aware of the fact that these are among the

15   emails that Dr. DiChiara shared with Eric Deters.

16       Q.   Are you aware of whether or not Eric --

17   or whether or not Dr. DiChiara asked Mr. Deters

18   to keep her communications with him confidential?

19       A.   I'm not aware that she asked him to do

20   that.  I am aware that in one of the email

21   correspondence, she did say to feel free to

22   share.

23       Q.   We're going to look at that in a minute.

24       A.   Okay.

25       Q.   That one.  But I want to focus in on 134

Page 152

1        and 135 to start with.

2               A.    Okay.

3               Q.    Do you know whether or not she directed

4        that Mr. Deters keep these confidential?

5               A.    I do not.

6               Q.    How about 136?  Do you know whether or

7        not she directed that 136 be kept confidential?

8               A.    I'm -- I'm not sure apart from the one

9        offer to share broadly that she gave him any

10       direction either way.

11              Q.    Okay.  Same question for 137 and 138.

12       Do you know whether or not those were asked to be

13       kept confidential?

14              A.    I'm not aware that --

15              Q.    Okay.

16              A.    -- she asked them to be kept

17       confidential.

18              Q.    139 to 141, same question.  Do you know

19       whether or not she asked that those be kept

20       confidential?

21              A.    I'm sorry, 139?

22              Q.    To 141.

23              A.    No, I am not aware.

24              Q.    Assuming that she had requested Mr.

25       Deters as a representative of the Deters Law Firm

1    to keep her communications with him confidential,

2    would that be a violation of SEP policy for her

3    to communicate with a representative of a law

4    firm?

5         A.   No.

6         Q.   Okay.  Let's look at 142.  That's the

7    share widely.

8              Do you know whether or not -- and

9    there's a study that's attached there.  It starts

10   at 142 and then the study -- if you look, sir,

11   there's a -- there's a link there at the bottom,

12   there's a footnote and that follows.  And if you

13   look, that -- that looks like the study runs from

14   143 through 173.  There's a study that follows.

15             Let me start with the study.  Have you

16   seen peer -- peer reviewed studies before?

17        A.   I have seen peer reviewed studies

18   before.

19        Q.   Okay.  Do you know whether or not -- by

20   the way, the purpose of peer review is, is public

21   publication for comment and review; correct?

22   That's why we peer review things; right?

23        A.   Public -- say that again.

24        Q.   The purpose of having peer reviewed

25   studies is to put studies out in the public for

1    professional -- medical professionals if it's a

2    medical study, to review and comment on the

3    study; correct?

4         A.   I would agree with that.

5         Q.   And you would agree with me there is

6    nothing that is SEP or SEH's confidential

7    information with respect to this public study at

8    143 through 173; correct?

9         A.   This is the first I'm seeing it, but it

10   does appear to be a published study as opposed to

11   internal business information.

12        Q.   And thus it would not be SEP's

13   confidential information; correct?

14        A.   Correct.

15        Q.   Let's go back to 142.  This is the share

16   widely.  This -- is there anything that's

17   referenced in this 142 that reflects, mentions,

18   or otherwise comments on any confidential

19   information of SEP or SEH?

20        A.   It does not appear to.

21        Q.   Okay.  Are you aware, sitting here, of

22   anything else in Beckerich 2 that Dr. DiChiara

23   either was thought to have or did share with Mr.

24   Deters, other than what we've already looked at?

25        A.   No.

Page 155

1         Q.   Okay.  All right.  Let me rubber band

2    this back up and we will move on to the next

3    exhibit.

4              All right.  Look at 37.  This is the

5    unredacted feel free to share widely.  It came

6    from Dr. DiChiara's personal email account;

7    correct?

8         A.   It appears to be that case, because it

9    includes the name of someone else on there.

10        Q.   What do you mean, someone else on there?

11        A.   I'm looking at --

12        Q.   Oh, Dustin and Amy?

13        A.   Yes.

14        Q.   Yes.  I'll represent to you that Dustin

15   is her husband.  It's a shared email account.

16        A.   Okay.

17        Q.   The -- that's not a -- that's not an SEP

18   email though; correct?

19        A.   That is correct.  It appears to be a

20   hotmail account.

21        Q.   And looking at this, at Exhibit 37,

22   there would be nothing that would be

23   inappropriate with respect to or in violation of

24   SEP's policy with respect to this Exhibit 37,

25   would there?

Page 156

1      A.   Does not appear to.

2      Q.   Okay.  Have you had occasion, sir, to

3   review any of the discovery in this matter,

4   including the unredacted emails that have been

5   produced between Dr. DiChiara and Mr. Deters?

6      A.   No.  I have only seen these redacted

7   ones.

8      Q.   Okay.  Just quickly, Exhibit 38, did Mr.

9   Colvin mention any of Dr. DiChiara's advocacy

10  with respect to state representatives?  Was that

11  something that was known to SEP?

12     A.   It was not known to me.

13     Q.   Okay.  39 and 40, Dr. DiChiara pens an

14  apology email September 5th.  The -- this got

15  sent to you on September 7th.

16          Do you see that at the top?

17     A.   I do, yes.

18     Q.   Was this the subject of discussion

19  between you and Dr. Prichard?

20     A.   Again, I don't specifically remember

21  that, but in our one-on-one meetings, this is

22  something of the nature that we likely would have

23  discussed.

24     Q.   Do you recall any discussions about what

25  Dr. Prichard wanted to do with Dr. DiChiara or

Page 157

1      this letter in early September?

2          A.    No.

3          Q.    Okay.  In the letter -- Dr. DiChiara

4      indicates in her apology letter that she shared

5      documents confidentially with Mr. Deters.  Other

6      than the publicly available study, are you aware

7      or do you have any reason to dispute that the

8      other materials that were provided to him was

9      shared in confidence?

10         A.    I don't have any reason to take a

11     position on that at all --

12         Q.    Okay.

13         A.    -- because I'm not aware that she

14     requested it in either way.

15         Q.    Okay.  All right.  41 and 41A -- I know

16     you've got 41.  Let's look at 41.

17               41 is a directive from Dr. Prichard to

18     Amy DiChiara.  Mr. Colvin is also sent this email

19     in which Dr. Prichard asks for all of the

20     documents that have been sent to Mr. Deters

21     without redactions on September 8th.

22         A.    I do see that.

23         Q.    Were you -- was -- was that request

24     discussed with you at all?

25         A.    It was not to my recollection.

1      Q.   Okay.  41A, which is one of the side

2      ones, is another copy of that email and it's got

3      the BCCs on it.  And I'll just represent to you

4      it's the same email, but Lisa Frey, Ms. Koch, and

5      Garren Colvin were all blind copied.  This was

6      not something that you were in the loop on?

7               MR. BIRKENHAUER:  Chris, can we borrow

8      yours real quick?

9               MR. WIEST:  You can if it's going to be

10     quicker.

11               MR. BIRKENHAUER:  In the stack.

12               MR. WIEST:  It's -- yeah, it was in that

13     side stack, but -- it may be at the very end.

14               MR. BIRKENHAUER:  Here it is.

15               THE WITNESS:  No, I do not remember

16     being in the loop on this.

17     BY MR. WIEST:

18     Q.   Dr. Prichard as the CEO was entitled to

19     take action on behalf of SEP; correct?

20     A.   Yes.

21     Q.   Okay.  There's no question that these

22     were authorized actions on behalf of SEP by Dr.

23     Prichard; correct?

24     A.   I have no reason to question that.

25     Q.   Okay.  42, Dr. DiChiara asks for a

1    little more time to respond.  Again, you -- you

2    were not in the loop on these communications;

3    correct?

4         A.   Correct.

5         Q.   Okay.  In terms of the testimony about

6    these communications, why they were done, who was

7    in the loop, would you defer to Mr. Colvin and

8    Dr. Prichard's testimony, because they had

9    firsthand knowledge?

10        A.   Yes.

11        Q.   And I take it in preparing to testify

12   today, you didn't speak with them; correct?

13        A.   That is correct.

14        Q.   And you didn't review their testimony;

15   correct?

16        A.   Correct.

17        Q.   Okay.  I want to ask about the vaccine

18   exemption handling generally.

19        A.   Okay.

20        Q.   There was an email that went out at

21   Exhibit 43.  Do you know if this was a form email

22   that went out to all unvaccinated providers

23   within SEP?

24        A.   I believe this was a form email, yes.

25        Q.   Okay.  Who within SEP was tracking

Page 160

1    exemptions particularly?

2         A.    I don't believe anyone in SEP was.   It

3    was tracked by Employee Health.

4         Q.    Through SEH?

5         A.    Yes.

6         Q.    Okay.  Was Dr. Beers kept in the loop in

7    terms of who was vaccinated or not vaccinated?

8         A.    I do not know.

9         Q.    Well, look at 44 with me just for a

10   minute, because she's got a list of unvaccinated

11   providers in the particular area.  Do you see

12   that at the bottom, they've got Kelly --

13        A.    Thank you.

14        Q.    -- Rawe?

15        A.    Yes, I do see that now.  And I may have

16   misunderstood your question earlier.  I thought

17   you were asking about being kept in the loop

18   about exemptions, but -- but, yes, operational

19   leaders were kept in the loop as deadlines loomed

20   regarding those who had not yet met the

21   vaccination policy requirements.

22        Q.    So I want to understand the information

23   that was flowing to the operational leaders.

24        A.    Yes.

25        Q.    If I understand your testimony, Employee

1    Health was tracking the folks who had been

2    vaccinated, the folks who were unvaccinated but

3    had an exemption, and the folks that were

4    unvaccinated and had no exemption approved; is

5    that fair?

6        A.    That would be fair, yes.  And the

7    important piece being that it was Employee Health

8    doing the tracking of that.

9        Q.    But they were providing that

10   information, for instance in this instance, for

11   Doctor -- for the operational leaders, for Dr.

12   Beers.

13           By the way, who is Gary Brown?

14       A.    Gary Brown is a director of operations

15   and some of his responsibilities included

16   gastroenterology.

17       Q.    Okay.  Was he reporting to you?

18       A.    He reports to our assistant vice

19   president for medical specialties, Dan Cole --

20       Q.    Okay.

21       A.    -- who reports to me.

22       Q.    And Dan Cole was also copied on this --

23       A.    Yeah.

24       Q.    -- we see; correct?  CC?

25       A.    Yes.

1      Q.   So I take it Dr. Beers would have gotten

2    this information from Employee Health about who

3    was vaccinated, who wasn't, and who needed to

4    come into compliance.  And the point of this

5    email is essentially to figure out if there was

6    going to be, what, interruption to services

7    because potentially people who were not in

8    compliance were going to lose their jobs?

9      A.   That is correct.  And as you had begun

10    that question before, referencing Gary Brown and

11    Dan Cole, I think you asked about exemptions as

12    well.  And I think it's important to note that

13    the operational leaders were only aware of those

14    that had not met their requirements of the

15    vaccination policy.  They were not aware of who

16    had been exempted or not exempted.

17      Q.   Said another way, the operational

18    leaders were not told whether or not a particular

19    employee either had been vaccinated or had an

20    exemption, they were simply told about the folks

21    that had not otherwise complied with the policy?

22      A.   That is correct.

23      Q.   Okay.  I understand.  Exhibit 45, it

24    looks like there was an email back about Dr.

25    DiChiara putting in for an exemption, Doctor --

Page 163

1      I'm never going to get this pronunciation right?

2           A.   Anusionwu.

3           Q.   Anusionwu got vaccinated and sent his

4      information over to Employee Health yesterday.

5      And there is from Casey Weaver.  Casey was a

6      practice group manager, I'm going to call her,

7      for gastro; correct?

8           A.   She is the practice manager for

9      gastroenterology, correct.

10          Q.   Okay.  And so in this respect, operation

11     leaders were informed, at least in this

12     interaction, with who was vaccinated and who

13     wasn't?

14          A.   The information that Casey had here came

15     from the providers themselves.

16          Q.   Okay.

17          A.   She was not informed by the

18     organization.

19          Q.   And so what would be the follow-up to

20     this?  Would the -- would Mr. Cole or Mr. Brown

21     then go back with Employee Health and say are

22     these folks squared away or not?  Is that the --

23          A.   One of the operational leaders would

24     work directly with Employee Health to make sure

25     they were aware of the information the providers

Page 164

1    had shared with us.

2         Q.   Okay.

3         A.   It was well known at the time that --

4    and so many exemption requests had come in that

5    Employee Health was not making an immediate

6    turnaround on the exemption approvals or denials.

7    So it is possible in this case that Dr. Anusionwu

8    had sent some information in about being

9    vaccinated, or someone would have submitted an

10   exemption request and it was still in process.

11        Q.   It was in the system to be adjudicated

12   or to be put into the system?

13        A.   Correct.  And so what I'm trying to say

14   is that the names that had been provided by Dr.

15   Beers to Casey Weaver, et al., of those that had

16   not been compliant with the vaccine policy, it

17   doesn't surprise me to see Casey's responses, one

18   of those has actually been vaccinated, his

19   information has been sent in but the system had

20   not been updated yet to show that.

21        Q.   What was the lag time?

22        A.   I don't recall.

23        Q.   Do you remember how many total exemption

24   requests there were?

25        A.   Total exemption requests were 1155.

1      Q.    Okay.

2      A.    And I'm only aware of that due to

3    preparation for today.  My memory is not that

4    good.

5      Q.    And I take it we would need to ask

6    probably the folks that were doing those in terms

7    of how long it was taking to adjudicate them,

8    that kind of question?

9      A.    Yes.

10     Q.    Okay.

11     A.    That would be the appropriate source.

12     Q.    Okay.  All right.  I want to look at 46

13   with you.  This was an email to Mr. Markus and

14   Mr. Guilfoyle, who is with the DBL Law Firm, from

15   me with respect to Dr. DiChiara, in which they

16   were informed that she had sought legal advice

17   from the Deters Firm, that the Deters Firm was

18   told that the request was confidential, that

19   Deters went so far as to communicate an

20   engagement agreement with her and asked her to

21   sign it, that at no time did Dr. DiChiara

22   authorize the release of any information, and

23   when it became apparent that the Deters Firm was

24   interested in litigation, that Dr. DiChiara did

25   not feel comfortable pursuing it.  At that time

1    she broke off communication with the firm

2    generally and Mr. Deters in particular.

3            Let me start with:  Do you know whether

4    or not Mr. Markus or Mr. Guilfoyle communicated

5    the contents of Exhibit 46 to anyone at SEP?

6        A.   I do not.

7        Q.   Okay.  Do you generally -- and Mr.

8    Birkenhauer can object if he would like.

9            Do you generally find that your outside

10   counsel at DBL keep SEP or SEH, as a client,

11   reasonably informed?

12       A.   Yes, I do feel they do.

13       Q.   And do you think that this communication

14   would have been the kind of communication that

15   would have been communicated to someone within

16   SEP?

17       A.   That would ask for conjecture on my

18   part.  I think that there are certain legal

19   proceedings that are handled by our counsel that

20   don't necessarily need clear information sharing

21   all the time.  We trust our counsel to share

22   information with us when it's appropriate.

23       Q.   Okay.  I started this deposition with a

24   topic list.  And you said that you were prepared

25   to testify to those topics.  And one of the

Page 167

1    topics at number 43 was:  Who at SEP/SEH was

2    aware of communications with Dr. DiChiara's

3    counsel and SEP/SEH's counsel in September '21,

4    and when they were made aware of those

5    communications.

6            What did you do to prepare to testify to

7    topic number 43?

8        A.   I reviewed these emails that took place

9    between the DBL attorneys and you.

10       Q.   The exhibits or internal emails --

11       A.   No, the exhibits.

12       Q.   -- as well?  There was actually a second

13   topic as well, 35, that asked about

14   communications with Dr. DiChiara's counsel from

15   July 1st, 2021, till the present by any defendant

16   or their attorneys.

17           As you sit here today, you are not able

18   to tell me though, in response to topic 43, who

19   at SEP or SEH was aware of this particular

20   communication at Exhibit 46 in September of '21

21   and when they were made aware?

22       A.   I am not able to.

23           MR. WIEST:  Let's go off the record.

24               (Off the record.)

25           VIDEOGRAPHER:  We are back on the

Page 168

```
 1        record.  The time is 2:22.

 2   BY MR. WIEST:

 3        Q.   All right.  Exhibit 46, do you know when

 4   anyone at SEP was informed about this

 5   communication?

 6        A.   I do not know when.  I am aware that Mr.

 7   Guilfoyle shared the information with Katie Koch.

 8        Q.   Okay.

 9        A.   Who in turn shared that information with

10   Dr. Prichard and with me.

11        Q.   Okay.

12        A.   I, I still remain saying that I have no

13   recollection of receiving it.

14        Q.   Okay.

15        A.   But with -- with counsel, a review of

16   email demonstrates that I did receive it.

17        Q.   Do you believe that it was on or about

18   September 13th, or within a day or two of that?

19        A.   I have no reason to say otherwise.

20        Q.   Okay.  That's fair enough.

21             MR. WIEST:  By the way, I know we talked

22   about this in a prior deposition, no defendant in

23   this case is relying on advice of counsel;

24   correct.

25             MR. BIRKENHAUER:  Correct.
```

1              MR. WIEST:  Then that takes 22 off.

2    BY MR. WIEST:

3         Q.   Exhibit 47 is Dr. DiChiara's religious

4    accommodation request.  And I take it that this

5    was something that would have been handled with

6    Employee Health and the panel that was set up

7    that you -- you're not personally aware of;

8    correct?

9         A.   That is correct.  Until reviewing the

10   documents for today, I was not aware of this and

11   had never seen it.

12             MR. WIEST:  Nick, query whether we don't

13   want to add topic 36 to the SEH deposition as

14   well.

15             MR. BIRKENHAUER:  Okay.  I think that

16   probably makes better sense, Chris.

17             MR. WIEST:  Let's -- we'll plan on that

18   then.

19             MR. BIRKENHAUER:  Okay.

20   BY MR. WIEST:

21        Q.   48 is an email regarding blocking Dr.

22   DiChiara's schedule, in other words stopping to

23   see patients -- or stopping to see -- or ceasing

24   to see patients.

25             Do you know whether or not there was any

Page 170

1    discussion of terminating her employment on or

2    before September 13th of 2021?

3        A.    No.

4        Q.    Okay.  49 is another email between

5    myself, Mr. Guilfoyle, at this point my

6    colleague, Mr. Bruns, and Mr. Markus, who is also

7    with the DBL firm.  And there's some additional

8    emails that are attached to that on September

9    15th that follow.

10           Do you know whether or not this was --

11   this email was equally communicated to SEP?

12       A.    Yes, in the same fashion that I

13   mentioned earlier.

14       Q.    Okay.  And it would have been done on or

15   around September 15th; fair?

16       A.    Fair.

17       Q.    Okay.  In terms of the contents of the

18   email and Mr. Guilfoyle's question about why

19   communications with Mr. Deters may have been

20   privileged, a couple follow-ups.  First, Mr.

21   Guilfoyle was authorized to communicate on behalf

22   of SEP and SEH; correct?

23       A.    I can only speak to the fact that he was

24   authorized to communicate on behalf of SEP.

25       Q.    Okay.  The parties to the Beckerich

1        lawsuit were both SEP and SEH; correct?

2            A.    Yes.

3            Q.    Beckerich 2 as well; correct?

4            A.    Right.

5            Q.    You're not a lawyer; correct?

6            A.    That is correct.

7            Q.    And I take it as you sit here today,

8        you're not in a position to dispute or agree with

9        the contents of the position that we've taken at

10       Exhibit 49; correct?

11           A.    I would not be the appropriate party to

12       dispute or agree to that.

13           Q.    Fair enough.  Exhibit 50 is some

14       additional communications with Dr. Beers and

15       Casey Weaver.  And I think your testimony is

16       you're not sure when the discussions began

17       regarding the termination of Dr. DiChiara's

18       employment; correct?

19           A.    I am not aware of when that began.

20           Q.    Okay.  Have you done any inquiry to

21       figure out when that was?  When that --

22           A.    I'm sorry?

23           Q.    Have you done any inquiry to ascertain

24       when that occurred?

25           A.    No.

1      Q.    In the absence of that, would you have

2    any reason to dispute the testimony of Mr. Colvin

3    or Dr. Prichard on those points?

4      A.    No.

5      Q.    In other words, they were the ones, to

6    the extent that they had conversations about it,

7    that would be the decision-makers and they would

8    be the best people to have knowledge of that?

9      A.    Well, certainly Bob Prichard would be

10   the decision-maker, so he would be the one to

11   have the direct --

12     Q.    Okay.

13     A.    -- knowledge of that.

14     Q.    Are you aware that he testified that he

15   had spoken perhaps up to four times in weekly

16   meetings with Mr. Covin about that issue?  About

17   Dr. DiChiara's employment?

18     A.    I wasn't aware that he had testified to

19   that, no.

20     Q.    If he had, you would have no reason to

21   dispute that?

22     A.    I wouldn't have any reason to dispute

23   that.

24     Q.    Mr. Colvin recalled at least one

25   conversation that he personally recalled where

Page 173

1    Dr. Prichard and he had discussed her

2    termination.  You would have no reason to dispute

3    his testimony; correct?

4         A.   I would not.  In a similar fashion to

5    occasions where Bob and I would have regular

6    meetings and have verbal conversations about

7    ongoings of business, it -- I would have no

8    reason to believe that didn't happen in that case

9    as well.

10        Q.   Okay.  51.  Same question I had before,

11   Exhibit 51, the communications between myself and

12   Mr. Guilfoyle; Mr. Bruns, Mr. Markus are copied.

13   This would have also been relayed to SEP and SEH

14   in or around the time of their occurrence;

15   correct?

16        A.   If it was relayed to SEP, it would have

17   been done around the time of the occurrence.

18        Q.   Okay.  Do you have any reason, sitting

19   here today, to believe that this was not relayed

20   to SEP?  The contents of Exhibit 51?

21        A.   I don't have any reason to believe that

22   it wasn't.

23        Q.   Okay.  The same question on 52.  This is

24   another email exchange between myself, Mr.

25   Guilfoyle and Mr. Markus, Mr. Burns is copied, in

Page 174

1    which we obtained the withdrawal of the subpoena

2    that Deters had issued to Dr. DiChiara.

3            No reason to dispute that that would

4    have been communicated to SEP or SEH in or around

5    September 17th, 2021?

6        A.    I don't have any reason to dispute it.

7        Q.    Okay.  Exhibit 53 is another email dated

8    September 20th, '21, in which there is additional

9    communications relative to Dr. DiChiara's

10   position.

11           No reason to believe this was not

12   communicated to SEP, either; correct?

13       A.    I have no reason to believe that it

14   wasn't.

15       Q.    Okay.  All right.  54 was the granting

16   of her religious accommodation request, Dr.

17   DiChiara's request.

18           Do you know who, if anyone, that would

19   have been communicated to other than the

20   recipients of this email?

21       A.    I'm not aware of anyone that would have

22   received this other than the recipients of this

23   email.

24       Q.    Okay.  And Amy Smith is an employee of

25   SEH; correct?

Page 175

 1          A.    She is.

 2          Q.    Okay.  All right.  56 is a joint letter

 3     from Dr. Prichard and Mr. Colvin regarding

 4     compliance with the vaccine mandate.

 5               I want to ask the -- if it's a St.

 6     Elizabeth communication, an SEH communication, it

 7     would say St. Elizabeth.  And if it's an SEP, it

 8     would say St. Elizabeth Physicians.

 9               Would you agree with that?

10          A.    Yes.

11          Q.    And here it was from both and both

12     signed it?

13          A.    Correct.

14          Q.    Okay.  How often are there joint

15     communications like that?

16          A.    Less often than not, but it's not

17     unheard of.

18          Q.    Okay.  Kelley Jump at Exhibit 57.  She

19     was the executive assistant to Dr. Prichard in

20     both his SEH and his SEP capacity; correct?

21          A.    That's correct.

22          Q.    Is she an SEH or an SEP employee?

23          A.    SEH.

24          Q.    Okay.  By October 4th, there was an

25     attempt to terminate Dr. DiChiara's employment,

Page 176

1      would you agree?  October 4th of '21.

2           A.    I believe that was the date on which she

3      was delivered her termination letter.

4           Q.    Okay.  Do you know who had discussed

5      that or was involved in that decision?

6           A.    To my knowledge, it was only Dr.

7      Prichard.

8           Q.    Okay.  If Dr. Prichard had indicated

9      that he had informed Mr. Colvin and if Mr. Colvin

10     had an objection he would have heeded to that, do

11     you have any reason to dispute that?

12          A.    Would you restate that?

13          Q.    If Dr. Prichard testified that he had

14     informed Mr. Colvin in advance, that it had been

15     discussed for perhaps a period of three to four

16     weeks at weekly meetings between the two of them,

17     and that if Mr. Colvin would have objected, he

18     would have listened to that objection because he

19     reported to Mr. Colvin.

20                Would you have any reason to dispute

21     that?

22          A.    I believe he would have listened to it,

23     but it may not have changed the decision.  The

24     decision rested with Dr. Prichard.

25          Q.    Okay.  And if Dr. Prichard were to have

Page 177

1    testified that it possibly would have changed the

2    outcome, would you dispute that?  That was his

3    testimony.

4         A.   If he -- I have no reason to dispute

5    whatever Dr. Prichard testified to.

6         Q.   Okay.  Other than Dr. Prichard, are you

7    aware of anyone else, other than perhaps Mr.

8    Colvin, who was involved in making, discussing,

9    or consulting with the termination of Dr.

10   DiChiara?

11        A.   No.

12        Q.   Okay.  And I take it you're not aware of

13   the details of those conversations?

14        A.   I am not.

15        Q.   Okay.  What documents -- well, maybe we

16   need to look at the termination letter.

17        A.   Okay.

18        Q.   Are you aware, sitting here today, of

19   what documents, if any, were relied upon in

20   making the decision to terminate Dr. DiChiara's

21   employment?

22        A.    As a result of preparing for today's

23   deposition as a corporate representative, I

24   realized that a couple of policies were utilized

25   as well as the employment agreement.

Page 178

1          Q.    Okay.

2          A.    If there was anything beyond that, I'm

3     not aware.

4          Q.    Let me -- we're going to look at the

5     letter in a minute.

6          A.    Yeah.

7          Q.    There are specific things that are

8     referenced in that letter.  There are specific

9     provisions of the employment agreement and there

10     may be specific policies that are referenced.

11          A.    Yes.

12          Q.    Other than that, are you aware of any

13     other grounds that form the basis of her

14     termination?

15          A.    I am not aware of anything that is not

16     mentioned in the termination letter.

17          Q.    As you sit here today, has SEP or SEH

18     learned anything, including in communication with

19     this lawsuit, that would provide other grounds

20     for termination other than what is contained in

21     that termination letter?

22          A.    No.

23          Q.    So, no, there's nothing else; correct?

24          A.    Correct.

25          Q.    Thank you.  All right.  I didn't ask

Page 179

1    this, but I needed to.  It's topic 16 on the

2    list.

3              Are you aware of anyone -- I mean, we

4    looked at the Grunkemeyer letter, but are you

5    aware of any other meetings that either Mr.

6    Colvin, Mr. Prichard -- or Dr. Prichard or

7    decision-makers had other than with respect to

8    the meeting with Dr. DiChiara regarding the

9    vaccine mandate?

10        A.    Sorry, I'm just reading number 16.

11        Q.    Yeah.

12        A.    Other than the meetings that Dr.

13    DiChiara requested with them and the letter from

14    Dr. Grunkemeyer, I'm not aware of any other.

15        Q.    Okay.  So there's no other physician or

16    pharmacist that requested or got a similar

17    meeting that you're aware of?

18        A.    Not that I'm aware of.

19        Q.    Fair enough.  Are you aware of any

20    discussions that we haven't already talked about

21    relative to the Eric Deters or Deters Law Firm

22    lawsuit, other than what we've talked about, that

23    occurred internally at SEP or SEH?

24        A.    No, not that I recall.

25        Q.    Okay.  Do you know when or how anyone

Page 180

1      learned that Eric Deters or the Eric Deters law

2      firm, the Deters Law Firm, had been communicating

3      with Amy DiChiara?

4          A.    I believe, and again it's all based on

5      my review for today because I was --

6          Q.    Okay.

7          A.    -- not in the loop on most of this, that

8      it was her delivery of an apology letter to Dr.

9      Prichard.

10         Q.    That that we looked at earlier?

11         A.    That we looked at earlier.  And then I

12     became aware of that on -- was it Tuesday the 7th

13     after Memorial -- after Labor Day.

14         Q.    Okay.  Let's -- who is Donna Dieman

15     employed by?

16         A.    Donna Dieman at the time was employed by

17     St. Elizabeth Physicians.

18         Q.    Where is she employed now?

19         A.    I am not aware of where she's employed

20     now.  She's no longer employed by St. Elizabeth

21     Physicians.

22         Q.    Okay.  Do you have a last point of

23     contact with her?

24         A.    We, we --

25         Q.    You do?

Page 181

1        A.    We do.

2        Q.    Okay.

3        A.    I don't have it with me, but yes.

4        Q.    Okay.

5        A.    We have a means of reaching her.

6        Q.    You were not -- other than what's in her

7    notes at 58, you're not aware of the contents of

8    the termination meeting, are you?

9        A.    No.

10       Q.    Other than perhaps the recording of it

11    that we produced in discovery that Dr. DiChiara

12    took; correct?  I don't know if you've listened

13    to that or not.

14       A.    No.  I -- I wasn't aware there was a

15    recording even.

16       Q.    Okay.  Were you aware there's a

17    recording of her meeting with Garren Colvin

18    and --

19       A.    You're speaking of an audio recording, I

20    assume?

21       Q.    Yes, sir.

22       A.    No, I was not aware of that.

23       Q.    Okay.  There's no -- there's no policy

24    violation for taking such a recording, is there?

25       A.    I'd like to reference back to -- well,

Page 182

1    that would be an SEH policy.  I'm not aware of a

2    policy violation as a result of doing that.

3         Q.   Okay.  Let's look at the termination

4    letter.

5         A.   Okay.

6         Q.   It's 59.  There are four provisions of

7    the employment agreement that are cited.

8    10.2(h), 10.2(m), 10.2(n), and 10.2(q); right?

9         A.   That is correct.

10        Q.   And I want to go through -- I know we

11   talked about the -- those provisions

12   specifically, but I want to talk about what is

13   cited and what the actual grounds are for it.

14   And I know the agreement is in front of you at

15   Exhibit 4.  I'm going to try and be brief, but

16   it's important that, I think, we talk about this.

17   10.2 -- and it may be helpful, I was going to

18   tell you to pull the termination letter out of

19   the exhibit stack.  If you go back to the --

20        A.   I've taken the opposite direction, I

21   guess.

22        Q.   That's fine.  The, the joy of looking at

23   two documents at once.

24             MR. BIRKENHAUER:  Chris, what was the

25   exhibit number on the term letter?

Page 183

 1              MR. WIEST:  59 and 4 are what we're

 2      looking at.

 3              THE WITNESS:  Here, I've got it.

 4              MR. BIRKENHAUER:  Okay.

 5              THE WITNESS:  Okay.  I'm set.  Thank

 6      you.

 7  BY MR. WIEST:

 8      Q.   All right.  10.2(h) says,

 9      misappropriating any funds or property of SEP

10      with the exception of incidental medical

11      supplies; right?

12      A.   Yes.

13      Q.   And the basis for this termination was

14      disclosing internal emails between us and between

15      you and Garren Colvin to an outside third party

16      without consent or authorization, which emails

17      are the property of SEP.  That's what the

18      termination letter says, correct, for the

19      10.2(h)?

20      A.   Correct.

21      Q.   I know we looked at the share widely

22      with the public study; correct?  We looked at

23      that?

24      A.   Yes.

25      Q.   That is not internal emails that's being

Page 184

1    referenced; correct?

2          A.    I would agree with that.

3          Q.    The internal emails that were referenced

4    were the back and forth earlier, before we got to

5    that share widely email; correct?

6          A.    Correct.

7          Q.    Are you aware of the share widely

8    referring to anything else other than the public

9    study, as you sit here today?

10          A.    I am not aware of that specifically.

11          Q.    Assume, because -- well, let's start

12    with the assumption.

13                Assume that Dr. DiChiara had

14    communicated those emails to the Deters Law Firm

15    for the purposes of obtaining legal advice and

16    then asked that they keep those confidential.  Is

17    it a violation of 10.2(h) to provide emails to a

18    law firm to obtain legal advice?  Confidential --

19    confidentially.  On a confidential basis.

20          A.    Again, not a lawyer, but I would say

21    that if that -- the advice being sought was that

22    for federally protected legal advice, I would say

23    no.

24          Q.    Okay.  How about general legal advice?

25    What are my rights?  What are my obligations?

Page 185

1    What am I required to do?

2         A.   I would say those questions can be asked

3    without sharing confidential business

4    information.

5         Q.   When we looked at the provision in the

6    confidentiality section that talked about being

7    able to get advice from a lawyer -- remember

8    that?  And this is at 4.5.  It's on page 4 of the

9    agreement.

10        A.   Yes.  So it does say that physician may

11   disclose the terms of this agreement to

12   professionals providing services to the

13   physician, including but not limited to legal

14   counsel.

15        Q.   And I know that there's a proviso that

16   they be informed that they need to keep things

17   confidential; correct?  Assume Dr. DiChiara did

18   that with respect to the Deters firm and said,

19   you folks need to keep this confidential.  Does

20   that violate 10.2(h) to provide information to a

21   law firm to get legal advice about rights,

22   obligations, et cetera?

23        A.   But you're asking me to assume that she

24   did that and I have no reason to believe that she

25   did.

1      Q.    Okay.  I will represent to you, sir,

2    that there is discovery in this case that has

3    been produced to your counsel that, in fact, she

4    did that.  She said keep this confidential.  So

5    it's not just a hypothetical.

6      A.    Okay.

7      Q.    There's other evidence.  I'm not -- I'm

8    not going to ask you to look at it.  Your counsel

9    has seen it.

10      A.    Okay.

11      Q.    Assume that that's true, is that a

12    violation of 10.2(h) if she said keep this

13    confidential and she's asking about legal

14    obligations and rights?

15      A.    Pardon?

16      Q.    Legal obligations and rights.

17      A.    Again, I'm not an expert on the

18    interpretation of legal documents, but I would

19    say that it is misappropriating SEP property.

20    Now, whether or not she could demonstrate that

21    she met the letter of the confidentiality

22    clause...

23      Q.    Well, assume she can.  Assume that she

24    can do that, that she complied with that section.

25    Is that misappropriation then?

Page 187

1      A.   If she complied with that section -- I

2  don't know.  I don't know how to answer that.  I

3  would have to seek advice.

4      Q.   Okay.  10.2(m) talks about SEH's

5  policies and SEP's policies and procedures;

6  correct?

7      A.   Yes.

8      Q.   And specifically Section 103 of the

9  associate handbook and the

10 confidentiality/nondisclosure agreement; correct?

11     A.   Yes.

12     Q.   We've talked, and I know you've talked

13 about 10.2(h), about the federally protected.

14 The same would be true for 10.2(m); correct?

15          If it's federally-protected

16 communications, that's outside the ambit of these

17 policies; correct?

18     A.   Law supersedes.

19     Q.   Right.  Going to the associate handbook,

20 and I hate to drag you back to that, but I

21 think -- I think we need to.  And by the way,

22 there's also the confidential/nondisclosure

23 agreement, that's Exhibit 6; correct?

24     A.   Confidentiality and nondisclosure

25 agreement is Exhibit 6.

Page 188

1        Q.    Okay.  Did -- and I'm looking at the

2   list of confidential information.  Was what was

3   disclosed information relating to patients?

4        A.    I don't believe so.

5        Q.    Was it information relating to

6   physicians?

7        A.    I don't believe so.

8        Q.    Was it information relating to fellow

9   employees?

10       A.    Yes.

11       Q.    Who were the fellow employees?

12       A.    Dr. Prichard.

13       Q.    Okay.  Anyone else?

14       A.    Well, as a matter of practice, I would

15   include Garren Colvin in that.

16       Q.    He's an employee of SEP?

17       A.    He is not.

18       Q.    Okay.  It doesn't say affiliates; right?

19   It says fellow employees?

20       A.    That's correct.

21       Q.    Okay.  Was the information that was

22   shared -- I'm going to go through the list of

23   confidential information under this policy --

24   information about a patient's condition or

25   treatment?

1        A.   No.

2        Q.   Was it clinical data?

3        A.   No.

4        Q.   Was it an employee record?

5        A.   No.

6        Q.   Was it marketing plans?

7        A.   No.

8        Q.   Was it product or service plans?

9        A.   No.

10       Q.   Was it a strategy or forecast?

11       A.   I could put it into that category.

12       Q.   Okay.  What was being forecasted in

13   those emails?

14       A.   I think I would put it more in the

15   strategic side of things --

16       Q.   Okay.

17       A.   -- as to how we were addressing and

18   combatting the COVID crisis.

19       Q.   Okay.  And so Dr. DiChiara's concerns

20   about that that was being communicated was a

21   strategy of the company?

22       A.   I think that she was raising questions

23   and concerns about a strategy of the company.

24       Q.   Okay.  And thus because she was raising

25   concerns about it, it becomes a strategy of the

Page 190

1    company?

2        A.    No.   Not because she was raising

3    concerns, but the content of the emails included

4    that.

5        Q.    Was the public release of the vaccine

6    policy confidential information?

7        A.    No.

8        Q.    How would her concerns about that

9    publicly-released policy be a strategy of SEP?

10        A.    Because she was suggesting a change to

11    that approach.

12        Q.    So was this a strategy of the company or

13    is it a strategy of individuals within the

14    company that's being covered by this confidential

15    policy?

16        A.    So at this point the -- it's a suggested

17    change she made to an existing strategy, so it

18    would be a conversation about strategies.

19        Q.    Well, it doesn't say that.   It says

20    strategies or forecasts; right?

21    Strategies/forecasts.

22        A.    That is what it says.

23        Q.    It doesn't say potential changes to

24    strategies; correct?

25        A.    But she was suggesting changes to an

1    existing strategy.

2        Q.   And so anyone within SEP that

3    communicates about a potential change in course

4    or policy, that's -- the position of SEP is

5    that's our confidential information?

6        A.   Yes.

7        Q.   Even if the strategy is already public

8    information?

9        A.   Again, I'll reaffirm because the

10   suggestion being made was a change in the

11   strategy.  Regardless of the current strategy

12   being public, until that's fully vetted, it would

13   be confidential business information.

14       Q.   Would the fact that others were voicing

15   concerns, Dr. Grunkemeyer, who I think was with

16   OrthoCincy who was a provider at SEH, who were

17   voicing similar concerns and making their

18   concerns public, does that impact the, the fact

19   that it's out there?

20       A.   Because Dr. Grunkemeyer is not an

21   employee of either St. Elizabeth corporation,

22   there is -- there is different -- there's

23   different ways to approach the letter that he

24   sent.

25       Q.   Okay.

Page 192

1       A.   Our policies would not apply to his

2    letter.

3       Q.   So if she had concerns about SEP's

4    policy and she thought that they should somehow

5    change course, if she had communicated that to

6    her husband, to friends or family, that would be

7    SEP's private information as well?  Confidential

8    information?

9       A.   I would view it as such.

10      Q.   Well, I need to be very clear.  Is that

11   SEP's official position?  Not just kind of your

12   thoughts, but is that SEP's official position on

13   this?

14      A.   I don't think I'm in a position to

15   answer that question right now.

16      Q.   Okay.  Is speaking with her husband

17   generally misappropriating SEP's information?

18      A.   I can't speak to conversations between a

19   husband and wife.

20      Q.   Okay.  How about was what she

21   communicated to Mr. Deters and the Deters Firm a

22   patient list?

23      A.   It was not.

24      Q.   Was it financial information?

25      A.   No.  I would like to make note that it

1    says at the header of that, confidential

2    information includes but is not limited to, those

3    listed examples.

4        Q.   Okay.  And we've looked before at her

5    employment agreement.  By the way, what

6    supersedes what, the employment agreement or the

7    nondisclosure/confidentiality agreement, do you

8    know?

9        A.   The employment agreement, my

10   understanding is, would trump.

11       Q.   And the employment agreement allowed

12   communication with an attorney; correct?  We

13   talked about that.  As long as the attorney

14   said -- as long as you told the attorney to keep

15   this confidential; right?

16       A.   It does say that in the employment

17   agreement.

18       Q.   Okay.  I want to look at 106 of the

19   associate handbook; correct?  That's also cited.

20       A.   Remind me which exhibit.  Oh, I found

21   it.

22       Q.   106, it's -- oh, I'm sorry.  It is

23   Exhibit 12.  We talked about 106 in the -- if you

24   look on, on page 6 of the policy it says, any

25   personal use should be on the associate's own

Page 194

1      time; correct?

2          A.    Yes.

3          Q.    Do you know whether or not the emails

4      that Dr. DiChiara communicated with Mr. Deters

5      and the Deters firm was on her own time?

6          A.    I do not know.

7          Q.    Okay.  One -- let me see.  That was

8      10.2(m).  10.2(n), that, I believe what was being

9      cited was disruptive in the unprofessional

10     conduct aspects of 10.2(n).

11              Would you agree that's what the

12     termination letter says?

13         A.    Yes.

14         Q.    Okay.  Disruptive.  How was Dr.

15     DiChiara's communications, in particular

16     disruptive?

17         A.    So what we have to keep in mind here is

18     that Dr. DiChiara was a physician of SEP --

19         Q.    Right.

20         A.    -- who's a key player in our care

21     delivery model during an unprecedented time in

22     which we were trying to attack a pandemic, the

23     likes of which we've never seen before.  And by

24     taking this course of action, she committed a

25     betrayal against the organization.

1          Q.    So the betrayal, I think, is the

2     10.2(q), we'll talk about that in a second.

3     That's the duty of loyalty that's cited; right?

4          A.    I --

5          Q.    I'm focusing in, because I have to, on

6     each of the grounds that are cited in the letter.

7     And I want to know not whether or not there

8     was -- we're going to talk about 10.2(q) and the

9     duty of loyalty, we're going to get to that.  But

10    I want to know how was it disruptive?  Because

11    that's what the language in the letter says.

12         A.    Right.  I -- I stand by my response as

13    to a betrayal to the organization is a disruption

14    to the organization when a key player in our care

15    delivery model shares confidential business

16    information --

17         Q.    With a law firm?

18         A.    -- causing -- causing a redirection of

19    resources that could otherwise be applied to our

20    response to the pandemic.

21         Q.    Okay.  Let's talk about that.  What

22    additional resources went to dealing with the

23    particular information that Dr. DiChiara provided

24    as opposed to what would have otherwise been done

25    with Deters filing the same suit without that

Page 196

1        information?

2            A.    The fact that Dr. Prichard went through

3        the steps that he needed to go through and making

4        the decision then to terminate her employment.

5            Q.    So what made it disruptive was that Dr.

6        Prichard had to terminate her for it?  Or decided

7        to terminate her for it?

8            A.    The efforts that went into him making

9        that decision certainly disrupted him from

10       focusing on other things.

11           Q.    You would agree with me, he didn't have

12       to fire her.  He chose to fire her; correct?

13           A.    That is correct.

14           Q.    And if he wanted to avoid this

15       disruption that you're talking about, he could

16       have said, I accept your apology, don't

17       communicate to Deters anymore, and left it at

18       that.  He could have; correct?

19           A.    He could have.

20           Q.    And he chose not to; correct?

21           A.    That is correct.

22           Q.    Do you know whether or not he proceeded

23       against the advice of counsel in making the

24       termination decision?

25           A.    I do not know that.

1          Q.   What -- and what was disruptive and

2     unprofessional conduct, and I want to quote, was,

3     quote, your unauthorized disclosure of the

4     subject emails to a law office which already had

5     sued SEP and which was actively preparing to sue

6     SEP again, and which emails related to the

7     subject matter of the lawsuits; correct?

8          A.   That is what it says, yes.

9          Q.   And the lawsuits that are referenced

10    here is Beckerich 1 and Beckerich 2; correct?

11         A.   The contemporary ones, yes.  There are

12    previous lawsuits that may be reference to, but

13    I'm not sure exactly which ones other than

14    Beckerich 1 and Beckerich 2.

15         Q.   If Dr. Prichard were to have testified

16    that he was referring to Beckerich 1 and

17    Beckerich 2, you would have no reason to dispute

18    that?

19         A.   I'd have no reason to dispute it.

20         Q.   I want to talk about Mr. Deters' prior

21    lawsuits just for a moment.  How many times had

22    he sued SEP or SEH prior to, you know, the fall

23    of '21?

24         A.   I do not know that number off the top of

25    my head, numerous.

1      Q.   Do you know if any of them were SEP?

2      A.   I don't know for sure.

3      Q.   Do you know if any of them were tried?

4      A.   I don't know for sure.

5      Q.   Do you know if any of them resulted in

6   verdicts against SEP or SEP physicians?

7      A.   I do not know for sure.

8      Q.   Does the fact that Mr. Deters had

9   previously been involved and represented clients

10   that had sued SEP or SEH mean that no SEP or SEH

11   employee could ever communicate with him again?

12      A.   No.

13      Q.   I mean, I'm sure you're aware Mr. Bruns

14   and I are responsible for preparing, on Dr.

15   DiChiara's behalf, the present lawsuit; correct?

16      A.   Yes.

17      Q.   Would it be SEP's position that we would

18   no longer be able to provide advice to any SEP

19   employees regarding their rights or

20   responsibilities because we were involved in

21   bringing the current lawsuit?

22      A.   No.

23      Q.   Okay.  And we talked about the subject

24   matter of the lawsuits, that we discussed before;

25   correct?  That included the Title VII claim and

Page 199

1    the ADA claim; correct?

2         A.   Yes.

3         Q.   Okay.  We're finally into the last cited

4    reason, the duty of loyalty owed to SEP.  And

5    that duty of loyalty I just want to understand.

6    It's the position of SEP or Dr. Prichard in this

7    letter that that was breached because Dr.

8    DiChiara had provided these emails to Mr. Deters

9    in furtherance of the lawsuit; correct?

10        A.   So keeping in mind I didn't write the

11   letter, that would be my understanding of --

12        Q.   Okay.

13        A.   -- how that applies, yes.

14        Q.   There's another follow-up on the second

15   page.  Finally, it would appear that you have

16   been less than forthcoming during SEP's

17   investigation of the foregoing matters.  You

18   represented in your letter of apology dated

19   September 5th, 2021, that you had intended your

20   communications with the subject law firm to be

21   confidential.  However, in the email attached to

22   the complaint filed by the law firm, you

23   apparently had advised the recipient of that

24   email, free to share widely.  We can only presume

25   this email was sent to a representative of said

1    law firm, although we cannot confirm that fact

2    due to your refusal to provide us with unredacted

3    copies of the emails as we had requested.

4          So first of all, I read that right;

5    correct?

6        A.    You did.

7        Q.    We talked about the feel free to share

8    widely.  And your testimony was other than that

9    specific study that was referenced, that was the

10   only indication that you had that she had told

11   Deters he could share anything widely; correct?

12       A.    I believe what I said is I had no reason

13   to believe that she had said that on the others.

14       Q.    Okay.  And the unredacted copies, that

15   was the emails we looked at with Dr. Prichard at

16   first and then there was the communication

17   between Mr. Guilfoyle and myself about the

18   documents being privileged.  That's also cited as

19   a basis for the termination; correct?

20       A.    Restate that, please.

21       Q.    The basis for the termination included

22   SEP's position that Dr. DiChiara had been less

23   than forthcoming; correct?

24       A.    Yes.

25       Q.    And that was because she declined to

1    provide her emails with the Deters firm; correct?

2         A.   Well, the letter states that the reason

3    that she was less than forthcoming is because in

4    her letter of apology, she stated that she had

5    intended her communications to be confidential.

6    And that the interpretation of the feel free to

7    share widely is that that didn't take place.

8         Q.   Okay.  We looked at, I don't know,

9    three, four, maybe five emails between Mr.

10   Guilfoyle and myself in which the position that

11   was taken, in the one email Mr. Guilfoyle agreed,

12   was that the information with the Deters firm was

13   privileged.

14        Is it SEP's position that an employee

15   has to share or waive their attorney-client

16   privilege to keep from getting terminated?

17        A.   It's not the position of SEP.  In my

18   review of these materials leading up to it, and

19   again I'm not a lawyer, but I was not clear on

20   what privileged information was shared.  There --

21   it didn't appear to be anything related to

22   medical disability.  Didn't appear to be anything

23   related to sincerely held religious beliefs, it

24   was simply she was making a scientific argument.

25        Q.   You told me you're not aware of the

1    basis under which the evaluation -- under which

2    those exemption requests were processed; correct?

3    You don't understand -- you, you were not aware

4    of the standards?

5         A.   That is correct.

6         Q.   The policy though, and we can go back

7    and look at it, talked about it being an undue

8    burden.  In other words, if an exemption request

9    would pose an undue burden to the organization,

10   it would not be granted; correct?

11        A.   Correct.

12        Q.   Do you know whether or not scientific

13   information about the vaccine efficacy or safety

14   would weigh in in any way to that exemption issue

15   and those that were evaluating it, as you sit

16   here today?

17        A.   Would you restate that?

18        Q.   Certainly.  In terms of undue burden,

19   would the people that were evaluating whether or

20   not it was an undue burden want to know the

21   vaccine safety or efficacy in evaluating the

22   undue burden of a particular exemption request?

23        A.   Being that I'm not aware of the criteria

24   used or the process followed, I would be

25   challenged to answer that question.

1      Q.    Okay.  And so you're not taking a

2    position one way or the other on that, we're

3    going to defer to the folks that were evaluating

4    those requests for that?

5      A.    Yes.

6      Q.    Assume that it is relevant for that, it

7    would then relate, would it not, to religious and

8    medical exemptions; correct?

9          MR. BIRKENHAUER:  Just objection as to

10    form.  Would what relate?

11      Q.    Vaccine -- the communications by Dr.

12    DiChiara relating to, among other things, vaccine

13    safety and efficacy, would relate to the

14    exemption processing, correct, and the burden?

15    Or do you not know?

16      A.    I don't know.

17      Q.    Okay.  Whomever drafted this email, and

18    Dr. Prichard in signing it though, said that the

19    email she provided related to the subject matter

20    of the lawsuits; correct?

21      A.    It does say that.

22      Q.    Okay.  Do you have any reason to dispute

23    that as you sit here today?

24      A.    Only my own reading of the material that

25    was provided to me in that I saw nothing in the

Page 204

1    emails exchanged or the document that Dr.

2    DiChiara shared with Mr. Colvin and Dr. Prichard

3    that spoke to medical disability or sincerely

4    held religious beliefs.

5         Q.   And you don't know how or if those would

6    relate to exemption processing, if at all?

7         A.   I do not.

8         Q.   Okay.  All right.  I -- if Dr. Prichard

9    had testified that one of the factors was her

10   refusal to provide the emails with the Deters

11   firm, would you dispute that, in the termination?

12        A.   If he testified to that, I'd have no

13   reason to dispute it.

14        Q.   Okay.  Let's press on.  Exhibit 60 is a

15   preservation letter.  Do you know what steps SEP

16   took to preserve information relative to Dr.

17   DiChiara's lawsuit?

18        A.   I know that we have a standard process

19   that is followed and overseen by counsel, but I

20   am not aware of the particular steps involved.

21        Q.   Okay.  Do you know whether or not SEP,

22   in fact, preserved all information relating to,

23   quote, the processing of any other COVID-19

24   vaccine vaccination exemptions for any other

25   employee related to Title VII or ADA matters?

1        A.    Would you mind pointing out where you

2    are?

3        Q.    Yes, sir.  Last sentence, it's item

4    eight on the preservation letter.

5        A.    Thank you.  Okay.  And would you restate

6    your question?

7        Q.    Do you know whether or not SEP and St.

8    Elizabeth -- and/or St. Elizabeth, because

9    they're both referenced as targeted defendants in

10   the case in the first sentence, took steps to

11   preserve all information relating to the

12   processing of any other COVID-19 vaccination

13   exemptions for any other employee related to

14   Title VII or ADA matters?

15       A.    I have no reason to believe they didn't.

16       Q.    Okay.  You have no reason -- you don't

17   know if they did or not though, correct, as you

18   sit here today?

19       A.    I don't have personal knowledge of it.

20       Q.    Who's responsible for ensuring that

21   items are preserved relative to a lawsuit?  Who

22   within SEP?  Ms. Koch?  I mean, I --

23       A.    I would -- I would interpret that to be

24   our in-house legal counsel.

25       Q.    And that's Ms. Koch?

Page 206

1          A.    It is.

2          Q.    Okay.  I want to look at 61.  You were a

3      recipient on Dr. Prichard's notification to the

4      board regarding the basis of Dr. DiChiara's

5      termination; correct?

6          A.    Yes.

7          Q.    And what he quotes in Exhibit 61 in his

8      communication to the board is, quote, that she

9      shared internal information with an outside law

10     firm that sued SEP regarding our position

11     requiring the COVID vaccine.

12         A.    That's correct.

13         Q.    Please keep -- please keep this

14     information confidential in that we are expecting

15     future legal action.

16               You have no reason to dispute Dr.

17     Prichard's statement with respect to what was --

18     I mean, I realize we just went through the

19     termination agreement and we just went through

20     the employment agreement, but boiled down, this

21     is how he viewed it; correct?

22         A.    Yes.

23         Q.    You have no reason to dispute it as you

24     sit here today, do you?

25         A.    I have no reason to dispute it.

Page 207

1       Q.   Had he discussed why there was

2    anticipated litigation or future legal action

3    over this?

4       A.   Not with me.

5       Q.   Okay.  Let me ask, have you reviewed

6    the -- Exhibit 63, the EEOC position statement?

7       A.   Yes, I have.

8       Q.   Mr. Birkenhauer was authorized to send

9    this on behalf of SEP and/or perhaps SEH;

10   correct?

11      A.   I can speak to SEP, and that is correct.

12      Q.   Okay.  All right.  Let me ask, 64, are

13   you aware that Dr. DiChiara sought relief from

14   her covenant not to compete?

15      A.   At the time I was not that I recall.

16   But I did --

17      Q.   Okay.

18      A.   -- review this.

19      Q.   I asked Dr. Prichard about it and he

20   testified that he made the decision not to

21   release her from that obligation or --

22      A.   That would be his decision to make.

23      Q.   And that was my question.  You would

24   have no reason to dispute his testimony on that

25   score?

1        A.    No.

2        Q.    Okay.  I've got some follow-ups and then

3     we're going to get into some financial

4     information.

5            MR. BIRKENHAUER:  Chris, before you --

6     maybe after.

7            MR. WIEST:  We can take a break.  Why

8     don't we take a break, because it's going to

9     allow me to go through my list and check stuff

10    off, so...

11           MR. BIRKENHAUER:  Okay.

12                (Brief recess.)

13           (Plaintiff's Exhibit Number 78

14           was marked for identification.)

15           VIDEOGRAPHER:  Back on the record, 3:29.

16  BY MR. WIEST:

17       Q.    I have marked as Exhibit 78, a CourtNet

18    printout of lawsuits that SEP or SEH have been

19    involved in in Kenton and Boone Counties over the

20    last 10 years.  And you can trust my math or you

21    can add them up yourself.  I actually tabbed the

22    totals.  On each tab is a total either running

23    Saint Elizabeth or St. Elizabeth as the party.

24    If -- and I'm trying to make this easy, if

25    possible, for you.

1          Do you have any reason to dispute that

2     in the last 10 years there's been 3,114 lawsuits,

3     as reflected on court records, in Kenton and

4     Boone Counties alone for St. Elizabeth?

5          A.    I have no reason to dispute it.

6          Q.    Okay.  Do you know how many of these

7     were disruptive to either organization?

8          A.    Without knowing the details of each

9     individual one, I could not speak to that.

10         Q.    Okay.  Let me mark 79.

11              (Plaintiff's Exhibit Number 79

12              was marked for identification.)

13         Q.    This is a redacted -- partially redacted

14    list of names of the participants in Beckerich 2.

15    Do you know whether any of these individuals were

16    SEP employees?

17         A.    In looking at the list, it appears there

18    are several, yes.

19         Q.    Okay.  I've done the math on this.  Out

20    of the 38 participants, 20 have either left or

21    been terminated.  Do you dispute that?

22         A.    I'm seeing -- I'm seeing eight that have

23    left the organization for reasons unrelated to

24    COVID.  And 12 that left as a result of either

25    not being able to or not being willing to comply

1      with the testing accommodation that was put in

2      place after they received their exemption.

3          Q.    Okay.  In any event, 20 out of 38 are no

4      longer with the organization; correct?  Either

5      organization?

6          A.    Correct.  I think it's worth noting that

7      16 still are.

8          Q.    Okay.  Let me ask:  SEP and SEH pride

9      themselves on being good places to work; right?

10     There's awards, things like that; right?

11         A.    We do.

12         Q.    What's typical turnover?

13         A.    So I can speak for SEP.

14         Q.    That will work.

15         A.    And right now our non-provider turnover

16     is sitting at roughly 17 and a half percent.

17         Q.    Okay.  Is that per year?

18         A.    That's on a 12-month rolling average.

19         Q.    Okay.  So every month it gets updated?

20         A.    Every month we update it, and it's a

21     12-month look back.

22         Q.    Has it always been around there?

23         A.    No, it has been a good bit higher.

24         Q.    Okay.  And it's lower -- when did it get

25     into this under 20 percent range?

1          A.    At some point during 2021.

2          Q.    Okay.  Do you know whether or not Dr.

3    DiChiara's position was filled with someone else?

4          A.    Yes, we did replace Dr. DiChiara with

5    another physician.

6          Q.    When did that occur?

7          A.    In August of 2022.

8          Q.    Was that provider vaccinated?

9          A.    I'm confident that that provider

10   complied with our employment requirements, which

11   includes being vaccinated or having requested and

12   received an exemption.

13         Q.    Do you know which is the case?

14         A.    I do not.

15         Q.    Do you know whether or not that provider

16   had religious beliefs against vaccination?

17         A.    I do not.

18         Q.    There's no current vacancy for that

19   position?

20         A.    That is correct.

21         Q.    Was that provider filled full-time or

22   part-time?

23         A.    Full-time.

24         Q.    The -- what is SEP's position if the

25   court determines that there was a violation of

1      federal law in her termination in terms of

2      rehiring her?  Is that something that SEP is

3      generally not in favor of or are they in favor of

4      or --

5          A.   I really can't take a position on a

6      decision to rehire as she hasn't requested to be

7      rehired.

8          Q.   Okay.  Assume she -- assume she requests

9      it or the court may order it unless the

10     organization doesn't want her back.  In that

11     hypothetical, what's the position of the

12     organization?

13         A.   We currently don't have one.  It's not

14     been contemplated.

15         Q.   It's not been discussed?

16         A.   It hasn't been discussed.

17         Q.   Okay.  Who would make that decision

18     ultimately?

19         A.   Ultimately it would be the president and

20     CEO of St. Elizabeth Physicians.

21         Q.   Which is whom currently?

22         A.   Heidi Murley.

23         Q.   Okay.  Absent a court order to that

24     effect, there's no willingness to rehire Dr.

25     DiChiara; correct?

1          A.    I didn't say that.  I -- we haven't

2     considered that situation.

3          Q.    Okay.  At all?

4          A.    We haven't considered it at all.

5          Q.    Okay.  Do you know whether any providers

6     were unwilling to treat COVID-19 positive

7     patients?

8          A.    I'm not aware of any provider that was

9     unwilling.  We had one provider who was status

10    post-transplant that because of health reasons,

11    on the advice that was -- the guidance that was

12    provided by CDC, we accommodated her practicing

13    in a part of the hospital that didn't care for

14    COVID-19 patients.  But other than that, I'm not

15    aware of anyone that expressed a desire not to

16    care for them.

17         Q.    Okay.  What was the general position of

18    SEP as respects -- and let me -- let me be more

19    precise.

20              Dr. DiChiara was qualified for her

21    position that she was holding; correct?

22         A.    Yes.

23         Q.    Dr. DiChiara did a good job in terms of

24    the performance of her duties; correct?

25         A.    From everything I'm aware of, that she

Page 214

1    was a good clinician, yes.

2         Q.   Okay.   There were no patient complaints

3    about her?

4         A.   I can't say that for certain.

5         Q.   Okay.

6         A.   But I am -- I'm not aware of any severe

7    issues that would lead us to believe she was a

8    poor clinician.

9         Q.   Said another way, if that -- if there

10   were issues that led to the organization -- if

11   there were patient complaints that were racking

12   up or there was dissatisfaction with her

13   performance, that would have been something that

14   you would be aware of; correct?

15        A.   Typically, yes.

16        Q.   And you were not in her case?

17        A.   I was not.

18        Q.   Okay.   All right.   Let's get into --

19   generally when providers have an employer

20   agreement like Dr. DiChiara's, and I understand

21   it was subject to automatic renewal every year;

22   right?

23        A.   That is correct.   After the initial

24   term, yes.

25        Q.   Right.   And that is typical; correct?

 1        A.    That is typical.

 2        Q.    Generally speaking, could a provider

 3   expect renewal of that agreement absent some

 4   performance issue?

 5        A.    Yes.

 6        Q.    Okay.  All right.  Let's look at some

 7   comp.

 8              Are we up to 80?

 9              VIDEOGRAPHER:  Yes.

10              MR. WIEST:  Okay.

11              MR. BIRKENHAUER:  Chris, for now can we

12   set aside the binder?

13              MR. WIEST:  We can.  We're getting into

14   all new exhibits --

15              THE WITNESS:  But it was so much fun.

16              MR. WIEST:  -- and I promise you, Mr.

17   Bast, if possible, I don't intend to get back to

18   it, so...

19              THE WITNESS:  And unless it breaches

20   protocol, you're welcome to call me Jake.

21              MR. WIEST:  That's fine.  In fact, if

22   you want to move that down --

23              MR. BIRKENHAUER:  Yeah.

24              MR. WIEST:  -- if that's going to be

25   easier for him, we're happy to do that.

Page 216

1              Ready?

2              THE WITNESS:  Yes.

3              MR. WIEST:  This is 80.

4         (Plaintiff's Exhibit Number 80

5         was marked for identification.)

6    BY MR. WIEST:

7         Q.   80 is Dr. DiChiara's 2015 compensation

8    calculation summary; correct?

9         A.   It does appear to be the case, yes.

10        Q.   And we talked about wRVUs, and this

11   includes a calculation of that figure that leads

12   into an ultimate compensation model; correct?

13        A.   That is correct.

14        Q.   You would agree that in 2015 she was 0.5

15   FTEs.  We see that at the top right; correct?

16        A.   Yes.

17        Q.   I will tell you, sir, ultimately some of

18   these did not end up having that, but this one

19   did in 2015.

20        A.   Okay.

21        Q.   If her total compensation in 2015, and I

22   pulled it from the second to the last page,

23   defendant's 443, was 356,412.17; correct?

24        A.   If you can help me zero in where on page

25   4, because I would usually turn to page 1 for

1    that number.

2        Q.    Look at the bottom right.  This is

3    the -- there's a chart.  Are we on the same --

4        A.    We must not be.

5            MR. BIRKENHAUER:  443.

6        Q.    443.

7        A.    443, okay.

8        Q.    And I'm on the --

9        A.    That -- that is what it shows there.

10   I'm cross-referencing with where I would normally

11   find the number on page 1.

12       Q.    And you're looking at the 350,889.85 on

13   page 1?

14       A.    I am.

15       Q.    I -- I don't want to guess, but there --

16   it looks like there's some physician meetings,

17   stipends, cell phone allowances that may be part

18   of that?  Equipment purchases?

19       A.    What I'm trying to do in my head is the

20   sum of net earned compensation, which is 313,978,

21   and the estimated surplus.

22            Okay.  Let me look at what you're

23   referencing here.

24       Q.    Provider statement of payroll payments

25   at 443.

1          A.    Okay.  So what this would show here is

2     the -- the earnings she received on her paycheck,

3     which would include some things that are outside

4     of the compensation formula that we spoke of

5     earlier.  It includes a cell phone allowance, it

6     includes continuing medical education

7     reimbursement, which a -- a part of which

8     includes reimbursement for certain work-related

9     equipment purchases like cell phones or laptop

10    computers that could be used in the course of

11    their practice.  So that is on top of the

12    compensation formula we spoke of earlier.

13         Q.    Okay.

14         A.    The meeting attendance as well.  There

15    are certain meetings, especially if one is a

16    participant in one of our governance committees,

17    where they are reimbursed for attendance at that

18    meeting.  So this is all inclusive of that.

19         Q.    It includes what I -- so my question

20    was:  It includes the stipends as well; correct?

21         A.    It does include the stipends as well.

22         Q.    If I -- but, but the base compensation,

23    I think you told me, was 350,889.85; right?

24    That's the total compensation, the adjusted

25    compensation?

1          A.   Yes.

2          Q.   If I were to try and figure out what

3     that would be on a .6 FTE basis, because I was

4     trying to figure out what somebody would have

5     earned as a .6 FTE, would you agree it would be

6     appropriate to divide that by .5 and then

7     multiply it by .6?

8          A.   Yes.

9          Q.   And if I were to do that, in 2015 that

10    would be 421,067.82, if you trust my calculator's

11    math?

12         A.   I'll trust your calculator.

13         Q.   Okay.  All right.

14              (Plaintiff's Exhibit Number 81

15              was marked for identification.)

16         Q.   This is the same provider compensation

17    calculation summary for 2016; correct?

18         A.   Correct.

19         Q.   There is, if I look -- if you'll go back

20    to 503, defendant's 503.  That's the bottom

21    right.

22         A.   Yeah.

23         Q.   This had 359,115.20.  Do you see that?

24         A.   I do.

25         Q.   And I know that there's some stipends,

1    but there's also -- it looks like there's some

2    additional adjustments.  It looks like it's a --

3    I think it's a pay for performance is the

4    differential between the front page and the back

5    page mostly.  It looks like there was a $47,000

6    pay for performance.

7            Do you see that in February?

8        A.    What was the amount you said?

9        Q.    It was 47,062.52.  It was in February.

10    Do you see that on 503?

11        A.    503.

12        Q.    Look at the very bottom.

13        A.    Oh, I see it.  Yes.

14        Q.    So what --

15        A.    So that would be that value-based

16    incentive of which I spoke.

17        Q.    Okay.  And so she had hit some of the

18    metrics for the organization that year and,

19    therefore, earned $47,062.52?

20        A.    Yeah.  And this payment received in this

21    calendar year would be a result of performance in

22    the previous year.

23        Q.    So there's a follow on for that.  In

24    other words, it trails -- it trails?

25        A.    That's correct.  Yes.

1    Q.    Okay.  If I were to calculate that on a

2    point -- would it be appropriate for that pay for

3    performance if I were to adjust that from .5 to

4    .6 like we did before or is that a net -- is that

5    just a lump sum?

6    A.    That's a lump sum.

7    Q.    And so it doesn't matter if somebody is

8    a full FTE or a .5 FTE?

9    A.    Well, that would be calculated as a

10   percentage of their productivity pay.

11   Q.    Okay.  So it --

12   A.    So yes.

13   Q.    So it would be appropriate to adjust

14   that?

15   A.    So the -- to the extent that if she had

16   been a .6, and -- and what's worth noting here,

17   not to get into too many excruciating details, is

18   that a tenth of an FTE difference in a

19   physician's boarded FTE status would not

20   necessarily result in higher productivity.

21   Q.    So are you saying .6 versus .5 isn't

22   necessarily a linear increase in pay?

23   A.    It's not necessarily.  Since so much of

24   one's pay is based on productivity, it's more

25   based on an individual's productivity and

Page 222

1    workload.  I have noted physicians who are

2    part-time FTEs to produce more work RVUs than

3    other physicians in the same specialty that are

4    full-time.

5         Q.   Because they're cranking out more

6    procedures?

7         A.   Correct.

8         Q.   So if she's equally productive between

9    her .5 and her .6, it would be linear; right?

10             In other words, if she's able to

11   accomplish what she can accomplish in .5, and

12   that additional .1 she's equally productive, then

13   it would be linear?

14        A.   I would agree with your statement that

15   if, if she's equally productive and there's --

16   there's an equal number of work RVUs attributed

17   to each tenth of an FTE then, yes, it would be

18   linear.  That has not always been my experience

19   and observation.

20        Q.   Does the compensation depend at all on

21   the organization's performance?  In other words,

22   does the actual formula that you're paying the

23   physicians depend on whether or not SEP had a

24   good year or a bad year?

25        A.   Financially?

Page 223

1          Q.    Yes, sir.

2          A.    No, it does not.

3          Q.    Okay.  It does depend on the market

4    adjustments for the particular year nationally,

5    because that's what you're surveying?

6          A.    It depends on the -- market adjustment

7    would not be the right term.  It depends on the,

8    the published salary -- or compensation surveys.

9          Q.    Okay.

10         A.    That we utilize.

11         Q.    But those are based on market, aren't

12   they?  I mean you go out and you survey the

13   market about what people are making?

14         A.    The third-party vendors that we use --

15         Q.    Right.

16         A.    -- yes, survey the market.

17         Q.    Okay.  Is that -- is there a trail time

18   to that?  In other words, are they publishing it

19   for current year or are they publishing it -- are

20   you getting last year's data?

21         A.    We're getting last year's information.

22         Q.    Okay.  So there's always a one-year lag

23   time in that?

24         A.    There is, but that's universal for

25   anyone who uses those benchmarks, which most

Page 224

1    organizations do.

2        Q.   Oh, I'm not questioning that, I'm just

3    trying to see what metrics they're measuring

4    against.

5        A.   Yeah.

6        Q.   And to see, for instance, if the market

7    took a hit in 2020, that's going to maybe be

8    reflected in '21?

9        A.   That would be correct.

10       Q.   Okay.  If -- if we were to look at

11   linear for her, assuming that, that she was

12   equally productive, and I were to look at the

13   309,9 -- well, I guess you said it would be

14   linear, too, with the pay for performance

15   possibly, because it's a -- it's a -- pay for

16   performance is a percentage issue; right?  It's

17   up to 15 percent I think you told me earlier.

18       A.   Correct.  It's a percentage of their

19   productivity comp.

20       Q.   Okay.  So -- so I guess I'd have to take

21   the 359,115.2 -- I guess I would need to take out

22   the stipends because those are static; right?

23   Those aren't moving; right?

24       A.   Correct.

25       Q.   And so -- and then I would need to do

1    the calculation we did before, divide by .5,

2    times .6 to get a .6 FTE equivalent; correct?

3        A.   That's correct.

4        Q.   I'm not going to do that math, I'll do

5    it later.

6             All right.  82.  Let me get this copy to

7    your counsel.  Thank you.

8             (Plaintiff's Exhibit Number 82

9             was marked for identification.)

10       Q.   82 is the 2017 compensation formula;

11   correct?

12       A.   Correct.

13       Q.   Do you know if this was .5 FTE or .6

14   FTE?

15       A.   I do not without referencing records.

16       Q.   Okay.  What records would you need to

17   look at?

18       A.   I would go back through any of her

19   contract amendments as well as the human

20   resources records as to which FTE she was boarded

21   at.

22       Q.   Okay.  If I go back and I look at the

23   same calculation here, it looks like there was

24   another pay for performance, which you indicated

25   was a lead time, and so if it's a pay for

Page 226

1       performance in '17, it would be based on '16's

2       performance; correct?

3             A.   That is correct.

4             Q.   And then we would get to the non -- the

5       total there at the bottom right that includes the

6       stipends; correct?

7             A.   That's correct.

8             Q.   Okay.  82 is the 2017 compensation

9       formula for Dr. DiChiara; correct?  Exhibit 82

10      that you've got in front of you?

11            A.   2017 --

12            Q.   Yes, sir.

13            A.   -- compensation summary for Dr.

14      DiChiara.

15            Q.   Okay.

16            A.   Yes.

17            Q.   Here's 82.

18            A.   That should be 83.

19            Q.   Oh, 83, sorry.  Let's re-mark -- give

20      your counsel 82, I'm going to re-mark this one as

21      83.

22                 (Plaintiff's Exhibit Number 83

23                 was marked for identification.)

24            Q.   83 is the 2018 compensation; correct?

25            A.   That is correct.

Page 227

1          Q.    I am certain the 2018 was a .6 FTE, and

2     it looks like there was a couple of pay for

3     performances and there was a total of 444,737.18

4     in 2018; correct?

5          A.    Including the stipends, yes.

6          Q.    Yes, sir.  All right.  I'm going to hand

7     you 84.

8               (Plaintiff's Exhibit Number 84

9               was marked for identification.)

10         Q.    There's a cover note on 84 from Dr.

11    Prichard about 2019 being a tremendous year and

12    yet not achieving the goals we set out to

13    achieve.

14              Do you see that?

15         A.    I do.

16         Q.    Do you know what he's referring to?

17         A.    He's referring to -- let me review this

18    real quick.

19         Q.    Yes, sir.  Please do.

20         A.    I don't want to rely on my memory.

21              All right.  This is referring to the

22    fact that we historically have set rather

23    aggressive quality metric benchmarks for

24    ourselves on that provider value-based incentive

25    program I've referenced that's part of the

Page 228

1    compensation formula.

2         Q.    Okay.

3         A.    And in this particular year, those

4    particular metrics, we did not hit all of our

5    goals and yet accomplished a lot organizationally

6    in other ways.  And so since this is a

7    discretionary component with regard to

8    performance, the board of directors did make a

9    determination to pay out a certain amount of

10   credit of that provider value-based incentive,

11   even though it may not have been earned by the

12   individual provider.

13        Q.    Okay.  All right.

14        A.    In other words, this worked to the

15   advantage of the physicians.

16        Q.    No, no, I understand that.  And that was

17   on the VBI?  That was on the incentive payment we

18   talked about?

19        A.    Correct.  Yes.

20        Q.    Okay.  I want to talk about 2020.  COVID

21   hit in March of 2020.

22        A.    Is that when that was?

23        Q.    It was.  I take it that when

24   discretionary procedures were suspended or halted

25   by the governor, that would effect productivity

Page 229

1      for the physicians; correct?

2           A.    Had SEP not intervened in the way that

3      we did, yes, it would have.

4           Q.    How did SEP intervene?

5           A.    The exact formula, I would have to

6      reference.  I don't remember it off the top of my

7      head, but the -- the prevailing term is we

8      backstopped the physicians during the months of

9      March, April, and May of 2020 in order to ensure

10     that they were not unfairly hit with reduced

11     compensation as a result of not doing procedures

12     that they relied upon for a big part of their

13     compensation.

14          Q.    Okay.  How did you backstop the

15     physicians?

16          A.    Do you have the --

17          Q.    In other words --

18          A.    -- 2020 statement?  It may refresh my

19     memory.

20          Q.    We will go and do that right now.

21               (Plaintiff's Exhibit Number 85

22               was marked for identification.)

23          Q.    85; right?  I think.

24               MR. BIRKENHAUER:  Yes.

25          A.    Okay.  So you'll see at the top of

Page 230

1    defendant 824, or the first page of this

2    document, you see the months of March, April and

3    May are parenthetically referenced as the greater

4    of average or 90 -- times 90 percent or actual

5    compensation.

6            So the formula utilized the work RVUs

7    that Dr. DiChiara produced from the months of

8    March 2019 through February of '20 to determine

9    what their -- what her average monthly work RVU

10   production was and automatically imputed no less

11   than 90 percent of that during the months of

12   March, April, and May of 2020, that she would

13   receive more than that 90 percent of that average

14   if she produced more than that, so...

15      Q.   If she actually did more in that period?

16      A.   If she actually did more in that

17   month -- in, in one of those three months.  In

18   this case it appears she did not so she received

19   the imputed average of the 418.85 per month that

20   you see in the far right column, because her

21   actual work RVUs were 268, 73, and 229

22   respectively.

23      Q.   I take it that the impact of this may

24   have varied depending on practice group.  In

25   other words, if I were an infectious disease

1    doctor or a pulmonologist in the heart of

2    treating COVID patients and my services were not

3    halted by government order, that's going to be

4    different than a gastro doc for whom services

5    could generally wait?

6         A.   I, I will -- I will agree with the

7    statement that the impact of the procedure

8    order -- the order to halt procedures, the impact

9    was different across different specialties.  It's

10   not to say that some specialties actually

11   benefitted, but it is fair to say that it was --

12   the impact was different across specialties.

13        Q.   I mean if I'm a heart doctor treating

14   heart attacks, that's not halted; right?  That

15   has to be treated.  That can't be postponed;

16   correct?

17        A.   One -- one would assume that.

18        Q.   Right.  And in this case for Dr.

19   DiChiara, as I understand what you're telling me,

20   for March, April, and May, she did not hit the --

21   her average.  And so what the organization did is

22   say we're going to take 90 percent of your

23   average over the last 12 months effectively?

24        A.   Correct.

25        Q.   Okay.  And so it would be a hit, if you

Page 232

1    will -- maybe a 10 percent hit, but it is a hit

2    compared to normal; correct?

3         A.    Yes.   That would be correct.

4         Q.    Okay.

5         A.    The philosophy that we took at the time,

6    when other organizations were laying off

7    physicians and associates or furloughing

8    physicians and associates, is that a 10 percent

9    reduction was far more generous than a 100

10   percent reduction.

11        Q.    And I take it the reason that you did

12   the 10 percent reduction was the organization was

13   taking a hit because the procedures weren't being

14   done?

15        A.    I don't recall the exact reasoning why

16   90 percent was chosen, but I -- it's a fair thing

17   to say that it was intended to provide some sort

18   of buffer.

19        Q.    Absolutely.   Absolutely.   Okay.   So 2020

20   may be an aberrant year, you would agree?

21        A.    Yes.

22        Q.    Okay.

23        A.    In many ways.

24        Q.    In many ways.   86.

25             (Plaintiff's Exhibit Number 86

Page 233

1                  was marked for identification.)

2         Q.    This --

3         A.    Do you mind if we wait just a second?

4         Q.    Absolutely.

5         A.    Okay.  We're good.  Thank you.

6         Q.    And I will tell you, I just ran this

7    through September of '21 because, as you're

8    aware, she was terminated on October 4th.

9         A.    Okay.

10        Q.    And that's what we have.  So if I

11   understand your testimony before, the pay for

12   performance is going to take a hit because 2020,

13   there was that suspension of procedures; correct?

14        A.    In our normal compensation formula, that

15   would be correct.  What I'm struggling to

16   remember is if we made any additional exceptions

17   on the calculation for the value-based incentive

18   paid in '21 as a result of performance in 2020,

19   because it was an aberrant year.

20        Q.    Right.

21        A.    And I do not recall for sure at this

22   point in time if that was the case.  I'll also

23   note, anticipating here because Dr. DiChiara's

24   pay for performance was significantly lower in

25   2021, that I believe to be more of a reflection

Page 234

1    of the fact that she did not complete the year

2    working at SEP and, therefore, it was -- it was

3    not possible to calculate all of the earnings

4    that would have been available in a pay for

5    performance -- in the value-based incentive

6    structure.

7         Q.   Do you know what she would have been

8    paid had she been able to complete the year?

9         A.   No.  Because that's reliant on continued

10   quality performance, patient experience

11   performance, which -- the results of which we

12   were not able to know.

13        Q.   There had never been an issue with her

14   performance from the perspective of patient care

15   or anything else.  We talked about that before.

16        A.   I'm not aware of any significant patient

17   care issues with her.

18        Q.   Is anyone able to calculate what it

19   would have been, had she continued the 2021 year?

20        A.   It -- it would be very subjective.

21        Q.   Okay.

22        A.   In all honesty, and I -- I love playing

23   with numbers, I do not believe that there would

24   be an accurate way to estimate that.

25        Q.   Okay.  And so '21 may not be a good year

1    for representation purposes because it was

2    partial and it may include 2020 suspension of

3    services?

4        A.    I think that the nine months in which

5    she worked in 2021, from a productivity

6    standpoint, would be a fair representation still.

7        Q.    How did that look?

8        A.    Well, that's represented -- if we're

9    looking at the same table you've been utilizing

10   in the other exhibits, which is 887 in this case.

11       Q.    Right.

12       A.    It would be the first line of numbers,

13   the physician productive hours line.

14       Q.    Okay.

15       A.    Totalling $168,512.24.

16       Q.    Okay.  Let me go back to -- so I'm

17   looking at 2020 and it looks like it's down from

18   early 2020, in other words, January, February,

19   March -- I'm going to call it the pre-COVID

20   months of 2020, it looks like it's about on par

21   with the September, October, November, December

22   months of 2020, at least January.  It looks like

23   it went back up in February, correct, to 19,000?

24       A.    If you could be more specific on the

25   months you're referencing.

1          Q.   Yeah, let's start with January of '21.

2          A.   January of --

3          Q.   That looks like it's in line with

4     September, October, November, and December of

5     2020; correct?  In fact it looks like it's the

6     same number, they're all 14,999.92.

7          A.   I would agree, they look like the same

8     number.

9          Q.   Okay.  And then it looks like there was

10    a bump in February up to 19,189.04; right?

11              And then it looks like it bumped up in

12    May.  What -- what is SEP comp adjust up?

13         A.   Yeah.  That's -- that's what I'm looking

14    at here as well myself.  I think the line that I

15    referred you to, productive hours, was the

16    physician monthly draw payment.  So one thing we

17    didn't get into the details earlier is that

18    compensation formula applies to calculating

19    annual compensation.  But our physicians are paid

20    on a draw that's established on an annual basis,

21    based on the expected productivity.

22         Q.   Okay.

23         A.   And so there is then settlements that

24    occur on a quarterly basis.  If they are

25    outperforming that draw, they would receive a

Page 237

1      settlement, which are more clearly reflected on

2      the first page of each of these compensation

3      statements.  But let me look here.  It's easier

4      to decipher on 882.

5          Q.   Okay.

6          A.   If you would turn to that.

7          Q.   Yeah.

8          A.   Do you see roughly three-quarters of the

9      way down in the first table at the top, it talks

10     about settlement paid quarter one.

11         Q.   Okay.

12         A.   Settlement paid quarter two.  So those

13     reflect lump sum payments to Dr. DiChiara

14     following the conclusion of each of those

15     quarters, because she was outproducing her draw.

16         Q.   Okay.  And if she had continued to

17     outproduce her draw for the rest of year, she

18     would have continued to be paid those lump sum

19     payments?

20         A.   Potentially so, except for the fact that

21     we saw that she increased her draw in February,

22     so it -- it all depends on how her performance

23     was the remainder of the year, whether or not she

24     would outperform that draw.

25         Q.   Okay.  But she had been outperforming

Page 238

1    and then there was a payment adjustment in May

2    and August that reflects that; correct?

3        A.    That is correct.

4        Q.    Okay.  How much of this was determined

5    based on -- I mean, was this what she did in '21

6    or is this what she did in 2020 that's kind of

7    being paid a year in arrears?  I mean, can you

8    explain that?

9        A.    Yeah.  The quarterly settlements are all

10    within that same calendar year.

11        Q.    Okay.

12        A.    So a quarter one settlement would

13    indicate that for the first three months of 2021,

14    her productivity calculation resulted in a higher

15    amount of pay than her draw was set at.

16        Q.    Okay.  All right.  So do you think

17    '21 -- well, we talked about it, '21 is difficult

18    to calculate because you need to complete a whole

19    year to really get an accurate summary?

20        A.    That is correct.

21        Q.    Okay.  All right.  Okay.  There were --

22    I know we looked at some of this before on the

23    recruiting page, but SEP also provided benefits

24    to its -- this is Exhibit 87 -- to its providers,

25    both physicians and other employees, associates;

1      correct?

2              (Plaintiff's Exhibit Number 87

3              was marked for identification.)

4      A.   Correct.

5      Q.   And that included medical benefits,

6 dental benefits, vision benefits; correct?

7      A.   Yes.

8      Q.   Short-term disability; correct?

9      A.   Yes.

10      Q.   Long-term disability; correct?

11      A.   Yes.

12      Q.   There was a 403(b) plan; correct?

13      A.   That is correct.

14      Q.   An employer contribution to Fidelity?

15      A.   Yes.

16      Q.   And that vested after three years of

17 service, which she had; correct?

18      A.   She did.

19      Q.   A 457 deferred comp; correct?

20      A.   Yes.

21      Q.   A health savings account; correct?

22      A.   She was eligible for the health savings

23 account if she chose the high deductible plan out

24 of the two options on the health benefit.

25      Q.   Okay.  And we're going to look at what

Page 240

 1       she elected in a minute.

 2             A.   Okay.

 3             Q.   There was a medical FSA, a limited FSA,

 4       and a dependent care FSA, if she so elected;

 5       correct?

 6             A.   Correct.

 7             Q.   And as a .6 FTE, she was eligible for

 8       these benefits; correct?  It was full-time, 30 to

 9       40, or part-time, 20 to 29 hours?

10             A.   Yes.

11             Q.   Okay.  Group life insurance, she was

12       eligible for that; correct?

13             A.   Yes.

14             Q.   Cell phone stipend, we looked at some of

15       that; correct?

16             A.   That is correct.

17             Q.   All right.  Do you know why on the last

18       page -- and I realize it says 2020 physician

19       benefit summary on the bottom right.  I will

20       represent to you -- well, if you look, it's

21       actually -- I think there was a typo on this by

22       whomever prepared it, because if you look at the

23       very first page, it's 2021, that's the one I

24       pulled and that's the header of it.

25             A.   That's noted, yes.

1      Q.   Okay.  I mean, this is the 2021 benefit

2   package; correct?

3      A.   It, it -- it says that it is, yes.

4      Q.   Okay.  You have no reason to believe

5   that it's not?

6      A.   I have no reason to believe that it's

7   not.

8      Q.   Okay.  This is how I think we need to

9   figure out what she was electing.  Let me give

10   you 88.

11         (Plaintiff's Exhibit Number 88

12          was marked for identification.)

13      Q.   If you look, there is before-tax

14   deductions and after-tax deductions.

15      A.   Yes.

16      Q.   And we can see the, the value, if you

17   will, or the cost of these particular benefits;

18   correct?

19      A.   Yes.

20      Q.   And so --

21      A.   And --

22      Q.   Yeah.

23      A.   Just not to be semantical, it's the

24   employee portion of these benefits.

25      Q.   So it's not the employer portion of

Page 242

1       these benefits; is that correct?

2            A.    That is correct.

3            Q.    How would I go --

4            A.    If you go over to the far right, it

5       talks about the employer paid benefits.

6            Q.    I see.  And so if I were to calculate

7       the employer paid benefits, I would have to add

8       up the amounts that are there under the high

9       deductible plan -- for instance, the first --

10      this one is 2018, the first page.  The second

11      page is 2020.

12           A.    Okay.

13           Q.    I would need to add those up to

14      ascertain what the employer was paying; correct?

15           A.    That's correct.

16           Q.    Okay.  Were these benefits kind of

17      static from an employer cost standpoint or were

18      they going up?  Do you know?

19           A.    These two particular years I could not

20      tell you for sure.  However, as a general rule of

21      thumb, especially health benefits, the cost

22      incurred by the employer has been going up

23      routinely over the last several years.  And the

24      percentage of the total premiums borne by the

25      associates has gone down.

1          Q.    Okay.  So the employee contribution is

2     going down, the employer contribution is going

3     up.  Do you know by what percentage?

4          A.    I do not.

5          Q.    Can you give me a ballpark?

6          A.    I can't.

7          Q.    Okay.  I mean, is it double-digit

8     percentages?  10 percent or more?

9          A.    I -- I don't think so.

10         Q.    Okay.

11         A.    At least on average over the course of

12    the last four years it hasn't been double digits.

13    I can't say for certain that any one of those

14    years it didn't hit double digits.

15         Q.    Has the inflation affecting the economy

16    increased employer costs on that front?

17         A.    I think the bigger contributor to the

18    increased employer costs has been utilization of

19    the members of that health plan.

20         Q.    Okay.  And has that been going up at

21    SEP?

22         A.    I think it's been going up in general,

23    you know, in --

24         Q.    Everywhere?

25         A.    -- in industry, but, but yes.

1       Q.   Okay.  All right.  It would be accurate

2   to assume 2021 is more than 2020, and 2022 is

3   more than '21, and 2023 is more than '22; fair?

4       A.   It would be fair to say that, yes.

5       Q.   Okay.  89.

6            (Plaintiff's Exhibit Number 89

7            was marked for identification.)

8       Q.   I'm going to do these -- yeah, yeah.

9   I'm going to hand you what I've marked as 89.

10  These are Dr. DiChiara's W-2s.  I'm not going to

11  go through this with you, sir.

12           You have no reason to dispute the W-2s

13  that SEP prepared for her; correct?

14      A.   I do not.

15      Q.   Okay.  I'm going to hand you what I've

16  marked as 90.

17           (Plaintiff's Exhibit Number 90

18           was marked for identification.)

19      Q.   I'm not going to get into the details of

20  this, I'm just going to ask you to authenticate

21  it.

22           Exhibit 90 is the 990 IRS filing for SEP

23  for 2017?

24      A.   That is correct.

25      Q.   And I know I told you I wasn't going to

Page 245

1    get into the details, but there's a couple of

2    questions that I had with respect to this

3    particular exhibit.  It includes a $14 million --

4    if you look at page 10, a $14 million occupancy

5    expense.

6             Is that a payment that SEP is making to

7    SEH, or is some of that?

8        A.   I would have to consult my CFO to know

9    exactly which parts of the income statement roll

10   up onto this line.  But it is safe to say that

11   there are properties that SEP leases and occupies

12   that are owned by SEH, and properties that SEP

13   leases and occupies that are owned by other

14   landlords.

15       Q.   Okay.  So at least part of it may be

16   SEH, we don't know how much?

17       A.   Could be.

18       Q.   Okay.  There is a pension plan accrual

19   and contribution.  Was that the employer match

20   that we just looked at before?

21       A.   May I ask which line you're looking at?

22       Q.   Yes, sir.  Line 8.

23       A.   I believe that would be the case, yes.

24       Q.   If you go back to line 28 -- or page 28,

25   defendant's 122.

1        A.    Yes.

2        Q.    It reflects Dr. Prichard's salary at

3    $896,908.  Was that accurate or was that just

4    SEP's contribution?  Do you know?

5        A.    No, this would reflect total 990

6    reported earnings, but it does include values of

7    benefits and retirement contributions.  So the

8    base compensation and incentive compensation

9    would actually be his compensation --

10       Q.    Okay.

11       A.    -- if that's your question.

12       Q.    Okay.

13       A.    So the sum of columns Romanette (i) and

14    (ii).

15       Q.    Okay.  Do you know if Mr. Colvin's

16    salary and benefits at line 6 on page 28 is a

17    full statement of his earnings and benefits or

18    would I need to look at the 990 for SEH also?

19       A.    If I understand how 990s function, and I

20    believe that there is a reference to that, that

21    that represents his full salary.  But that

22    doesn't later reference to the fact that that's

23    paid by SEH.

24       Q.    Okay.  All right.  I'm not going to get

25    into nearly as much detail on the rest of these

Page 247

1      because they all kind of follow, and I'm just

2      mainly going to ask you to authenticate them.

3            91 is the 990 for 2018.

4            (Plaintiff's Exhibit Number 91

5            was marked for identification.)

6      A.    That is correct.

7      Q.    Okay.  For SEP?

8      A.    Yes.

9      Q.    92 is the 990 for 2019 for SEP?

10           (Plaintiff's Exhibit Number 92

11           was marked for identification.)

12     A.    Correct.

13     Q.    93 is the 990 for 2020 for SEP?

14           (Plaintiff's Exhibit Number 93

15           was marked for identification.)

16     A.    Correct.

17     Q.    94 is the 990 for 2021 for SEP?

18           (Plaintiff's Exhibit Number 94

19           was marked for identification.)

20     A.    Correct.

21     Q.    These 990s, the information contained in

22     them, you have no reason to doubt their accuracy;

23     correct?

24     A.    I have no reason to doubt their

25     accuracy.

Page 248

1          Q.    Let me ask, are the tax preparers who

2     prepare these 990s shared between SEH and SEP, do

3     you know?

4          A.    I do not know.

5          Q.    Okay.  Where does SEP do its banking?

6          A.    The reason I'm thinking is, I don't know

7     that we don't have multiple banks.  But I know

8     Fifth Third is the primary bank.

9          Q.    Okay.  Where does SEH do its banking?

10         A.    I can't say for certain.

11         Q.    Okay.  Are there any shared SEP/SEH bank

12    accounts?

13         A.    Not that I'm aware of.

14              MR. WIEST:  Okay.  All right.  Nick, let

15    me check with Tom.  We may be done with the

16    corporate depo.  I'm going to be about 15 minutes

17    with Jake on his individual.  It may be less than

18    that, but let me, if you don't mind --

19              MR. BIRKENHAUER:  Yeah, of course.

20              MR. WIEST:  Let me check with Tom before

21    I close this out.

22              MR. BIRKENHAUER:  Sounds good.

23                   (Brief recess.)

24              VIDEOGRAPHER:  We are back on the

25    record, 4:29.

Page 249

1           MR. WIEST:  Mr. Bast, I have no more

2      questions for you today on your 30(b)(6)

3      deposition.  We will do your individual

4      deposition in short order.  Not on video.

5           I don't know if you want him to read or

6      sign.  I'll leave that up to your counsel.

7           MR. BIRKENHAUER:  We will read, please.

8           MR. WIEST:  Okay.

9           MR. BIRKENHAUER:  And I have no

10     questions.

11          MR. WIEST:  Okay.

12

13                    (Witness excused.)

14          (Deposition concluded at 4:30 p.m.)

15

16

17

18

19     _____        _____

20     JACOB JOSEPH BAST                       DATE

21

22

23

24

25

Page 250

```
 1                              )
    COMMONWEALTH OF KENTUCKY     )
 2                              )

 3

 4             I, Lee Ann Goff, Notary Public in and for

 5    the Commonwealth of Kentucky, do hereby certify:

 6             That the witness named in the deposition,

 7    prior to being examined, was by me duly sworn;

 8             That said deposition was taken before me at

 9    the time and place therein set forth and was taken

10    down by me in shorthand and thereafter transcribed

11    into typewriting under my direction and supervision;

12             That said deposition is a true record of

13    the testimony given by the witness and of all

14    objections made at the time of the examination.

15             I further certify that I am neither counsel

16    for nor related to any party to said action, nor in

17    any way interested in the outcome thereof.

18             IN WITNESS WHEREOF I have subscribed my

19    name and affixed my seal this 21st day of September,

20    2023.

21

22                        /s/Lee Ann Goff
                          _____
23                        Lee Ann Goff

24                        Notary Public KYNP30963

25    My Commission Expires:  7/1/25
```