# EXHIBIT A

# Expert Report
# Robb Stokar, Esq.

*Amy DiChiara, MD v. Summit Medical Group, Inc. d/b/a Saint Elizabeth Physicians, et. al.*,

United States District Court for the Eastern District of Kentucky, Case Number 2:22-cv-00111

Dated: February 7, 2024

I.      **Background, qualifications, and terms of compensation in this matter**

My name is Robb Sneiderman Stokar, Esq. I graduated from Cornell University in 2003 with a degree in Industrial and Labor Relations. In 2007 I graduated from the Ohio State University Michael E. Moritz College of Law. I was licensed to practice law in Illinois in November 2007 following the passage of the July 2007 Bar Exam. In November 2013 I was licensed to practice law in Ohio, by waiver. Currently, I am admitted to practice law in the state courts of Illinois and Ohio. I am also licensed to practice law in the following federal courts: Northern, Central, and Southern Districts of Illinois; 7th Circuit Court of Appeals; and the Northern and Southern Districts of Ohio. I have also practiced law in the Eastern District of Kentucky on several occasions, pro hac vice.

From 2007 until 2013 I practiced law in Chicago, Illinois. For all but fourteen (14) months of that time, my practice was focused on plaintiff's side labor and employment law. I have practiced law in Cincinnati, Ohio since 2013. For all but approximately two years of that time, my practice focused on plaintiff's side labor and employment law. My current practice consists of approximately 50% employment law, 40% labor law, and 10% personal injury.

Currently I am the owner and founder of Stokar Law, LLC. Immediately prior to founding my law firm, I was with the firm of Minnillo & Jenkins, Co., LPA, now known as Minnillo Law Group, Co., LPA. At Minnillo & Jenkins, I held the position of Associate from January 2016 until January 2019. I then held the position of Equity Partner from January 2019 until August 2022.

Since 2008, I have served as either lead counsel or second chair in approximately fifty (50) matters dealing with alleged violations of Title VII of the Civil Rights Act or the Americans with Disabilities Act, including matters resolved prior to litigation.

I am being compensated under a written engagement agreement for expert services by and between Chris Wiest, Attorney at Law, PLLC, dated January 28, 2024, which provides for a $350 per hour rate of compensation, and a minimum of $3,000 per day or part of the day for any deposition or trial. At the time of the execution of the written agreement, I had not formed any final opinions, made no guarantee of any opinion, and agreed that any opinion rendered would be based on the facts of the matter and applicable law. A current copy of my CV is attached hereto as Exhibit A.

## II.     Summary of factual background

Doctor Ami DiChiara, MD has been licensed to practice medicine in Kentucky since May 2011. She was previously employed as a gastroenterologist with Summit Medical Group, Inc. d/b/a Saint Elizabeth Physicians ("SEP") beginning in January 2013. SEP is a wholly owned subsidiary of Saint Elizabeth Healthcare ("St. Elizabeth"). Dr. DiChiara's employment with SEP/St. Elizabeth was terminated on October 4, 2021.

The genesis of her termination surrounds the response of a multitude of healthcare providers at SEP and St. Elizabeth to SEP and St. Elizabeth's position surrounding mandatory vaccination to COVID-19. In response to both the COVID-19 illness entering the United States as well as various pharmaceutical companies developing a vaccine against COVID-19, St. Elizabeth and SEP mandated their employees receive the COVID-19 vaccine or face termination. St Elizabeth and SEP implemented this policy in or about August 5, 2021 and imposed an October 1, 2021 deadline for its employees to be vaccinated.

However, certain employees of St. Elizabeth and SEP, many of which are medical professionals with doctoral and/or advanced nursing degrees, did not share the same opinion that the vaccine should be mandatory. Consequently, numerous employees objected to receiving the

3

vaccine for a variety of reasons, including their sincerely held religious belief(s) and/or medical reasons.

St. Elizabeth and SEP appear not to have handled these exemption requests pursuant to best business practices and/or potentially federal law. The evidence suggests that more than 90% of exemption requests were not granted or processed until mid to late September, 2021.

In response to SEP and St. Elizabeth's failure to grant accommodations, forty (40) employees of SEP and/or St. Elizabeth filed suit in the United States District Court for the Eastern District of Kentucky, Northern Division at Covington in Case No. 2:21-cv-00105, *Beckerich et. al. v. St. Elizabeth Medical Center, Inc. et. al. ("Beckerich")*. Attached to the re-filed complaint[1] in *Beckerich* (Doc. No. 1), was an August 16, 2021 Memoranda from Dr. DiChiara to Mr. Garren Colvin, Dr. Robert Prichard and the Board of St. Elizabeth Healthcare outlining her concerns with the COVID-19 vaccine and her opposition to the mandate that St. Elizabeth employees receive it. (Page IDs. 105-132)[2]. Additionally, the re-filed complaint contained a string of email correspondence prominently featuring emails from Dr. DiChiara expressing similar concerns. (Page IDs 133-172). *Beckerich* was filed as a class action, with the putative class to include a definition that included all employees of SEP or St. Elizabeth who do not want the COVID-19 vaccination. (*Id.* at ¶556, Page ID 79).

Although Dr. DiChiara was not a named plaintiff in the *Beckerich* matter, she was a putative class member, and her knowledge, medical opinions, and conclusions related to the COVID-19 vaccination mandate were included as exhibits to the *Beckerich* complaint. Dr. DiChiara provided the Memorandum and emails the counsel in *Beckerich* as part of her participation in the *Beckerich*

---

[1] The matter was originally filed in state court in Kentucky, removed to federal court, voluntarily dismissed, then re-filed again in federal court in the Eastern District of Kentucky
[2] Unless otherwise indicated, all Page ID numbers refer to the Page ID associated with Document 1 in the *Beckerich* matter, EDKY Case No. 2:21-cv-00105-DLB-EBA

4

matter, having been sent an engagement letter by the Plaintiffs' Counsel/firm. In doing so, she was participating in an investigation and/or proceeding related to alleged violations of Title VII and/or the Americans with Disabilities Act.

### III. Materials relied upon

I have relied upon various materials for the rendering of the opinions in this report. Those materials include:

1. Plaintiff's Amended Verified Complaint with Jury Demand Endorsed Hereon in *DiChiara v. Summit Medical Group. Inc. et. al.*, EDKY Case No. 2:22-cv-00111, including its exhibits;

2. Document #1 in EDKY Case No. 2:21-cv-00105, *Beckenrich v. Saint Elizabeth Medical Center, Inc. et. al.*;

3. Robert Prichard, Jr., MD's October 4, 2021 letter to Dr. DiChiara, terminating her employment.

4. The deposition testimony of Amy DiChiara, M.D.

5. The deposition testimony of Robert Prichard, M.D.

6. The FRCP 30(b)(6) deposition testimony of SEP.

7. The FRCP 30(b)(6) deposition testimony of St. Elizabeth.

### IV. Opinions and bases of opinions

My opinions are based on the facts and circumstances known to me at present, and I reserve the right to amend or correct opinions should additional factual information come to light. Further, should I be provided with additional materials other than those reviewed for this report, I reserve the right to amend or correct the opinions below.

The perspective from which I offer my opinions is that of an experienced plaintiff's lawyer have personally prosecuted Title VII and ADA claims for over a decade.

### A.  Case Evaluation Procedure

To understand the import of Dr. DiChiara's actions, it is necessary to discuss how a plaintiff's side employment lawyer evaluates a potential new matter. During my initial contact with a prospective new client, my first objective is to learn the underlying facts of the circumstances that lead the individual to contact an attorney. I then must analyze those facts and apply them to the controlling law to determine whether the prospective client has a viable cause of action.

In my experience in private practice, approximately five to ten (5%-10%) percent of the individuals who contact me for a consultation have, in my opinion, a viable cause of action. Others may have experienced unpleasantries or other non-niceties in their workplace, however, the employer's actions or omissions may not rise to the level of a violation of any state or federal law.

Once I determine the prospective client may have a viable cause of action, there is often further investigation and information gathering. This happens because individuals from a variety of workplaces and industries contact me looking for representation, and I may not be familiar with those industries, the particular requirements of those industries, or the exact nature of the work in those industries.

By way of non-exhaustive example, in the ADA context, what may constitute a bona fide occupational qualification in one industry may not meet such a qualification in a different industry. Without further information gathering, including retention of or correspondence with individuals with deep knowledge of the industry where the prospective client works(ed), I would be unable to make a complete assessment of the merits of a potential claim.

In my opinion, foregoing this additional investigation, information gathering, and acquiring deeper knowledge of the target industry is a disservice to the prospective client. Without such information, a lawyer may file a claim which may be vulnerable to dismissal on dispositive motion(s) and/or provide the client an incorrect assessment of the strengths and/or weaknesses of their particular case.

Additionally, there may be particular facts associated with a prospective cause of action that require analysis of a new or developing field, or information that is consistently changing. For that reason, having an individual like Dr. DiChiara participate and assist in the representation of the client is imperative.

**B.    Evaluation of Dr. DiChiara's participation in the *Beckerich* Matter**

In *Beckerich*, employees approached legal counsel with their concerns regarding their employer's handling of exemption requests to the employer's COVID-19 vaccine mandate. The concerns were raised in both Title VII and ADA contexts. At the time, COVID-19 and its vaccine were relatively new, the science was quickly developing, and there was an abundance of information floating through the public realm. Because of the circumstances surrounding the COVID-19 vaccine, it would have been both reasonable and prudent as a plaintiff's lawyer to consult with one or more medical professionals to form an opinion on the validity of claims brought under Title VII and/or the ADA in the context of a client seeking an exemption to a vaccine mandate.

**i.    Title VII Claims**

The *Beckerich* plaintiffs were alleging violations of Title VII, specifically focused on

7

religious accommodations to the vaccine mandate. "The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination." *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987). To establish a prima facie case, a plaintiff must show that "(1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement." *Tepper v. Potter*, 505 F.3d 508, 514, 2007 U.S. App. LEXIS 24090, *9, 2007 FED App. 0420P (6th Cir.).

In evaluating the *Beckerich* plaintiffs' claims, a plaintiff's side lawyer must first determine whether the *prima facie* elements were met. This appears relatively simple for the *Beckerich* matter in that the employees all held sincere religious beliefs that conflicted with an employment requirement (the vaccine mandate), the informed the employer about the conflict (requested an exemption), and were informed they would be discharged if they did not comply with the vaccine mandate.

Once a lawyer can establish a *prima facie* case, the lawyer must then evaluate whether a plaintiff could overcome the employer's burden shifting defense, wherein it could not reasonably accommodate the employee's religious beliefs without incurring an undue hardship or burden on its business. *See Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516, 2002 U.S. App. LEXIS 6005, *18, 2002 FED App. 0114P (6th Cir.).

Dr. DiChiara's August 16, 2021 Memoranda and August 2021 emails could both reasonably used in furtherance of and were relevant to analysis of the Title VII claims. In fact, Defendants admitted as much in the termination letter, when they admitted that the materials Dr. DiChiara provided were "e-mails related to the subject matter of the lawsuits," and the lawsuits themselves

8

were Title VII and ADA lawsuits. And, Dr. DiChiara admits that she wanted to further the "class action, to ensure that Title VII [and] ADA claims and legality were upheld, [and] if there was anything that [she] could provide that would help." (DiChiara deposition, Page 100, lines 6-11). Thus, it was clearly understood by counsel in *Beckerich*, SEP/St. Elizabeth, and Dr. DiChiara, that providing information to legal counsel was in furtherance of and relevant to a Title VII and ADA claim analysis and participation in the process. Counsel for the *Beckerich* plaintiffs' utilization of Dr. DiChiara's knowledge was a reasonable and necessary step in furtherance of the prosecution of the claims.

### a. Prima Facie Case

Establishing the *prima facie* elements of a cause of action are incumbent upon the plaintiff who holds sincere religious beliefs to inform his/her employer of those beliefs. As it was public knowledge that the COVID-19 research and vaccine relied on fetal tissue, it is my opinion that an individual who had a sincerely held religious belief regarding reproductive rights, and informed his/her employer of those beliefs, would satisfy the first two elements of a *prima facie* case. SEP/St. Elizabeth's unequivocal statement that they would terminate and employee who did not receive the COVID-19 vaccination satisfies the third prong.

The next step in evaluation of such a claim would turn to whether a plaintiff could rebut the employer's defense of undue hardship. It is on this topic that Dr. DiChiara's submissions were invaluable.

### b. Undue Hardship

Dr. DiChiara's submissions were of great value in evaluating whether the *Beckerich* plaintiffs could overcome the employer's undue hardship defense. Initially, she cites to studies that while the vaccine may prevent symptomatic illness (or less the symptoms experienced by a

9

vaccinated individual), the vaccine does not prevent infection. (*Beckerich* at PageID 109-110). This was especially true with the Delta variant circulating at the time of her memo. (*Id.* at PageID 111-114).

She then further points out, quite helpfully, that SEP/St. Elizabeth does not require proof of other therapeutic medicines that benefit the only individual, rather than the population as a whole, *e.g.* insulin, antihypertnesives, statins. (*Id.* at 114).

Further, she offers alternative solutions to achieve SEP/St. Elizabeth's objective of preventing the spread of COVID-19. These solutions include universal masking, health and temperature screenings and keeping sick employees at home. (*Id.* at 131). Employing these strategies would obviously not create an undue burden as they appear to be common methods of infection control that existed prior to COVID-19. And as SEP/St. Elizabeth presumably allows other employees experiencing non-COVID-19 illness to utilize these same preventative measures, it would be unlikely that St. Elizabeth could prevail on an undue burden defense.

Finally, although first in her analysis, Dr. DiChiara points out the vaccine does not do what St. Elizabeth's believes it does, namely **<u>prevent the spread</u>** of COVID-19. (*Id.* at PageID 109-110, and citing SEP/St. Elizabeth's stated purpose at PageID 114) (emphasis added.). These facts cut to the critical issues of the undue hardship or burden defense. Specifically, SEP/St. Elizabeth's desire to prevent transmission of COVID-19 cannot be accomplished through a vaccine mandate, and waiving any requirement to the mandate would not impose any burden or hardship upon the employer.

Such information is critical, as a plaintiff's lawyer, and is relevant in furtherance of prosecuting a Title VII claim. Counsel for the *Beckerich* plaintiffs was acting reasonably and prudently in utilizing her assistance in participating of advancing a Title VII claim.

### ii. Americans with Disability Act Claims

The ADA forbids "discriminat[ion] against a qualified individual on the basis of disability" as it applies to hiring and firing. 42 U.S.C. § 12112(a). Prohibited discrimination also includes "not making reasonable accommodations," *Hostettler v. College of Wooster*, 895 F.3d 844, 852, 2018 U.S. App. LEXIS 19612, *13, 2018 FED App. 0140P (6th Cir.). The evaluation of ADA claims in the *Beckerich* matter would, in my opinion, turn on the question of whether granting an exemption to the vaccine mandate constituted a reasonable accommodation for any employee with a disability, which includes any employee with a medical contraindication to the vaccine or its ingredients.

In addition to establishing a disability, the employee also bears the initial burden of proposing an accommodation and showing that accommodation is objectively reasonable. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457, 2004 U.S. App. LEXIS 231, *27, 2004 FED App. 0012P (6th Cir.). The employee must also show that s/he can perform the essential functions of the position with or without a reasonable accommodation. *Burns v. Coca-Cola Enters.*, 222 F.3d 247, 256, 2000 U.S. App. LEXIS 17723, *25, 2000 FED App. 0246P (6th Cir). An employee who can perform his or her job prior to receiving the vaccine can certain perform the same job, at the same level, after foregoing vaccination. Dr. DiChiara's input on COVID-19 was both reasonably used and relevant in furtherance of the prosecution of the *Beckerich* ADA claims.

Dr. DiChiara's August 16, 2021 Memorandum is an ideal roadmap for why the request to be exempt from the vaccination requirement is an entirely objectively reasonable request. When viewed from SEP/St. Elizabeth's stated purpose of preventing the spread of COVID-19, the Memorandum clearly and articulately demonstrates, with objective medical research, why exempting and employee from vaccination is reasonable.

Dr. DiChiara devotes six pages of her Memorandum to objective medical evidence of why the COVID-19 vaccine does not achieve SEP/St. Elizabeth's stated purpose. (*Beckerich* at Page IDs 109-114). She goes into significant detail on how the COVID-19 vaccine does **not stop the spread of infection** and, in some instances, may make the spread worse through asymptomatic viral shedding and genetic mutations of the virus. During that explanation, she demonstrates the inconsistent messages broadcasted to the populus through media, compared with the objective scientific research she reviewed. She then closes that section with her perspective that while a vaccine may have individual benefits, it has no benefit on stopping transmission.

She next explains the benefits of natural immunity, which, in her words are "equal, if not superior" to vaccination. (*Id.* at PageID 115). This contention is followed with objective, scientific data and how that data supports her position. Considering SEP/St. Elizabeth's never considered a natural immunity exception to the vaccine mandate, this information would be especially relevant in evaluating the reasonable accommodation requirement of an ADA claim.

Finally, Dr. DiChiara closes the memo with data about the potential harmfulness of the vaccine. In a medical setting, where those in charge of patient care have pledged to "Do No Harm" it seems critical that SEP/St. Elizabeth should be especially cautious of doing harm to its own employees. Again, these contentions are relevant in evaluating a potential ADA matter.

Dr. DiChiara's emails beginning on August 26, 2021, only bolster the positions made in her August 16, 2021 Memorandum. She continues to provide SEP/St. Elizabeth's sound, scientific reasoning on why its position is incorrect and, potentially, harmful to its employees. At no point in my review did I see any compelling explanation from SEP/St. Elizabeth's why an exemption from the vaccine requirement would be unreasonable. Quite the opposite, SEP/St. Elizabeth seems to ignore her input and recommendations and brush her valid concerns aside.

This last point, as a plaintiff's lawyer, carries significant weight and relevance in evaluating an ADA claim. An employer is required to engage in the ADA's interactive process in good faith. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1041, 2014 U.S. App. LEXIS 3592, *31, 2014 FED App. 0038P (6th Cir.). As evidenced by SEP/St. Elizabeth's outright refusal to consider or seriously discuss Dr. DiChiara's concerns, it would lead me to believe that it was not fulfilling its duty to engaged in the interactive process in good faith, if even at all. When evaluating a potential claim, these facts are certainly relevant and a strong factor in deciding whether or not to represent the prospective client.

In fact, Defendants admitted as much in the termination letter, when they wrote that the materials Dr. DiChiara provided were "e-mails related to the subject matter of the lawsuits," and the lawsuits themselves were Title VII and ADA lawsuits.

C. **Impact on Defendants of Dr. DiChiara's participation in the *Beckerich* matter**

SEP/St. Elizabeth's exemption handling procedures were concerning enough to spur litigation from the *Beckerich* plaintiffs. My opinion, based on the deposition testimony that I reviewed, is that when SEP/St. Elizabeth's implemented its mandate, it did not establish a fully developed procedural framework to evaluate exemption requests. SEP/St. Elizabeth simply recited the standard for exemption as mere lip service. (Blank Deposition, pages 50-52, lines 17 to 11).

The communication from SEP/St. Elizabeth to its workforce, also specifically stated "Exemptions are not guaranteed. Reasonable Accommodations will be granted where they do not create an undue burden on St. Elizabeth Healthcare's operations." (*Id.* at Page 52, lines 7-11). Based on the foregoing, it is my opinion, bolstered by the factual record, that the executives at SEP/St. Elizabeth's initially took a stringent approach to evaluation of exemption requests, only changing that approach once the *Beckerich* litigation was filed. Based on my experience in

employment law, the language in the statement was specifically selected to discourage employees from seeking an exemption to vaccination by signaling that requests for exemption would be prejudged as an undue burden on St. Elizabeth Healthcare's operations.

However, following Dr. DiChiara's participation in the *Beckerich* matter, SEP/St. Elizabeth's was forced to alter its approach to exemption requests, and likely did so because of Dr. DiChiara's contributions to the *Beckerich* litigation. Prior to the filing of *Beckerich*, SEP/St. Elizabeth's had approved approximately 10% of the exemption requests. (Blank deposition, pages 68-69, lines 22-4). But after *Beckerich* was filed, a process in which Dr. DiChiara clearly participated, the approval rate for exemptions jumped to 90%. (Blank deposition, page 69, lines 5-18).

In my opinion, Dr. DiChiara's participation in the *Beckerich* matter and the matter itself, was a cause, if not a catalyst, in SEP/St. Elizabeth's nine-fold increase in granting exemption requests. Without her participation in the litigation, including her medical analysis of COVID-19, it is unlikely SEP/St. Elizabeth's would have changed its position regarding exemptions. I especially believe this to be true regarding Dr. DiChiara's insights and analysis as to why granting exemptions would not constitute an undue hardship.

In review of the *Beckerich* complaint, forcing SEP/St. Elizabeth's compliance with federal law was one, if not the primary, objective in filing the *Beckerich* matter. Dr. DiChiara's information and opinions were relevant and in furtherance of the asserted claims and one of the objectives in the litigation. Without a source of medical information and expertise, like Dr. DiChiara, the impact of the *Beckerich* litigation upon the increase in the rate of exemptions being granted would not have hit the 90% rate. Put simply, Dr. DiChiara's opinions, when disclosed

publicly through court filings forced SEP/St. Elizabeth to fulfill its obligations under federal law and correctly process (and grant) COVID-19 exemption requests.

## V.  Conclusion

For the foregoing reasons, Dr. DiChiara's August 16, 2021 Memorandum and subsequent email traffic with SEP/St. Elzabeth's management personnel could be and were reasonably used and was entirely relevant in furtherance of Title VII and/or ADA claims regarding the improper handling of exemption requests related to the COVID-19 vaccine.  As a plaintiff's lawyer, her participation in the matters was a prudent act in furtherance of a client's position to advance a viable cause of action.

I might add that the anti-retaliation provisions of Title VII and the ADA, and particularly the participation clause components of those statutes, are critically necessary to bring forward employment claims under those provisions; without them, employers would be free to terminate any employee who testifies truthfully or provides critical information necessary to ensuring enforcement, including through civil lawsuits.  If employers were entitled to terminate such individuals, there would be rampant violations of the law, which is what Congress intended to prevent in the enactment of the anti-retaliation provisions of Title VII and the ADA.  By all accounts, it is clear to me that Dr. DiChiara was participating in the prosecution of Title VII and ADA claims and is entitled to legal protection for such participation; including to be free of any retaliation to include tangible adverse employment acts.

I reserve the right to alter the opinions expressed herein if new evidence comes to light or I am provided additional materials.  I believe the facts recited herein are true and accurate based upon my knowledge.  My conclusions and opinions are correct when applying the facts as I know them to the applicable law.

Executed this 7th day of February 2024

_____
Robb Stokar




# CURRICULUM VITAE

Robb Stokar
Stokar Law, LLC
9200 Montgomery Road
Bldg. E – Unit 18B
Cincinnati, OH 45242

**Education:**
Cornell University, School of Industrial and Labor Relations, B.S. – 2003
The Ohio State University Michael E. Moritz College of Law, J.D. – 2007

**Bar Admissions:**
Illinois, 2007
Northern, Central and Southern Districts of Illinois, 2007
7th Circuit Court of Appeals, 2008
Ohio, 2013
Southern District of Ohio, 2014
Northern District of Ohio, 2021

**Work Experience:**
Stokar Law, LLC – Owner and founder, 2022 to present
Minnillo & Jenkins, Co., LPA (n/k/a Minnillo Law Group) 2016 to 2019, associate; 2019-2022, equity partner
Smith, Rolfes & Skavdahl (n/k/a Rolfes Henry) 2013 to 2016, associate
The Law Offices of Joshua N. Karmel, 2008 to 2013, of counsel
Pissetzky & Berliner (now dissolved), 2007 to 2008, associate

**Practice Areas:**
Plaintiff's side employment litigation 50%
Public sector labor representation 40%
Personal injury 10%

**Sample Reported Cases:**
*Harmon v. City of Cincinnati*, 2023-Ohio-788
*Kellard v. City of Cincinnati*, 2021-Ohio-1420
*Lohmann v. City of Cincinnati*, 2018-Ohio-2505
*Green v. Scurto Cement Constr., Ltd.*, 820 F. Supp. 2d 854

**Representative Matters:**
*Duhig v. Merrill Lynch & Co*, NDIL 2009-cv-72 (Title VII age discrimination)
*Wickramasinghe v. Illinois Institute of Technology - Stuart School of Business*, NDIL 2009-cv-471 (Title VII gender discrimination)

*Washington v. Aramark Management Services, L.P. et al*, NDIL 10-cv-4165 (Title VII religious and race discrimination)
*Green et. al. v. Scurto Cement Construction et. al.*, NDIL 10-cv-4562 (Title VII race discrimination)
*Draffkorn v. Sherman Hospital*, NDIL 12-cv-5156 (Title VII sexual harassment and retaliation)
*Kelley v. St. Aloysius Orphanage et. al.*, SDOH 15-cv-739 (ADA discrimination and FMLA retaliation)
*Smith v. Walgreen Co. et. al.*, SDOH 16-cv-957 (ADA discrimination and 42 USC 12203 retaliation)
*House v. City of Cincinnati*, SDOH 18-cv-181 (ADA discrimination and Title VII violations)
*Nagel v. Maketewah Country Club Company et. al.*, SDOH 21-cv-416 (Title VII gender discrimination)
*Parsons v. Wal-Mart Associates, Inc. et. al.*, EDKY 21-cv-81 (ADA discrimination and FLSA violation)