IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

| | | |
|---|---|---|
| DR. AMY DICHIARA | : | |
| | : | |
| Plaintiff, | : | Case No. 2:22-cv-00111-DLB-EBA |
| | : | |
| v. | : | Judge David L. Bunning |
| | : | |
| SUMMIT MEDICAL GROUP, INC., et al. | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, Summit Medical Group, Inc. d/b/a St. Elizabeth Physicians ("SEP"); Saint Elizabeth Medical Center, Inc. d/b/a St. Elizabeth Healthcare ("St. Elizabeth"); Dr. Robert Prichard ("Dr. Prichard"); and Garren Colvin ("Mr. Colvin") (collectively referred to as "Defendants"), by counsel, hereby submit their Reply in Support of their Motion for Summary Judgment (Doc. 52).[1]

Respectfully submitted,

/s/ Nicholas C. Birkenhauer
Mark D. Guilfoyle (KBA #27625)
Nicholas C. Birkenhauer (KBA #91901)
DRESSMAN BENZINGER LAVELLE PSC
109 East Fourth Street
Covington, Kentucky 41011
(859) 341-1881
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on the 18th day of October, 2024, this Reply was filed with the Court's electronic filing system, which will effectuate electronic service upon all counsel of record.

/s/ Nicholas C. Birkenhauer
Nicholas C. Birkenhauer

---

[1] Due to the substantial overlap in the context of cross-motions, Defendants also incorporate their Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 57) as if set forth herein.

i

# SUMMARY OF ARGUMENT

I. SEP and St. Elizabeth are entitled to summary judgment on Count I for Retaliation…. 1

    A. Count I fails on the merits for lack of protected Title VII/ADA activity……. 1

        1. Dr. DiChiara cannot invoke the participation clause, but she did not participate (much less reasonably) in Title VII/ADA claims anyway……………………………………………………………......... 1

        2. Dr. DiChiara also did not complain about alleged Title VII/ADA violations at all, to anyone – much less in a reasonable manner………… 4

    B. Count I also fails on the merits for lack of notice……………………..…….. 5

        1. Counsel's September 13th email did not provide notice of protected activity; it actually *negated* any potential protected activity………….. 5

        2. Counsel's September 20th email did not provide notice of any putative participation in or assistance with Title VII/ADA claims…………........ 6

        3. Plaintiff's attempt to invoke some sort of "negative inference" from the attorney-client privilege is baseless and inapposite on notice...………... 7

    C. Count I fails on the merits for lack of causation as well…………………. 8

    D. In addition to failing on the merits, St. Elizabeth is not subject to Count I………………………………………………………………………………. 9

II. Defendants are entitled to summary judgment on the KCRA Retaliation claim…... 11

III. Defendants are entitled to summary judgment on the Wrongful Discharge claim… 12

IV. SEP is entitled to summary judgment on the Breach of Contract claim…………… 12

V. Defendants are entitled to summary judgment on the Tortious Interference Claim. 13

VI. SEP is entitled to judgment on the Declaratory Judgment claim…………………... 14

CONCLUSION….....……………………………………………..……………………… 14

**I.      SEP and St. Elizabeth are entitled to summary judgment on Count I for Retaliation.**

   **A.      Count I fails on the merits for lack of protected Title VII/ADA activity.**

      **1.      Dr. DiChiara cannot invoke the participation clause, but she did not participate (much less reasonably) in Title VII/ADA claims anyway.**

The fundamental rule in the Sixth Circuit is that a plaintiff cannot maintain a participation claim unless she (or another) has filed a charge with the EEOC.[2]  This rule is logical because the filing of an EEOC charge is a condition precedent to filing a Title VII/ADA court proceeding, meaning there can be no Title VII/ADA *court* proceeding unless there is first an *EEOC* proceeding.  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) ("Congress gave initial enforcement responsibility to the EEOC. Thus, an employee alleging employment discrimination … must first file an administrative charge with the EEOC[.] …  As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge.")

Plaintiff appears to argue that *Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541 (2019) has overruled this principle, but *Davis* reaffirmed that filing an EEOC charge is a **mandatory** requirement for a Title VII plaintiff; it is just not a ***jurisdictional*** requirement (meaning a defendant cannot raise lack of subject matter jurisdiction as a defense after answering).  *Id*. at 552 ("[A] rule may be mandatory without being jurisdictional, and Title VII's charge-filing requirement fits that bill.")  *Booker* remains good law in this Circuit, and it is fatal to any participation argument.

In any event, Dr. DiChiara did nothing to participate in *Beckerich II*, which did not even exist until days after she forwarded emails on August 31.  She was not a plaintiff; she did not opt-

---

[2] *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) ("The purpose of the statute is to protect access to the machinery available to seek redress for civil rights violations and to protect … that machinery once it has been engaged.  Accordingly, any activity … prior to the instigation of statutory proceedings is to be considered pursuant to the opposition clause."); *Scheske v. Univ. of Mich. Health Sys.*, 59 F. Supp. 3d 820, 827 (E.D. Mich. 2014) ("Because Plaintiff's presentation … occurred before she filed her complaint with the EEOC, she must show that the presentation was opposition activity.")

1

in as a class member; she did not forward emails in response to discovery requests; and she did not plan to participate in any respect. Indeed, this is undisputed because Dr. DiChiara herself represented that Deters Law was not representing her; it was not authorized to use the emails she forwarded in litigation; and that it was "never [her] intent" to seek litigation. (Doc. 50-36.)

Plaintiff attempts to avoid her own communications (which defeat participation) by mischaracterizing Dr. Prichard's testimony. First, Plaintiff argues Dr. Prichard admitted she was participating in and/or assisting with the Title VII/ADA claims in *Beckerich II*. (Doc. 58, p. 13.) But in reality, Dr. Prichard testified: "[t]here's no indication she had anything to do with Title VII or ADA." (Prichard Dep., Doc. 45, p. 290:4 – 290:6; *see also id*., p. 288:20 – 288:22: "Never did we discuss anything that pertained to exemptions, how the company would handle such things.")

Second, Plaintiff argues Dr. Prichard admitted the emails she sent to Eric Deters were "relevant to" Title VII/ADA claims. (Doc. 58, p. 13.) However, Dr. Prichard only admitted the emails she forwarded were "***related to the subject matter*** of the lawsuits." (*Id*., p. 294:18 – 294:21; emphasis added.) That "subject matter" included hundreds of allegations and 23 claims ranging from Violation of the Right to Refuse Medical Care to Fraud and Violation of the Nuremberg Code of 1974. (Doc. 50-15, p. 88 – 109.) In that context, any email containing "COVID" or "vaccine" would relate to the "subject matter" of the cases.[3] If Plaintiff's argument was accepted in this context, then any person who provided "COVID" emails would be specifically participating in or assisting with Title VII/ADA claims, even though their emails said nothing of Title VII or the ADA. This is untenable as a matter of law.

---

[3] Plaintiff also mischaracterizes the testimony of SEP's representative in her quest to transform the purposely-vague phrase "subject matter" into "Title VII/ADA claims." (*See* Doc. 58, p. 9, where she argues the representative admitted "the subject matter, and central focus" of *Beckerich II* were Title VII/ADA claims.) The representative agreed that Title VII/ADA claims were within the (exceptionally broad) "subject matter" and were listed as Counts I and II, but he never testified they were the "central focus." (Bast Dep., Doc. 46, p. 144:14 – 145:7.) Plaintiff manufactured the term "central focus" in her Response.

2

Third, Plaintiff argues she has established protected activity because Dr. Prichard admitted she was terminated for providing documents "to a law firm to prosecute those very [Title VII/ADA] claims." (Doc. 58, p. 14.) With this argument, Plaintiff is mischaracterizing an email Dr. Prichard sent to the SEP board, which actually stated that her termination "was based upon her violation of her contract in that she shared internal information with an outside law firm that sued SEP *regarding our position requiring the covid vaccine*." (Doc. 44-61; emphasis added.) This was consistent with what this Court described as the "core" of *Beckerich II*: the legality of requiring vaccination as a condition of private employment.[4] The email did not say she was terminated for trying to help with the prosecution of Title VII/ADA claims, because she was not doing so. Indeed, the Court need only refer to how Plaintiff's emails (Exhibit 3) were actually used in *Beckerich II* to confirm they had nothing to do with Title VII/ADA.[5] Clearly, the emails were not cited as supporting or furthering Title VII/ADA claims, as Plaintiff has falsely argued. This is fatal to any argument that she "participated" in *Beckerich II's* Title VII/ADA claims.[6]

---

[4] *See Beckerich v. Saint Elizabeth Medical Center, Inc., et al.,* Eastern District of Kentucky Case No. 2:21-cv-105-DLB-EBA, Doc. 34, Page ID# 1054: "At its core, this case is about conditions of employment, and whether a private employer can modify its employment conditions to require employees to be vaccinated[.]"

[5] *See* Doc. 50-35, Page ID# 2957: "The most recent fraud is Americans are not receiving an FDA approved vaccine (**Exhibit 3**);" *see also id.* at 2959: "The Comirnaty vaccine is the one approved and is not even in production (**Exhibit 3**). The attached emails prove the fraud (**Exhibit 3**)."

[6] In an effort to avoid how her emails were actually cited to support putative fraud, Plaintiff argues Dr. Prichard testified it was "not a huge assumption" the emails were also attached "to further the Title VII and ADA claims." (Doc. 58, p. 8, fn. 4.) Actually, he testified the emails were attached to a lawsuit with Title VII/ADA claims "by happenstance," because there was "no indication she had anything to do with Title VII or ADA." (Prichard Dep., Doc. 45, p. 290:4 – 290:10.) In light of that, he testified it *would* be a "huge assumption" to assume the emails were being used to further Title VII/ADA claims. (*Id.*, p. 290:14 – 290:16.) But regardless of whether it would have been a "huge assumption" or not, the parties can do nothing but *assume* because the DiChiara emails did not mention Title VII/ADA in any respect, and because they were not cited in support of the Title VII/ADA claims. Actually, it would be less of an assumption to believe the emails were cited for Count XXI under the Nuremberg Code of 1947, for at least Dr. DiChiara's letter mentioned the Nuremberg Code (unlike Title VII/ADA). (*See Beckerich v. Saint Elizabeth Medical Center, Inc., et al.,* E.D. Ky. Case No. 2:21-cv-105-DLB-EBA, Doc. 1-5, Page ID# 123.)

3

Finally, even if Plaintiff had participated in *Beckerich II* (she did not), she is protected by the participation clause only if her participation was reasonable. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 726 (6th Cir. 2008) ("The analysis of a participation claim does not generally require a finding of reasonableness, … [b]ut when confidential information is at issue, a reasonableness requirement is appropriate.") Clandestinely forwarding confidential emails at 2:21 a.m., which emails have nothing to do with Title VII or the ADA, to a law firm which did not represent her, and which (correctly) concluded that her emails did not further Title VII/ADA claims, is not reasonable participation in a Title VII/ADA claim. This is particularly true when Dr. DiChiara's own statements demonstrate she did not forward the emails due to a reasonable motivation, but because she was "pissed off" at Dr. Prichard and Mr. Colvin. (Doc. 50-22, Page ID# 2913.)

### 2. Dr. DiChiara also did not complain about alleged Title VII/ADA violations at all, to anyone – much less in a reasonable manner.

Defendants do not dispute that the opposition clause protects complaints made "**to anyone**" – but Plaintiff conveniently ignores that those complaints must be "*about allegedly unlawful practices*." (Doc. 58, p. 10; bold and underline in original; italics added to demonstrate the dispositive point Plaintiff is trying to gloss over.)[7] Defendants' Motion specifically argued that "Dr. DiChiara did not say anything – let alone 'complain' – about any allegedly unlawful practices under Title VII or the ADA," and yet Plaintiff's Response does not even attempt to rebut this argument by showing how or when she putatively complained about alleged Title VII/ADA discrimination to anyone (including Eric Deters). (*Contrast* Doc. 52-1, p. 10, *with* Doc. 58, p. 11-12.) That is because she never did so, and she has waived any argument to the contrary. *Ctr. for*

---

[7] Similarly, the case cited by Plaintiff describes the opposition clause as protecting an employee who "speaks out about discrimination" or "reports discrimination on her own initiative … [or] when her boss asks a question." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 273 and 278 (2009). Dr. DiChiara did not speak out about or report discrimination to anyone, much less her boss.

4

*Biological Diversity v. Rural Utils. Serv.*, 2009 WL 3241607, *3 (E.D. Ky. Oct. 2, 2009) (noting that when a party fails to respond to an argument in a motion, the Court can assume that opposition to the argument is waived). Plaintiff's opposition claim fails as a matter of law.[8]

### B. Count I also fails on the merits for lack of notice.

Plaintiff's repetitive arguments about SEP being on notice of protected activity because of "testimonial admissions" by Dr. Prichard (Doc. 58, p. 12-14) are wrong for the reasons discussed above. None of Plaintiff's other notice arguments can survive summary judgment either.

#### 1. Counsel's September 13th email did not provide notice of protected activity; it actually *negated* any potential protected activity.

Dr. DiChiara argues a September 13th email from her counsel put SEP on notice that she "took the position" the emails she forwarded to Eric Deters were "used to further" Title VII/ADA claims. (Doc. 58, p. 14.) In reality (as opposed to Plaintiff's manufactured litigation narrative), counsel's September 13th email said nothing about Title VII or the ADA.

Instead, her counsel represented as follows: (1) Dr. DiChiara had "sought preliminary legal advice from the Deters Firm, vis-à-vis the Saint Elizabeth mandate" (i.e., she was not providing information to assist with Title VII/ADA claims); (2) "[w]hen it became apparent that the Deters Firm was interested in litigation … that Dr. DiChiara did not feel comfortable pursuing, she broke off communication" (i.e., she never wanted to participate in any litigation, much less Title VII/ADA claims); (3) Dr. DiChiara "did not authorize" the use of her emails (i.e., she did not intend for any of her emails to be used at all, much less to support Title VII/ADA claims); and (4) "while Mr. Deters has sought her assistance with his suit, … she is asserting her position that she will not do so" (i.e., she was not participating in or assisting with *Beckerich II* in any manner).

---

[8] Even if Plaintiff had not waived her opposition claim, and even if she had actually complained to someone about Title VII/ADA violations, the opposition claim would still fail for lack of reasonableness. (*See* Doc. 57, p. 19-20.) The claim also fails for lack of notice on the part of SEP. (*See* Part I(B), *infra*.)

5

(Doc. 44-46.) To claim this email put SEP on notice of Title VII/ADA protected activity is absurd. The email only *negates* any suggestion that Dr. DiChiara was engaging in protected activity.[9]

### 2. Counsel's September 20th email also did not provide notice of any putative participation in or assistance with Title VII/ADA claims.

Dr. DiChiara next argues that a September 20th email from her counsel "<u>outlined the specific claims (including the anti-retaliation claims under Title VII and the ADA) that would be brought if Defendants took adverse employment action against Dr. DiChiara</u>." (Doc. 58, p. 14; emphasis in original.) Relative to Title VII, this is a copied-and-pasted argument from Plaintiff's Motion (Doc. 53, p. 9), which Defendants have already debunked on the grounds that the email's use of "Title VII retaliation" could only have referred to a termination on the basis of requesting a religious exemption (since neither Plaintiff nor counsel had ever claimed any other sort of putative protected activity as of September 20). (Doc. 57, p. 22; *see also* fn. 9, *supra*.) However, Plaintiff's Response now takes this misleading argument one step further by claiming the email also set forth a "specific claim" of ADA retaliation, when there is literally no reference to the ADA at all in the email. (*See* Doc. 44-53.) The blatant mischaracterization of her own counsel's email is just the most recent example of Plaintiff's efforts to manufacture protected activity and notice.

Finally, Plaintiff acts as if the September 20th email states she was participating in, assisting with, or looking to "ensure" successful Title VII/ADA claims. But the email actually states (consistent with counsel's September 13th email) that she was "seeking legal counsel concerning her rights and obligations" – not that she was providing information to advance Title

---

[9] The Court should bear in mind that this email was sent more than two weeks after Dr. DiChiara allegedly formulated "serious concerns that [Defendants] were violating the ADA and Title VII." (Doc. 53, p. 7.) If Dr. DiChiara actually had Title VII/ADA concerns, and if her forwarding of confidential emails to Eric Deters on August 31 had really been "fueled" by Title VII/ADA concerns as she claimed two years later, certainly Dr. DiChiara's counsel – who are more than competent employment law attorneys – would have cited those Title VII/ADA concerns and invoked the protection of the statutory anti-retaliation provisions.

6

VII/ADA claims on behalf of other employees. (Doc. 44-53.) Again, if that had been Dr. DiChiara's motivation, certainly her counsel would have said so. The silence is deafening.[10]

### 3. Plaintiff's attempt to invoke some sort of "negative inference" from the attorney-client privilege is baseless and inapposite on notice.

Plaintiff's final notice argument is that she is entitled to a "negative inference" that Dr. Prichard was advised by counsel not to terminate her, but he "chose to do it anyway[.]" (Doc. 58, p. 15.) Plaintiff's flawed logic appears to go as follows: (1) Dr. Prichard consulted with counsel regarding the termination; (2) Dr. Prichard is not raising an advice-of-counsel defense to the allegedly unlawful termination; therefore (3) counsel must have advised against termination.

First, Plaintiff cites no authority for the notion that a party's decision not to waive the attorney-client privilege (which is the consequence of an advice-of-counsel defense) leads to a negative inference that privileged communications are adverse to the party. *But see Knorr-Bremse v. Dana Corp.*, 383 F.3d 1337, 1345 (Fed. Cir. 2004) ("[T]he assertion of attorney-client … privilege and the withholding of the advice of counsel shall no longer entail an adverse inference as to the nature of the advice."), *abrogation on other grounds recognized in Safoco, Inc. v. Cameron Intern. Corp.*, 2009 WL 2424108, fn. 135 (S.D. Tex. 2009). If this inference existed, it would apply every time a party does not call his own attorney as a witness, which is wrong.[11]

---

[10] Plaintiff cites Dr. Prichard's testimony that he did not ask her why she provided the confidential emails to Eric Deters. (Doc. 58, p. 13, fn. 6.) To the extent Plaintiff is trying blame SEP for her own failure to put SEP on notice of (what she now claims to be) protected activity, it is certainly not an employer's burden to ask whether an employee engaged in protected activity. Plaintiff cannot survive summary judgment on notice, which she carries of the burden of showing, with a bogus "you didn't ask" excuse.

[11] When it comes to privilege, Plaintiff wants to have her cake and eat it too. On the one hand, her decision not to waive privilege was just an invocation of her rights, consistent with the "important public policy" of "protecting the integrity of the attorney-client relationship." (Doc. 58, p. 30.) But when Defendants do not waive their privilege, somehow that leads to a "negative inference" that the privileged communications are unfavorable. Plaintiff cannot have it both ways, and if this inference actually existed, then Plaintiff's decision to stand on her privilege entitled the Defendants to assume that her privileged communications were adverse to her (e.g., by explicitly negating any attempt to engage in protected Title VII/ADA activity).

7

Second, this case demonstrates the flawed factual assumption of Plaintiff's proffered "negative inference." That is, Plaintiff asks the Court to simply ignore the other natural inference (and the reality in this case): that defense counsel likewise believed Plaintiff's termination did not violate the law (as Defendants have maintained throughout this case). Dr. DiChiara cannot survive summary judgment with unreasonable factual assumptions and non-existent legal inferences.

Finally, Plaintiff fails to explain how such an inference, even if it existed (it does not), would somehow establish the notice element of her claim. That is, unless Plaintiff is suggesting that it was the undersigned, rather than Dr. Prichard, who possessed the telepathic ability to read Dr. DiChiara's "thoughts" and "concerns," and thus it was the undersigned who knew Dr. DiChiara was really engaging in protected activity (without telling anyone). This argument is absurd.

### C. Count I fails on the merits for lack of causation as well.

Plaintiff argues the October 4th termination letter is the "smoking gun" which, in conjunction with the recording of the termination meeting, establishes she was terminated "*because of her participation in the Title VII and ADA suit*." (Doc. 58, p. 15-16; emphasis in original.) This is a complete mischaracterization of the letter and the meeting. Dr. Prichard stated during the meeting (consistent with the letter) that Dr. DiChiara's forwarding of confidential emails to Eric Deters "really violated our trust" and "violated several of our policies." (Doc. 57, p. 39-40.) In response, Dr. DiChiara admitted she could "see why you'd view it" as a betrayal, and she was only "seeking information" from Eric Deters – not trying to help other employees pursue Title VII/ADA claims. (*Id*.) Plaintiff's attempts to insert phrases like "Title VII" and "ADA" into documents and discussions *ex post facto* is nothing short of shocking.

Building on the false premise of termination based on protected activity, Plaintiff claims this is a "direct evidence" case that does not trigger the burden-shifting framework. (Doc. 58, p.

8

16.) On this point, Plaintiff not only ignores the actual evidence on why she was fired, but also that an employee's dissemination of confidential information has been found to be a "legitimate non-discriminatory reason" for termination in the Sixth Circuit. (*See* Doc. 52-1, p. 13-14.)

Plaintiff also falsely argues the honest-belief rule does not entitle Defendants to summary judgment on any attempt to show pretext. (Doc. 58, p. 22.) Defendants have proven that neither Dr. DiChiara nor her counsel ever argued that she had participated in, assisted with, or otherwise had anything to do with Title VII/ADA claims (until this theory was concocted after she was terminated). But ***even if*** the Court accepts Plaintiffs' tenuous protected activity arguments (e.g., that she engaged in protected activity by having unspoken "thoughts" and "concerns" about Title VII/ADA violations), such that the decision to terminate Dr. DiChiara was "mistaken, foolish, trivial, or baseless," Defendants would ***still*** be entitled to summary judgment on pretext under the honest-belief rule. (*See* Doc. 52-1, p. 14.) That is because Plaintiff can do nothing to show an "obvious" or "intentional" error in making that decision. Count I fails on causation as well.

**D. In addition to failing on the merits, St. Elizabeth is not subject to Count I.**

Plaintiff offers no response to any of the joint employer or "interference with employment" arguments in Defendants' Motion. (Doc. 52-1, p. 15- 22.) Instead, Plaintiff just copies and pastes the same arguments from her own Motion. (*Compare* Doc. 53, p. 13-17, *with* Doc. 58, p. 22-26.)

With regard to joint employment, Plaintiff argues the test "is not whether the parent … actually controlled[,]… but instead whether it had the *ability* to do so." (Doc. 58, p. 23; emphasis in original.) First, the evidence is undisputed that only SEP had the ability to fire Dr. DiChiara (i.e., the most important aspect of control), and even if St. Elizabeth had influence in SEP's decision to terminate, that would still not equate to an ability to terminate. *Nethery v. Quality Care Investors, L.P.,* 814 Fed. Appx. 97, 104, fn. 2 (6th Cir. 2020) ("[A]ny influence that Quality Care

9

did have over Reliant's employees was because Reliant took Quality Care's wishes into account when exercising *its own* power.") Second, the actual exercise of control is more important than ability anyway. *E.E.O.C. v. Skanska USA Bldg., Inc.,* 550 Fed. Appx. 253, 256 (6th Cir. 2013) ("Skanska routinely exercised its ability to direct and supervise … performance"). Here, it is undisputed that St. Elizabeth did not hire, direct, or supervise Dr. DiChiara; she was hired, paid, directed, and terminated by SEP. (Doc. 52-1, p. 16-20.) Third, Plaintiff has offered no legal authority supporting a joint employment relationship in these circumstances. *But see Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 928-30 (5th Cir. 2021) (affirming summary judgment finding that the hospital was not a physician's joint employer, even though the physician's employment with his physician group was terminated upon the explicit request of the hospital).[12]

With regard to "interference with employment," the only new aspect of Plaintiff's Response is the following: "As in *Christopher*, SEH terminated her privileges on October 5, 2021 as well." (Doc. 58, p. 26; DiChiara Dec., Doc. 58-1, ¶ 3.) However, in *Christopher*, the hospital interfered with the plaintiff's employment by denying privileges, which in turn prevented her from working for the physicians who employed her. But in this case, Dr. DiChiara was terminated by her actual employer on October 4, and subsequently her privileges were revoked by St. Elizabeth on October 5. In short, revocation of hospital privileges on October 5 was the ***consequence*** of Dr. DiChiara's termination by SEP the day prior – not the ***cause*** of her termination as was the case in *Christopher*. Plaintiff is erroneously trying to apply *Christopher* backwards.

---

[12] *Perry* also collects cases across many circuits which "have reached the same general conclusion: A physician with hospital privileges it not a hospital employee for purposes of federal antidiscrimination law." *Perry*, 990 F.3d at fn. 5. As Defendants have pointed out, the mere fact that physicians treat patients on hospital property does not support any employment theory. *Compare* Doc. 57, p. 26, fn. 15, *with Benaissa v. Salina Reg'l Health Ctr., Inc.*, 2021 WL 5710033, *4 (10th Cir. 2021) ("We agree with the district court's conclusion that use of hospital premises is inherent in the medical field and therefore not a reliable indicator of employee status[.]") (quotation marks omitted). Plaintiff has provided no authority to the contrary.

With regard to single employer/integrated enterprise, this theory is addressed in detail in Defendants' Response to Plaintiff's Motion. (Doc. 57, p. 24-34.) Also, Plaintiff cites no authority supporting an integrated enterprise in context of a hospital and physician group. *But see Perry*, 990 F.3d at 926-28 (affirming summary judgment in hospital's favor on an integrated enterprise theory). Notably, as applied to the most important factor (i.e., control over labor relations), the hospital in *Perry* had a specific contractual right to "request removal" of the physician – at which point the physician group was required to "immediately remove" him – and yet there was still no integrated enterprise. *Id*. at 927. Here, St. Elizabeth had no such right – nor was there any attempt by St. Elizabeth to "request" termination by SEP. Thus, the evidence in this case defeats an integrated enterprise even more forcefully than in *Perry*.

## II.     Defendants are entitled to summary judgment on the KCRA Retaliation claim.

KCRA "direct retaliation" claims are analyzed under the same framework, so Count II fails against all Defendants for the same reasons as above. Also, to the extent Plaintiff is attempting to assert a "direct retaliation" claim against Mr. Colvin or St. Elizabeth, it fails because Dr. DiChiara now finally admits Dr. Prichard was "the man who actually fired" her. (*See* Doc. 58, p. 13.) Defendants agree it was Dr. Prichard, on behalf of SEP, who terminated her. There can be no viable "direct retaliation" claim against Mr. Colvin or St. Elizabeth in these circumstances.

With regard to the so-called "conspiracy to retaliate" claims, the intra-corporate conspiracy doctrine bars any theory that Dr. Prichard conspired with his employer (St. Elizabeth) or the corporation he was acting on behalf of (SEP). Also, there was no agreement to terminate (much less to retaliate) between Dr. Prichard/SEP and Mr. Colvin/St. Elizabeth.[13] (Doc. 57, p. 29-30.)

---

[13] In multiple briefs, Plaintiff has claimed that Dr. Prichard and Mr. Colvin testified that "they decided" to proceed with termination. (Doc. 53, p. 17; Doc. 58, p. 28.) However, the testimony cited in those briefs does not support this assertion. The testimony only establishes that Mr. Colvin was given a heads up, and he did not object. Plaintiff's assertions on this point are disingenuous at best.

11

Therefore, any "conspiracy to retaliate" claim fails on the merits against Mr. Colvin/St. Elizabeth for the additional reason that they were not a part of any conspiracy.[14]

### III. Defendants are entitled to summary judgment on the Wrongful Discharge claim.

Plaintiff cites no Kentucky authority allowing a person with an employment contract to bring a claim for wrongful discharge against public policy (over and above breach of contract). Nor does she cite any authority for how an employment contract requiring 90 days' notice for termination without cause somehow equates to an at-will relationship that can be terminated at any time. Plaintiff was not an at-will employee, thus she cannot bring a wrongful discharge claim.

Even if she could bring the claim, it still fails. Plaintiff admits SEP did not ask her to violate any law (Doc. 58, p. 34), thus the claim depends on whether KRE 503 has an "employment-related nexus." On this point, Plaintiff argues the nexus exists because the attorney-client privilege "applies in the employment context." (Doc. 58, p. 32.) However, the same could be said about many (or even most) laws; that does not mean *every* such law "make[s] clear it intends to protect employees in their employment situation" as is required to meet the nexus test. (Doc. 52-1, p. 28.)

### IV. SEP is entitled to summary judgment on the Breach of Contract claim.

This entire claim relies on the premise that "engaging in protected activity" does not violate the contract. (Doc. 58, p. 36.) Plaintiff cannot show protected activity (or notice), so it fails.

---

[14] With regard to Plaintiffs' argument that the intra-corporate conspiracy doctrine cannot apply because St. Elizabeth and SEP are "separate corporate entities" (Doc. 58, p. 27), the only case cited held that the doctrine did not apply between Meade County officials and an officer in the Louisville Police Department. *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 2024 WL 56938, at *1 and *19 (Jan. 4, 2024). No comparison can be drawn to a hospital and a subsidiary physician group. Second, this is another example of Dr. DiChiara wanting to have it both ways. First she argues St. Elizabeth and SEP are a single integrated enterprise under Title VII, but then she argues the anti-conspiracy doctrine does not apply because they are separate entities. The legal reality is that the St. Elizabeth/SEP relationship is clearly insufficient to constitute an integrated enterprise under a strict legal standard. And while St. Elizabeth and SEP have not invoked the anti-conspiracy doctrine as between them (they are invoking the absence of an agreement), the doctrine would arguably apply because it more broadly applies to employees and agents who are "members of the same collective entity." *See Roof v. Bel Brands, USA, Inc.*, 641 Fed. Appx. 492, 499 (6th Cir. 2016).

With regard to SEP's right to terminate for a breach of loyalty as SEP determines in good faith under Section 10.2(q), Plaintiffs attempts to differentiate between a "good faith belief" and a "good faith determination," claiming the "former is subjective; the later [*sic*] is not." (Doc. 58, p. 35.) Plaintiff misses the point. The operative phrase is "good faith," which under Kentucky law, is subjective. (Doc. 52, p. 30.) When "good faith" is used to modify a noun in a Kentucky contract, the noun that is being modified – whether it is belief, determination, decision, etc. – is inherently subjective. And, Plaintiff cannot dispute Dr. Prichard's subjective state of mind on her disloyalty.

With regard to Section 10.2(m), Plaintiff argues that SEP's entitlement to terminate for a violation of policy "as …solely determined by SEP" is somehow ambiguous. (Doc. 58, p. 36.) Yet there is nothing ambiguous about it: if SEP determined that Plaintiff violated a policy, it could terminate her. Here, SEP determined her for conduct that violated *four* policies.

Plaintiff also ignores the other provisions under which she was terminated: Section 10.2(n) for disruptive/unprofessional conduct, and Section 10.2(h) for misappropriation. The testimony shows Dr. Prichard considered her conduct disruptive, unprofessional, and a misappropriation of SEP property. (Doc. 57, p. 37-38.) These unrefuted reasons justified termination as well.

**V.    Defendants are entitled to summary judgment on the Tortious Interference claim.**

Under no circumstances did Mr. Colvin or St. Elizabeth interfere with Plaintiff's contract with SEP. Plaintiff finally admits Dr. Prichard was "the man who actually fired" her (*see* Doc. 58, p. 13), which is true. The hypothetical possibility that Mr. Colvin may have told Dr. Prichard he was "in agreement" with a decision Dr. Prichard already made is not tortious interference.

Plaintiff argues malice can be inferred on the part of Mr. Colvin because she "participat[ed] in a lawsuit that included … personal aspersions" against him and which led to him being "targeted by public protests." (Doc. 58, p. 38.) First, Plaintiff did not participate in that lawsuit, as confirmed

13

by her letter of apology. Second, Mr. Colvin testified he did not even feel like Dr. DiChiara had violated his trust (since she was not a St. Elizabeth employee), much less that he considered Dr. DiChiara responsible for the "personal aspersions" or "public protests" against him. (Colvin Dep., Doc. 47, p. 124:24 – 125:2.) Third, the fact that Mr. Colvin was subjected to unfair attacks and protests (at his personal residence) was one of the ugliest aspects of the vaccine litigation; the fact that Plaintiff is trying to twist those circumstances in her favor – as part of some sort of inference of malice on the part of Mr. Colvin – is illogical, unwarranted, and, frankly, appalling.

For her final argument on malice, Plaintiff declares, "[d]eliberately violating the law to hurt someone … is malicious." (Doc. 58, p. 39.) This argument is fallacious on about a dozen levels. Plaintiff is grasping at straws to get this claim to trial. It unequivocally fails for lack of interference, breach, causation, and malicious/wrongful conduct by Mr. Colvin/St. Elizabeth.

**VI.    SEP is entitled to judgment on the Declaratory Judgment claim.**

Count VII is clearly moot and irrelevant to damages. If Plaintiff's case survives this Motion, Defendants will prove at trial they did not cause Plaintiff any damages.

## CONCLUSION

Plaintiff cannot establish Title VII/ADA protected activity (or notice) with some generalized notion that she was helping Deters Law with its anti-vaccination crusade by providing scientific information that she believed undercut the need for vaccination. Rather, she must show that she specifically participated in or assisted with Title VII/ADA claims, or otherwise complained about Title VII/ADA discrimination. Here, the evidence is undisputed that (1) Dr. DiChiara did not participate in any such claims (in fact, she broke off communication with Deters Law when they filed those claims); (2) she did not provide any information mentioning Title VII/ADA (and thus her information was never cited as putative support for Title VII/ADA claims);

14

and (3) she never complained about alleged discrimination to anyone (including Eric Deters). Thus, this case is about whether an employee engages in (and puts her employer on notice of) Title VII/ADA protected activity by having "thoughts" and "concerns" about Title VII/ADA violations, but intentionally omits them from all communications with her employer and the person she was providing information to. As a matter of law (and common sense), that cannot be the case.

In fact, Plaintiff knows that cannot be the case, hence the lengths she has gone in an effort to literally insert "Title VII" and "ADA" into documents and conversations *ex post facto*, when in reality no such phrases were ever used. No matter how hard Plaintiff tries to mischaracterize her own contemporaneous communications, her own counsel's emails, and the deposition testimony in this case, she cannot escape the fact that at no time did she ever mention Title VII, the ADA, or any alleged concerns about employee rights being jeopardized by the exemption process. As aptly testified to by Dr. Prichard, there was "no indication she had anything to do with Title VII or ADA" when he decided to terminate her. (Prichard Dep., Doc. 45, p. 290:4 – 290:6.) Nor did she give any such indication when she told she was being terminated on October 4. (Doc. 57, p. 39-40.)

Even when viewed in the light most favorable to Plaintiff, the evidence defeats both the protected activity and notice elements of her retaliation claim, which is the linchpin of this entire case. For these reasons, as well as those set forth in Doc. 52-1 and Doc. 57, Defendants are entitled to summary judgment on all claims asserted in this action.

                Respectfully submitted,

                /s/ Nicholas C. Birkenhauer
                Mark D. Guilfoyle (KBA #27625)
                Nicholas C. Birkenhauer (KBA #91901)
                DRESSMAN BENZINGER LAVELLE PSC
                109 East Fourth Street
                Covington, Kentucky 41011
                (859) 341-1881
                *Counsel for Defendants*